**CASE NO. 14-4085**

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

|  |  |
|---|---|
| RICHARD AND GWEN DUTCHER, et al., | ) ) ) |
| Plaintiffs-Appellants, | ) ) |
| v. | ) ) |
| STUART T. MATHESON, et al., | ) ) |
| Defendants-Appellees. | ) ) |

On Appeal from the United States District Court
For the District of Utah, Central Division
Honorable Judge Ted Stewart D.C.
No. 2:11-cv-00666-TS

**APPELLANTS' OPENING BRIEF**

Respectfully submitted,

Marcus R. Mumford
MUMFORD PC
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
Tel.: (801) 428-2000
Email: mrm@mumfordpc.com

Oral Argument Is Requested.

November 25, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

PRIOR OR RELATED APPEALS ............................................................ix

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENTS .........3

STATEMENT OF THE FACTS ................................................................7

ARGUMENT ....................................................................................18

**THE COURT'S CAFA RULING WAS ERROR**...............................................18

**CAFA Does Not Confer Jurisdiction Over This Case**...................................18

The Local Controversy Exception ................................................19

*More Than Two-Thirds of the Proposed Class Members Are Utah Citizens* .........................................................................20

*The Matheson Defendants' Conduct Is A Significant Basis For The Claims Asserted* ...............................................................23

*The Principal Injuries Were Incurred In Utah*........................................26

*The Coleman Case Does Not Preclude The Local Controversy Exception* ...........................................................................26

The Home State Exception ........................................................29

*More Than Two-Thirds of the Proposed Class Members Are Utah Citizens* .........................................................................29

*The Matheson Defendants Are Primary Defendants*.................................29

i

The Discretionary Exception ..........................................................................31

**Comity Militates Against The Exercise Of Federal Jurisdiction** ................33

**The Court Abused Its Discretion Denying Jurisdictional Discovery** ...........35

**THE COURT ERRED IN CLOSING THE CASE** ...........................................36

**DISMISSAL WAS INAPPROPRIATE BECAUSE PLAINTIFFS' COMPLAINT STATED PLAUSIBLE CLAIMS FOR RELIEF** ..................38

**The Court Erred In Dismissing The Complaint Based On Contested OCC Interpretations Without Conducting A *Chevron* Analysis** ...........................39

**The District Court Erred In Concluding That Recon Can Conduct Utah Non-Judicial Foreclosures Without Complying With Utah Law** ................41

The OCC's Interpretation Of "State Or Local Law" In § 92a(a) Deserves No Deference Because Congress Has Spoken To The Question At Issue ..........42

Canons Of Statutory Construction Reveal Congressional Intent To Apply Utah Law ........................................................................................................47

OCC Interpretation Of § 92a Deserves No Deference ..................................48

**The District Court Erred In Holding That Recon Competes With Utah Title Companies For Purposes Of Section 92a** ................................................51

**IT WAS ERROR TO DISMISS WITH PREJUDICE BASED ON THE DISPUTED CONCLUSION THAT RECONTRUST WAS LOCATED IN TEXAS** ......................................................................................................55

CONCLUSION .................................................................................................57

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ................................57

CERTIFICATE OF COMPLIANCE..................................................................58

CERTIFICATE OF DIGITAL SUBMISSION ....................................................59

ii

CERTIFICATE OF SERVICE .................................................................60

ATTACHMENTS:

*Dutcher v. Matheson*, 2:11-cv-00666 TS (D. Utah),
    February 8, 2012 Memorandum Decision and Order..............................No. 1

*Dutcher v. Matheson*, 2:11-cv-00666 TS (D. Utah),
    July 23, 2012 Memorandum Decision and Order ...................................No. 2

*Dutcher v. Matheson*, 2:11-cv-00666 TS (D. Utah),
    April 25, 2014 Memorandum Decision and Order...................................No. 3

*Dutcher v. Matheson*, 2:11-cv-00666 TS (D. Utah),
    Judgment in a Civil Case .......................................................................No. 4

*Dutcher v. Matheson*, 2:11-cv-00666 TS (D. Utah),
    July 3, 2014 Memorandum Decision and Order ......................................No. 5

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*American Trust Co. v. South Carolina State Board of Bank Control*,
    381 F.Supp.313 (D.S.C. 1974) ........................................................43, 49, 51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................56

*Bell v. Countrywide*,
    860 F.Supp.2d 1290 (D. Utah 2012) ......................................................*passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................56

*Bryan v. Bellsouth Communications, Inc.*,
    492 F.3d 231 (4th Cir. 2007) ...........................................................36

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)....................................................... 6, 37, 39-42, 46, 48, 51

*Coffey v. Freeport McMoran Copper & Gold*,
    581 F.3d 1240 (10th Cir. 2009) ........................................... 18-19, 21, 23, 25

*Coleman v. ReconTrust Co., N.A.*,
    No. 2:10-CV-1099 DB (D. Utah filed Nov. 5, 2010).................. 26-28, 32, 42

*Contreras-Bocanegra v. Holder*,
    678 F.3d 811 (10th Cir. 2012) .............................................................. 40-41

*Cox v. ReconTrust Co., N.A.*,
    No. 2:10-CV-492 CW, 2011 WL 835893 (D. Utah Mar. 3, 2011) ...............42

*Cuomo v. Clearing House Ass'n, LLC*,
    557 U.S. 519 (2009)........................................................................39

*Dunn v. Endoscopy Ctr. of S. Nev.*,
    No. 2:11-CV-0560 RLH, 2011 WL 5509004 (D. Nev. Nov. 7, 2011) .........28

*Dutcher v. Matheson*,
    No. 2:11-CV-666 TS, 2012 WL 423379 (D. Utah Feb. 8, 2012) ................42

*Dutcher v. Matheson*,
    733 F.3d 980 (10th Cir. 2013) ..............................................................*passim*

*First Nat'l Bank v. City of Hartford*,
    273 U.S. 548 (1927)......................................................................................55

*First Nat'l Bank in Plant City v. Dickinson*,
    396 U.S. 122 (1969)......................................................................... 44-45, 52

*First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co.*,
    385 U.S. 122 (1966).......................................................................... 46-47

*Fed. Nat. Mortg. Ass'n v. Sundquist*,
    2013 UT 45, 311 P.3d 1004.................................................................*passim*

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).....................................................................................48

*Garrett v. ReconTrust Co., N.A.*,
    No. 2:11-cv-763 DS, 2011 WL 7657381 (D. Utah Dec. 21, 2011)  5-6, 36, 43

*Garrett v. ReconTrust Co., N.A.*,
    546 Fed. Appx. 736 (10th Cir. 2013) ........................................................6, 43

*Johnson v. Advance America*,
    549 F.3d 932 (4th Cir. 2008) ....................................................... 19-20, 32, 34

*Kleinsmith v. Shurtleff*,
    571 F.3d 1033 (10th Cir. 2009) ..................................................................39

*Lafalier v. Cinnabar Servs. Co., Inc.*,
    No. 10-cv-0005 CVE, 2010 WL 1486900 (N.D. Okla. Apr. 13, 2010).. 24-25

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010)............................................................................ 34-36

*Lewis v. Fidelity & Deposit Co. of Maryland*,
    292 U.S. 559 (1934)..................................................................44, 46

*Mattera v. Clear Channel Communications, Inc.*,
    239 F.R.D. 70 (S.D.N.Y. 2006).................................................23

*McGaughey v. Treistman*,
    No. 05 Civ. 7069 (HB), 2007 WL 24935 (S.D.N.Y. Jan. 4, 2007)..............30

*Morgan v. City of Rawlins*,
    792 F.2d 975 (10th Cir. 1986) .................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)...............................................................51

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)..................................41-43, 45-47, 50, 52, 57

*New Hampshire Bankers Ass'n v. Nelson*,
    336 F.Supp. 1330 (D.N.H. 1972) .............................................45

*Prime Care of Northeast Kan., LLC v. Humana Ins. Co.*,
    447 F.3d 1284 (10th Cir. 2006) ...............................................19

*Procter & Gamble Co. v. Haugen*,
    317 F.3d 1121 (10th Cir. 2003) ...............................................38

*Rasberry v. Capitol Cnty. Mut. Fire Ins. Co.*,
    609 F.Supp.2d 594 (E.D. Tex. 2009) ..................................... 27-29

*Schreiber v. Burlington Northern, Inc.*,
    472 U.S. 1 (1985)................................................................54

*Schuylkill Trust Co. v. Commonwealth of Penn.*,
    296 U.S. 113 (1935)............................................................55

*Servants of Paraclete v. Does*,
    204 F.3d 1005 (10th Cir. 2005) ...............................................42

*St. Louis Cnty. Nat'l Bank v. Mercantile Trust Co. Nat'l Ass'n*,
    548 F.2d 716 (8th Cir. 1976) ........................................................ 44, 46-47, 50

*Sullivan v. Everhart*,
    494 U.S. 83 (1990)........................................................................ 43-44, 47

*Triplett v. LeFlore County*,
    712 F.2d 444 (10th Cir. 1983) ..................................................................57

*United States v. Doe*,
    572 F.3d 1162 (10th Cir. 2009) ...................................................................52

*U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*,
    614 F.3d 1163 (10th Cir. 2010) ..............................................................8, 39

## STATUTES

12 U.S.C. § 92a ..........................................................................*passim*

28 U.S.C. § 1332............................................................................1

UTAH CODE ANN. § 57-1-19 .................................................................8

UTAH CODE ANN. § 57-1-21 .............................................3-4, 28, 32, 38, 51-52

UTAH CODE ANN. § 57-1-23.5 .............................................................28

UTAH CODE ANN. § 57-1-36 .................................................................8

## OTHER

3 Moore's Federal Practice (1983) .......................................................57

8 Wright & Miller, Fed. Prac. & Proc. Civ. § 2008.3 (3d ed.) .........................14, 36

12 C.F.R. § 9.7 ............................................................... 39, 41, 46, 48-51

Comptroller's Trust Examiners' Manual, Opinion Section, G-1 (1969).................49

OCC Interp. Ltr. 695, 1996 WL 187825 (Dec. 8, 1995) .................................. 49-50

S. Rep. No. 109-14 (2005), 2005 WL 627977....................................................30, 32

U.S. Const. amend. X..............................................................................................39

Wright & Miller, Fed. Prac. & Proc. Civ. § 1357 (1969)..........................................8

## PRIOR OR RELATED APPEALS

1.    *Dutcher v. Matheson*, No. 12-4150, hereinafter "Dutcher I," was decided by this Court on August 13, 2013. *Dutcher v. Matheson*, 733 F.3d 980 (10th Cir. 2013).

2.    *Garrett v. ReconTrust Co., N.A.*, No. 12-4060 was decided by this Court on September 19, 2013. *Garrett v. ReconTrust Co., N.A.*, 546 Fed. Appx. 736 (10th Cir. 2013) (unpublished).

3.    *Federal National Mortgage Association v. Sundquist*, 2013 UT 45, 311 P.3d 1004, was decided by the Utah Supreme Court in July 2013.  The *Sundquist* decision addressed several issues now before this Court.

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Richard and Gwen Dutcher, Richard and Michelle Ferguson, and Catherine Richards Ahlers ("Appellants") brought this case in Utah state court. Defendants-Appellees removed the case to the United States District Court for the District of Utah pursuant to 28 U.S.C. §§ 1332, 1441 & 1446(a). Appellants' Appendix (hereinafter "App.") at 42. The District Court denied Appellants' motion to remand, finding that there was federal question jurisdiction and alternatively that Appellants had fraudulently joined certain defendants to defeat diversity jurisdiction. App. 136. An appeal to this Court followed. *See Dutcher v. Matheson*, No. 12-4150 (10th Cir.). In *Dutcher I*, this Court did not reach the merits of the appeal but found error in the District Court's jurisdictional determinations. *Dutcher I* **vacated** the District Court's orders and **remanded** for "further development" of jurisdictional issues under the Class Action Fairness Act ("CAFA"). *Dutcher*, 733 F.3d 990.

On remand, the District Court ruled that it had jurisdiction under CAFA and re-closed the case. App. 313. On July 16, 2014, Appellants timely appealed the District Court's orders pursuant to Fed. R. App. P. 4(a)(1). App. 369. This appeal is from a final order and judgment disposing of all claims. This Court's jurisdiction derives from 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Did the District Court err in retaining federal jurisdiction under CAFA over a local, intrastate matter, brought by a putative class of Utah homeowners, in Utah state court, to stop illegal non-judicial foreclosures under Utah's non-judicial foreclosure law?

2.     Did the District Court err by closing the case after its CAFA jurisdictional ruling to avoid having to confront additional authority supporting Appellants' position and based on the assumption that its vacated rulings from 2012 were still operative?

3.     Does Recon, a California corporation – and by definition a "national bank" although it neither takes deposits nor makes loans – have the power to conduct non-judicial foreclosures in Utah on real property located in Utah without complying with Utah law?

**4.**     Did the District Court err in dismissing with prejudice under Rule 12(b)(6) claims based on breaches of the fiduciary duties Recon owes to Utah homeowners under trust deeds recorded in Utah, based on its conclusion, contrary to allegations in the complaint, that Recon is located in Texas as to that fiduciary relationship?

## STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENTS

The power to conduct non-judicial foreclosures in Utah is a privilege that must be exercised in strict compliance with Utah law, given the absence of court supervision. This appeal concerns Appellees' deliberate scheme to take homes from Utah homeowners without complying with Utah's non-judicial foreclosure laws. The Matheson Defendants illegally exercised the "power of sale," purportedly authorized by Recon, as a subsidiary of Bank of America, N.A. ("BOA"), even though Recon is not a qualified trustee under Utah Code Ann. §§ 57-1-21, -22 and -23.5. In this way, Appellees circumvented the strictures of Utah's non-judicial foreclosure procedures. Appellees argue that they need not comply with Utah law because Recon is a bank organized in Texas under the National Banking Act ("NBA"), 12 U.S.C. § 92a, and its "foreclosure sales [in Utah] are governed by Texas law." App. 54.

But this position is contrary to time-honored law holding that the rights and powers of a trustee depend on both the nature of the trust and the authority of a trustee as set forth in the statutes and common law of the state where the trust relationship was created: **Utah**. In recent years, judges in Utah's federal court have issued at least five different rulings on both sides of this issue:

In *Cox v. ReconTrust Company, N.A.*, 2011 WL 835893, at *6 (Mar. 3, 2011 D. Utah), Judge Waddoups held: "Under a straightforward reading of § 92a(b), this

court must look to Utah law [as opposed to the laws of some other state] in its analysis of whether ReconTrust's activities in Utah exceed ReconTrust's trustee powers." Judge Benson rejected the argument made by Recon and BOA "that for purposes of § 92a the laws of … Texas apply, not Utah law," based on "the reasoning applied in *Cox*." *Coleman v. ReconTrust Co., N.A.*, Case No. 2:10-cv-1099, Slip Op. at 2 (D. Utah Oct. 4, 2011). Most significantly, Judge Jenkins issued a comprehensive ruling on the issue in *Bell v. Countrywide Bank, N.A.*, 860 F. Supp. 2d 1290, 1297 (D. Utah 2012), holding, *inter alia*:

> A state bank which seeks to foreclose on real property in Utah must comply with Utah law. A federally chartered "bank" which seeks to foreclose on such property must comply with Utah law as well. The reason is found within the federal statutes, the history of federal legislation, as well as principles of Federalism.

*Id*. Even the Utah Supreme Court held that "Utah Code sections 57-1-21 and 57-1-23 are not preempted by federal law" and that "[a] national bank seeking to foreclose real property in Utah must comply with Utah law." *Sundquist*, 2013 UT 45 at ¶ 3.

Conversely, Judge Sam held in *Garrett v. ReconTrust Co., N.*A., 2011 WL 7657381, at *3-*4 (Dec. 21, 2011 D. Utah):

> Section 92a … ties the state law at issue in this case to where the national bank is "located." Additionally, the OCC has interpreted that phrase to mean a national bank is "located" only where it "acts in a fiduciary capacity." ReconTrust performs all fiduciary duties at issue in this case in Texas…. Therefore, the state laws that apply to ReconTrust by virtue of Section 92a are those of Texas, rather than Utah.

4

*Id.* (citations omitted). In September 2013, this Court affirmed the *Garrett* ruling but specified that it was "not binding precedent," and was based on plaintiff's failure to raise key arguments below. *Garrett*, 546 Fed. App'x at 739 & n.1.

In the case underlying the instant appeal, Judge Stewart said it was a "close issue," but found "the reasoning of *Garrett* more persuasive … [and] that Texas law should inform the application of the [NBA] to ReconTrust," and dismissed Appellants' claims with prejudice for failure to state a claim. App. 148. Less than a month later, Judge Jenkins issued his ruling in *Bell*.

In 2012, Appellants moved Judge Stewart to reconsider and for leave to amend their complaint. *See* App. 6. Judge Stewart denied the motions: "The Court is aware that *Bell* reached a different result. However, that opinion is not properly described as controlling law." App. 235. Judge Stewart reached that conclusion in part based on his exercise of federal diversity jurisdiction.

In *Dutcher I*, this Court vacated the District Court's dismissal and denial of Appellants' motions for reconsideration and to amend and remanded for "further development" of issues related to CAFA. *Dutcher*, 733 F.3d at 989. On remand, the District Court denied Appellants' requests for jurisdictional discovery to develop the record and, after finding jurisdiction under CAFA, re-closed the case without any further proceedings.

Appellants bring this appeal to review the District Court's 2012 rulings, as well as those issued after *Dutcher I* on remand.  Regarding CAFA, the District Court should have applied its mandatory or permissive exceptions, as well as principles of comity, and declined to exercise federal jurisdiction, especially in light of the Utah Supreme Court's ruling in *Sundquist*. The District Court improperly rejected the allegations in Appellants' Complaint without giving them the right to conduct jurisdictional discovery. Regarding its re-closing the case immediately after its CAFA ruling, the District Court erroneously relied on rulings vacated by this Court in *Dutcher I* and avoided having to confront the full body of authority supporting Appellants' position.

Substantively, the District Court should not have dismissed Appellants' claims with prejudice in 2012 based on a conclusion that Recon did not need to comply with Utah's non-judicial foreclosure law and that, as a national bank located in Texas, needed only comply with Texas law. The NBA did not permit such a conclusion, and reliance on Appellees' arguments based on the OCC's interpretation was improper under a *Chevron* analysis.

# STATEMENT OF THE FACTS[1]

1.    Appellants each executed a note ("Note") in Utah to purchase homes in Utah ("Property"). *See* App. 20-23 ¶¶ 31, 39, 47; 181-85 ¶¶ 25, 51.

2.    Appellants each executed a Deed of Trust (hereinafter "Trust Deeds") in Utah for the purpose of securing the Notes. App. 20-23 ¶¶ 32, 40, 48; 181-85 ¶¶ 26, 52; *see also* Addendum ("Add.") 153, 172, 188.

3.    The Trust Deeds were each specifically identified on every page by a stamp indicating that they are Utah specific, and recorded in the offices of the Salt Lake, Summit or Utah County recorders. Add. 153-66, 172-80, 188-98; App. 181-85 ¶¶ 29, 54.

4.    The Trust Deeds were each recorded in the Utah offices of the appropriate County Recorder, with a return addresses to entities based in California, Pennsylvania, and Utah. App. 181 ¶ 30; Add. 172.

5.    The Trust Deeds each defined "Applicable Law" as "all controlling applicable federal, state and location statutes…." App. 182 ¶¶ 32-33; 185 ¶¶ 57-58; Add. 154 ¶¶ (J) & (R), 173 ¶¶ (I) & (Q), and 189 ¶¶ (J) & (R).

6.    The Trust Deeds each required that all notices, including any Substitution of Trustee, Notice of Default, or Notice of Trustee's Sale, be delivered in writing to

---

[1] A Rule 12(b)(6) dismissal is reviewed *de novo* "for plausibility, specifically whether enough facts have been pled to state a plausible claim," on the Complaint, documents referenced therein, and documents included in *Dutcher I. United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010).

Appellants at the Utah Property addresses. App. 182-86 ¶¶ 34, 59; Add. 161 ¶ 15, 178 ¶ 15, and 195 ¶ 15.

7.      The Trust Deeds each declared that both federal law and the "law of the jurisdiction in which the Property is located" govern the instrument and its construction, consistent with Applicable Law. App. 182-86 ¶¶ 35, 60; Add. 162 ¶ 16, 178 ¶ 15, and 195 ¶ 16.

8.      The Trust Deeds each required the Beneficiary to provide notice of acceleration to Appellants in Utah. App. 182-86 ¶¶ 36, 61; Add. 162 ¶ 16, 178 ¶ 15, and 195 ¶ 16.

9.      The Trust Deeds each provided Appellants with the right to reinstate after acceleration, a remedy to be performed in Utah prior to the exercise of the power of sale. App. 182-86 ¶¶ 37, 62; Add. 162 ¶ 19, 178 ¶ 19, and 196 ¶ 19.

10.     The Trust Deeds recite non-uniform covenants specifically purporting to comply with the Applicable Law of the state of Utah, by setting forth both the acceleration and reinstatement periods required before the power of sale could be exercised by the Trustee. These covenants specifically recite statutory requirements that unambiguously refer to the requirements of Utah's trust deed statute, Utah Code Ann. § 57-1-19 to § 57-1-36, setting forth the manner in which each Property could be sold by non-judicial process through public advertisement

and setting forth the distribution of proceeds from such sale consistent with state law. App. 182-86 ¶¶ 38, 63; Add. 164 ¶ 22, 179 ¶ 22, and 197 ¶ 22.

11.     The Trust Deeds recite the Trustee's duties related to any reconveyance of the Property, an act that must be performed by recordation in offices of the appropriate County Recorder in the state of Utah. App. 182-86 ¶¶ 39, 64; Add. 164 ¶ 23, 180 ¶ 23, and 197 ¶ 23.

12.     Consistent with Utah statute, the Trust Deeds specifically recite that any successor trustee, as with the original trustee, shall have "all the title, power and duties conferred upon Trustee herein and by Applicable Law." App. 183-87 ¶¶ 40, 65; Add. 164 ¶ 24, 180 ¶ 24, and 197 ¶ 24.

13.     The Trust Deeds required that copies of any notice of default and sale be sent to each Appellant's Property address. App. 183-87 ¶¶ 41, 66; Add. 164 ¶ 25, 180 ¶ 25, and 197 ¶ 25.

14.     The Trust Deeds purportedly became effective by each Appellant's signature in Utah, acknowledged by a Notary Public in Utah. App. 183-87 ¶¶ 42, 67; Add. 166, 180, 198.

15.     Subsequently, in anticipation of the commencement of non-judicial foreclosure proceedings on each Trust Deed, Recon caused a Corporate Assignment of each Trust Deed (the "First Assignment") to BAC Home Loans Servicing, to be recorded in Utah. On the same date, BAC Home Loans Servicing

recorded in Utah a Substitution of Trustee as to each Trust Deed, naming Recon as

successor trustee. Recon then recorded a Notice of Default and Election to Sell in

Utah on behalf of BAC Home Loans Servicing, specifically reciting the alleged

breach by Appellants as provided in Utah Code Ann. Title 57, Chapter 1 (1953), as

amended and supplemented. Then, with respect to each Trust Deed, BAC Home

Loans Servicing recorded in Utah another Corporate Assignment (the "Second

Assignment") to Federal National Mortgage Association ("FNMA"). App. 183-84

¶¶ 43-46; 191-92 ¶¶ 68-71; Add. 182-05, 200-03.

16.     Each First Assignment, Substitution of Trustee, Notice of Default, and

Second Assignment was prepared on a Utah specific form, as identified in the

lower right hand corner of the document. App. 77-91; Add. 152-205.

17.     Regarding each Trust Deed, Recon claims to be "substitute" trustee under

Utah law, even though Recon does not qualify as a trustee under Utah law. App.

184-88 ¶¶ 47, 72.

18.     Purporting to be a qualified trustee under Utah law, Recon published notice

of a non-judicial foreclosure sale of each Appellant's home in Utah. Matheson, not

as trustee but holding himself to be an agent of Recon, conducted the foreclosure

sales of Appellants' homes in Utah. App. 184-85 ¶¶ 48- 50; 188 ¶¶ 73-75.

19.     Subsequent to the sale of each Utah Property, Recon recorded a Trustee's

Deed in Utah terminating Appellants' ownership interest in the Property in favor of

FNMA, located in Simi Valley, California (the "FNMA Trustee's Deed"). Each FNMA Trustee's Deed states that the non-judicial foreclosure properly complied with the requirements of Utah Code Ann. Title 57 – recitals that were false given that Recon was admittedly not a duly qualified trustee under Utah law. App. 184 ¶ 50; 188 ¶ 75; Add. 186-87, 204-05.

20.     On June 24, 2011, Appellants initiated this action in Utah state court for violations of Utah's non-judicial foreclosure statutes and other claims. They alleged that Appellees had engaged in a similar pattern of conduct in foreclosing on a putative class of Utah homeowners since at least January 2001, and sought to have Appellants designated as class representatives. App. 12-37.

21.     On July 19, 2011, Appellees removed to the District Court based on diversity jurisdiction. On August 19, 2011, they moved to dismiss for failure to state a claim under Rule 12(b)(6), and Appellants moved to remand. App. 1, 3.

22.     On February 8, 2012 the District Court denied remand on a finding that Appellants had fraudulently joined the two Utah defendants to destroy diversity and dismissed the Complaint for failure to state a claim, concluding that provisions of Utah's non-judicial foreclosure law did not apply to Appellees' actions because Recon was located in Texas and need not comply with Utah law. App. 142, 151.

23.     On February 22, 2012, the court clerk entered judgment and closed the case. App. 6.

24.     On March 21, 2012, Appellants moved the District Court to alter or amend judgment, or in the alternative, to set aside judgment, and for leave to amend, based in part on the ruling of another Utah district judge that contradicted the District Court's February 8, 2012 ruling. App. 153-54 (citing *Bell v. Countrywide Bank, N.A.*, 860 F. Supp. 2d 1290, 1297-1309 (D. Utah 2012).

25.     On July 23, 2012, the District Court denied Appellants' motions, holding that *Bell* was not controlling law, it did not change the District Court's ruling, and Appellants' proposed amendments were "futile." App. 245.

26.     On August 22, 2012, Appellants filed timely notice of appeal, and pursued the appeal under USCA Case Number 12-4150. App. 7.

27.     On August 13, 2013, this Court issued its ruling in *Dutcher I*: VACATING the District Court's dismissal of this action and the denial of Appellants' motions for reconsideration and to amend, and REMANDING with instructions to determine whether CAFA jurisdiction applies. *Id.*

28.     On September 4, 2013, the mandate issued. App. 8.

29.     On September 17, 2013, the District Court held a status conference. App. 8. Appellants requested jurisdictional discovery, Appellees opposed, and the District Court held that it would not allow jurisdictional discovery unless it was deemed necessary after jurisdictional briefs. *Id.*

30.     In October, the parties filed jurisdictional briefs. App. 248, 255, 281, 301.

12

31.    Appellees argued that CAFA applied because, according to the Complaint,

(a) the proposed class contains over 100 members, (b) there was "minimal

diversity" meaning "at least one class member is different from the citizenship of

at least two Defendants in this matter," and (c) Appellants' claims exceed CAFA's

amount in controversy requirement. App. 256.

32.    Appellees argued that neither of CAFA's mandatory exceptions applied, and

also that the permissive exception did not apply. App. 262-75.

33.    Finally, Appellees argued that jurisdictional discovery would be futile

because while "some 'limited discovery' may be necessary to make a jurisdictional

determination," the Senate had cautioned that "jurisdictional determinations should

be made largely on the basis of readily available information." App. 275-76.

34.    Appellants argued (1) that CAFA jurisdiction was limited; and (2) that the

District Court should apply either (i) the mandatory CAFA local controversy or

home state exceptions, or (ii) CAFA's discretionary exception. App. 282-97.

35.    Appellants argued that District Court should decline jurisdiction on comity

because of the Utah Supreme Court's ruling adopting *Bell* to hold that "[a] national

bank seeking to foreclose real property in Utah must comply with Utah law." App.

297-98 (quoting *Sundquist*, 2013 UT 45 at ¶ 3).

36.    Finally, Appellants requested permission to conduct jurisdictional discovery

explaining that it "is likely often to be impossible" to resolve jurisdictional issues

"without factual input," and these cases commonly present situations where it would be an abuse of discretion to deny jurisdictional discovery. App. 298-99 (quoting 8 Wright & Miller, Fed. Prac. & Proc. Civ. § 2008.3 (3d ed.)). Appellants proposed discovery to establish (1) the number of Utah citizens in the putative case, and (2) the significance of the Matheson Defendants' actions. App. 299.

37.     On December 20, 2013, Appellees filed a reply brief. App. 301.

38.     On April 25, 2014, the District Court ruled that CAFA jurisdiction applied and "instructed [the clerk of the court] to close this case forthwith." App. 331.

39.     The April 25, 2014 ruling misconstrued the mandate of this Court from *Dutcher I*, as being "for the limited purpose of determining whether this Court has jurisdiction over Plaintiffs' claims by virtue of" CAFA. *Id.*

40.     Appellants argued that even if the District Court was correct in its CAFA ruling, it should not have closed the case. *See Dutcher*, 733 F.3d at 990.

41.     On CAFA, the District Court held that the local controversy exception did not apply because (1) it could not take the so-called "leap of faith" necessary to conclude that at least two-thirds of the proposed class, made up entirely of Utah homeowners, were citizens of Utah; and (2) Appellants' allegations regarding the Matheson Defendants were insufficient to meet the local controversy's "significant basis" requirement because "[t]he majority of the factual allegations contained in Plaintiffs' Complaint pertains to actions taken by ReconTrust and [BOA]." App.

14

318, 322-23. While the District Court could "infer that the principal injuries suffered by Plaintiffs occurred within" Utah, it construed a prior putative class action filed several months prior against Recon, BOA and six other financial institutions, to be based on similar facts, precluding the applicability of the local controversy exception. App. 323-24.

42.     The District Court held that the home state exception to CAFA did not apply because (1) it again could not take the "leap of faith" necessary to conclude that at least two-thirds of the proposed class, made up entirely of Utah homeowners, were citizens of Utah; and (2) "the primary defendants," interpreted to mean "all primary defendants," were not all citizens of Utah. App. 326-27.

43.     The District Court declined CAFA's discretionary exception because "it is unclear at this point the percentage of the proposed class who are citizens of the State of Utah," "this matter involves claims of national importance, including the application and interpretation of the [NBA]," "this matter will not be entirely governed by the law of the State of Utah [because] it also involves the application of federal law and potentially implicates the law of other states," and "this class action was not plead in such a way as to avoid CAFA jurisdiction." App. 328.

44.     The District Court denied Appellants' request for jurisdictional discovery on grounds that it "would be futile," and therefore "Plaintiffs will not be prejudiced if denied the opportunity to conduct jurisdictional discovery." App. 329.

45.    As to principles of comity, the District Court held that it was "not bound by a state court's interpretation of federal law." App. 330.

46.    The District Court concluded that it had CAFA jurisdiction and instructed the court clerk "to close this case forthwith." App. 331.

47.    On May 7, 2014, the District Court entered judgment. App. 332.

48.    On May 23, 2014, Appellants moved the District Court to alter or amend its order to close this case in order "to allow for further proceedings" on grounds that the Tenth Circuit's mandate had expressly VACATED the District Court's prior rulings dismissing the case and denying Appellants motion for leave to amend their complaint. App. 338-39. Appellants argued that the District Court's CAFA ruling had the effect of "returning the parties to their original positions before" its 2012 orders which were vacated by the Tenth Circuit, and that the District Court should allow Appellants to amend their complaint. App. 339.

49.    On July 3, 2014, the District Court denied Appellants' motion to alter or amend, explaining that the issue turned on an interpretation of the Tenth Circuit's mandate and, while Appellants' motion "finds some support in the literal definition of the word vacate," it did not read the mandate so broadly and thus "ordered that judgment be entered" following its CAFA ruling to enable "the parties to litigate the merits of [Appellants'] claims on appeal." App. 366-67. The District Court held

16

further: "In any event, to the extent there is any ambiguity in prior orders, the Court hereby readopts its prior dismissal rationale in full." App. 367.

50.     On July 16, 2014, Appellants timely appealed from the District Court's orders finding jurisdiction under CAFA, denying further proceedings, as well as those prior orders dismissing the case and denying Appellants' motion to reconsider the District Court's ruling or amend the complaint. App. 369-70.

**ARGUMENT**

## I.    THE COURT'S CAFA RULING WAS ERROR.

The Tenth Circuit "review[s] de novo whether the District Court had jurisdiction to act." *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013); *Prime Care of Northeast Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284 (10th Cir. 2006) (reviewing CAFA jurisdiction de novo). "Federal courts are courts of limited jurisdiction" and "must have a statutory basis for their jurisdiction." *Dutcher*, 733 F.3d at 984. This Court must "**presume no jurisdiction exists** absent an adequate showing by the party invoking federal jurisdiction." *Id*. at 985 (emphasis added). "As the parties removing this case to federal court, the defendants bear the burden of establishing jurisdiction by a preponderance of the evidence." *Id*.

### A. CAFA Does Not Confer Jurisdiction Over This Case.

CAFA jurisdiction is not mandatory and should not be applied in this case. As this Court wrote: "CAFA was enacted to respond to perceived abusive practices by plaintiffs and their attorneys in litigating major class actions with interstate features in state courts." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009). Other circuits have similarly observed that although "CAFA has indeed relaxed the requirements for demonstrating diversity jurisdiction" it has only done so "to allow federal courts more readily to supervise those class actions that are 'interstate cases of national importance.'" *Johnson v.*

18

*Advance America*, 549 F.3d 932, 938 (4th Cir. 2008). In other words, "Congress did not give federal courts jurisdiction over *all* class actions, specifically excluding those consisting of 'primarily local matters.'" *Id*. CAFA did not alter "the federal system of dual sovereignty where we presume state courts to be competent." *Id*.

Like *Johnson*, this case "falls into that class of cases which Congress found appropriate to leave to the States under CAFA." *Id*. The Fourth Circuit held:

> All the transactions … took place in South Carolina and are alleged to have violated only South Carolina law…. [While] plaintiffs could have expanded their action to fall under the provisions of CAFA, … they opted to bring their suit only under South Carolina law and to name only those parties who were South Carolina citizens involved in entirely South Carolina transactions.

*Id*. The same reasoning applies here. The underlying transactions took place in Utah. Appellants have only accused Appellees of violating Utah law. As the masters of their Complaint, Appellants brought their suit under Utah law and named a class of Utah homeowners, of which almost all will be Utah citizens.

This case does not have "interstate features." *See Coffey*, 581 F.3d at 1243; *Johnson*, 549 F.3d at 938. As set forth below, CAFA jurisdiction does not apply for several reasons.

  i.  <u>The Local Controversy Exception</u>

CAFA provides that courts "shall decline" jurisdiction where: (1) more than two-thirds of the members are citizens of the State where the action is filed; (2) plaintiffs seek "significant relief" from at least one local defendant who is a citizen

and whose alleged conduct forms a "significant basis" for the claims asserted; (3) the "principal injuries" were incurred in the State; and (4) no other class action "has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons" in the three years prior. These elements are met.

    1. *More Than Two-Thirds of the Proposed Class Members Are Utah Citizens.*

Appellants' proposed class is defined and limited to Utah homeowners. App. 17-18, 21-24. The District Court admitted that "[l]ogic dictates that a large percentage of the proposed class, as former owners of real property within the forum, were citizens of the State of Utah." App. 318. Notwithstanding, the District Court concluded that it would have to take a "leap of faith" to reach this conclusion, while at the same time refusing Appellants' request for jurisdictional discovery. *Id.* This was error.

"[A] person is a citizen of a state if the person is domiciled in that state." *Middleton v. Stephenson*, 749 F.3d 1197, 1200 (10th Cir. 2014). A person "acquires domicile in a state when the person [1] resides there and [2] intends to remain there indefinitely" which is usually established by an analysis of the "totality of the circumstances" analysis. *Id.* at 1200-01. Although a person's residency does not control citizenship, *see Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir. 1972) (residency cannot be equated with citizenship), the Tenth

Circuit has held that the "place of residence is *prima facie* the domicile." *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994). Some courts even hold that residency "creates a presumption" of citizenship unless the evidence establishes to the contrary. *See Nat'l Inspection & Repairs, Inc. v. George May Int'l Co.*, 202 F. Supp. 2d 1238, 1242 (D. Kan. 2002).

This Court has not considered the showing needed to meet these class citizenship elements. *See Jeter v. Wild West Gas, LLC*, 2014 WL 3890308, at *6 (N.D. Okla. Aug. 7, 2014) ("The Court is unaware of any guidance from the Tenth Circuit regarding the class citizenship element of the CAFA exceptions."). In *Woods v. Standard Ins. Co.*, -- F.3d. --, 2014 WL 5822659, at *6 (10th Cir. 2014), the defendant conceded that a class of New Mexico state and local government employees were all New Mexico citizens. Likewise, in *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009), the defendants did not contest citizenship where Oklahoma property owners sued the operator of a zinc smelter.

Other courts allow for jurisdictional discovery and then make a "credible estimate" based on the evidence. *Preston v. Tenet Heathsystem Memorial Medical Center, Inc.*, 485 F.3d 804, 822 (5th Cir. 2007). In *Preston*, the district court was asked to consider whether a class of patients who had been treated at a Louisiana hospital during hurricane Katrina satisfied the citizenship elements of CAFA

21

exceptions. *Id*. at 814-22. The Fifth Circuit affirmed remand to state court based on the district court's "reasonable inference regarding the temporary dual residency of the displaced Louisiana citizens at issue," where hospital records showed how approximately 97% of the patients in the class lived in Louisiana at the time of hurricane Katrina, and despite the hospital's evidence of a large percentage of patients and beneficiaries who had left the state. *Id.* at 822.

Here, Appellants defined the class to include 100% Utah residents, i.e., Utah homeowners, which created a presumption of citizenship as to the class members. *Dyer*, 19 F.3d at 520. The District Court should have recognized the presumption and made reasonable inferences based thereon. *Id*.; *Preston*, 485 F.3d at 822; *Mattera v. Clear Channel Communications, Inc.*, 239 F.R.D. 70, 80 (S.D.N.Y. 2006).[2] The District Court's failure to apply the residency presumption and refusal to permit jurisdictional discovery were error.

---

[2] In *Mattera*, the court found that even in the absence of "evidence, in the form of an affidavit or otherwise, establishing such citizenship, it is reasonably likely that more than two-thirds of the putative class members … all of whom work in New York – are citizens of New York," notwithstanding the fact that many of the putative class members working for radio stations in New York City were probably citizens of the surrounding states. *Mattera*, 239 F.R.D. at 80; *see also Dunham v. Coffeyville Resources, LLC*, 2007 WL 3283774 (D. Kan. Nov. 6, 2007) (citing *Mattera* to conclude the applicability of the CAFA local controversy exception).

2. *The Matheson Defendants' Conduct Is A Significant Basis For The Claims Asserted.*

The District Court recognized that Appellants were seeking significant relief from the Matheson Defendants, but held that their conduct was not a significant basis for the claims asserted because "the Matheson Defendants are, at most, ancillary defendants." App. 320-23. To determine whether conduct forms a significant basis for claims asserted, "[t]he Court must … compare the local defendant's conduct with the alleged conduct of all defendants to determine if the actions and the relief sought from the defendant is significant in view of the entire wrong alleged in the complaint." *Lafalier v. Cinnabar Servs. Co., Inc.*, 2010 WL 1486900, at *7 (N.D. Okla.), *aff'd* 391 Fed. App'x 737 (10th Cir. Aug. 19, 2010). It is also relevant whether plaintiffs seek relief jointly and severally. *Coffey*, 581 F.3d at 1244–45.

Here, the District Court conflated issues by counting how many allegations in the Complaint pertain to actions taken by Recon and BOA as opposed to the Matheson Defendants. App. 323. It improperly rejected Appellants' allegations regarding the significance of the Matheson Defendants' conduct without allowing them to conduct jurisdictional discovery. App. 322-23. The Complaint alleges that Appellees colluded with one another by conducting illegal foreclosure sales against Utah homeowners in contravention of Utah's non-judicial foreclosure law. App.

13. The Matheson Defendants exercised illegal "power of sale" on the steps of the

courthouse to take Appellants' homes. App at 29. The Complaint states:

> [T]he primary defendants, Matheson and MMOJ, … are executing the
> unlawful foreclosure sales in Utah….
>
> Since 2001, Defendants Matheson and MMOJ have regularly
> exercised and continue to exercise unlawful "powers of sale" and
> conduct unauthorized sales on trust deeds in the state of Utah. In
> particular, Matheson and MMOJ know or should know that any sale
> they conduct where Recon[] is the purported trustee is not an
> authorized sale under Utah law because Recon[] is not authorized to
> obtain, exercise or delegate power of sale under Utah's non-judicial
> foreclosure statutory regimen. Matheson and MMOJ violate Utah law
> when they exercise powers of sale purportedly provided by Recon[] as
> trustee or substitute trustee.
>
> In fact, Matheson and MMOJ are the critical end players in a complex
> financial scheme orchestrated with Recon[] and [BOA] to circumvent
> Utah law and take homes from Utah homeowners without giving
> those homeowners the opportunity to meet with a lawful trustee, as
> the Utah legislature required in enacting Utah's non-judicial
> foreclosure laws.

App. 15.

Such allegations are sufficient to establish that the Matheson Defendants'

conduct forms a significant basis for the claims alleged. In *Lafalier*, the

"significant basis" element was satisfied because "each plaintiff assert[ed] claims

against the [local defendants]" for allegedly "conspir[ing] to reduce the appraisals

of plaintiffs' homes during the buyout and violat[ing] the [Open Meetings Act] in

an attempt to cover up their conduct." *Lafalier*, 2010 WL 1486900, at *7, *aff'd*,

391 Fed. App'x 737.  In *Woods*, the "significant basis" element was not satisfied

where the local defendant, Ms. Quintana, was an employee of the insurance

company, and her role was limited to provid[ing] customer service.  It was not her

"job to collect evidence of insurability, make coverage determinations, record who

had purchased insurance coverage, or verify that employees were in fact receiving

coverage." *Woods*, 2014 WL 5822659, at *8.  There was nothing to suggest that

she "collected or retained premiums, solicited any employee to purchase insurance,

enrolled state employees, or had any actual contact with Plaintiffs or class

members." *Id*. The *Woods* plaintiffs did not allege Ms. Quintana made any false or

misleading statements, but only that she violated the law "by failing to disclose the

… allegedly unlawful practices to the state employees." *Id.*

In contrast with *Coffey*, *Woods* held that the "significant basis" element was

satisfied where (1) "all class members had claims against" the local defendant "as

opposed to a mere subset of class members"; and (2) "all class members were

seeking to hold the company jointly and severally liable for all of plaintiffs'

damages." *Id*. at *9 (citing *Coffey*, 581 F.3d at 1244-45).

Here, the "lack of authority" to "conduct non-judicial foreclosure sales in the

state of Utah is an issue of law common to all members of the class" so that all

members have claims against the local defendants and are seeking to hold them

jointly and severally liable. App. 26. It was error to conclude that the Matheson

Defendants were merely "ancillary," especially without the benefit of jurisdictional discovery. App. 323.

3. *The Principal Injuries Were Incurred In Utah.*

Appellants met the third element of the local controversy exception by alleging that unlawful foreclosures took place within Utah. App. 324.

4. *The* Coleman *Case Does Not Preclude The Local Controversy Exception.*

The District Court erred in denying the local controversy exception based on similarities with *Coleman v. ReconTrust Co., N.A.*, No. 2:10-CV-1099 DB (D. Utah), filed six months before Appellants' action in federal court and asserting Fair Debt Collection Practices Act ("FDCPA") and other claims against Recon, BOA and six other national financial institution-related defendants. The District Court found that *Coleman* was a "class action … asserting the same or similar factual allegations" that Recon was not a qualified "trustee" under Utah's non-judicial foreclosure law. App. 324-25. But the legislative history of CAFA "makes clear that the 'local controversy' exception is not overcome merely because purported classes overlap in significant respects" or because the cases "aris[e] out of the same event and includ[e] a common defendant." *Rasberry v. Capitol Cnty. Mut. Fire Ins. Co.*, 609 F. Supp. 2d 594, 605 (E.D. Tex. 2009). While "[d]rawing the line between factual allegations that are similar … is inherently imprecise," the *Rasberry* court held that the "essential contours" of two cases were "wholly

26

dissimilar," even though they "arise[d] from a common event," because "[t]he principal objects of both suits are factually and analytically distinct," "the factual basis giving rise to both actions differs dramatically," and "[t]he proof necessary to prevail" in one case "differs in all crucial respects from the proof necessary to prevail" in the other. *Id. Rasberry* "complain[ed] of Capitol County's use of unlicensed adjusters," seeking "declaratory and injunctive relief," while the other case "complained of Capitol County's failure to pay contractor overhead and profit" and "sought to recover money damages." *Id.*

The same conclusion is warranted here. First, the *Coleman* complaint is principally an action under the FDCPA challenging the debt collection practices of the defendants in that case, which included MERS, HSBC Bank, Wells Fargo Bank, U.S. Bank, Bank of New York Mellon, Keybank, and others, in addition to Recon and BOA. App. 290. *Coleman* alleged debt collection abuses in (1) the "initiation of foreclosure to coerce payment of the debt"; (2) "threats to take action that cannot legally be taken"; (3) "false representations that documents filed are legal process"; (4) "threatening and taking nonjudicial action to effect dispossession"; (5) "securities fraud"; (6) "theft"; (7) "defrauding creditors"; (8) "unlawful dealing with property by a fiduciary"; (9) "communications fraud"; (10) "racketeering activity" as defined by federal statute; and (11) "investment of the proceeds" of a criminal enterprise. App. 290-91. It was based on alleged threats

27

and misrepresentations, turning on communications with the putative class, so that the principal objects of the two suits are factually and analytically distinct, even thought both arise from what might be considered a "common event." *Rasberry*, 609 F. Supp. 2d at 605. In contrast, Appellants asserted claims based on the taking of homes and illegal foreclosures conducted by Appellees without the "power of sale" under Utah Code Ann. § 57-1-21 & -23.5, as opposed to threats and misrepresentations in the collection of a debt, seeking statutory damages and a permanent injunction. App. 291-92. Indeed, the statutory damages under § 57-1-23.5, only went into effect on May 10, 2011, several months after *Coleman* was filed.

The different contours of this case and *Coleman* is further evident in the court's denial of plaintiffs' motion to certify a class on, *inter alia*, the fact that at least two plaintiffs had quitclaimed their interest in their respective properties to a non-party entity prior to the lawsuit, meaning those "plaintiffs face unique, individualized defenses (such as a lack of standing) that render them atypical of the proposed class," leading the court to conclude that common questions would not predominate over questions affecting individual class members. App. 292.[3]

_____

[3] Denial of class certification in *Coleman* may have compromised its status as an "other" "class action" for purpose of the local controversy exception. App. 292. CAFA provides that the "other" cases have to be "filed" as a "class action." App. 271 (citing *Dunn v. Endoscopy Ctr. of S. Nev.*, 2011 WL 5509004 (D. Nev. Nov. 7, 2011)). But *Dunn* was inapposite. *See Dunn*, 2011 WL 5509004, at *3. At least one

ii. <u>The Home State Exception</u>

CAFA provides that courts "shall decline" jurisdiction where: (1) more than two-thirds of the members are citizens of the State where the action is filed; and (2) the primary defendants are citizens of the State where the action was originally filed. These elements of the home state exception are satisfied in this case.

1. *More Than Two-Thirds of the Proposed Class Members Are Utah Citizens*.

The District Court's conclusion that Appellants did not meet their burden here is erroneous for the same reasons as stated above. App. 326.

2. *The Matheson Defendants Are Primary Defendants.*

The District Court rejected the home state exception based on its conclusion that "most courts have construed the term 'primary Defendants' to mean all primary defendants," so that the home state exception would not apply as long as Recon and BOA were primary defendants. App. 326-27.

But courts have reached different conclusions on this issue because "[t]he term 'primary defendants' has no clear, unambiguous meaning and is not an

_____

district court has held that the denial of class certification defeats subject matter jurisdiction under CAFA. *Gonzalez v. Pepsico, Inc.*, 2007 WL 1100204, at *4 (D. Kan. Apr. 11, 2007) (citing *McGaughey v. Treistman*, 2007 WL 24935, at *3 (S.D.N.Y. Jan. 4, 2007)). In *McGaughey*, the court dismissed for lack of subject matter jurisdiction under CAFA after denying plaintiffs' motion for class certification because "[p]laintiff's action is no longer a class action." *McGaughey*, 2007 WL 24935, at *3*; but see Edwards v. ZeniMax Media Inc*., 2013 WL 5420933, at *1 (D. Colo. Sept. 27, 2013) (retaining subject matter jurisdiction for case removed under CAFA even after denial of class certification); *Burdette v. Vigindustries, Inc.*, 2012 WL 5505095, at *2 (D. Kan. Nov. 13, 2012) (same).

established term of art." *Martin v. State Farm Mut. Auto. Ins. Co*., 2010 WL

3259418, at *9 (S.D. W. Va. Aug. 18, 2010) (quoting *Kearns v. Ford Motor Co*.,

2005 WL 3967998, at *7 (C.D. Cal. Nov.21, 2005)).

> In *Kearns*, the U.S. District Court for the Central District of California held that "primary defendants" were not "those with the deepest pockets or those with the greatest culpability," but rather "a 'primary defendant' is any with direct liability to the plaintiffs."

*Martin*, 2010 WL 3259418, at *9 (contrasting *Kearns*, 2005 WL 3967998, at *7,

with *Brook v. UnitedHealth Group, Inc*., 2007 WL 2827808, at *5 (S.D.N.Y. Sept.

27, 2007)). Appellants also pointed to CAFA's legislative history:

> [T]he term "primary defendants" should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

S. REP. No. 109-14, 2005 WL 627977, at *43.

Here, Appellants have established how they seek significant relief from "the

actions of Matheson, MMOJ and other defendants in non-judicial foreclosure

proceedings." App. 24-25. Recon, as a subsidiary of BOA, has claimed to be a

qualified trustee in Utah, and the actions of the Matheson Defendants in

conducting illegal non-judicial foreclosure sales without "power of sale" is what

triggers Appellees' liability. App. 15-31 ¶¶ 12, 14-15, 19, 22, 38, 46, 61, 75, 78,

88, 91-92. It was error to find against Appellants on this point while denying their

request for jurisdictional discovery, and concluding that the home state exception

did not apply either because the Matheson Defendants were not "primary

defendants," or because less than "all primary defendants" were Utah citizens.

    iii. <u>The Discretionary Exception</u>.

       CAFA's discretionary exception provides that a court may, "in the interests

of justice and looking at the totality of the circumstances," decline to exercise

jurisdiction over a class action where more than one-third of the members, and the

primary defendants, are citizens of the State based on consideration of whether (1)

the claims involve matters of national or interstate interest; (2) the claims are

governed by the laws of the state; (3) the class action has been pleaded in a manner

that seeks to avoid federal jurisdiction; (4) the forum has a distinct nexus with the

class members, the alleged harm, or the defendants; (5) the aggregate class from

one state is substantially larger than citizens from any other State; and (6) whether

there has been in the 3-year period preceding, one or more class actions asserting

the same or similar claims on behalf of the same or other persons.

       The District Court should have recognized that this case "falls into that class

of cases which Congress found appropriate to leave to the States under CAFA."

*Johnson*, 549 F.3d at 938. First, it does not require a "leap of faith" to conclude

that more than one-third of the class of Utah homeowners are Utah citizens. App.

328. Second, the District Court pointed to the fact that "the primary defendants in

this case are not citizens of Utah" as supporting its decision. *Id*. But that is not one

of the discretionary exception factors. Third, the District Court's analysis that "this matter involves claims of national importance, including the application and interpretation of the [NBA]," was circular, encouraging any defendant seeking to avoid the discretionary exception to make an ill-conceived preemption argument. Fourth, the District Court alluded to preemption to argue that "this matter will not be entirely governed by" Utah law. App. 328. But the Utah Supreme Court recently found that "Utah Code sections 57-1-21 and 57-1-23 are not preempted by federal law" and that "[a] national bank seeking to foreclose real property in Utah must comply with Utah law." *Sundquist*, 2013 UT 45 at ¶ 3. Fifth, the District Court found, without explanation that "this class action was not plead [sic] in such a way as to avoid CAFA jurisdiction." App. 328. This is puzzling, because the Complaint addressed this issue directly. App. 15, ¶ 12. And CAFA expressly "includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus." S. REP. 109-14, at 28. Finally, the District Court declined to apply the discretionary exception based on the filing of *Coleman* as a prior class action. App. 328. Appellants refer the Court to the discussion of *Coleman* above.

*     *     *

To summarize: CAFA is not mandatory. It is meant to apply to large *interstate* class actions, and not local controversies like here. *See* S. REP. NO. 109-

14, 2005 WL 627977, at *4. Whether under a mandatory or permissive exception, this case "falls into that class of cases which Congress found appropriate to leave to the States under CAFA." *Johnson*, 549 F.3d at 938.

**B. Comity Militates Against The Exercise Of Federal Jurisdiction.**

In addition to CAFA's exceptions, the District Court should have remanded under principles of comity. The United States Supreme Court has held that comity considerations may "preclude the exercise of lower federal-court adjudicatory authority" where "an adequate state-court forum is available":

> The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction. The doctrine reflects "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways."

*Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 421 (2010) (citation omitted). This is a truly local controversy involving matters traditionally left to the states. More specifically, Utah's highest court issued a ruling on the principal issues raised by the motion to dismiss and in the *Dutcher I* appeal, holding that "[a] national bank seeking to foreclose real property in Utah must comply with Utah law." *Sundquist*, 2013 UT 45 at ¶ 3. This is just the type of case where, out of "proper respect for state functions," the District Court should have "resist[ed] engagement in [this] case." *Levin*, 560 U.S. at 421. Its rejection of comity principles was error.

The District Court improperly distinguished *Levin* on grounds that *Levin* involved "a federal suit claiming that a state taxing scheme was unconstitutional," where, in contrast, "here, the issue is whether a state statute is preempted by a federal statute and regulating scheme." App. 330. But there is no preempting federal statute or regulating scheme in this case. That finding presupposes Appellees' defense that it may violate Utah non-judicial foreclosure law because "Texas law applies to Texas-based fiduciary activities." App. 275. But that very matter is at issue. According to the well-pleaded complaint rule, the issue here is whether the defendants can avail themselves of Utah's non-judicial foreclosure procedures to take homes from Utah homeowners, without complying with Utah's laws.

Appellees suggest that they do not have an interest in how Utah's supreme court applies the laws of Utah, but that is not a "dramatic[]" variance from the interests at issue in *Levin*. "Comity… serves to ensure that 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.'" *Levin*, 560 U.S. at 431 (citation omitted). Just like state taxation, laws governing trusts and real property are "core matters of traditional state sovereignty" left to the States. *Sundquist*, 2013 UT 45 at ¶ 36. As in *Levin*, principles of comity "demand deference to the state adjudicative

process," and justify remand of this action to Utah's state court. *Levin*, 560 U.S. at 432.

With respect to *Sundquist*, the District Court erroneously claimed that "the same issue raised in [*Sundquist*] has already been addressed by [the District Court] and, subsequent to *Sundquist*, by a panel of the Court of Appeals for the Tenth Circuit in *Garrett v. ReconTrust Co., N.A.*" App. 330. It appears this was intended as a type of futility argument. But *Sundquist* has already rejected Appellees' position on preemption. *Compare* App. 144, *with Sundquist*, 2013 UT 45 at ¶ 4 (holding that "[a] A national bank seeking to foreclose real property in Utah must comply with Utah law"). And this Court has already partially rejected Appellees' case on the merits, finding that § 92a was not "part of the" NBA and that the absence of a federal cause of action precludes us from relying on complete preemption. *Dutcher*, 733 F.3d at 987, 990.

## C. The Court Abused Its Discretion Denying Jurisdictional Discovery.

This Court wrote previously how CAFA jurisdiction presented a "thorny question" for which "further development" was needed. *Dutcher*, 733 F.3d at 989. Yet no "further development" occurred in this case. The District Court refused Appellants' requests for jurisdictional discovery. In its decisions, the District Court did not hold oral argument, did not take evidence, and it denied Appellants'

35

attempts at "further development". It should have authorized jurisdictional

discovery:

> When factual disputes exist, discovery is likely to follow. … "[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." … district courts may be found to have abused their discretion in denying discovery regarding issues of personal jurisdiction or subject matter jurisdiction.

8 Wright & Miller, Fed. Prac. & Proc. Civ. § 2008.3 (3d ed.) (citations omitted).

The District Court denied Plaintiffs' request for jurisdictional discovery based on a

conclusion that it would be "futile." App. 329.  This was an abuse of discretion.

## II.    THE COURT ERRED IN CLOSING THE CASE.

In *Dutcher I*, this Court was unequivocal: "we VACATE the District Court's

dismissal of this action and the denial of the plaintiffs' motions for reconsideration

and to amend." *Dutcher*, 733 F.3d at 990. As the Fourth Circuit has explained,

"[t]o say that when an order is vacated it is as if the order never existed is a

convenient way of describing the effect of the vacatur." *Bryan v. Bellsouth

Communications, Inc.*, 492 F.3d 231, 241 (4th Cir. 2007). In other words, when an

order is vacated "the result quickly conveys to the parties that the vacatur of the

decision returns the parties to their original positions, before the now-vacated order

was issued." *Id*. Contrary to these principles, after finding CAFA jurisdiction, the

District Court instructed "[t]he Clerk of Court…to close this case forthwith." App.

331.

By dismissing without further consideration, the District Court impermissibly reinstated rulings that were vacated, and i again avoided consideration of relevant authority, including *Bell*, which considered whether the OCC's interpretation of 12 U.S.C. § 92a was reasonable and/or permissible, as well as *Sundquist*, which endorsed *Bell* and added independent bases to support Appellants' position. Both decisions conducted the requisite *Chevron* analysis, something the District Court has continually refused to do. Importantly, the District Court denied Appellants' motions for reconsideration and to amend based, in part, on its conclusion that "Plaintiffs did not make a *Chevron* review argument previously." App. 245. Having been returned to their original position after vacatur, Appellants should have had the opportunity to have the District Court consider their *Chevron* argument, especially in light of *Bell* and *Sundquist*.

The District Court held that "the Tenth Circuit's mandate should [not] be read so broadly." App. 366. The question is not one of breadth, but simply, what does the mandate say. *See Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003) ("a District Court is bound to follow the mandate"). The mandate specifically vacated the District Court's orders. For the District Court to reinstate its orders, without more, was clear error.

### III.   DISMISSAL WAS INAPPROPRIATE BECAUSE PLAINTIFFS' COMPLAINT STATED PLAUSIBLE CLAIMS FOR RELIEF.

The Tenth Circuit recognizes that granting a motion to dismiss is a "harsh remedy, which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986) (citation omitted). This Court reviews a Rule 12(b)(6) dismissal de novo "for plausibility, specifically whether enough facts have been pled to state a plausible claim." *Lemmon*, 614 F.3d at 1167. The Complaint states plausible claims against Appellees for violations of Utah Code Ann. §§ 57-1-21, and -23.5, wrongful foreclosure, and other claims.

The Tenth Circuit upheld the constitutionality of Utah Code Ann. §§ 57-1-21, et seq., as it applies to attorneys/trustees, and observed that "[m]aking it easier for Utahns to meet with trustees, who play a pivotal role in nonjudicial foreclosures, is a legitimate state interest." *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1048 (10th Cir. 2009). Here, it is undisputed that Recon does not qualify as a "trustee" with the "power of sale" under the Utah non- judicial foreclosure statutes. Thus, Appellees moved for dismissal based on preemption. But there is no federal law that supplants Utah's non-judicial foreclosure law.

The Tenth Amendment enshrines federalism into the Constitution, providing that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.

38

Const. amend. X. Title 12 U.S.C. § 92a(a) permits national banks to, *inter alia*, "act as trustee…or in any other fiduciary capacity" <u>only</u> if such actions are "not in contravention of State or local law." And the Supreme Court has reiterated how "[s]tates … have always enforced their general laws against national banks – and have enforced their banking related laws against national banks for at least 85 years." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 534 (2009). The District Court erred in granting Appellees' bootstrapped preemption argument: that 12 C.F.R. § 9.7(d) (2011), promulgated pursuant to the NBA, as construed by the Office of the Comptroller of the Currency ("OCC"), applies to preclude Appellants from seeking recovery for violations of Utah law.

### A. The Court Erred In Dismissing The Complaint Based On Contested OCC Interpretations Without Conducting A *Chevron* Analysis.

The District Court based its dismissal on the OCC's interpretation of § 92a. This was error. Appellants are only aware of two cases, *Bell* and *Sundquist*, where the level of deference to be afforded the OCC's interpretation of § 92a was at issue. In both cases, not only did the courts find that the OCC's interpretation was improper given the unambiguous nature of the statute, but that the OCC's interpretation was undeserving of deference. The District Court has now had at least four opportunities to conduct a *Chevron* analysis, but has refused.

In *Chevron*, the United States Supreme Court **mandated** that courts conduct a two-step analysis whenever an agency's statutory interpretation is at issue.

39

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984);

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81

(2005) (*Chevron* framework governs review of agency interpretation); *Contreras-*

*Bocanegra v. Holder*, 678 F.3d 811, 816 (10th Cir. 2012) ("we employ the two-

step analysis mandated by *Chevron*."). Because the OCC's interpretation of § 92a

was at issue, the District Court should have conducted a *Chevron* analysis.

*National Cable* is instructive.

There, the appellate court declined to apply *Chevron* to assess the FCC's

interpretation of the Federal Communications Act, based on the appellate court's

ruling that the agency's interpretation was "the best." *Nat'l Cable*, 545 U.S. at 984.

The Supreme Court concluded that the lower court "erred in refusing to apply

*Chevron*" because nothing in the prior decision held that the agency's

interpretation was "the *only permissible* reading of the statute." *Id.* Here, there is

nothing even remotely as conclusive concerning the OCC's interpretation of § 92a

upon which the District Court relied. Yet the District Court has failed and refused

multiple times to conduct a *Chevron* analysis. App. 140-156 (failing to conduct

*Chevron*); *id.* 233-237 (refusing to conduct *Chevron*); *id.* 331.

The District Court cannot simply blame Appellants for not raising *Chevron*

in opposition to Defendants' motion to dismiss from 2012. *See* App. 235

("Plaintiffs did not make a *Chevron* review argument previously."). Appellants

40

raised the issue on a motion for reconsideration, after the *Bell* decision. App. 157-66. "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or *the controlling law.*" *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2005) (emphasis added). *Chevron*, and cases like *National Cable* and *Contreras-Bocanegra* are "controlling law," and they mandate application of the *Chevron* framework. *Nat'l Cable*, 545 U.S. at 984; *Contreras-Bocanegra*, 678 F.3d at 816. The failure and later refusal to employ *Chevron* was error.

### B. The District Court Erred In Concluding That Recon Can Conduct Utah Non-Judicial Foreclosures Without Complying With Utah Law.

With *Bell* and now *Sundquist*, Utah's federal district court and its Supreme Court have both held that "[a] national bank seeking to foreclose real property in Utah must comply with Utah law." *Sundquist*, 2013 UT 45 at ¶ 3; *Bell*, 860 F.Supp.2d at 1297. In reaching the opposite, the District Court relied on the OCC's interpretation of 12 U.S.C. § 92a(a), and 12 C.F.R. § 9.7, which *Sundquist* and *Bell* rejected. *Sundquist*, 2013 UT 45 at ¶¶ 39-46; *Bell*, 860 F.Supp.2d at 1308.  But, pursuant to *Chevron*, the District Court should not have deferred to the OCC's interpretations in determining which State's laws applied. *Id.*

i. The OCC's Interpretation Of "State Or Local Law" In § 92a(a) Deserves No Deference Because Congress Has Spoken To The Question At Issue.

Under *Chevron*, the first inquiry is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990). The plain meaning of § 92a(a), as well as the design of the statute as a whole are clear: Congress intended that the applicable "State or local law" is the state where a national bank exercises the fiduciary duties enumerated in 12 U.S.C. § 92a(a), in this case, Utah. Indeed, two courts, *Bell* and *Sundquist*, have considered this precise question, and both courts have concluded that § 92a is unambiguous and dictates that Utah law applies.

Among the several District of Utah cases to address the issues presented here, *Bell* is the only decision that actually applied the necessary *Chevron* framework. *Compare Bell*, 860 F.Supp.2d at 1297, with *Dutcher*, 2012 WL 423379, at *4-*8, *rev'd*, 733 F.3d 980, *Cox*, 2011 WL 835893, *Garrett*, 2011 WL 7657381, *aff'd*, 546 Fed. App'x 736, and *Coleman*, No. 2:10-CV-1099, Dkt 87 at 2. In doing so, *Bell* conducted a thorough analysis of the legislative history, concluding that "Congress did not intend the laws of one State to pre-empt the

42

laws of another State in dealing with a national bank." *Bell*, 860 F. Supp. 2d at 1304; *see also Sundquist*, 2013 UT 45, ¶ 22 ("there is nothing in the text of the NBA to suggest that a national bank may appoint a Texas trustee to foreclose on Utah property"). Rather, "the law that shall apply to a national bank acting as trustee under a trust deed is the local State law, which in this instance is Utah law." *Bell*, 860 F. Supp. 2d at 1304; *see also Sundquist*, 2013 UT 45, ¶ 3 ("A national bank seeking to foreclose real property in Utah must comply with Utah law"). *Bell*'s conclusion is not only supported by the plain meaning of § 92a, but also by the "design of the statute as a whole." *Sullivan*, 494 U.S. at 89.

The Supreme Court has held that "[t]he policy of competitive equality is … firmly embedded in the statutes governing the national banking system." *First Nat. Bank in Plant City, Fla. v. Dickinson*, 396 U.S. 122, 133 (1969). In regards to the grant of fiduciary powers to national banks, the Supreme Court stated: "The policy of equalization was adopted in the [NBA] … [and] the policy is expressed in provisions … conferring power to act as a fiduciary." *Lewis v. Fidelity & Deposit Co. of Maryland*, 292 U.S. 559, 564-65 (1934). In other words, Congress intended "[t]he policy of competitive equality [to be] incorporated into section 92a." *St. Louis Cnty. Nat. Bank v. Mercantile Trust Co. Nat. Ass'n*, 548 F.2d 716, 720 (8th Cir. 1976); *American Trust Co.*, 381 F. Supp. at 323 ("in enacting § 92a, Congress intended to create the same kind of 'competitive equality' with regard to trust

43

services"); *New Hampshire Bankers Ass'n v. Nelson*, 336 F. Supp. 1330, 1334

(D.N.H. 1972) (seeking with the NBA "to keep national banks and state banks on

the same basis of 'competitive equality'").

      To hold otherwise, as the District Court did, completely undermines the

statute's overall purpose of competitive equality as well as the Supreme Court's

holding that "the congressional policy of competitive equality with its deference to

state standards [is not] open to modification by the Comptroller of the Currency."

*Dickinson*, 396 U.S. at 138. The applicable "State or local law" referred to in § 92a

is that of the state where the national bank acts in a fiduciary capacity and the state

in which the national bank actually competes with state banks. *Sundquist*, 2013 UT

45 at ¶ 25.  The facts of this case make this abundantly clear, where every Trust

Deed asserts that Recon is a "substitute" trustee under Utah law, even though it

does not qualify as a trustee under Utah law, App. 184-88 ¶¶ 47, 72, where Recon

publishes notice of a non-judicial foreclosure sale of each Appellant's home as a

purportedly qualified trustee under Utah law, App. 184-85 ¶¶ 48- 50; 188 ¶¶ 73-75,

and where subsequent to the sale of each Utah Property, Recon recorded a

Trustee's Deed in Utah terminating Appellants' ownership interest in the Property

in favor of FNMA, giving FNMA a Trustee's Deed stating that the non-judicial

foreclosure properly complied with the requirements of Utah Code Ann. Title 57 –

recitals that were false given that Recon was admittedly not a duly qualified trustee under Utah law. App. 184 ¶ 50; 188 ¶ 75; Add. 186-87, 204-05.

The District Court's holding promotes a system whereby a national bank can establish its primary place of business in a state with the most bank-friendly foreclosure laws and proceed to foreclose on homeowners across the country in violation of the laws of the other forty-nine states; regardless of how the state banks in those other states are permitted to act. This is the exact system rejected by *First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co.*, 385 U.S. 252 (1966). In *Walker Bank*, the court was asked to address a national bank's ability to "establish and operate new branches." *Id*. at 253. *Walker Bank* held that "Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." *Id.* at 261.  Just as Recon has sought to exercise powers in Utah not afforded Utah financial institutions, the national banks in *Walker Bank* sought to set up branch banks in a manner not afforded to Utah state banks.  *See id*. (arguing that "statute limiting branching solely to the taking over of an existing bank, is not applicable to national banks").

While *Walker Bank* dealt with branch banking, it is still informative on the intent of Congress concerning § 92a.  Just as competitive equality applies to branch banking, it applies to § 92a.  *See Lewis*, 292 U.S. at 565 (equalization is expressed in provisions "conferring power to act as a fiduciary"); *see also St. Louis*, 548 F.2d

45

at 720 ("The policy of competitive equality was incorporated into section 92a.").

In other words, "to allow [a national bank] to accomplish what a state bank could

not would frustrate the purpose of section 92a." *St. Louis*, 548 F.2d at 720; *see also*

*Sundquist*, 2013 UT 45 at ¶ 22 ("[N]othing in the text of the NBA to suggest that a

national bank may appoint a Texas trustee to foreclose on Utah property when a

Utah bank could not do so.").  Surely the same system that was rejected in *Walker*

*Bank* over fifty years ago cannot prevail here.

In sum, *Chevron* requires that the courts, as well as the OCC, "give effect to

the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

Title 12 U.S.C. § 92a(a) plainly states that national banks can only exercise certain

powers "when not in contravention of State or local law." By pursuing foreclosure

sales in Utah, Defendants exercised powers in Utah, which it acknowledged by

explaining how it was proceeding pursuant to Utah law. App. 184 ¶¶ 47-50; 188 ¶¶

73-75; Add. 186-87, 204-05. Accordingly, the applicable "State or local law" was

Utah law. This conclusion is bolstered when competitive equality and the "design

of the statute as a whole" are considered. *Sullivan*, 494 U.S. at 89.

The OCC should have never promulgated 12 C.F.R. § 9.7(d) to elaborate on

which state's laws should apply.  Its interpretation of 12 U.S.C. § 92a(a) should be

afforded no deference.  The District Court's reliance on "the language of 12 C.F.R.

§ 9.7 and the collection of post § 9.7 OCC opinion letters," App. 148, is clear error.

But even if Congressional intent was not clear, independent canons of statutory construction dictate that Utah law applies.

    ii. <u>Canons Of Statutory Construction Reveal Congressional Intent To Apply Utah Law</u>.

The *Sundquist* court identified the first "clear statement canon, which applies where Congress is thought to have legislated in a manner that would 'alter the usual constitutional balance between the States and the Federal Government'…or 'intrude' on a field of traditional state sovereignty." *Sundquist*, 2013 UT 45 at ¶ 31 (citations omitted). Where "Congress 'intends to pre-empt the historic powers of the State or when it legislates in traditionally sensitive areas,'… a clear statement of intention to do so is required." *Id*. ¶ 32 (citations omitted).  Section 92a contains no such "clear statement."  As the *Sundquist* court reasoned:

> A delegation of authority to intrude on matters of such intensely local concern may not simply be inferred.  Rather, a clear statement of an intent to permit the laws of a foreign state to regulate the manner and mode of a foreclosure sale in another state should be required.

*Id*. ¶ 37.

Under the "second clear-statement canon," the Supreme Court has found that "not all ambiguities can reasonably be seen as a legislative delegation to an agency." *Id*. ¶ 33 (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)). There is a difference between "'major questions' of policy and mere 'interstitial matters' of 'daily administration.'" *Id*. With respect to

the former, it is "highly unlikely that Congress would leave the determination of major policy questions to agency discretion, and thus…a clear statement of congressional intent to do so [is required]." *Id*. No such clear statement is found in § 92a. As the *Sundquist* court properly reasoned:

> The matter of authorizing one state to regulate non-judicial sales for the foreclosure of real property in another state would be monumental—hardly the sort of interstitial administrative detail that Congress would likely leave for an agency. Any inference of an intent to leave that to the Comptroller would accordingly require a clear statement of such intent.

*Id*. ¶ 38. This discussion from *Sundquist* helps demonstrate why, even if there was some ambiguity with respect to which state's laws apply, it was not appropriate for the OCC to fill in the gaps.

### iii. OCC Interpretation Of § 92a Deserves No Deference.

The second inquiry under *Chevron* is "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. As explained below, 12 C.F.R. § 9.7(d) is an impermissible construction of § 92a and deserves no deference.

Again, *Bell* and *Sundquist* are instructive. Applying the principle of competitive equality, *Bell* held that "[t]he Comptroller's interpretation of § 92a, as set forth in 12 C.F.R. § 9.7(d), modifies the statute and gives out-of-state national banks a sizeable competitive advantage over their state-chartered counterparts." *Bell*, 860 F.Supp.2d at 1308. This "sizeable competitive advantage" is not in

48

harmony with the principle of competitive equality, and is not a permissible construction of the statute. As previously noted, "to allow [a national bank] to accomplish what a state bank could not would frustrate the purpose of section 92a." *St. Louis*, 548 F.2d at 270; *see Sundquist*, 2013 UT 45 at ¶ 22 (NBA does not "suggest that a national bank may appoint a Texas trustee to foreclose on Utah property when a Utah bank could not").

Section 9.7(d) not only undermines the principle of competitive equality but is also a departure from the OCC's prior interpretation of 12 U.S.C. § 92a. *Bell*, 860 F. Supp. 2d at 1304; *see Sundquist*, 2013 UT 45 at ¶ 43. This unexplained departure is arbitrary and capricious and demonstrates why the OCC's interpretation of § 92a is not entitled to deference.

The Supreme Court has stated that unexplained agency inconsistency can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable*, 545 U.S. at 981. Long before 12 C.F.R § 9.7 was promulgated, the OCC was of the opinion that "a national bank with fiduciary powers may exercise them in another State or country if the bank conforms to the laws of *that jurisdiction*." *American Trust*, 381 F. Supp. at 323 n.16 (emphasis added) (citing Comptroller's Trust Examiners' Manual, Opinion Section, G-1 (1969)). This same opinion was also expressed in the OCC's Interpretive Letter No. 695, wherein the OCC stated "section 92a authorizes national banks to offer

fiduciary services in multiple states, but then conditions the exercise of that power within each state *on a state-by-state* basis." Interpretive Letter No. 695, 1996 WL 187825 (December 8, 1995).

Prior to the promulgation of 12 C.F.R. § 9.7(d), the OCC was of the opinion that "State or local law" referred to the laws of any state wherein a national bank sought to offer fiduciary services; not just the state wherein the national bank "accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets." 12 C.F.R. § 9.7(d). The OCC was never of the opinion that if a national bank acted in a fiduciary capacity in multiple states, the national bank could "designate[] from among those states," 12 C.F.R. § 9.7(d), which "State or local law" should apply.  Further, as the *Bell* court notes, "how the Comptroller decided to limit the above-listed activities as the trustee's core fiduciary functions, excluding the liquidation or disposal of trust assets, is nowhere explained." *Bell*, 860 F. Supp. 2d at 1307. Such a lack of explanation is also arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) ("an agency must cogently explain why it has exercised its discretion in a given manner"); *Sundquist*, 2013 UT 45 at ¶ 42.

In sum, the OCC's interpretation set forth in 12 C.F.R. § 9.7(d) not only undermines "[t]he policy of competitive equality [that] is … firmly embedded in

50

the statutes governing the national banking system," *Dickinson*, 396 U.S. at 133, it is also an unexplained and impermissible departure from prior agency interpretation. *See Nat'l Cable*, 545 U.S. at 981. Section 9.7(d) is not entitled to any deference under *Chevron*. The only permissible construction of § 92a promotes, rather than hinders, competitive equality: "a national bank with fiduciary powers may exercise them in another State or country if the bank conforms to the laws of that jurisdiction." *American Trust*, 381 F. Supp. at 323 n.16. The District Court's reliance on the OCC's interpretation was error and must be reversed.

### C. The District Court Erred In Holding That Recon Competes With Utah Title Companies For Purposes Of Section 92a.

In addition to allowing national banks to act in a fiduciary capacity "when not in contravention of state or local law," § 92a also permits national banks to act in a fiduciary capacity "[w]henever the laws of such State authorize or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks." 12 U.S.C. § 92a(b). Pursuant to the Utah Code, among the parties who can act as a trustee of a trust deed is "any title insurance company." Utah Code Ann. § 57-1-21(1)(iv). The District Court found that "Utah title companies compete with Recon." App. 149. But this was error.

"[N]o word in a statute should be construed to be superfluous." *United States v. Doe*, 572 F.3d 1162, 1167 (10th Cir. 2009). In finding that "Utah title

companies compete with Recon," App. 149, the District Court relied on a dictionary definition of the word "compete." App. 149 n.35. But that renders the phrase "by State banks, trust companies, or other corporations which compete with national banks," superfluous. 12 U.S.C. § 92a(b). The District Court reasoned that parties can specialize in any number of different areas, but when they "get together for badminton, they are properly described as badminton competitors." App. 149. In other words, no matter a party's area of business, once it undertakes an activity enumerated in 12 U.S.C. § 92a(a) to any degree, it automatically competes with national banks. But this is not what Congress intended.

If Congress meant to adopt this meaning of "compete," then it would not have included the phrase "by State banks, trust companies, or other corporations which compete with national banks." 12 U.S.C. § 92a(b). Instead, it would have inserted a phrase like "parties which compete with national banks." It would have been unnecessary for Congress to include "State banks" and "trust companies" because the party's identity would be irrelevant. As long as the party "picked up a badminton racket," it would be in competition, regardless of whether it was a State bank, a trust company, or otherwise. Tellingly, the District Court failed to include "active member[s] of the Utah State Bar" as those who compete with national banks. Utah Code Ann. § 57-1-21(1)(a)(i). Indeed, the notion that Utah attorneys compete with national banks is absurd, even if they do exercise the power of sale

52

from time to time. Rather than the overly broad approach adopted by the District Court, Congress intended 'compete' to mean something more than a "baseball,… football, and … basketball" player "get[ting] together for badminton." App. 149.

A second canon of statutory construction is that "words grouped in a list should be given related meaning." *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 9 (1985). The competition clause at issue contains the list "State banks, trust companies, or other corporations which compete with national banks." 12 U.S.C. § 92a(b). Therefore, what constitutes "other corporations which compete with national banks" should be informed by the inclusion of "State banks" and "trust companies" in the list. Rather than refer to any random entity that competes with national banks, Congress specifically referred to "State banks" and "trust companies." 12 U.S.C. § 92a(b). In contrast to corporations like title companies, state banks and trust companies are heavily engaged in the powers enumerated in § 92a(a). State banks and trust companies do not incidentally engage in the enumerated powers, but the enumerated powers are the basis for their day-to-day business activities.

As *Bell* explained, "[Recon] is not in competition with a title insurance company, … [and] the statutes prohibit a bank from engaging in title insurance activity." *Bell*, 860 F. Supp. 2d at 1309; *see Sundquist*, 2013 UT 45 at ¶ 16 ("As a national bank, ReconTrust competes with Utah banks. It is not subject to

53

competition from either members of the Utah State Bar or Utah title insurance companies."). It was not Congress's intent that any corporation, as long as it dabbled in one of the enumerated powers, would be deemed to compete with national banks. This is demonstrated by *First Nat. Bank v. City of Hartford*, 273 U.S. 548 (1927).

In *City of Hartford*, the Supreme Court addressed competition with national banks in the context of taxation. Essentially, national banks in a state could not be taxed "at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state." 273 U.S. at 551. Like the competitive equality inherent in § 92a, the statute at issue in *City of Hartford* "was intended to prevent the fostering of unequal competition with the business of national banks." *Id*. at 558. In determining exactly what constituted 'competition' with national banks, the Supreme Court continually referred to "substantial" competition. *See id*. But "[u]nless the moneyed capital is in substantial competition with the business of national banks, the preference is innocent in aim and harmless in result." *Schuylkill Trust Co. v. Commonwealth of Penn.*, 296 U.S. 113, 131 (1935).

In contrast with the District Court, when it comes to national banks, the Supreme Court has not been willing to declare any party that "picks up a badminton racket" to be in competition. Something more is required. This is precisely why Congress included the terms "State banks" and "trust companies"

54

together with the term "other corporations which compete." At the very least, the

District Court should be required to make factual findings regarding the extent to

which Utah title companies engage in the powers enumerated by 12 U.S.C. § 92a.

The District Court made no such findings in its order dated February 8, 2012, or

later orders, but merely assumed that Utah title companies "drum[] up foreclosure

trustee business" and are therefore in competition with national banks. App. 149.

The District Court's finding that title companies compete with national banks was

error.  App. 149.

## IV.    IT WAS ERROR TO DISMISS WITH PREJUDICE BASED ON THE DISPUTED CONCLUSION THAT RECONTRUST WAS LOCATED IN TEXAS.

Finally, the District Court erred in dismissing the Complaint with prejudice,

and in denying Appellants' motion for leave to amend. In significant part, the

District Court's order was based in the assumption that Recon was "acting in a

fiduciary capacity in Texas and merely servicing that relationship by conducting

foreclosure sales in Utah." App. 146. The District Court concluded that Appellants

"alleged no contrary facts bearing on where the relevant events took place," and

rather "placed their faith in fervent repetitions of the conclusion that Recon was

acting as a fiduciary in Utah." App. 147.

The District Court based its decision on the fact that the Substitution of

Trustee and Notice of Default were signed in Texas, with Texas addresses listed

for return mail. But it ignored completely the facts Appellants alleged to show that the supposed fiduciary documents were meaningless to create a relationship until those documents were *recorded in Utah*. While ministerial actions may have been performed in Texas, the underlying Trust Deeds were clearly products of the state of Utah. They were executed in Utah, SOF ¶ 2, recorded in Utah, *id*. ¶ 3, and the "Applicable Law" governing the Trust Deeds was Utah law. *Id*. ¶ 5. Finally, all notices, including those related to the exercise of the power of sale, were to be mailed to the property addresses located in Utah, *id*. ¶ 6, and the actual exercise of the power of sale occurred in Utah.

The analysis is not as simple as concluding, as the District Court did, that Recon "exercised the power of sale in Utah," which is not determinative. App. 147. Given that these arguments arise in the context of a motion to dismiss, the Court must assume that Appellants' allegations are true, and determine whether they state a plausible claim for relief. *Twombly*, 550 U.S. at 547. The District Court was wrong to characterize the Complaint, which referred to actual title documents, as "'naked assertion[s]' devoid of 'further factual enhancement.'" App. 147 (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). At a minimum, it should have given Appellants the opportunity to amend their Complaint. *Triplett v. LeFlore County*, 712 F.2d 444, 446 (10th Cir. 1983) ("In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely 'if it appears at all

possible that the plaintiff can correct the defect.'" (citing 3 Moore's Federal Practice, ¶ 15.10 & n.2 (1983)).

## CONCLUSION

For the reasons stated, the Court should reverse and again vacate the rulings of the District Court.  This case should be remanded to the Utah state court where it was originally filed.  Alternatively, the dismissal of the underlying action should be reversed and this case allowed to proceed on the merits.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Appellants respectfully request oral argument in this matter.  This case presents important issues for which there is a split among Utah's federal district judges, as well as the Utah Supreme Court, on the proper outcome.  The parties previously requested and were granted oral argument in *Dutcher I*.  Oral argument will again assist the Court and should be granted in this case.

Respectfully submitted,

/s/ Marcus R. Mumford
Marcus R. Mumford
MUMFORD PC
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
(801) 428-2000
mrm@mumfordpc.com

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

> [**X**] this brief contains 13,753 words, excluding the parts of the brief
> exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> [  ] this brief uses a monospaced typeface and contains <state the number
> of> lines of text, excluding the parts of the brief exempted by Fed. R. App.
> P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [**X**] this brief has been prepared in a proportionally spaced typeface using
> Microsoft Word 2010 in Times New Roman, 14 point font, or

> [  ] this brief has been prepared in a monospaced typeface using <state name
> and version of word processing program> with <state number of characters
> per inch and name of type style>.

Date: November 25, 2014

/s/ Marcus R. Mumford
Marcus R. Mumford
Attorney for Plaintiffs-Appellants
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
mrm@mumfordpc.com
(801) 428-2000

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Security Essentials, Version 4.6.305.0, last updated November 25, 2014, and according to the program are free of viruses.

/s/ Marcus R. Mumford

{signature of counsel}

59

# CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014 I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Craig Mariger
cmariger@joneswaldo.com

*Attorney for Stuart T. Matheson and*
*Matheson, Mortensen, Olsen & Jeppson, PC*

Amy Miller
amiller@mcguirewoods.com
Brian Pumphrey
bpumphrey@mcguirewoods.com

*Attorneys for Stuart T. Matheson;*
*Matheson, Mortensen, Olsen & Jeppson, PC;*
*ReconTrust Co., N.A.; BAC Home Loans*
*Servicing; and Bank of America, N.A.*

Date: November 25, 2014

/s/ Marcus R. Mumford
Marcus R. Mumford
Attorney for Plaintiffs-Appellants
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
mrm@mumfordpc.com
(801) 428-2000

**CASE NO. 14-4085**

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT


| | |
|---|---|
| | ) |
| RICHARD AND GWEN DUTCHER, et al., | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| v. | ) |
| | ) |
| STUART T. MATHESON, et al., | ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |

---

On Appeal from the United States District Court
For the District of Utah, Central Division
Honorable Judge Ted Stewart D.C.
No. 2:11-cv-00666-TS

---

**ATTACHMENTS TO OPENING BRIEF**

---

# ATTACHMENT 1

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RICHARD AND GWEN DUTCHER, RICHARD AND MICHELLE FERGUSON, and CATHERINE RICHARD AHLERS, on their own behalf and on behalf of a class of similarly situated persons, | |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS |
| vs. | |
| STUART T. MATHESON; MATHESON, MORTENSEN, OLSEN & JEPPSON, P.C.; RECONTRUST COMPANY, N.A.; BAC HOME LOANS SERVICING LP; and BANK OF AMERICA, N.A., | Case No. 2:11-CV-666 TS |
| Defendants. | |

This matter is before the Court on Defendants Stuart T. Matheson; Matheson, Mortensen, Olsen & Jeppson, P.C.; ReconTrust Company, N.A.; BAC Home Loans Servicing LP; and Bank of America, N.A.'s (collectively "Defendants") Motion to Dismiss.  Also before the Court are Plaintiffs Richard and Gwen Dutcher, Richard and Michelle Ferguson, and Catherine Richard Ahlers's Motion to Remand and *Ex Parte* Application for Temporary Restraining Order and Motion for Preliminary Injunction.  For the reasons set forth below, the Court will grant

Defendants' Motion to Dismiss and deny Plaintiffs' Motion to Remand and *Ex Parte* Application for Temporary Restraining Order and Motion for Preliminary Injunction.

## I.  BACKGROUND

Defendant ReconTrust Co. ("Recon") is a national banking organization that has been granted fiduciary powers by the Office of the Comptroller of Currency ("OCC").  Pursuant to that power, Recon has acted as a foreclosure trustee during non-judicial foreclosure sales in Utah. Plaintiffs are Utah residents whose homes have been subject to foreclosure sales managed by Recon.

Defendant Stuart Matheson is a licensed attorney in Utah.  Defendant Matheson Mortensen Olsen & Jeppson, P.C. ("MMOJ") is a law firm located in Utah at which Mr. Matheson is employed.

In their Complaint, Plaintiffs assert six causes of action against Recon, each based on a central claim—that Recon did not have authority to conduct a trustee sale because it was not an authorized trustee under Utah law.  The six claims are: (1) violation of Utah Code. Ann. 57-1-23.5; (2) violation of Utah Code Ann. 57-1-21; (3) conversion; (4) wrongful lien; (5) wrongful foreclosure; and (6) intentional infliction of emotional distress.

## II. DISCUSSION

The National Bank Act—12 U.S.C. § 92a(a)—gives the Comptroller of Currency authority to "grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee . . . or any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with

national banks are permitted to act *under the laws of the State in which the national bank is located*."[1]   Section (b) provides that

> [w]henever the laws of such State authorize or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this section.

Recon has been granted authority to exercise fiduciary powers by the Comptroller of Currency. In doing so, Recon must comply with the laws of the state in which it is "located."   But to the extent those state laws allow banks, trust companies, or other institutions that compete with Recon to perform fiduciary duties, Recon is allowed to perform the same functions even if state law prohibits Recon from doing so.

The OCC has issued a regulation interpreting these provisions—12 C.F.R. § 9.7.   That regulation states that a bank is located in, and thus governed by the laws of, the state where it "acts in a fiduciary capacity."[2]   A bank "acts in a fiduciary capacity in the state in which it accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets."[3]

In order to decide whether Recon acted with authority in the foreclosure sales at issue here, the Court must first determine where Recon is located for purposes of the associated fiduciary relationships.   The Court then must decide whether the laws of that state permit Recon

---

[1]12 U.S.C. 92a(a) (emphasis added).

[2]*Id.* § 9.7(d).

[3]*Id.*

to act as a foreclosure trustee, or if they permit state banks, trust companies, or institutions that compete with Recon to exercise such power.

As a threshold argument, Plaintiffs have contended that this Court lacks jurisdiction over this case because it arises under Utah state law.  Thus, the Court must first determine whether it has jurisdiction.

A.     MOTION TO REMAND

Defendants' notice of removal relies on either the Class Action Fairness Act or diversity jurisdiction as the grounds for this Court's jurisdiction.  However, a different ground for jurisdiction is found in a recent decision from this Court—*Cox v. ReconTrust Co., N.A.*[4]  In *Cox*, the Court noted that

> under [the National Banking Act], a state law claim challenging a national bank's ability to serve as trustee is completely preempted. . . . Congress intended that state law challenges to the authority of national banks to carry out specific trustee powers could be removed to federal court.
> . . . .
> [T]wo things are clear.  First, Congress intended that state law should define the limits of the trust powers that a national bank may exercise in a state.  Second, even though state law sets the limits, federal statute will ultimately be the source of the answer to the question of whether a national bank is properly exercising a state law trustee power in a state.  Because federal statute answers the controlling question, and because Congress granted the trustee powers in the first place, the court concludes that Congress intended that challenges to a national bank's activities as a trustee should be heard in federal court.[5]

---

[4]2011 WL 835893 (D. Utah Mar. 3, 2011).

[5]*Id.* at *4-5.

4

Furthermore, the Court finds that even if the issue were not properly considered a federal question, the Court would still have diversity jurisdiction because Plaintiffs have fraudulently joined the only Defendants with the potential to defeat diversity—Matheson and MMOJ.

"Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity."[6]  The doctrine of fraudulent joinder provides that "joinder of a resident defendant . . . against whom there is in fact no cause of action, will not defeat removal."[7]  The Tenth Circuit considered the doctrine of fraudulent joinder in the case of *Montano v. Allstate Indemnity*.[8]  The court held that:

> The case law places a heavy burden on the party asserting fraudulent joinder.  A representative example states: To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against the joined party in state court.  In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party.  We are then to determine whether that party has any possibility of recovery against the party whose joinder is questioned.[9]

Accordingly, to decide whether Matheson and MMOJ were fraudulently joined, the Court must determine whether Plaintiffs have any chance of recovering against them.  If there is such a chance, then Matheson and MMOJ are not fraudulently joined and the Court would not have diversity jurisdiction in this case.

---

[6]*Purdy v. Starko, Inc.*, 2010 WL 3069850, at *2 (D. Utah Aug. 4, 2010) (quoting *Kan. State Univ. v. Prince*, 673 F. Supp. 2d 1297, 1294 (D. Kan. 2009)).

[7]*Roe v. Gen. Life Ins. Co. & Phillips Petroleum Co.*, 712 F.2d 450, 452 (10th Cir. 1983) (citing *Dodd v. Fawcett Publ'ns, Inc.*, 329 F.2d 82, 85 (10th Cir. 1964)).

[8]211 F.3d 1278 (10th Cir. 2000) (unpublished).

[9]*Id.* at *1 (quoting *Hart v. Bayer Corp.*, 199 F.3d 239, 246 (5th Cir. 2000)).

5

Plaintiffs claim that, beyond their role as agents for Recon, Matheson and MMOJ are independently liable for their "intentional torts and violations of Utah statutory law." As to the Utah statutory claims, the Court finds that Matheson and MMOJ were acting as agents for Recon, which purported to be the successor trustee, and thus were not truly exercising the "power of sale." Instead, Recon was exercising the power of sale through its agents. As the Utah Supreme Court noted in *Oxendine v. Overturf*,[10] it is well established that "an attorney [cannot] be held liable to a non-client absent fraud, collusion or privity of contract."[11] Thus, there must be some showing of independent misbehavior on Matheson or MMOJ's part, apart from their execution of their principal's wishes.

Plaintiffs have alleged a fraud/collusion claim, but have not supported it with adequate allegations. Plaintiffs state that it is "clear that Matheson and MMOJ have colluded with the other Defendants to do something forbidden by Utah law," that they "knew that Bank of America and ReconTrust were acting as the designated successor trustees without complying with Utah law," and that they are "the critical end players in a complex financial scheme orchestrated with ReconTrust and BAC and/or Bank of America to circumvent Utah law and take homes from Utah homeowners."[12] None of these statements is supported by a citation to the record. Such conclusory language, no matter how strong or how pervasive, will not suffice on its own.

---

[10] 973 P.2d 417 (Utah 1999).

[11] *Id.* at 421. The *Oxendine* court did recognize that the rule has ben slightly relaxed, but only to the extent that some third parties to an attorney client relationship may have a cause of action if it is clear that the attorney client agreement was intended to benefit the third party.

[12] Docket No. 33, at 3-4.

Completely absent from Plaintiffs' submissions is any factual material showing some intent, independently held by Matheson and MMOJ, to engage in a business they knew was contrary to law or fraudulent.  While it is the case that an independent fraud claim could be brought against a party such as Matheson or MMOJ if there was factual support, here the complete lack of supported allegations suggests that Plaintiffs were more interested in defeating diversity than pleading an adequate claim.

In light of the above, a claim against Matheson and MMOJ based on either tort or Utah law must fail.  It follows that both parties were fraudulently joined and thus cannot defeat diversity.  Therefore, based on either federal question or diversity jurisdiction, the Court will deny Plaintiffs' Motion to Remand.

B.      MOTION TO DISMISS

Because the argument that Recon is not authorized to act as foreclosure trustee is central to Plaintiffs' claims, the Court must determine which state's law it should apply in deciding whether Recon had such authority.  "[T]he state laws that apply to a national bank's fiduciary activities by virtue of 12 U.S.C. 92a are the laws of the state in which the bank acts in a fiduciary capacity."[13]

> A national bank acts in a fiduciary capacity in the state in which it accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets.  If these activities take place in more than one

---

[13]12 C.F.R. § 9.7(d).

> state, then the state in which the bank acts in a fiduciary capacity for section 92a
> purposes is the state that the bank designates from among those states.[14]

Thus, in this case, if Recon accepted its appointment as trustee in Utah, executed the substitution

of trustee documents in Utah, and made decisions about trust assets in Utah, then Utah law

applies.  Recon argues, however, that all such activity took place in Texas, and therefore Texas

law should apply.  The Court must determine where Recon is located.  Once that determination is

made, only the law of the location state applies.  "Except for the state laws made applicable to

national banks by virtue of 12 U.S.C. 92a, state laws limiting or establishing preconditions on the

exercise of fiduciary powers are not applicable to national banks."[15]

The issue of which state law applies to Recon's foreclosure trusteeships in Utah has now

been considered by three different judges in this Court, and their conclusions have varied.  In

*Cox*, the court held that Utah law applied.  Based on "a straight forward reading of § 92a(b),"[16]

*Cox* rejected the authorities that Recon relied on (which are largely the same authorities Recon

relies on in the instant case) as inapplicable because they "contemplate a bank providing trust

services to banking customers in a certain state, but acting in several states as part of providing

those services.  Here, in contrast, ReconTrust is conducting foreclosure activities on behalf of

Bank of America in several states, including Utah.  Defendants' authorities are therefore not

---

[14]*Id.*

[15]*Id.* § (e).

[16]2011 WL 835893, at *6.

persuasive."[17]  *Coleman v. ReconTrust Co.*, decided a short time later, relied on *Cox* to reach the same conclusion.[18]

In *Garrett v. ReconTrust Co.*,[19] the court came to the opposite conclusion.  Relying on the same statute and interpretive regulation, the court reasoned:

> Section 92a of the NBA ties the state law at issue in this case to where the national bank is "located."  Additionally, the OCC has interpreted that phrase to mean a national bank is "located" only where it "acts in a fiduciary capacity." ReconTrust performs all fiduciary duties at issue in this case in Texas.  The OCC regulations define acting in a fiduciary capacity as "the state in which it accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets."
>
> Here, ReconTrust performs the functions specified in this regulation for Utah properties in Texas.  Therefore, the state laws that apply to ReconTrust by virtue of Section 92a are those of Texas, rather than Utah.  Since Texas law permits national banks to act as trustee under the deeds of trust and to exercise the power of sale with regard to such deeds of trust ReconTrust is not "acting in contravention of State Law" of the state in which it is "located" for purposes of 12 U.S.C. § 92a and 12 C.F.R. § 9.7 when it performs trustee sales with respect to Utah properties.[20]

This Court must now determine which analysis to adopt.  In so doing, the Court notes that this is a close issue.  However, having fully considered the cases, as well as the arguments advanced by the parties, the Court finds that the reasoning of *Garrett* more persuasive.  Both the language of 12 C.F.R. § 9.7 and the collection of post § 9.7 OCC opinion letters on the issue indicate that Texas law should inform the application of the NBA to Recon in this case.

---

[17]*Id.*

[18]Docket No. 37 Ex. A.

[19]2:11-cv-763, Docket No. 9.

[20]*Id.* at 3-4 (citations omitted).

In an OCC opinion letter issued in 2008, the OCC clarified that a bank's location is determined with reference to the specific fiduciary relationship in question:

> the relevant law is the law of the state in which the national bank acts, or proposes to act, in a fiduciary capacity. . . . [T]he state in which the bank acts in a fiduciary capacity for any given fiduciary relationship is the state in which the bank performs the core fiduciary activities of accepting fiduciary appointments, executing documents that create the fiduciary relationship, or making decisions regarding the investment or distribution of fiduciary assets.  For each fiduciary relationship, a national bank will refer to only one state's laws for purposes of defining the extent of its fiduciary powers pursuant to Section 92a.[21]

Thus, for each deed of trust in question here, the Court must determine where Recon was performing the relevant fiduciary acts.  This location is not determined by where the customer resides or where the property that is subject to the deed of trust is located: "once the state in which a [trust company] is acting in a fiduciary capacity is identified, the fiduciary services may be offered regardless of where the fiduciary customers reside or where the property that is being administered is located."[22]  Thus, the physical location of the foreclosure sale managed by Recon is not in itself indicative of Recon's "fiduciary location."

Relying on *Cox*, Plaintiffs argue the OCC letters are inapplicable to Recon because they "contemplate a bank providing trust services to banking customers in a certain state, but acting in

---

[21]OCC Interpretive Letter 973, Docket No. 19 Ex. H, at 3.

[22]OCC Interpretive Letter 1103, Docket No. 19 Ex. G, at 3.  *See also* OCC Interpretive Letter 1106, Docket No. 19 Ex. K, at 2-3 ("Once the state in which a national bank is acting in a fiduciary capacity is identified, the fiduciary services may be offered regardless of where the fiduciary customers reside or where property that is being administered is located . . . . [W]ith the exception of those state laws specifically referenced in Section 92a, any state laws limiting or establishing preconditions on the exercise of fiduciary powers by a national bank are not applicable to national banks.").

several states as part of providing those services.  Here, in contrast, ReconTrust is conducting

foreclosure activities on behalf of Bank of America in several states, including Utah."[23]  Recon

may be both "acting in a fiduciary capacity" and foreclosing in Utah, in which case the language

Recon relies on in the OCC letters would not be applicable.  Conversely, it may be that Recon is

acting in a fiduciary capacity in Texas and merely servicing that relationship by conducting

foreclosure sales in Utah.  In such a case, the language clearly would apply.  However, before

making such a determination, the key facts relevant to Recon's location as to these fiduciary

relationships must be analyzed.  By merely stating that the language is inapplicable without

engaging in such an analysis, Plaintiffs have put the cart before the horse.[24]

      To determine where Recon is located as to the fiduciary relationships in question, the

Court must ascertain: (1) where Recon accepted its fiduciary appointment; (2) where Recon

executed the documents creating the relationship; and (3) where Recon makes its discretionary

decisions regarding the investment or distribution of the fiduciary assets.[25]  Several documents

submitted by Recon are helpful on this point.  The substitution of trustee documents as to these

properties were signed by the beneficiary bank in Texas, and Recon lists a Texas address for

---

[23]*Cox*, 2011 WL 835893, at *6.

[24]Plaintiffs also argue that OCC Letter 695 contradicts Recon's position.  Whatever the proper interpretation of this letter may be, the letter was written in 1995, six years before 12 C.F.R. § 9.7(d)—the provision that definitively addresses the issue of location—was promulgated. Accordingly, it should not be read to contradict later letters that address the issue of location relying on § 9.7(d).

[25]12 C.F.R. § 9.7(d).

return mail.[26]  Furthermore, the notices of default executed by Recon were signed and notarized

in Texas and had Texas return addresses.[27]  These facts are uncontested and tend to establish that

Recon was making its foreclosure decisions, as well as accepting its appointments, in Texas.

Considering the same facts, *Garrett* reached the same conclusion.

In response, Plaintiffs have alleged no contrary facts bearing on where the relevant events

took place.  Rather, they have placed their faith in fervent repetitions of the conclusion that

Recon was acting as a fiduciary in Utah.  This leaves the Court with the sole fact that Recon

exercised the power of sale in Utah, which is far from determinative.  Given that the parties

arguments arise in the context of a motion to dismiss, the Court's role is to determine whether,

assuming all Plaintiffs' allegations are true, Plaintiff has stated a plausible claim for relief.[28]

Because Plaintiffs have offered no evidence indicating that Recon accepted its appointment,

executed the acceptance documents, or made fiduciary decisions in Utah, the Court finds that

Plaintiffs' accusations are "'naked assertion[s]' devoid of 'further factual enhancement,'"[29] and

thus fatally insufficient.  Accordingly, the Court finds that Recon was located in Texas as to the

fiduciary relationships in question here.

Having determined that Recon is located in Texas, the Court must now determine

whether Recon has complied with Texas law, and only Texas law—any purported violation of

---

[26]Docket No. 19 Ex. D.

[27]*Id.* Ex. E.

[28] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[29] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

Utah law is thus irrelevant at this stage.[30]  Plaintiffs do not dispute that Texas law allows Recon

to act as a foreclosure trustee.  Furthermore, *Garrett* concluded that Texas law authorized Recon

to do so: "Texas law permits national banks to act as trustee under the deeds of trust and to

exercise the power of sale with regards to such deeds of trust."[31]  Accordingly, the Court finds

that Recon did not violate Texas law by acting as foreclosure trustee in Utah and has therefore

not violated sections 92a(a) or (b) of the NBA.

Furthermore, even if Texas law does not apply, the Court finds that Recon has still acted

in compliance with the NBA.  As noted above, the NBA allows the Comptroller of Currency to

authorize national institutions to perform trust duties in a state as long as (1) not in contravention

of state law and (2) the state allows state banks, trust companies, or other companies that

compete with national banks to exercise those powers.[32]  The Act goes on to state that

> [w]henever the laws of such State authorize or permit the exercise of any or all of
> the foregoing powers by State banks, trust companies, or other corporations which
> compete with national banks, the granting to and the exercise of such powers by
> national banks shall not be deemed to be in contravention of State or local law
> within the meaning of this section.[33]

---

[30]12 C.F.R. § 9.7(e) ("Except for the state laws made applicable to national banks by
virtue of 12 U.S.C. 92a, state laws limiting or establishing preconditions on the exercise of
fiduciary powers are not applicable to national banks.").

[31]*Garrett v. ReconTrust Co.*, 2:11-cv-763, Docket No. 9, at 3.

[32]12 U.C.A. § 92a(a).

[33]*Id.* § (b).

Utah law allows title companies and attorneys to act as non-judicial foreclosure trustees.[34]

Accordingly, if title companies or attorneys compete with national banks, then Recon is entitled

to exercise the same power, even if Utah state law expressly forbids it.

      The Court finds that Utah title companies compete with Recon.  Recon holds itself out as

a provider of foreclosure trustee services in Utah, as is readily obvious from the fact that the basis

for this suit is Recon's provision of those services.  It follows that a Utah title company that

offers the same services is in direct competition with Recon.  Accordingly, Recon is entitled to

the same privileges as a Utah title company.  Plaintiffs' argument that Recon does not compete

with title companies because federal law prohibits national banks from selling title insurance

assumes too broad a definition of "compete."  The Court does not read "compete" to require

competition between two entities in every aspect of their business, or even in their primary

businesses.  Rather, the Court finds that "compete" should be given its ordinary definition: an

attempt by two or more parties, engaged in the same activity, to exceed each other's

performance.[35]  While one party may spend most of its time playing baseball, another football,

and another basketball, whenever the three get together for badminton, they are properly

described as badminton competitors.  In the same manner, whatever Recon's or Utah title

companies' other activities, when drumming up foreclosure trustee business, they are "in

competition."

---

[34]Utah Code Ann. § 57-1-21(3).

[35]*See* The New Oxford American Dictionary 354 (3d ed. 2010) (defining "compete" as "strive to gain or win something by defeating or establishing superiority over others who are trying to do the same").

There is some question as to whether a finding that Recon competes with Utah title companies (a) merely entitles Recon to perform trustee sales in Utah but does not excuse it from the responsibilities imposed upon its competitors by Utah Code Ann. 57-1-21 or (b) grants Recon blanket authority to perform trustee sales regardless of the state law requirements for doing so. Under § 57-1-21, a title company is only permitted to exercise the power of sale if it "(A) holds a certificate of authority or license under Title 31A, Insurance Code, to conduct insurance business in the state; (B) is actually doing business in the state; and (C) maintains a bona fide office in the state."[36]

In resolving this issue, the Court finds that the NBA's use of the word "exercise" is telling. The statute authorizes "the *exercise*" of trust powers by a national bank as long as a national bank competitor is granted the same powers. Exercise, used as a verb, means "use or apply (a faculty, right, or process)."[37] The word thus sweeps in both the right to the power (use) as well as the mode of its execution (application). In other words, the NBA allows banks not just the privilege to exercise trust power, but also deems the manner of its exercise to be "not in contravention of state law."[38] Thus, Recon is not violating Utah Code Ann. § 57-1-21 by either (1) performing trustee sales or (2) failing to comply with the requirements imposed on Utah title companies performing such sales.

---

[36]Utah Code Ann. § 57-1-21(1)(a)(iv), (3).

[37]The New Oxford American Dictionary 606 (3d ed. 2010).

[38]12 U.C.A. § 92a(b).

Accordingly, the Court finds that regardless of whether the NBA incorporates Utah or Texas law, Recon has not operated beyond the law by acting as a foreclosure trustee in Utah.

So holding dispenses of all six of Plaintiffs' claims.  Plaintiffs' first two claims are based on an application of Utah trust law.  Because Texas law applies, Utah law is irrelevant. Furthermore, even if Utah law were to apply, it would only apply as incorporated through the NBA.  Plaintiffs' state trust law contentions would thus be irrelevant in the face of the Court's finding that Recon has not violated the NBA.  Plaintiffs' conversion, wrongful lien, and wrongful foreclosure claims are predicated on the theory that Recon had no authority to act as foreclosure trustee under Utah trust law, and are thus similarly futile.  Finally, Plaintiffs' intentional infliction of emotional distress claim fails because it is based on Plaintiffs' theory that the Defendants colluded to engage in criminal behavior, and that this criminal behavior was "extreme and outrageous."  This theory, tenuous as it is to start, crumbles upon a finding that Defendants' actions were authorized by law.  Accordingly, the Court will grant Defendants' Motion to Dismiss as to all claims.

C.      OTHER MOTIONS

Plaintiffs have also filed a motion for a temporary restraining order and/or preliminary injunction prohibiting Recon from engaging in foreclosure trustee activities in Utah, as well as a motion for class certification for those similarly situated to Plaintiffs.  In light of the analysis above, both motions are moot and therefore the Court will deny them.

Appellate Case: 14-4085   Document: 01019346461   Date Filed: 11/25/2014   Page: 89

III.  CONCLUSION

In light of the foregoing, the Court will grant Defendants' Motion to Dismiss, deny

Plaintiffs' Motion to Remand, and deny Plaintiffs' *Ex Parte* Application for Temporary

Restraining Order and Motion for Preliminary Injunction as moot.  The hearing set for this matter

is stricken.  It is therefore

ORDERED that Plaintiffs' Motion to Remand (Docket No. 20) is DENIED. It is further

ORDERED that Defendants' Motion to Dismiss (Docket No. 18) is GRANTED. It is

further

ORDERED that Plaintiffs' *Ex Parte* Application for Temporary Restraining Order and

Motion for Preliminary Injunction (Docket No. 25) and Plaintiffs' Motion to Certify Class

(Docket No. 28) are DENIED AS MOOT.  The Clerk of the Court is directed to close this case

forthwith.

DATED   February 8, 2012.

BY THE COURT:

_____

TED STEWART
United States District Judge

17

# ATTACHMENT 2

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| RICHARD DUTCHER, et al.,<br><br>Plaintiffs,<br><br><br>vs.<br><br>STUART T. MATHESON, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING ALL PENDING MOTIONS<br><br><br><br><br>Case No. 2:11-CV-666 TS |

This matter is before the Court on (1) Plaintiffs' Motion for Reconsideration, or, in the Alternative, to Alter or Amend Judgment,[1] (2) Plaintiffs' Motion for Leave to Amend,[2] and (3) the State of Utah's Motion to Intervene.[3]  For the reasons set forth more fully below, the Court will deny the Motions.

---

[1]Docket No. 54.

[2]Docket No. 56.

[3]Docket No. 51.

## I.  BACKGROUND

The facts of this case are fully set out in the Court's Order dated February 8, 2012,[4] and the Court will not repeat them here.  In that Order, the Court addressed whether the National Bank Act required Defendant ReconTrust to comply with either Utah or Texas law when performing non-judicial foreclosures in Utah.  The Court found that (1) Texas law applied and (2) even if Utah law applied, ReconTrust was still authorized to perform foreclosures under the National Bank Act because it was in competition with title companies.

Shortly after the Court issued its opinion, another judge of this Court considered the same questions with respect to ReconTrust in *Bell v. Countrywide Bank NA*[5] and reached the opposite result.  Plaintiffs filed both of their motions based on *Bell*.  The State of Utah has also filed a motion to intervene and join in Plaintiffs' Motion to Reconsider.

## II.  MOTION TO RECONSIDER

Plaintiffs' Motion to Reconsider is timely made under Fed. R. Civ. P. Rule 59(e).  The Tenth Circuit has recognized the following grounds which warrant a motion to reconsider under Rule 59(e): "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[6]  "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. . . .  It is not appropriate to revisit issues already addressed or

---

[4]Docket No. 48.

[5]2012 WL 899290 (D. Utah Mar. 15, 2012).

[6]*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2005) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir.1995)).

advance arguments that could have been raised in prior briefing."[7]  None of these situations are present in the instant case.

The Court is aware that *Bell* reached a different result.  However, that opinion is not properly described as controlling law.  Nor has any new evidence been presented.

Plaintiffs argue that the Court committed clear error by not reaching the same conclusions as *Bell*.  *Bell* found: (1) that the OCC regulation in question was invalid under *Chevron* and (2) that banks do not compete with title companies.  As to the first point, the Court notes that Plaintiffs did not make a *Chevron* review argument previously.  Accordingly, Plaintiffs' Motion to Reconsider is an attempt to "advance arguments that could have been raised in prior briefing." As to the second point, the Court considered and rejected the argument that ReconTrust did not compete with title companies in its prior Order.  That another judge of this Court reached a different conclusion does not equate to clear error on this Court's part.  Accordingly, the Court will deny Plaintiffs' the Motion to Reconsider.

### III.  MOTION TO AMEND

Plaintiffs' Motion to Amend assumes that *Bell* would change the Court's analysis.  It does not.  Amendment would therefore be futile and is denied.[8]

---

[7]*Id.*

[8]*Broad. Music, Inc. v. Creation Club, Inc.*, 2007 WL 752177, at *1 (D. Utah Mar. 6, 2007).

## IV.  MOTION TO INTERVENE

On March 21, 2012, nearly one month after judgment was entered in this case, the State

of Utah moved to intervene, stating it had become "alarmed about defending the integrity of its

trustee statute and in preserving Utah citizens in their homes."[9]

> Whether intervention be claimed of right or as permissive, it is at once apparent,
> from the initial words of both Rule 24(a) and Rule 24(b), that the application must
> be 'timely.'  If it is untimely, intervention must be denied.  Thus, the court where
> the action is pending must first be satisfied as to timeliness.[10]

The State of Utah's motion is not timely.  As the Seventh Circuit has explained:

> Once the judge not only flags an issue as important but also sets a schedule for its
> resolution, the time has come to intervene.  People potentially affected by the
> decision can't sit on the sidelines, as if intervention were a petition for rehearing.
> If they receive notice that the court will hold a hearing to address a particular
> question, they must participate rather than wait and see what the court does.[11]

The Court will therefore deny the State of Utah's motion.

## V.  CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion for Reconsideration, or, in the Alternative, to Alter or

Amend Judgment (Docket No. 54) is DENIED.  It is further

ORDERED that Plaintiffs' Motion for Leave to Amend (Docket No. 56) is DENIED.  It

is further

ORDERED that the State of Utah's Motion to Intervene (Docket No. 51) is DENIED.

---

[9]Docket No. 52, at 3.

[10]*NAACP v. New York*, 413 U.S. 345, 365 (1973).

[11]*United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010).

4

DATED   July 23, 2012.

BY THE COURT:

TED STEWART
United States District Judge

5

# ATTACHMENT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD DUTCHER and GWEN DUTCHER, RUCHARD FERGUSON and MICHELLE FERGUSON; and CATHERINE RICHARDS AHLERS, on their own behalf and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>STUART T. MATHESON; MATHESON MORTENSON, OLSEN & JEPPSON, P.C.; RECONTRUST COMPANY N.A.; BAC HOME LOANS SERVICING LP; AND BANK OF AMERICA, N.A.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON CAFA JURISDICTION<br><br><br>Case No. 2:11-CV-666 TS |

This matter is before the Court on remand from the Court of Appeals for the Tenth

Circuit for the limited purpose of determining whether this Court has jurisdiction over Plaintiffs'

claims by virtue of the Class Action Fairness Act ("CAFA").  Also before the Court is

ReconTrust Company, N.A.'s ("ReconTrust") Motion to Transfer.[1]  In its Motion, ReconTrust

seeks to transfer a recently filed case—*Allred v. ReconTrust Co. N.A.*, Case No. 2:13-CV-1124

BJ—to this Court.  For the reasons discussed below, the Court finds that it has jurisdiction under

CAFA and will deny ReconTrust's Motion.

---

[1] Docket No. 97.

1

I. BACKGROUND

Plaintiffs are Utah residents whose homes have been subject to foreclosure sales performed by Defendants in Utah. Plaintiffs' Complaint brings six causes of action based on a central theme—that Defendant ReconTrust did not have authority to conduct a trustee sale in Utah because it was not an authorized trustee under Utah law. Plaintiffs also bring their claims on behalf of all persons subject to the allegedly unlawful foreclosure actions of Defendants. Plaintiffs allege that the proposed class exceeds 10,000 members. Plaintiffs also allege, on information and belief, that more than 75% of the proposed class members are citizens of Utah.

Plaintiffs originally filed suit in Utah state court on June 24, 2011. Defendants subsequently removed the action to this Court and collectively moved to dismiss Plaintiffs' claims. Plaintiffs moved for a temporary restraining order and preliminary injunction and also sought to remand this matter to state court. In a memorandum decision entered February 8, 2012, the Court denied Plaintiffs' motions and granted Defendants' motion to dismiss.[2] In that decision, the Court concluded that the Utah foreclosure statute at issue, Utah Code Ann. § 57-1-21, was preempted by the National Banking Act.

Plaintiffs appealed the Court's ruling. On appeal, the Tenth Circuit requested supplemental briefing on whether this Court had jurisdiction to hear Plaintiffs' claims. The Tenth Circuit subsequently held (1) the Court erred in concluding that federal question jurisdiction was proper under the doctrine of federal preemption and (2) that Defendants had not met their burden to prove fraudulent joinder and, therefore, diversity jurisdiction was not established. The Court of Appeals noted that Defendants had also argued that jurisdiction was

_____

[2] *See* Docket No. 48.

proper under CAFA but indicated that "we do not believe it appropriate to resolve this thorny

question without further factual development in the district court."[3]  Accordingly, the court

concluded that "[w]hether the requirements of the Class Action Fairness Act have been met is a

question that is best left to the district court to decide in the first instance on remand."[4]

## II.  DISCUSSION

Congress enacted CAFA to "respond to perceived abusive practices by plaintiffs and their

attorneys in litigating major class actions with interstate features in state courts."[5]  Pursuant to

CAFA, the federal district court's diversity jurisdiction was expanded to include certain class

action suits where complete diversity did not exist.  Congress "relaxed the requirements for

demonstrating diversity jurisdiction and for removing class actions to allow federal courts more

readily to supervise those class actions that are interstate cases of national importance."[6]

 "CAFA jurisdiction exists when the proposed class contains at least one-hundred

persons, the amount in controversy exceeds $5,000,000.00, and there is minimal diversity."[7]  It is

undisputed that these requirements have been met in this case.[8]  At issue are the exceptions to

CAFA jurisdiction.

---

[3] Docket No. 79, at 17.

[4] *Id.*

[5] *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009).

[6] *Johnson v. Advance Am.*, 549 F.3d 932, 938 (4th Cir. 2008) (internal quotation marks
and citation omitted).

[7] *Valdez v. Metro. Prop. & Cas. Ins. Co.*, 867 F. Supp. 2d 1143, 1163 (D.N.M. 2012)
(citing 28 U.S.C. § 1332(d)(2), (5)).

[8] *See* Docket Nos. 85, 88.

CAFA contains two statutory exceptions that, if met, mandate that a district court decline to exercise jurisdiction.  These exceptions are characterized as the "local controversy exception" and the "home state exception."[9]  CAFA also contains a permissive exception that grants district courts discretion to decline jurisdiction over a class action otherwise subject to CAFA jurisdiction where certain expressly enumerated factors are met.[10]

The exceptions to CAFA jurisdiction are "intended to be narrow, 'with all doubts resolved in favor of exercising jurisdiction over the case.'"[11]  Because the exceptions are treated as exceptions to jurisdiction, "the party seeking remand has the burden to show that the . . . exception[s] appl[y]." [12]

A.      LOCAL CONTROVERSY EXCEPTION

The local controversy exception was created to exempt from CAFA jurisdiction "those cases consisting of primarily local, *intrastate* matters."[13]  The exception is "intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under [CAFA] because state courts have a strong interest in adjudicating such disputes."[14]  The local

---

[9] *See Coffey*, 581 F.3d at 1243.

[10] *See* 28 U.S.C. § 1332(d)(3).

[11] *Opelousas Gen. Hosp. Auth. v. Fairpay Solutions, Inc.*, 655 F.3d 358, 360 (5th Cir. 2011) (quoting *Evans v. Walter Indus. Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006)); *see also Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010) (holding that "CAFA grants broad federal jurisdiction over class actions and establishes narrow exceptions to such jurisdiction").

[12] *Lafalier v. Cinnabar Serv. Co., Inc.*, No. 10-CV-0005 CVE, 2010 WL 1486900, at *5 (N.D. Okla. April 13, 2010) (citing *Evans*, 449 F.3d at 1164; *Cox v. Allstate Ins. Co.*, 2008 WL 2167027 (W.D. Okla. May 22, 2008)).

[13] *Coffey*, 581 F.3d at 1243 (citing S. Rep. No. 109-14, at 39 (2005)).

[14] S. Rep. No. 109-14, at 39.

controversy exception is found at 28 U.S.C. § 1332(d)(4)(A).  That section states that a district

court shall decline to exercise jurisdiction over a class action in which

> (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
> (II) at least 1 defendant is a defendant--
>> (aa)  from whom significant relief is sought by members of the plaintiff class;
>> (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
>> (cc) who is a citizen of the State in which the action was originally filed; and
> (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
> [IV] during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons . . . .[15]

The Court will consider each of these elements and the parties' arguments individually

below.

### 1.    CLASS CITIZENSHIP

Plaintiffs argue that the first element is met because it is reasonably likely that a

significant percentage of the proposed class are Utah citizens.  Defendants contend that Plaintiffs

have failed to establish that greater than two-thirds of the class members are Utah citizens

because they have not provided any evidence of the proposed class members' citizenship and

Plaintiffs' Complaint merely alleges a class comprised of individuals who formerly owned

property in Utah.

A party seeking to avail itself of the local controversy exception must prove by a

preponderance of the evidence that at least two-thirds of the proposed class were citizens of the

---

[15] 28 U.S.C. § 1332(d)(4)(A)(i)–(ii).

forum state on the date the case became removable.[16]  "Some courts have adopted a 'reasonable probability' standard to determine if at least two-thirds of the plaintiffs are from the forum state."[17]  However, even under this standard, a court cannot make a "leap of faith" and assume that proposed class members are citizens of the forum.[18]  Plaintiffs must come forward with more than just allegations as to the citizenship of the proposed class.[19]

Here, Plaintiffs have not presented any evidence to support their assertion that more than two-thirds of the proposed class were citizens of the State of Utah at the time of removal.  Logic dictates that a large percentage of the proposed class, as former owners of real property within the forum, were citizens of the State of Utah.  However, other courts "have not found inferences as to citizenship based on property ownership to be particularly persuasive, and for obvious reasons—a person may own property in a particular state without being a citizen of it."[20]  Furthermore, the Court cannot infer that two-thirds of the proposed class were citizens of the State of Utah based only on Plaintiffs "on information and belief" allegations.  For these reasons, the Court finds that Plaintiffs have failed to meet their burden as to this element.

---

[16] *See In re Spring Nextel Corp.*, 593 F.3d 669, 673 (7th Cir. 2010); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 813–14 (5th Cir. 2007).

[17] *Lafalier*, 2010 WL 1486900, at *5 (citing *Dunham v. Coffeyvill Res., LLC*, 2007 WL 3283774 (D. Kan. Nov. 6, 2007); *Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 80 (S.D.N.Y. 2006)).

[18] *Id.*; *see also Gerstenecker v. Terminix Int'l, Inc.*, 2007 WL 2746847, at *2 (S.D.Ill. Sept. 19, 2007) (reasoning that while the real property at issue was located in Illinois, to conclude that two-thirds of the property owners are Illinois residents "requires a leap of faith this Court cannot make").

[19] *Lafalier*, 2010 WL 1486900, at *5.

[20] *Reece v. AES Corp.*, 2013 WL 1342379, at *4 (E.D. Okla. April 2, 2013) (citing *Gerstenecker*, 2007 WL 2746847).

Plaintiffs request jurisdictional discovery to establish the "numerosity and make-up of the putative class, to establish that Plaintiffs have exceeded the one-third or two-thirds threshold of Utah citizens as class members for purposes of applying the Local Controversy, Home state, and discretionary exceptions to CAFA."[21]  Defendants take issue with Plaintiffs' failure to provide evidence in support of their assertion that they meet the citizenship requirement of the local controversy exception, yet they also oppose any request for discovery.  The Court will address Plaintiffs' request for jurisdictional discovery more fully below.

    2.      LOCAL DEFENDANT

Plaintiffs argue that the second element is met because Defendants Stuart T. Matheson and Matheson, Mortenson, Olsen & Jeppson, P.C. (collectively referred to hereinafter as the "Matheson Defendants") are citizens of Utah, whose conduct forms a significant basis for the claims asserted, and from whom significant relief is sought.  Defendants contend that the Matheson Defendants merely acted as ReconTrust's agents and therefore are not defendants from whom significant relief is sought or whose conduct forms a significant basis for the claims asserted.

The second element requires (1) that at least one defendant is a citizen of the State in which the action was originally filed (2) "from whom significant relief is sought by members of the plaintiff class" and (3) "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class."[22]

---

[21] Docket No. 88, at 19.

[22] 28 U.S.C. § 1332(d)(4)(A)(i)(II).

First, it is undisputed that the Matheson Defendants are citizens of the State of Utah. Second, in *Coffey v. Freeport McMoran Copper & Gold*, the Tenth Circuit upheld a district court's finding "that the 'significant relief element is satisfied . . . where the petition claims that every potential plaintiff is entitled to recover from [the local defendant] and the proposed class seeks to collect damages from all defendants jointly and severally.'"[23]  Here, as in *Coffey*, the Complaint alleges that every potential Plaintiff is entitled to recover from the Matheson Defendants and the proposed class seeks to collect damages from all of the Defendants jointly and severally.  In light of these factual similarities, the Court finds that Plaintiffs have met their burden to demonstrate that significant relief is being sought against the Matheson Defendants.

The crux of Defendants' argument centers on the third requirement—that the Matheson Defendants' alleged conduct forms a significant basis for the claims asserted.  The Court begins its analysis with the relevant statutory text.[24]  The statute provides that the local defendant must be a defendant "whose alleged conduct forms a *significant basis* for the claims asserted by the proposed plaintiff class."[25]  At issue is the scope and meaning of the term "significant basis." CAFA does not contain an explicit definition of the term "significant basis."

The Court follows the "general principle of statutory construction that terms used in a statute should be given their plain meaning."[26]  The New Oxford American Dictionary defines

---

[23] *Coffey*, 581 F.3d at 1244 (quoting *Coffey v. Freeport-McMoRan Copper & Gold Inc.*, 623 F. Supp. 2d 1257, 1267 (W.D. Okla. 2009)).

[24] *Parson v. Johnson & Johnson*, --- F.3d ----, 2014 WL 1399750, at *3 (10th Cir. April 11, 2014) (citing *Scimone v. Carnival Corp.*, 720 F.3d 876, 884 (11th Cir. 2013)).

[25] 28 U.S.C. § 1332(d)(4)(A)(i)(II)(bb) (emphasis added).

[26] *Parson*, 2014 WL 1399750, at *5 (citing *Miss. ex rel. Hood v. AU Optronics Corp.*, --- U.S. ----, 134 S. Ct. 736, 744 (2014)).

the word "significant" as being "sufficiently great or important to be worthy of attention."[27] "Basis" is defined as "the underlying support or foundation for an idea, argument, or process."[28] In view of these definitions, the Court finds that the plain language of § 1332(d)(4)(A)(i)(II)(bb) requires Plaintiffs to prove that the Matheson Defendants' alleged conduct is sufficiently great or important to provide the underlying support or foundation for their claims.

This interpretation of the "significant basis" requirement is supported by the legislative purposes of CAFA. In enacting CAFA, "[t]he primary 'abuses' Congress identified were misuse of the 'complete diversity requirement' and abuse of the 'amount-in-controversy' requirement."[29] By requiring that the party seeking to avail itself of the local controversy exception demonstrate that the local defendant's alleged conduct is sufficiently important to provide the foundation for its claims, the Court ensures that local ancillary defendants are not joined to a class action suit merely to avoid CAFA jurisdiction.

Plaintiffs argue that the Matheson Defendants' alleged conduct meets the significant basis requirement because the Matheson Defendants "were on the front lines of the serial illegally [sic] taking of homes from Utah homeowners—they exercised the illegal 'power of sale' knowing that they had not complied with Utah law to obtain that 'power;' they are, indeed, the primary defendants."[30] In their prior motion to remand, Plaintiffs similarly argued that it is "clear that [the Matheson Defendants] have colluded with the other Defendants to do something

---

[27] Angus Stevenson & Christine Lindberg, *New Oxford Am. Dictionary* 1626 (3d ed. 2010).

[28] *Id.* at 137.

[29] *Parson*, 2014 WL 1399750, at *5 (citing S. Rep. No. 109-14, at 46 (2005)).

[30] Docket No. 88, at 8.

forbidden by Utah law," that they "knew that Bank of America and ReconTrust were acting as the designated successor trustees without complying with Utah law," and that they are "the critical end players in a complex financial scheme orchestrated with ReconTrust and BAC and/or Bank of America to circumvent Utah law and take homes from Utah homeowners."[31]

As this Court indicated previously, "[s]uch conclusory language, no matter how strong or how pervasive, will not suffice on its own."[32]  Plaintiffs' hyperbolic characterization of the importance of the Matheson Defendants to their claims is not supported by their earlier statements of the case.  The only factual allegation regarding the Matheson Defendants in Plaintiffs' Complaint states simply that "Matheson, purporting to act on behalf of ReconTrust and holding himself out as an agent of ReconTrust . . . conducted the non-judicial foreclosure sale . . . ."[33]  In their Proposed Amended Complaint,[34] Plaintiffs stated that "[t]his is a dispute regarding the qualifications of Defendant ReconTrust to act in the capacity as a properly qualified foreclosure trustee pursuant to U.C.A. § 57-1, subsections 21, 22 and 23.5(2) (Supp. 2011), in foreclosing on Utah homeowners."[35]

A thorough review of the factual allegations of Plaintiffs' Complaint supports Plaintiffs' characterization of this case in their Proposed Amended Complaint as "a dispute regarding the qualifications of Defendant ReconTrust to act in the capacity as a properly qualified foreclosure

---

[31] Docket No. 33, at 3–4.

[32] Docket No. 48, at 6.

[33] Docket No. 2 Ex. 1, at 10–11.

[34] Plaintiffs sought leave to file their Proposed Amended Complaint in conjunction with seeking reconsideration of this Court's prior dismissal of their claims.  The Court summarily denied leave to amend on the basis of futility after considering Plaintiffs' arguments for reconsideration.

[35] Docket No. 58, at 2.

trustee" under Utah law.  The majority of the factual allegations contained in Plaintiffs'

Complaint pertain to actions taken by ReconTrust and Bank of America.

The Court finds that the Matheson Defendants are, at most, ancillary defendants.

Consequently, the Court finds that Plaintiffs have failed to meet their burden to demonstrate that

the Matheson Defendants' alleged conduct forms a significant basis for the claims asserted by

the proposed class.

In an alternative argument, Plaintiffs assert that they should be allowed jurisdictional

discovery as to "[t]he actions of [the Matheson Defendants], their role in the underlying scheme

alleged in the complaint, and the relationship between Matheson and MMOJ and Recon[T]rust

and Bank of America, to establish the significance or their conduct as it relates to the claims

Plaintiffs have asserted."[36]  The plain language of § 1332(d)(4)(A)(i)(II)(bb) however

demonstrates the futility of discovery on this point.  That section states that the Court is to review

the local defendant's "alleged conduct" to determine whether "it forms a significant basis for the

claims asserted."[37]  Thus, under the plain language of the statute, the Court looks to Plaintiffs'

Complaint and the conduct alleged therein to evaluate this factor. [38]

3.    PRINCIPAL INJURIES

Plaintiffs argue that the principal injuries resulting from the Defendants' alleged conduct

incurred in the State of Utah.  Though Defendants assert that they do not concede Plaintiffs can

prove this point, Defendants do not provide any reasoned argument in support of their assertion.

---

[36] Docket No. 88, at 19.

[37] 28 U.S.C. § 1332(d)(4)(A)(i)(II)(bb).

[38] *See Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 157 (3d Cir. 2009) (holding that
the district court erred by not focusing its analysis on the alleged conduct and comparing it to the
alleged conduct of all of the defendants).

The allegations of Plaintiffs' Complaint provide that the allegedly unlawful foreclosures occurred within the State of Utah.  From this alleged conduct, the Court can infer that the principal injuries suffered by Plaintiffs occurred within the forum.  Therefore, Plaintiffs have met their burden on this element.

      4.      PRIOR CLASS ACTIONS

The final element that must be met for the local controversy exception to apply requires that "no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons" during the three years prior to the filing of suit.  The parties disagree as to whether this element is met.

In dispute is *Coleman v. ReconTrust Co., N.A.*,[39] a case filed with this Court approximately eight months before the filing of the instant case.  Plaintiffs do not dispute that *Coleman* is a class action suit, filed within the requisite 3-year time frame, which brought claims against a majority of the Defendants to this action.  Rather, Plaintiffs contend that *Coleman* did not raise the same or similar factual allegations as those alleged in their Complaint.

A review of the factual allegations contained in the complaint filed in *Coleman* belies Plaintiffs' contention.  As has been discussed previously, in this case Plaintiffs bring six causes of action based on a central theme—that Defendant ReconTrust did not have authority to conduct trustee sales in Utah because it was not an authorized trustee under Utah law.  Plaintiffs' factual allegations are focused on this theme.

Similarly, the claims in *Coleman* focus on the authority of ReconTrust to conduct trustee sales in Utah.  In paragraph 23 of their complaint, the *Coleman* plaintiffs stated that "[t]he

_____

[39] No. 2:10-CV-1099 DB (D. Utah filed Nov. 5, 2010).

Plaintiffs within the FDCPA Class and Utah Class have each been foreclosed upon and

sometimes dispossessed from their homes by defendants acting through an entity, ReconTrust,

which lacks authority to foreclose non-judicially because it lacks the power of sale under Utah

law . . . ."[40]   Paragraph 31 summarizes their factual allegations as follows:

> Defendant Bank of America, and the other defendants, have regularly employed
> defendant ReconTrust, a national banking association whose powers are limited to
> performing as a trust company only, and regularly employ ReconTrust, to
> foreclose, as trustee with power of sale, trust deeds on Utah Realty. . . .   Such
> foreclosures are without authority and illegal because § 57-1-21(3), UCA (1953)
> limits the power of sale to Utah lawyers and title companies, denying it to trust
> companies.[41]

A comparison of the Complaint in this case and that in the *Coleman* case demonstrates

that the two cases assert the same or similar factual allegations.  As such, the Court finds that

Plaintiffs have not met their burden on this point.

The Court would also note that *Coleman* and the instant suit are only two in a series of

similar actions challenging the authority of ReconTrust to conduct non-judicial foreclosure sales

under Utah law.[42]   Indeed, the *Coleman* action is currently stayed pending the resolution of

*Garrett v. ReconTrust Co., N.A.* on appeal, because "[t]he determinative issue in [*Coleman*] is

identical to the issue in *Garret*—the authority of RecontTrust to act as trustee with the power of

---

[40] Complaint at 6–7, *Coleman v. ReconTrust Co., N.A.*, No. 2:10-CV-1099 DB (D. Utah
Nov. 5, 2010).

[41] *Id.* at 8–9.

[42] *See Baker v. BAC Home Loans Servicing LP*, No. 2:11-CV-720 CW, 2012 WL 464024
(D. Utah Feb. 13, 2012); *Bell v. Countrywide Bank, N.A.*, 860 F. Supp. 2d 1290 (D. Utah 2012);
*Garrett v. ReconTrust Co., N.A.*, No. 2:11-CV-763 DS, 2011 WL 7657381 (D. Utah Dec. 21,
2011); *Loomis v. Meridias Capital, Inc.*, No. 2:11-CV-363 PMW, 2011 WL 5844304 (D. Utah
Nov. 18, 2011); *Cox v. ReconTrust Co., N.A.*, No. 2:10-CV-492 CW, 2011 WL 835893 (D. Utah
Mar. 3, 2011).

sale."[43]  While the majority of these actions were filed after the instant suit, the prevalence of

such suits in federal court addressing this question regarding the interplay of state and federal

law demonstrates that this is not a controversy "consisting of primarily local, intrastate

matters."[44]

     5.      SUMMATION

As Defendants properly argue, the elements of the local controversy exception are

enumerated in the conjunctive.  Plaintiffs' failure to establish any one of the elements results in

the inapplicability of the exception.  Plaintiffs have not met their burden to demonstrate three of

the four elements.  Therefore, the Court finds that the local controversy exception does not apply.

B.     HOME STATE EXCEPTION

The home state exception mandates that the Court decline CAFA jurisdiction if "two-

thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary

defendants, are citizens of the State in which the action was originally filed."[45]

For the same reasons provided previously, the Court finds that Plaintiffs have not met

their burden to demonstrate that two-thirds or more of the members of the proposed class in

aggregate are citizens of Utah.

The second part of the home state exception requires that the primary defendants in this

case be citizens of Utah.  Plaintiffs argue that this requirement is met here because the Matheson

Defendants are citizens of Utah.  "Although there is some disagreement regarding the definition

of 'primary,' most courts have construed the term 'primary Defendants' to mean all primary

---

[43] *Coleman*, 2:10-CV-1099 DB (D. Utah Aug. 28, 2010), ECF 136, at 2.

[44] *Coffey*, 581 F.3d at 1243 (citing S. Rep. No. 109-14, at 39 (2005)).

[45] 28 U.S.C. § 1332(d)(4)(B).

defendants."[46]  Here, the Court concludes that ReconTrust and Bank of America are primary

defendants.  It is undisputed that neither ReconTrust nor Bank of America are citizens of Utah.

Thus, even assuming that the Matheson Defendants are "primary defendants" for purposes of the

home state exception, Plaintiffs have failed to demonstrate that all of the primary defendants in

this case are citizens of Utah.

Based on the foregoing, the Court finds that Plaintiffs have failed to meet their burden to

establish that the home state exception applies in this case.

C.      DISCRETIONARY EXCEPTION

The discretionary interests of justice exception to CAFA jurisdiction is found in 28

U.S.C. § 1332(d)(3).  That section provides that

> [a] district court may, in the interests of justice and looking at the totality of the
> circumstances, decline to exercise jurisdiction under paragraph (2) over a class
> action in which greater than one-third but less than two-thirds of the members of
> all proposed plaintiff classes in the aggregate and the primary defendants are
> citizens of the State in which the action was originally filed based on
> consideration of--
> (A) whether the claims asserted involve matters of national or interstate interest;
> (B) whether the claims asserted will be governed by laws of the State in which the
> action was originally filed or by the laws of other States;
> (C) whether the class action has been pleaded in a manner that seeks to avoid
> Federal jurisdiction;
> (D) whether the action was brought in a forum with a distinct nexus with the class
> members, the alleged harm, or the defendants;
> (E) whether the number of citizens of the State in which the action was originally
> filed in all proposed plaintiff classes in the aggregate is substantially larger than
> the number of citizens from any other State, and the citizenship of the other
> members of the proposed class is dispersed among a substantial number of States;
> and

---

[46] *Reece*, 2013 WL 1342379, at *5 (comparing *Villalpando v. Exel Direct Inc.*, 2012 WL
5464620, at *8 (N.D. Cal. Nov. 8, 2012) with *Nicholson v. Prime Tanning Corp.*, 2009 WL
2900042, at *2 n.5 (W.D. Mo. Sept. 3, 2009)).

(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

After considering these factors, the Court will decline to apply the discretionary exception. In so doing, the Court would note in particular (1) the fact that it is unclear at this point the percentage of the proposed class who are citizens of the State of Utah; (2) the primary defendants in this case are not citizens of Utah; (3) this matter involves claims of national importance, including the application and interpretation of the National Banking Act; (4) this matter will not be entirely governed by the law of the State of Utah—it also involves the application of federal law and potentially implicates the law of other states; (5) this class action was not plead in such a way as to avoid CAFA jurisdiction; and (6) in the 3-year period prior to the filing of this suit, a prior class action was brought bringing similar claims and multiple similar class actions have been brought in this forum since that time.

D.    JURISDICTIONAL DISCOVERY

In the event the exceptions to CAFA jurisdiction do not apply, Plaintiffs request that they be allowed brief jurisdictional discovery. This Court is vested with broad discretion in deciding whether to allow jurisdictional discovery.[47] "'A refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant. Prejudice is present where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'"[48]

---

[47] *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975).

[48] *Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 103 (10th Cir. 2012) (unpublished) (quoting *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002)).

16

Here, Plaintiffs request brief jurisdictional discovery as to the actions of the Matheson Defendants and the numerosity and makeup of the proposed putative class.  As indicated previously, those elements of the CAFA exceptions that evaluate the conduct of the Matheson Defendants do so only in the context of the allegations of Plaintiffs' Complaint.  Further, even if Plaintiffs were able to establish the percentage of the proposed class that were citizens of the State of Utah at the time of removal, it would be unable to establish the remaining elements required to qualify for the exceptions to CAFA jurisdiction.  Because the CAFA exceptions require Plaintiffs to prove all of the elements in the conjunctive, the jurisdictional discovery sought by Plaintiffs would not impact the Court's decision in this case and would be futile.

Based on the foregoing, the Court finds that Plaintiffs will not be prejudiced if denied the opportunity to conduct jurisdictional discovery.  Therefore, the Court will deny Plaintiffs' request for jurisdictional discovery.

E.      COMITY

Plaintiffs argue that "even if it finds that there is a statutory basis for jurisdiction," the Court should decline to hear this action based on principles of comity because "this case presents issues of Utah law that have already been decided by Utah's highest court."[49]  In support of their argument, Plaintiffs rely on language from a recent United States Supreme Court case, *Levin v. Commerce Energy, Inc.*,[50] for the proposition that lower federal courts should resist engaging in certain cases that fall within their jurisdiction but that implicate state functions.[51]  That case, however, bears very few similarities to the case before this Court.  In *Levin*, the Court was

---

[49] Docket No. 88, at 18.

[50] 560 U.S. 413 (2010).

[51] *See* Docket No. 88, at 17.

presented with a federal suit claiming that a state taxing scheme was unconstitutional.  In

contrast, here, the issue is whether a state statute is preempted by a federal statute and regulating

scheme.  The interests at issue here vary dramatically from those before the Court in *Levin*.

To the extent Plaintiffs argue that the Court should decline to hear this case because the

Utah Supreme Court reached this issue in *Federal National Mortgage Ass'n v. Sundquist*,[52] the

Court is not persuaded.  "'It is beyond cavil that [federal courts] are not bound by a state court's

interpretation of federal law.'"[53]  Further, principles of comity do not support declining

jurisdiction where the same issue raised in this appeal has already been addressed by this Court

and, subsequent to *Sundquist*, by a panel of the Court of Appeals for the Tenth Circuit in *Garret*

*v. ReconTrust Co., N.A.*[54]

For these reasons, the Court finds that principles of comity do not justify declining the

exercise of jurisdiction in this case.

F.     MOTION TO TRANSER

Defendant ReconTrust seeks to transfer a related case—*Allred v. ReconTrust Co. N.A.*,

Case No. 2:13-CV-1124 BJ—to this Court.  DUCiv R 83-2(g) provides for the transfer of a later

filed related case to be heard by a district court judge hearing a related earlier filed case.  The

rule provides a number of factors that the Court may consider in evaluating whether to transfer a

related case.[55]  While many of those factors, on their face, appear to support a transfer in this

---

[52] 311 P.3d 1004, 1012–14 (Utah 2013).

[53] *Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007) (quoting *Grantham v. Avondale Indus., Inc.*, 964 F.2d 471, 473 (5th Cir. 1992)).

[54] 546 F. App'x 736 (10th Cir. 2013) (unpublished).

[55] *See* DUCivR 83-2(g)(i)–(vii).

instance, the Court finds that Defendant ReconTrust's Motion has been filed for an improper purpose.

A majority of the judges of this Court have now heard cases bringing claims similar to those brought in the instant suit.  This includes the Honorable District Court Judge Bruce Jenkins, who is now assigned to hear the *Allred* case.  Thus, there is no efficiency to be gained by having this matter heard by this Court.  Furthermore, a transfer of the *Allred* matter will not prevent inconsistent outcomes, as inconsistent outcomes have already been reached.  Rather, ReconTrust's Motion appears to be an example of judge shopping—a maneuver that this Court will not condone.

The Court will deny ReconTrust's Motion to Transfer.

## III.  CONCLUSION

Based on the foregoing, the Court hereby

FINDS that it has jurisdiction over this case pursuant to the Class Action Fairness Act.  It is further

ORDERED that Defendant ReconTrust's Motion to Transfer (Docket No. 97) is DENIED.  The Clerk of Court is instructed to close this case forthwith.

DATED this 25th day of April, 2014.

BY THE COURT:

_____

TED STEWART
United States District Judge

19

# ATTACHMENT 4

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

FILED

Central Division for the District of Utah

2014 MAY -7  �address 2: 56

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Richard Dutcher et al

v.

Stuart T. Matheson, et al

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:11 cv 666 TS

IT IS ORDERED AND ADJUDGED

that pursuant to the mandate of the Tenth Circuit Court of Appeals filed in the district court on
September 4, 2013, the court finds that it has jurisdiction over this matter under the Class
Action Fairness Act.

| | |
|---|---|
| May 7, 2014 | D. Mark Jones |
| *Date* | *Clerk of Court* |
| | *(By) Deputy Clerk* |

# ATTACHMENT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD DUTCHER and GWEN DUTCHER, RUCHARD FERGUSON and MICHELLE FERGUSON; and CATHERINE RICHARDS AHLERS, on their own behalf and on behalf of a class of similarly situated persons,<br><br>          Plaintiffs,<br><br>v.<br><br>STUART T. MATHESON; MATHESON MORTENSON, OLSEN & JEPPSON, P.C.; RECONTRUST COMPANY N.A.; BAC HOME LOANS SERVICING LP; AND BANK OF AMERICA, N.A.,<br><br>          Defendants. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br>Case No. 2:11-CV-666 TS |

This matter is before the Court on Plaintiffs' Motion to Alter or Amend Judgment and the State of Utah and Sean D. Reyes's (the "State of Utah") Motion to Intervene or Otherwise be Heard.[1]  Also before the Court is Plaintiffs' Motion to Extend Time.[2]  For the reasons discussed more fully below, the Court will grant Plaintiffs' Motion to Extend, deny Plaintiffs' Motion to Alter or Amend Judgment, and deny the State of Utah's Motion to Intervene.

---

[1] Docket Nos. 105, 107.

[2] Docket No. 112.

I.  BACKGROUND

Plaintiffs are Utah residents whose homes have been subject to foreclosure sales performed by Defendants in Utah.  Plaintiffs originally filed the instant suit in Utah state court on June 24, 2011.  Defendants subsequently removed the action to this Court and collectively moved to dismiss Plaintiffs' claims.  Plaintiffs moved for a temporary restraining order and preliminary injunction and also sought to remand this matter to state court.  In a memorandum decision entered February 8, 2012, this Court denied Plaintiffs' motions and granted Defendants' motion to dismiss.[3]  In that decision, the Court concluded that the Utah foreclosure statute at issue—Utah Code Ann. § 57-1-21—was preempted by the National Banking Act.

Plaintiffs appealed the Court's ruling.  On appeal, the Tenth Circuit stated that "[a]lthough this case presents significant questions regarding the interaction of federal banking and state foreclosure laws, our focus is upon a more fundamental question: whether the district court even had jurisdiction to consider the issues raised."[4]  The Tenth Circuit concluded that, "on the limited record presented," this Court "erred in determining it had jurisdiction to hear this case."[5]  Because they could not "affirm [this Court's] jurisdictional ruling," the Tenth Circuit vacated this Court's prior rulings and remanded "with instructions for the district court to determine whether it has jurisdiction to act and, relatedly, to rule in the first instance whether the Class Action Fairness Act provides jurisdiction."[6]

---

[3] *See* Docket No. 48.

[4] *Dutcher v. Matheson*, 733 F.3d 980, 983 (10th Cir. 2013).

[5] *Id.*

[6] *Id.* at 990.

## II.  DISCUSSION

A.     MOTION TO EXTEND TIME

On June 13, 2014, Plaintiffs moved for an extension of time to file their reply memorandum in support of their Motion to Alter or Amend Judgment.  Plaintiffs requested a two-day extension of the briefing deadline because of complications in counsel's schedule. Plaintiffs filed their reply on June 17, 2014.  Defendants have not responded or otherwise opposed Plaintiffs' Motion to Extend.  In light of this non-opposition, the Court will grant Plaintiffs' Motion and will consider the reply.

B.     MOTION TO ALTER OR AMEND JUDGMENT

Plaintiffs seek to alter or amend the judgment in this case pursuant to Federal Rule of Civil Procedure 59(e).  The Tenth Circuit has stated that the following grounds warrant a motion to reconsider under Federal Rule of Civil Procedure 59(e): "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[7]  Here, Plaintiffs argue that amendment is necessary to correct clear error and prevent manifest injustice.

Plaintiffs' Motion turns on the proper interpretation of the Tenth Circuit's mandate in this case.  "The mandate rule requires a district court to 'comply strictly with the mandate rendered by the reviewing court.'"[8]  "The mandate consists of [the Tenth Circuit's] instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those

---

[7] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[8] *Thompson v. Colorado*, 60 F. App'x 212, 215 (10th Cir. 2003) (unpublished) (quoting *Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128, 1132 (10th Cir. 2001)).

3

instructions."[9]  "[W]hile a district court is 'bound to follow the mandate, and the mandate

controls all matters within its scope, a district court on remand is free to pass upon any issue

which was not expressly or impliedly disposed of on appeal.'"[10]

     Plaintiffs interpret the Tenth Circuit's mandate as requiring that this Court readdress the

merits of Plaintiffs' claims.  According to Plaintiffs, the Tenth Circuit's use of the word "vacate"

in the mandate nullified or canceled this Court's prior orders and returned the parties to their

original position.[11]  While this argument finds some support in the literal definition of the word

vacate,[12] this Court is not persuaded that the Tenth Circuit's mandate should be read so broadly.

     At the outset of the mandate, the Tenth Circuit made clear that their focus was on

jurisdiction, rather than the merits of Plaintiffs' case.  In the body of the mandate, the Tenth

Circuit limited their discussion to jurisdictional issues and declined to address the merits of

Plaintiffs' claims.  Further, the conclusion of the mandate makes clear that the vacateur of this

Court's prior rulings came only because the Tenth Circuit could not affirm this Court's

jurisdictional ruling.  The Tenth Circuit then specifically remanded this matter "with instructions

for [this Court] to determine whether it has jurisdiction to act and, relatedly, to rule in the first

instance whether the Class Action Fairness Act provides jurisdiction."[13]

     Based on this language, the Court reads the Tenth Circuit's mandate as being limited to a

determination of whether this Court had jurisdiction to consider Plaintiffs' claims in the first

---

[9] *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003).

[10] *Thompson*, 60 F. App'x at 215 (quoting *Procter & Gamble*, 317 F.3d at 1126–27).

[11] *See* Docket No. 107, at 3.

[12] *See Black's Law Dictionary* 1546 (7th ed. 1999) (defining vacate as "[t]o nullify or cancel; make void; invalidate").

[13] *Dutcher*, 733 F.3d at 990.

instance.  Since this Court determined that CAFA jurisdiction applies, the purposes of the

mandate have been met.  It is for this reason that the Court ordered that judgment be entered in

this case, thereby enabling the parties to litigate the merits of Plaintiffs' claims on appeal.

In any event, to the extent there is any ambiguity in prior orders, the Court hereby re-

adopts its prior dismissal rationale in full.  With the finding of CAFA jurisdiction, the parties

may now pursue their arguments as to the merits of Plaintiffs' claims on appeal.

C.      MOTION TO INTERVENE

The State of Utah's Motion to Intervene is premised on the same argument as Plaintiffs'

Motion to Alter or Amend—that this Court acted contrary to the mandate by closing this case.

According to the State of Utah, the Court should reopen the case, allow it to intervene, and

consider at this stage of the litigation its Complaint in Intervention.[14]  For the same reasons

provided previously, the Court finds that the mandate does not dictate such a result.  Because it

will not reopen this case or readdress the merits of Plaintiffs' arguments, the Court once more

finds that the State of Utah's Motion to Intervene is untimely.[15]  The Court will therefore deny

the State of Utah's Motion.

## III.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Plaintiffs' Motion to Extend Time (Docket No. 112) is GRANTED.  It is

further

---

[14] Docket No. 105 Ex. 1.

[15] *See* Docket No. 70, at 4 (denying the State of Utah's motion to intervene filed nearly one month after judgment was entered in this case as untimely under Federal Rule of Civil Procedure 24(a) and (b)).

ORDERED that Plaintiffs' Motion to Alter or Amend Judgment (Docket No. 107) is

DENIED.  It is further

ORDERED that the State of Utah's Motion to Intervene or Otherwise be Heard (Docket

No. 105) is DENIED.

DATED this 3rd day of July, 2014.

BY THE COURT:

_____

TED STEWART
United States District Judge

**CASE NO. 14-4085**

**<u>ADDENDUM</u>**

<u>Page</u>

12 U.S.C. § 92a ...........................................................................................1

15 U.S.C. § 6713 .........................................................................................5

28 U.S.C. § 1332 .........................................................................................7

12 C.F.R. § 9.7 ..........................................................................................18

Utah Code Ann. § 57-1-19 ........................................................................19

Utah Code Ann. § 57-1-21 ........................................................................20

Utah Code Ann. § 57-1-22 ........................................................................21

Utah Code Ann. § 57-1-23.5 .....................................................................23

Utah Code Ann. § 57-1-36 ........................................................................24

S. REP. No. 109-14 (2005), 2005 WL 627977 .........................................25

*Coleman v. ReconTrust Co., N.A.*,
    No. 2:10-CV-1099 DB, slip op. (D. Utah Oct. 4, 2011) ............................104

*Cox v. ReconTrust Co., N.A.*,
    No. 2:10-CV-492 CW, 2011 WL 835893 (D. Utah Mar. 3, 2011) .............107

*Cunningham Charter Corp. v. Learjet, Inc.*,
    No. 07-CV-233 DRH, 2009 WL 3156693 (S.D.Ill Sep. 29, 2009).............113

*Dunn v. Endoscopy Ctr. of S. Nev.*,
    No. 2:11-CV-0560 RLH, 2011 WL 5509004 (D. Nev. Nov. 7, 2011) .......116

*Garrett v. ReconTrust Co., N.A.*,
    No. 2:11-CV-00763 DS, 2011 WL 7657381 (D. Utah Dec. 21, 2011).......121

*Lafalier v. Cinnabar Servs. Co., Inc.*,
       No. 10-CV-0005 CVE, 2010 WL 1486900 (N.D. Okla. Apr. 13, 2010) ....123

*McGaughey v. Treistman*,
       No. 05 Civ. 7069 (HB), 2007 WL 24935 (S.D.N.Y. Jan. 4, 2007) ............132

OCC Interp. Ltr. 695, 1996 WL 187825 (Dec. 8, 1995) .......................................136

Title Documents ...................................................................................................153

| United States Code Annotated |
| --- |
| Title 12. Banks and Banking |
| Chapter 2. National Banks (Refs & Annos) |
| Subchapter IV. Regulation of the Banking Business; Powers and Duties of National Banks |

12 U.S.C.A. § 92a

§ 92a. Trust powers

Effective: December 28, 2012
Currentness

(a) Authority of Comptroller of the Currency

The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

(b) Grant and exercise of powers deemed not in contravention of State or local law

Whenever the laws of such State authorize or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this section.

(c) Segregation of fiduciary and general assets; separate books and records; access of State banking authorities to reports of examinations, books, records, and assets

National banks exercising any or all of the powers enumerating [1] in this section shall segregate all assets held in any fiduciary capacity from the general assets of the bank and shall keep a separate set of books and records showing in proper detail all transactions engaged in under authority of this section. The State banking authorities may have access to reports of examination made by the Comptroller of the Currency insofar as such reports relate to the trust department of such bank, but nothing in this section shall be construed as authorizing the State banking authorities to examine the books, records, and assets of such bank.

(d) Prohibited operations; separate investment account; collateral for certain funds used in conduct of business

No national bank shall receive in its trust department deposits of current funds subject to check or the deposit of checks, drafts, bills of exchange, or other items for collection or exchange purposes. Funds deposited or held in trust by the bank awaiting investment shall be carried in a separate account and shall not be used by the bank in the conduct of its business unless it shall first set aside in the trust department United States bonds or other securities approved by the Comptroller of the Currency.

(e) Lien and claim upon bank failure

**Page 1**

In the event of the failure of such bank the owners of the funds held in trust for investment shall have a lien on the bonds or other securities so set apart in addition to their claim against the estate of the bank.

(f) Deposits of securities for protection of private or court trusts; execution of and exemption from bond

Whenever the laws of a State require corporations acting in a fiduciary capacity to deposit securities with the State authorities for the protection of private or court trusts, national banks so acting shall be required to make similar deposits and securities so deposited shall be held for the protection of private or court trusts, as provided by the State law. National banks in such cases shall not be required to execute the bond usually required of individuals if State corporations under similar circumstances are exempt from this requirement. National banks shall have power to execute such bond when so required by the laws of the State.

(g) Officials' oath or affidavit

In any case in which the laws of a State require that a corporation acting as trustee, executor, administrator, or in any capacity specified in this section, shall take an oath or make an affidavit, the president, vice president, cashier, or trust officer of such national bank may take the necessary oath or execute the necessary affidavit.

(h) Loans of trust funds to officers and employees prohibited; penalties

It shall be unlawful for any national banking association to lend any officer, director, or employee any funds held in trust under the powers conferred by this section. Any officer, director, or employee making such loan, or to whom such loan is made, may be fined not more than $5,000, or imprisoned not more than five years, or may be both fined and imprisoned, in the discretion of the court.

(i) Considerations determinative of grant or denial of applications; minimum capital and surplus for issuance of permit

In passing upon applications for permission to exercise the powers enumerated in this section, the Comptroller of the Currency may take into consideration the amount of capital and surplus of the applying bank, whether or not such capital and surplus is sufficient under the circumstances of the case, the needs of the community to be served, and any other facts and circumstances that seem to him proper, and may grant or refuse the application accordingly: *Provided,* That no permit shall be issued to any national banking association having a capital and surplus less than the capital and surplus required by State law of State banks, trust companies, and corporations exercising such powers.

(j) Surrender of authorization; board resolution; Comptroller certification; activities affected; regulations

Any national banking association desiring to surrender its right to exercise the powers granted under this section, in order to relieve itself of the necessity of complying with the requirements of this section, or to have returned to it any securities which it may have deposited with the State authorities for the protection of private or court trusts, or for any other purpose, may file with the Comptroller of the Currency a certified copy of a resolution of its board of directors signifying such desire. Upon receipt of such resolution, the Comptroller of the Currency, after satisfying himself that such bank has been relieved in accordance with State law of all duties as trustee, executory, [2] administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, or other fiduciary, under court, private, or other appointments previously accepted under authority of this section, may, in his discretion, issue to such bank a certificate certifying that such bank is no longer authorized to exercise the powers granted by this section. Upon the issuance of such a certificate by the Comptroller of the Currency, such bank (1) shall no longer be subject to the provisions of this section or the regulations of the Comptroller of the Currency made pursuant thereto, (2) shall be

**Page 2**

entitled to have returned to it any securities which it may have deposited with the State authorities for the protection of private or court trusts, and (3) shall not exercise thereafter any of the powers granted by this section without first applying for and obtaining a new permit to exercise such powers pursuant to the provisions of this section. The Comptroller of the Currency is authorized and empowered to promulgate such regulations as he may deem necessary to enforce compliance with the provisions of this section and the proper exercise of the powers granted therein.

(k) Revocation; procedures applicable

**(1)** In addition to the authority conferred by other law, if, in the opinion of the Comptroller of the Currency, a national banking association is unlawfully or unsoundly exercising, or has unlawfully or unsoundly exercised, or has failed for a period of five consecutive years to exercise, the powers granted by this section or otherwise fails or has failed to comply with the requirements of this section, the Comptroller may issue and serve upon the association a notice of intent to revoke the authority of the association to exercise the powers granted by this section. The notice shall contain a statement of the facts constituting the alleged unlawful or unsound exercise of powers, or failure to exercise powers, or failure to comply, and shall fix a time and place at which a hearing will be held to determine whether an order revoking authority to exercise such powers should issue against the association.

**(2)** Such hearing shall be conducted in accordance with the provisions of section 1818(h) of this title, and subject to judicial review as provided in such section, and shall be fixed for a date not earlier than thirty days nor later than sixty days after service of such notice unless an earlier or later date is set by the Comptroller at the request of any association so served.

**(3)** Unless the association so served shall appear at the hearing by a duly authorized representative, it shall be deemed to have consented to the issuance of the revocation order. In the event of such consent, or if upon the record made at any such hearing, the Comptroller shall find that any allegation specified in the notice of charges has been established, the Comptroller may issue and serve upon the association an order prohibiting it from accepting any new or additional trust accounts and revoking authority to exercise any and all powers granted by this section, except that such order shall permit the association to continue to service all previously accepted trust accounts pending their expeditious divestiture or termination.

**(4)** A revocation order shall become effective not earlier than the expiration of thirty days after service of such order upon the association so served (except in the case of a revocation order issued upon consent, which shall become effective at the time specified therein), and shall remain effective and enforceable, except to such extent as it is stayed, modified, terminated, or set aside by action of the Comptroller or a reviewing court.

**CREDIT(S)**

    (Pub. L. 87-722, § 1, Sept. 28, 1962, 76 Stat. 668; Pub. L. 96-221, Title VII, § 704, Mar. 31, 1980, 94 Stat. 187; Pub.L. 112-231, § 2(b)(1), Dec. 28, 2012, 126 Stat. 1619.)

Notes of Decisions (22)

Footnotes

1       So in original. Probably should be "enumerated".

2       So in original. Probably should be "executor".

12 U.S.C.A. § 92a, 12 USCA § 92a

**Page 3**

Current through P.L. 113-174 approved 9-26-14

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Page 4**

| United States Code Annotated |
| Title 15. Commerce and Trade |
| Chapter 93. Insurance |
| Subchapter I. State Regulation of Insurance |

15 U.S.C.A. § 6713

§ 6713. Title insurance activities of national banks and their affiliates

Effective: November 12, 1999
Currentness

(a) General prohibition

No national bank may engage in any activity involving the underwriting or sale of title insurance.

(b) Nondiscrimination parity exception

(1) In general

Notwithstanding any other provision of law (including section 6701 of this title), in the case of any State in which banks organized under the laws of such State are authorized to sell title insurance as agent, a national bank may sell title insurance as agent in such State, but only in the same manner, to the same extent, and under the same restrictions as such State banks are authorized to sell title insurance as agent in such State.

(2) Coordination with "wildcard" provision

A State law which authorizes State banks to engage in any activities in such State in which a national bank may engage shall not be treated as a statute which authorizes State banks to sell title insurance as agent, for purposes of paragraph (1).

(c) Grandfathering with consistent regulation

(1) In general

Except as provided in paragraphs (2) and (3) and notwithstanding subsections (a) and (b) of this section, a national bank, and a subsidiary of a national bank, may conduct title insurance activities which such national bank or subsidiary was actively and lawfully conducting before November 12, 1999.

(2) Insurance affiliate

In the case of a national bank which has an affiliate which provides insurance as principal and is not a subsidiary of the bank, the national bank and any subsidiary of the national bank may not engage in the underwriting of title insurance pursuant to paragraph (1).

**Page 5**

(3) Insurance subsidiary

In the case of a national bank which has a subsidiary which provides insurance as principal and has no affiliate other than a subsidiary which provides insurance as principal, the national bank may not directly engage in any activity involving the underwriting of title insurance.

(d) "Affiliate" and "subsidiary" defined

For purposes of this section, the terms "affiliate" and "subsidiary" have the same meanings as in section 1841 of Title 12.

(e) Rule of construction

No provision of this Act or any other Federal law shall be construed as superseding or affecting a State law which was in effect before November 12, 1999, and which prohibits title insurance from being offered, provided, or sold in such State, or from being underwritten with respect to real property in such State, by any person whatsoever.

**CREDIT(S)**

(Pub.L. 106-102, Title III, § 303, Nov. 12, 1999, 113 Stat. 1408.)

Notes of Decisions (1)

15 U.S.C.A. § 6713, 15 USCA § 6713
Current through P.L. 113-174 approved 9-26-14

End of Document                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1332

§ 1332. Diversity of citizenship; amount in controversy; costs

Currentness

<Notes of Decisions for 28 USCA § 1332 are displayed in two separate documents. Notes of Decisions for subdivisions I to X are contained in this document. For Notes of Decisions for subdivisions XI to end, see second document for 28 USCA § 1332.>

**(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

**(1)** citizens of different States;

**(2)** citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

**(3)** citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

**(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**(c)** For the purposes of this section and section 1441 of this title--

**(1)** a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

**(A)** every State and foreign state of which the insured is a citizen;

**Page 7**

**(B)** every State and foreign state by which the insurer has been incorporated; and

**(C)** the State or foreign state where the insurer has its principal place of business; and

**(2)** the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

**(d)(1)** In this subsection--

**(A)** the term "class" means all of the class members in a class action;

**(B)** the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

**(C)** the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

**(D)** the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

**(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;

**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

**(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

**(3)** A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

**(A)** whether the claims asserted involve matters of national or interstate interest;

**(B)** whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

**(C)** whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

**(D)** whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

**(E)** whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

**(F)** whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

**(4)** A district court shall decline to exercise jurisdiction under paragraph (2)--

**(A)(i)** over a class action in which--

**(I)** greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

**(II)** at least 1 defendant is a defendant--

**(aa)** from whom significant relief is sought by members of the plaintiff class;

**(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

**(cc)** who is a citizen of the State in which the action was originally filed; and

**(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

**(B)** two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

**(5)** Paragraphs (2) through (4) shall not apply to any class action in which--

**(A)** the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

**(B)** the number of members of all proposed plaintiff classes in the aggregate is less than 100.

**(6)** In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**(7)** Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

**(8)** This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

**(9)** Paragraph (2) shall not apply to any class action that solely involves a claim--

**(A)** concerning a covered security as defined under 16(f)(3)[1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)[2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

**(B)** that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

**(C)** that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

**(10)** For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

**(11)(A)** For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

**Page 10**

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

**(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

**(II)** the claims are joined upon motion of a defendant;

**(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

**(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

**(ii)** This subparagraph will not apply--

**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; July 25, 1958, Pub.L. 85-554, § 2, 72 Stat. 415; Aug. 14, 1964, Pub.L. 88-439, § 1, 78 Stat. 445; Oct. 21, 1976, Pub.L. 94-583, § 3, 90 Stat. 2891; Nov. 19, 1988, Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), 102 Stat. 4646; Oct. 19, 1996, Pub.L. 104-317, Title II, § 205(a), 110 Stat. 3850; Feb. 18, 2005, Pub.L. 109-2, § 4(a), 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

## COMMENTARY ON 1988 REVISION

*by David D. Siegel*

### Diversity Minimum Raised to $50,000

Section 1332, the diversity statute, was amended in several particulars in 1988 in the Judicial Improvements and Access to Justice Act (Pub.L. 100-702, 102 Stat. 4642), an enactment that addresses diverse aspects of federal jurisdiction and practice. The act also affects the rule-making procedure (see § 2072), venue (§ 1391), and removal (§§ 1441, 1446, and 1447), among other things, for which see the U.S.C.A. Commentaries on the cited statutes.

The main alteration affecting the diversity statute, and one of the cornerstones of the 1988 enactment, is the raising of the monetary minimum from $10,000 to $50,000 in subdivisions (a) and (b) of § 1332. (For the effective date of these and the other changes to be discussed, see the "Effective Date" caption below.) The last amendment of § 1332 that altered the monetary jurisdiction was in 1958, which raised the sum from $3000 to $10,000.

The sponsors of the change cite inflation as the main reason for the elevation to $50,000. And they note that since the jump exceeds the inflation factor for the years in question, which they approximate as warranting an increase to only $35,000, the excess was adopted as an "inflation cushion" to cover the near future because "Congress is slow to act in this area and may not revisit the issue for another three decades". (See Representative Kastenmeier's Report [August 26, 1988] for the House Judiciary Committee, accompanying H.R. 4807, p. 45.)

If Congress does decide to stay away from the issue for several decades, it will earn the gratitude of many federal practitioners, who want the diversity option kept open. The advocates of total abolition of diversity cite its historical basis (to protect nondomiciliaries from local prejudice) and argue that its validity has diminished over the years as the country has evolved from a mostly rural to a much more urban society. For a variety of reasons, including the opposition of key officials responsible for state court systems, the abolition proposal was rejected. (New York's Chief Judge, in a letter to U.S. Senator Daniel P. Moynihan [7/22/88], described as "disastrous" the potential impact the abolition of diversity would have on the New York state court system.)

The increase to $50,000 is a kind of compromise. (It may even be described as a compromise on a compromise, since the figure one generally heard bruited about was $100,000.) A stated expectation is that the increase to $50,000 will reduce the diversity caseload by "up to 40%" (Kastenmeier Report, above, page 45), but many practitioners disagree with that assessment and expect the impact to be far less.

In tort cases, for example, which account for a substantial part of the diversity calendar, damages are almost invariably unliquidated and all relief demands are mere conjectures pending the fact-finding process. This is notably the case with an award for pain and suffering, a key element in a personal injury claim. If the parties are diverse in citizenship and the injuries have been substantial--as they usually are when the plaintiff opts for federal jurisdiction--a case able to get over the $10,000 threshold will ordinarily have no trouble surmounting the $50,000 threshold as well. And if the action is for wrongful death instead of, or in addition to, personal injury, it qualifies almost automatically as one with a potential value in excess of $50,000. The plaintiff in a diversity action does not have to prove exact damages when confronted at the outset with the defendant's motion to dismiss for want of amount in controversy; it is sufficient if the plaintiff can show that the case can go for more than the monetary minimum. Before dismissing at the jurisdictional threshold on this ground the court must be able to say, after crediting all of the plaintiff's factual allegations under the so-called well-pleaded complaint rule, that a verdict in excess of the jurisdictional minimum (now $50,000) would have to be set aside as a matter of law. The court can rarely predict that that will be the case; hence a dismissal for want of sufficient amount in controversy is not a common event in federal practice.

**Page 12**

Commercial cases, in contrast with torts, more often lend themselves to the kind of precise evaluation at the outset that can lead to a definitive and early adjudication on the monetary point. That would be so, for example, when seller S is suing buyer B for the price of X quantity of goods delivered to B under a sales contract that fixes a price. The price multiplied by the number of goods delivered under the contract would be the amount in controversy. If S has failed to deliver the goods, however, and it is B who is suing for the difference in price that B had to pay to get the goods elsewhere on the market, damages may still be liquidated enough to support a jurisdictional determination, but now it depends on what B says it had to pay on the market, and the issue is closer. Again, dismissal is permissible only if, on all the proof adduced on a dismissal motion--which, since this involves subject matter jurisdiction, can even be by the court sua sponte under Rule 12(h)(3)--the court can conclude that even assuming the fact-finder's acceptance of the plaintiff's allegations, a monetary finding in excess of the court's jurisdiction cannot be sustained.

The $40,000 difference between the old minimum of $10,000 and the new one of $50,000 will obviously diminish diversity jurisdiction to some degree, but it is doubtful that the difference will be as much as 40%.

### Alien Admitted for "Permanent Residence" Deemed Citizen

Another 1988 change in the diversity statute affects aliens who have been admitted for permanent residence in the United States. They are no longer to be treated as aliens in a diversity measure, but as citizens, and the resident alien's citizenship is to be, as it is with other citizens, the state in which he or she is domiciled. This change is made with the addition of a paragraph at the end of subdivision (a) of § 1332.

Both before and after the amendment, the alienage provisions authorized jurisdiction where the suit was between citizen and alien, whichever side the alien might be on (paragraph [2] of § 1332[a]), and where the alien or aliens were merely additional parties to a conventional diversity action between citizens of different states. But the law did not allow, and constitutionally could not allow (see § 2 of Article III), suit entirely between aliens on the basis of that alone. If alien P were a French national, for example, and alien D a Spanish national, suit would not be permissible unless there were some basis other than diversity to rest it on.

Under the 1988 amendment, if either P or D qualifies as "an alien admitted to the United States for permanent residence", she qualifies as a citizen of the state in which she is in fact domiciled in this country and a diversity measure may be made accordingly. That's as the statute would have it, in any event. The list of permissible bases of federal subject matter jurisdiction contained in the judiciary article (see § 2 of Article III of the Constitution) may have to be squeezed a bit to sustain this treatment of an alien.

What about a suit in which there is an alien on one side and, on the other, a citizen and an alien who has been admitted to "permanent residence"? Lloyds Bank v. Norkin, 817 F.Supp. 414 (S.D.N.Y.1993), had that situation, and ruled that there is no jurisdiction. P was an alien and the defendants were H, a Connecticut citizen, and W, a permanent resident alien domiciled in New York. While a literal construction of the 1988 amendment would have conferred jurisdiction, the court held that the statute can't be construed literally. It would amount to a stealthy overruling of Strawbridge v. Curtiss, 7 U.S. 267, 2 L.Ed. 435.

Strawbridge is the 1806 decision by Chief Justice Marshall that construes the diversity statute to require complete diversity between the sides, and it doesn't embrace actions with aliens on both sides. So fundamental a decision is Strawbridge, holds the court, that if Congress had intended to overrule it in the 1988 amendment, it would have said so expressly somewhere along the line of the amendment's legislative history, and didn't. By finding the amendment inapplicable to support the alien-v-citizen-plus-alien jurisdiction, the court found no need to see whether the constitution itself would be a jurisdictional barrier (as many think it would).

What does the amendment accomplish, then? The court says that far from expanding diversity jurisdiction, the amendment was intended to curtail it. In a suit by a citizen of state against an alien, for example, which previously would have fallen within the diversity jurisdiction, it now falls beyond if the alien is a permanent resident domiciled in the plaintiff's own state.

There's a conflict on this issue. See, e.g., Singh v. Daimler-Benz, AG, 800 F.Supp. 260 (E.D.Pa.1992), affirmed 9 F.3d 303.

### In Estate and Ward Cases, Representative Will Henceforth Have Represented Person's Domicile

Another important amendment in 1988 is the addition of a paragraph (2) to subdivision (c) of § 1332. It directs that in a case involving the personal representative of an estate or the legal representative (guardian) of an infant or incompetent, the representative shall be deemed to have the decedent's or ward's citizenship. The representative's own citizenship is not to count. This settles an issue that produced some conflict, mainly in cases involving a decedent's estate, to which we return in a moment.

In ward cases, the amendment appears to disregard distinctions based on the nature of the guardianship. Whether the representative is one appointed only for the litigation (a guardian "ad litem") or one of a more permanent nature, suit by or against that representative in behalf of the infant or incompetent requires the court to consider the citizenship of the ward, not the citizenship of the representative. That should apply regardless of the title or designation the representative may have under state law (e.g., committee [for an incompetent], conservator [for a conservatee], etc.).

More controversial during the past two decades has been how to measure citizenship when a decedent's estate is involved in the case. The traditional notion was that the citizenship that would count would be the citizenship of the personal representative--the executor, executrix, administrator, administratrix, etc.--but this was found to leave too much power on the decedent's side to arrange things to suit its own choice-of-forum preferences. The law in many states often allows its probate or equivalent court to appoint as personal representative almost anyone the family and other potential beneficiaries want, a fact tailor-made for the manufacture--or, indeed, the undermining--of diversity by the decedent's side.

The family, well orchestrated by a thoughtful lawyer, would just march to probate court with all parties interested in the estate agreeing to the appointment of one X to be the representative. X might have no interest whatever in the estate, either as named beneficiary or as intestate distributee, nor any relationship at all to any interested person, and yet X's citizenship would be deemed the diversity measure on the decedent's side. This would serve the family well in any lawsuit contemplated by the estate, usually as a plaintiff if the estate had a cause of action to bring (such as for wrongful death or personal injury against some tortfeasor, the most usual scenario), or even as a defendant if the estate anticipated being sued.

If, as plaintiff, the estate wanted to sue in a federal court, it would just make sure X had a citizenship different from all the tortfeasors; if it wanted to sue in state court and be sure the case could not be removed to federal court by the defendants, it would just engineer the appointment of a Mr. X with a citizenship the same as one of the defendants.

And if the estate anticipated being a defendant, its engineering might prove equally rewarding. If it wanted to try to assure federal jurisdiction, including the power to remove the case should it be brought in a state court, it would just see to it that X's citizenship differed from that of the prospective plaintiff (and that X was not a citizen of the forum state either, see subdivision [b] of § 1441). And if state court jurisdiction were preferred, the manipulation would select a Mr. X with a citizenship the same as the prospective plaintiff's, which would restrict the plaintiff's suit to state court.

**Page 14**

The situation, whether involving decedent or ward, drew little judicial acknowledgment until the Third Circuit sat up and took notice of 28 U.S.C.A. § 1359 in 1968 in McSparran v. Weist, 402 F.2d 867 (certiorari denied in 1969 under the name Fritzinger v. Weist, 395 U.S. 903, 89 S.Ct. 1739). Section 1359 of Title 28, the gist of which has always been on the federal scene, provides that there shall be no federal subject matter jurisdiction where a party, "by assignment or otherwise", has sought to manufacture the jurisdiction. The "assignment" part had been recognized and implemented early, and under the statute there would be no jurisdiction in an action in which (e.g.) P of Iowa sued D of Ohio if it were shown that P was a mere assignee of the claim and that the assignment was made to P by R, an Ohio citizen, just to secure federal jurisdiction in the case. Since there would have been no diversity jurisdiction had R sued O, there could be none under the statute when assignee P sued O.

Effective, therefore, was the "by assignment" part of § 1359, but long unimplemented was the "or otherwise" language. McSparran took note of this and invoked the phrase to reject jurisdiction in a case in which an infant's representative was chosen solely to create diversity. Other circuits followed suit in decedents' cases, but while agreeing that acceptance of the representative's citizenship would no longer be automatic, there was disagreement about what test to use, or what to substitute, even among the circuits. Some sought to determine whether X had a substantial stake in the case. Others looked at the motive of the appointment. (For a review of the subject, see Pallazola v. Rucker, 797 F.2d 1116 [1st Cir. 1986].) Congress rejects these inquiries in the 1988 legislation and adopts instead the American Law Institute's proposal to have the decedent's citizenship looked to in all estate cases. ALI, Study of the Division of Jurisdiction Between State and Federal Courts: A Summary of ALI Proposals, discussed in 46 FRD 141 at 143 (1969).

The measure of citizenship to look to on the estate's side, therefore, is the state of which the decedent was a domiciliary at the time of death.

### Effective Date of 1988 Amendments

All of the amendments treated above in this Commentary on the 1988 Revision apply to actions commenced on or after the 180th day after the enactment. The enactment date is November 19, 1988, when the President signed the bill, which made the effective date May 18, 1989.

The latter two of the three amendments treated above--the change adding a new unnumbered paragraph to § 1332(a) about resident aliens and the change adding paragraph (2) to § 1332(c) about representatives--apply not only to cases commenced in a federal court on or after the effective date, but also to cases removed to a federal court on or after that date.

The effective date clause of the amendment raising the monetary minimum to $50,000, on the other hand, states only that it applies to actions "commenced" on or after the effective date; it doesn't refer to removals made after that date. The impact of this difference on an action commenced in state court and which the defendant now seeks to remove should be noted. If the state action was commenced before the effective date of the 1988 amendment, apparently it may be removed after the effective date (if otherwise in conformity with the requirements of the removal statutes, §§ 1441, 1446, and 1447, for which see the Commentaries on those statutes in U.S.C.A.) even if the amount in controversy exceeds only the old figure of $10,000 but falls short of the new $50,000 requirement. There is authority, however, emanating from the last increase in monetary jurisdiction in § 1332 (which occurred in 1958), to the effect that the moment that counts in removal situations is the moment of removal to federal court, not commencement in state court. See, e.g., Lorraine Motors, Inc. v. Etna Casualty and Surety Co., 166 F.Supp. 319 (ED NY 1958). On that view, which would seem to be the sounder one but which is not unanimous (see Kieffer v. Travelers Fire Ins. Co., 167 F.Supp. 398 [D. Md.1958]), a case in the $10,000-to-$50,000 range commenced in state court prior to the effective date of the 1988 amendment would not be removable unless the removal, too, occurred before the amendment's effective date.

**Page 15**

A state action commenced after the effective date would of course have to meet the new $50,000 threshold in order to be removable.

## COMMENTARY ON 1996 AMENDMENT OF SECTION 1332

*by David D. Siegel*

As discussed in the previous Commentary, one of the principal changes made in the 1988 revision of § 1332, the diversity statute, was an increase in the amount in controversy from $10,000 to $50,000. Whatever impact was hoped for with the change did not satisfy the powerful opponents of diversity jurisdiction, who continue to chisel it down. Since the amount in controversy is a minimum requirement, the way to chisel it down is to raise it up, and up it went in a 1996 amendment, from $50,000 to $75,000.

This will of course close the federal doors in additional cases, but, once again, in fewer cases than the diversity opponents would like. In ratios, the 1996 increase from $50,000 to $75,000 is less significant than the 1988 increase. It's a raise of only 50%. The 1988 increase from $10,000 to $50,000 was an increase of 400%.

In the context of the other pressures that the opponents of diversity jurisdiction were putting on Congress in 1996, which didn't work, the monetary increase can even be described as a victory for the defenders of diversity. As noted for the 1988 change from $10,000 to $50,000, so with the 1996 change: in many cases, and in virtually all significant tort cases, the case that can get over the $50,000 barrier can usually get over the $75,000 barrier, too. Encroachments on the diversity jurisdiction are therefore more likely to succeed on other fronts than just the spot elevation of the monetary figure. Two such fronts were reopened in 1996, but on neither did the diversity opponents break through.

One was an effort by the Judicial Conference to get Congress not just to increase the monetary figure, but to index it to inflation.

The other was an effort to "eliminate the in-state plaintiff in diversity jurisdiction cases", as described in the report of the Hatch Committee (Senate Report 104-366, September 9, 1996, page 29). This refers to the situation in which a local plaintiff sues a foreign defendant.

If a State X plaintiff secures personal jurisdiction of a State Y defendant in a State X federal court--assuming of course the satisfaction of the amount in controversy requirement--the federal court can't refuse the case merely because the plaintiff is a local citizen. But in this situation, the underlying purpose of the diversity jurisdiction is not served. The jurisdiction is designed to protect the out-of-state party from local prejudice, an objective best implemented by giving the option for federal jurisdiction to only the out-of-state party.

If the in-state plaintiff's use of the federal court in a diversity case were eliminated (as was proposed), the local plaintiff would be required to sue the out-of-state defendant in the local state court, and it would be up to the defendant to decide whether to invoke federal jurisdiction. If the defendant is content to let the case stay in state court, the plaintiff would have no complaint: it's the state court of the plaintiff's own state. But if the defendant should for that reason want federal jurisdiction, the defendant could secure it by removing the case to federal court under 28 U.S.C.A. § 1441. Removal is permissible in that situation under subdivision (b) of § 1441.

The final choice of forum in that scenario would be left with the out-of-stater, where, consistent with the purpose of diversity jurisdiction, it ought to be. The in-stater could sue the out-of-stater only in the state court. The out-of-stater could then let it stay there, or remove it to federal court.

**Page 16**

While barring the in-state plaintiff from opting for federal jurisdiction in diversity cases would not undermine the historical purpose of the diversity jurisdiction, Congress in 1996 still refused the request of the Judicial Conference to impose the bar, indicating the strength that the proponents of diversity jurisdiction still retain in legislative quarters.

Notes of Decisions (4324)

Footnotes

1        So in original. Reference to "16(f)(3)" probably should be preceded by "section".

2        So in original. Probably should be "77p(f)(3)".

28 U.S.C.A. § 1332, 28 USCA § 1332

Current through P.L. 113-174 approved 9-26-14

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Page 17**

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR Data is current as of November 13, 2014

Title 12 → Chapter I → Part 9 → §9.7

Title 12: Banks and Banking
PART 9—FIDUCIARY ACTIVITIES OF NATIONAL BANKS

---

### §9.7   Multi-state fiduciary operations.

(a) *Acting in a fiduciary capacity in more than one state.* Pursuant to 12 U.S.C. 92a and this section, a national bank may act in a fiduciary capacity in any state. If a national bank acts, or proposes to act, in a fiduciary capacity in a particular state, the bank may act in the following specific capacities:

(1) Any of the eight fiduciary capacities expressly listed in 12 U.S.C. 92a(a), unless the state prohibits its own state banks, trust companies, and other corporations that compete with national banks in that state from acting in that capacity; and

(2) Any other fiduciary capacity the state permits for its own state banks, trust companies, or other corporations that compete with national banks in that state.

(b) *Serving customers in other states.* While acting in a fiduciary capacity in one state, a national bank may market its fiduciary services to, and act as fiduciary for, customers located in any state, and it may act as fiduciary for relationships that include property located in other states. The bank may use a trust representative office for this purpose.

(c) *Offices in more than one state.* A national bank with fiduciary powers may establish trust offices or trust representative offices in any state.

(d) *Determination of the state referred to in 12 U.S.C. 92a.* For each fiduciary relationship, the state referred to in section 92a is the state in which the bank acts in a fiduciary capacity for that relationship. A national bank acts in a fiduciary capacity in the state in which it accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets. If these activities take place in more than one state, then the state in which the bank acts in a fiduciary capacity for section 92a purposes is the state that the bank designates from among those states.

(e) *Application of state law*—(1) *State laws used in section 92a.* The state laws that apply to a national bank's fiduciary activities by virtue of 12 U.S.C. 92a are the laws of the state in which the bank acts in a fiduciary capacity.

(2) *Other state laws.* Except for the state laws made applicable to national banks by virtue of 12 U.S.C. 92a, state laws limiting or establishing preconditions on the exercise of fiduciary powers are not applicable to national banks.

[66 FR 34798, July 2, 2001]

---

For questions or comments regarding e-CFR editorial content, features, or design, email ecfr@nara.gov.
For questions concerning e-CFR programming and delivery issues, email webteam@gpo.gov.

**57-1-19 Trust deeds -- Definitions of terms.**

As used in Sections 57-1-20 through 57-1-36:

(1) "Beneficiary" means the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or his successor in interest.

(2) "Trustor" means the person conveying real property by a trust deed as security for the performance of an obligation.

(3) "Trust deed" means a deed executed in conformity with Sections 57-1-20 through 57-1-36 and conveying real property to a trustee in trust to secure the performance of an obligation of the trustor or other person named in the deed to a beneficiary.

(4) "Trustee" means a person to whom title to real property is conveyed by trust deed, or his successor in interest.

(5) "Real property" has the same meaning as set forth in Section 57-1-1.

(6) "Trust property" means the real property conveyed by the trust deed.

Amended by Chapter 155, 1988 General Session

Utah Code

**57-1-21 Trustees of trust deeds -- Qualifications.**

(1)
  (a) The trustee of a trust deed shall be:
    (i) any active member of the Utah State Bar who maintains a place within the state where the trustor or other interested parties may meet with the trustee to:
      (A) request information about what is required to reinstate or payoff the obligation secured by the trust deed;
      (B) deliver written communications to the lender as required by both the trust deed and by law;
      (C) deliver funds to reinstate or payoff the loan secured by the trust deed; or
      (D) deliver funds by a bidder at a foreclosure sale to pay for the purchase of the property secured by the trust deed;
    (ii) any depository institution as defined in Section 7-1-103, or insurance company authorized to do business and actually doing business in Utah under the laws of Utah or the United States;
    (iii) any corporation authorized to conduct a trust business and actually conducting a trust business in Utah under the laws of Utah or the United States;
    (iv) any title insurance company or agency that:
      (A) holds a certificate of authority or license under Title 31A, Insurance Code, to conduct insurance business in the state;
      (B) is actually doing business in the state; and
      (C) maintains a bona fide office in the state;
    (v) any agency of the United States government; or
    (vi) any association or corporation that is licensed, chartered, or regulated by the Farm Credit Administration or its successor.
  (b) For purposes of this Subsection (1), a person maintains a bona fide office within the state if that person maintains a physical office in the state:
    (i) that is open to the public;
    (ii) that is staffed during regular business hours on regular business days; and
    (iii) at which a trustor of a trust deed may in person:
      (A) request information regarding a trust deed; or
      (B) deliver funds, including reinstatement or payoff funds.
  (c) This Subsection (1) is not applicable to a trustee of a trust deed existing prior to May 14, 1963, nor to any agreement that is supplemental to that trust deed.
  (d) The amendments in Laws of Utah 2002, Chapter 209, to this Subsection (1) apply only to a trustee that is appointed on or after May 6, 2002.
(2) The trustee of a trust deed may not be the beneficiary of the trust deed, unless the beneficiary is qualified to be a trustee under Subsection (1)(a)(ii), (iii), (v), or (vi).
(3) The power of sale conferred by Section 57-1-23 may only be exercised by the trustee of a trust deed if the trustee is qualified under Subsection (1)(a)(i) or (iv).
(4) A trust deed with an unqualified trustee or without a trustee shall be effective to create a lien on the trust property, but the power of sale and other trustee powers under the trust deed may be exercised only if the beneficiary has appointed a qualified successor trustee under Section 57-1-22.

Amended by Chapter 250, 2008 General Session

**Page 20**

**57-1-22 Successor trustees -- Appointment by beneficiary -- Effect -- Substitution of trustee -- Recording -- Form.**
(1)
  (a) The beneficiary may appoint a successor trustee at any time by filing for record in the office of the county recorder of each county in which the trust property or some part of the trust property is situated, a substitution of trustee.
  (b) The new trustee shall succeed to all the power, duties, authority, and title of the trustee named in the deed of trust and of any successor trustee.
  (c) The beneficiary may, by express provision in the substitution of trustee, ratify and confirm action taken on the beneficiary's behalf by the new trustee prior to the recording of the substitution of trustee.
(2) A substitution of trustee shall:
  (a) identify the trust deed by stating:
    (i) the names of the original parties to the trust deed;
    (ii) the date of recordation; and
    (iii)
      (A) the book and page where the trust deed is recorded; or
      (B) the entry number;
  (b) include the legal description of the trust property;
  (c) state the name and address of the new trustee; and
  (d) be executed and acknowledged by all of the beneficiaries under the trust deed or their successors in interest.
(3)
  (a) If not previously recorded at the time of recording a notice of default, the successor trustee shall file for record, in the office of the county recorder of each county in which the trust property or some part of it is situated, the substitution of trustee.
  (b) A copy of the substitution of trustee shall be sent in the manner provided in Subsection 57-1-26(2) to any:
    (i) person who requests a copy of any notice of default or notice of sale under Subsection 57-1-26(1)(a); and
    (ii) person who is a party to the trust deed to whom a copy of a notice of default would be required to be mailed by Subsection 57-1-26(3).
(4) A substitution of trustee shall be in substantially the following form:
Substitution of Trustee
(insert name and address of new trustee)
_____ is hereby appointed successor trustee under the trust deed executed by _____ as trustor, in which _____ is named beneficiary and _____ as trustee, and filed for record _____(month\day\year), and recorded in Book _____, Page _____, Records of ____ County, (or filed for record _____(month\day\year), with recorder's entry No. ____, ____ County), Utah.
(Insert legal description)
Signature_____
(Certificate of Acknowledgment)
(5)
  (a) A trustee of a trust deed may, in accordance with this Subsection (5), resign as trustee by filing for record in the office of the recorder of each county in which the trust property is located, a resignation of trustee.

Utah Code

(b) A trustee's resignation under this Subsection (5) takes effect upon the recording of a resignation of trustee.
(c) A resignation of trustee shall be in substantially the following form:
"Resignation of Trustee
(Insert name and address of trustee) hereby resigns as trustee under the trust deed executed by (insert name of trustor) as trustor, in which (insert name of the beneficiary) is named beneficiary and (insert name of trustee) as trustee, and filed for record (insert the month, day, and year the trust deed was recorded), and recorded in Book ___, Page ___, Records of _____ County, (or with recorder's entry no.____, _____ County), Utah.
(Insert legal description)
Signature _____
(Certificate of acknowledgment)"
(d)
(i) Within three days after the day on which a trustee resigns under this Subsection (5), the trustee shall deliver written notice of the trustee's resignation to each party in any legal action pending against the trustee that is related to or arises from the trustee's performance of a duty of a trustee.
(ii) Except as provided in Subsection (5)(d)(iv), within 10 days after the day on which a party receives a notice described in Subsection (5)(d)(i), the party may move the court to substitute the beneficiary of the trust deed as defendant in the action in the place of the trustee until a successor trustee is appointed.  When a successor trustee is appointed, the successor trustee shall be substituted as defendant in place of the beneficiary.
(iii) Except as provided in Subsection (5)(d)(iv), if, after the expiration of the time described in Subsection (5)(d)(ii), a party does not move the court to substitute the beneficiary or the successor trustee in place of the trustee as defendant, the court shall dismiss with prejudice all claims against the withdrawn trustee.
(iv) Subsection (5)(d)(ii) and (5)(d)(iii) do not apply to a cause of action against a trustee that alleges negligent or intentional misconduct by the withdrawn trustee.
(e)
(i) The withdrawal of a trustee of a trust deed under this section does not affect the validity or the priority of the trust deed.
(ii) After a trustee withdraws under this part, only a qualified successor trustee appointed by the beneficiary under Section 57-1-22 may exercise trustee powers, including the power of sale.

Amended by Chapter 395, 2013 General Session

**57-1-23.5 Civil liability for unauthorized person who exercises power of sale.**

(1) As used in this section:
  (a) "Unauthorized person" means a person who does not qualify as a trustee under Subsection 57-1-21(1)(a)(i) or (iv).
  (b) "Unauthorized sale" means the exercise of a power of sale by an unauthorized person.
(2)
  (a) An unauthorized person who conducts an unauthorized sale is liable to the trustor for the actual damages suffered by the trustor as a result of the unauthorized sale or $2,000, whichever is greater.
  (b) In an action under Subsection (2)(a), the court shall award a prevailing plaintiff the plaintiff's costs and attorney fees.

Enacted by Chapter 228, 2011 General Session

Utah Code

**57-1-36 Trust deeds -- Instruments entitled to be recorded -- Assignment of a beneficial interest.**

　　Any trust deed, substitution of trustee, assignment of a beneficial interest under a trust deed, notice of assignment of a beneficial interest, notice of default, trustee's deed, reconveyance of the trust property, and any instrument by which any trust deed is subordinated or waived as to priority, if acknowledged as provided by law, is entitled to be recorded.  The recording of an assignment of a beneficial interest under a trust deed or a notice of assignment of a beneficial interest does not in itself impart notice of the assignment to the trustor, or the trustor's heirs or personal representatives, so as to invalidate any payment made by the trustor, or the trustor's heirs or personal representatives, to the person holding the note, bond, or other instrument evidencing the obligation by the trust deed.

Amended by Chapter 208, 2013 General Session

S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.)
P.L. 109-2, THE CLASS ACTION FAIRNESS ACT OF 2005

DATES OF CONSIDERATION AND PASSAGE

House: February 17, 2005
Senate: February 7, 8, 9, 10, 2005
Cong. Record Vol. 151 (2005)

Senate Report (Judiciary Committee)
No. 109-14, February 28, 2005
[To accompany S. 5]

SENATE REPORT NO. 109−14

February 28, 2005

Mr. Specter, from the Committee on the Judiciary, submitted the following

REPORT

[To accompany S. 5]

*1  **3  The Committee on the Judiciary, to whom was referred the bill (S. 5) to amend title 28, United States Code, to allow the application of the principles of federal diversity jurisdiction to interstate class actions, having considered the same, reports favorably thereon, without amendments, do pass.

## CONTENTS

|                                                              | Page |
| ------------------------------------------------------------ | ---- |
| I. Legislative History                                       | 1    |
| II. Votes of the Committee                                   | 3    |
| III. Purposes                                                | 4    |
| IV. Background and Need for the Legislation                  | 6    |
| V. How It Works: S. 5 and Changes in Existing Law            | 27   |
| VI. Section-by-Section Analysis                              | 29   |
| VII. Critics Contentions and Rebuttals                       | 51   |
| VIII. Congressional Budget Office Cost Estimate              | 76   |
| IX. Regulatory Impact Statement                              | 78   |
| X. Additional Views                                          | 79   |

XI. Minority Views.................................................................................................................... 82

XII. Changes in Existing Law................................................................................................. 96

## I. LEGISLATIVE HISTORY

The Senate began consideration of the Class Action Fairness Act in the 105th Congress when the Senate Judiciary Subcommittee on **\*2** Administrative Oversight and the Courts convened a hearing on October 30, 1997. John H. Church, Jr., John C. Coffee, Jr., Lewis H. Goldfarb, Paul V. Niemeyer, Martha **\*\*4** Preston, and Brian Wolfman testified at the hearing on issues such as unfair class settlements, attorneys' fees, and state court abuses. On September 28, 1998, the Subcommittee on Administrative Oversight and the Courts approved S. 2083, the "Class Action Fairness Act of 1997," introduced by Senators Charles Grassley (R–IA) and Herb Kohl (D–WI), with an amendment in the nature of a substitute. No further action was taken on S. 2083 in the 105th Congress.

On February 3, 1999, S. 353, "The Class Action Fairness Act of 1999," was introduced in the 106th Congress by Senators Charles Grassley (R–IA), Herb Kohl (R–WI), and Strom Thurmond (R–SC).S. 353 was referred to the Senate Committee on the Judiciary. On May 4, 1999, the Judiciary Subcommittee on Administrative Oversight and the Courts held a legislative hearing (S. Hrg. 106–465) on the bill, and received testimony from Eleanor D. Acheson, John H. Beisner, Richard A. Daynard, E. Donald Elliot, John P. Frank, and Stephan G. Morrison.

On June 29, 2000, the Judiciary Committee approved S. 353 with an amendment in the nature of a substitute, offered by Chairman Orrin G. Hatch (R–UT), Senators Charles Grassley and Herb Kohl, by a rollcall vote of 11 years and 7 nays. S. 353 was then ordered favorably by the Committee without additional amendment.

The Senate continued consideration of the Class Action Fairness Act in the 107th Congress when Senator Charles Grassley (R–IA), introduced S. 1712 on November 15, 2001 with Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Thurmond (R–SC), Chafee (R–RI), and Specter (R–PA). While S. 1712 contained similar provisions from its predecessor bills, S. 1712 included some new provisions. On July 30, 2002, the Senate Judiciary Committee, which was then chaired by Senator Leahy (D–VT), held a hearing to discuss class actions generally, during which S. 1712 was discussed at length by Committee members. The Committee received testimony from Paul Bland, Thomas Henderson, former Solicitor General Walter E. Dellinger III, (Insurance) Commissioner Laurence Mirel, Shaneen Wahl and Hilda Bankston. No further action was taken on S. 1712 during the 107th Congress.

On February 4, 2003, Senator Charles Grassley (R–IA) introduced S. 274, the "Class Action Fairness Act of 2003." Senators Herb Kohl (D–WI), Orrin Hatch (R–UT), Thomas Carper (D–DE), Arlen Specter (R–PA), Lincoln Chafee (R–RI), and Zell Miller (D–GA) joined the bill as original cosponsors. On April 11, 2003, the Judiciary Committee reported S. 274 favorably, with amendments, after two days of mark-up. On October 17, 2003, Senator Grassley introduced S. 1751, the "Class Action Fairness Act of 2003," a compromise version of the bill, with Senators Alexander (R–TN), Allen (R–VA), Carper (D–DE), Chafee (R–RI), Cornyn (R–TX), Hagel (R–NE), Hatch (R–UT), Kohl (D–WI), Lugar (R–ID), Miller (D–GA), Specter (R–PA), Sununu (R–NH) and Voinovich (R–OH). Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 1751 was filed. On October 23, 2003, the Senate failed to invoke cloture by a vote of 59–39. Senators Grassley, Kohl, Hatch and Carper then negotiated key provisions of the bill with Senators Landrieu (D–LA), Schumer (D–NY), and Dodd **\*3** (D–CT). The compromise bill, S. 2062, the "Class Action Fairness Act of 2004," was introduced on February 10, 2004 by Senators Grassley, the original sponsor, and Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Chafee (R–RI), Collins (R–ME), Dodd (R–CT), Hagel (R–NE), Landrieu (D–LA), Lugar (R–ID), Miller (D–GA), Schumer (D–NY) Specter (R–PA) and Voinovich (R–OH) as cosponsors. Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 2062 was filed on July 7,2004. Senator Frist (R–TN) promptly filled the amendment tree and filed a cloture motion. On July 8, 2004, the Senate failed to invoke cloture by a vote of 44–43.

**Page 26**

**\*\*5**  On January 25, 2005, Senators Charles Grassley (R–IA), Herb Kohl (D–WI), and Orrin Hatch (R–UT) introduced S. 5, the "Class Action Fairness Act of 2005." Senators Alexander (R–TN), Carper (D–DE), Chaffee (R–RI), Collins (R–ME), DeMint (R–SC), DeWine (R–OH), Dodd (D–CT), Ensign (R–NV), Feinstein (D–CA), Frist (R–TN), Hagel (R–NE), Kyl (R–AZ), Landrieu (D–LA), Lieberman (D–CT), Lincoln (D–AR), Lott (R–MS), Lugar (R–IN), Martinez (R–FL), McConnell (R–KY), Santorum (R–PA), Schumer (D–NY), Sessions (R–PA), Snowe (R–ME), Sununu (R–NH), Thune (R–SD), Vitter (R–LA), and Voinovich (R–OH) joined as cosponsors to the bill. On February 3, 2005, the Senate Judiciary Committee reported S. 5 favorably, without amendments.

## II. VOTE ON THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the result of rollcall votes taken in any meeting of the Committee on any measure of amendment. The Senate Judiciary Committee, with a quorum present, met on February 3, 2005 to mark up S. 5. The Committee rejected one amendment. The following rollcall votes occurred on S. 5.

A Leahy amendment that would provide for an increase of federal judges' salaries in the amount of 16.5% of their current salaries (rounded to the nearest $100).

| YEAS | NAYS |
| --- | --- |
| Leahy | Hatch |
| Kennedy (Proxy) | Grassley |
| Biden | Kyl |
| Feingold | DeWine |
| Durbin | Sessions |
| | Graham |
| | Cornyn |
| | Brownback |
| | Coburn |
| | Kohl |
| | Feinstein |
| | Schumer |
| | Specter |

Motion to report favorably S. 5. The motion was approved by 13 yays to 5 nays.

| YEAS | NAYS |
| --- | --- |
| Hatch | Leahy |

**Page 27**

| | |
|---|---|
| Grassley | Kennedy (Proxy) |
| Kyl | Biden |
| DeWine | Feingold |
| Sessions | Durbin |
| Graham | |
| Cornyn | |
| Brownback | |
| Coburn | |
| Kohl | |
| Feinstein | |
| Schumer | |
| Specter | |

## III. PURPOSES

   By now, there should be little debate about the numerous problems with our current class action system. A mounting stack of evidence reviewed by the Committee demonstrates that abuses are undermining the rights of both plaintiffs and defendants. One key reason for these problems is that most class actions are currently adjudicated in state courts, where the governing rules are applied inconsistently (frequently in a manner that contravenes basic fairness and due process considerations) and where there is often inadequate supervision over litigation procedures and proposed settlements. The problem of inconsistent and inadequate judicial involvement is exacerbated in class actions because the lawyers who bring the lawsuits effectively control the litigation; their clients–the injured class members–typically are not consulted about what they wish to achieve in the litigation and how they wish it to proceed. In short, the clients are marginally relevant at best. This stands in stark contrast to the designed purpose of class actions. Class actions were designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries. As such, class actions are a valuable tool in our jurisprudential system. However, they are only beneficial when the class members are kept a priority throughout the process.

   To make matters worse, current law enables lawyers to "game" the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes and approving settlements without regard to **6  class member interests. In this environment, consumers are the big losers: In too many cases, state court judges are readily approving class action settlements that offer little–if any–meaningful recovery to the class members and simply transfer money from corporations to class counsel. Often, the settlement notices in such cases are so confusing that the plaintiff class members do not understand what–if anything–the settlement offers or how they can opt out of it. Multiple class action cases purporting to assert the same claims on behalf of the same people often proceed simultaneously in different state courts, causing judicial inefficiencies and promoting collusive activity. Finally, many state courts freely issue rulings in class action cases that have nationwide ramifications, sometimes overturning well-established laws and policies of other jurisdictions.

**\*5**  The Class Action Fairness Act of 2005 is a modest, balanced step that would address some of the most egregious problems in class action practice. The Committee emphasizes, however, that the Act is not intended to be a "panacea" that will correct all class action abuses.

The Act has three key components.

First, S. 5 includes a consumer class action bill of rights, with multiple components. One element prohibits federal courts from approving coupon or "net loss" settlements without making written findings that such settlements benefit the class members. Another element specifies the methods for calculating attorneys' fees in class settlements in which coupons constitute all or part of the relief afforded to claimants to ensure that such fee awards are consistent with the benefits afforded class members or the amount of real work that the class counsel have performed in connection with the litigation. Yet another element of the bill of rights provides an additional mechanism to safeguard plaintiff class members' rights by requiring that notice of class action settlements be sent to appropriate state and federal officials, so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.

Second, S. 5 corrects a flaw in the current diversity jurisdiction statute (28 U.S.C. S 1332) that prevents most interstate class actions from being adjudicated in federal courts. One of the primary historical reasons for diversity jurisdiction "is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court." [1] Because interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit, the Committee firmly believes that such cases properly belong in federal court. To that end, this bill (a) amends section 1332 to allow federal courts to hear more interstate class actions on a diversity jurisdiction basis, and (b) modifies the federal removal statutes to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire. Thus, S. 5 makes it harder for plaintiffs' counsel to "game the system" by trying to defeat diversity jurisdiction, creates efficiencies in the judicial system by allowing overlapping and "copycat" cases to be consolidated in a single federal court, places the determination of more interstate class action lawsuits in the proper forum–the federal courts.

Third, S. 5 directs the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations for ensuring that attorneys' fees are determined in a fair and reasonable way. This provision will help address the problem of excessive attorneys' fees and will facilitate legislative oversight of the Judicial Conference's efforts in this area.

### **\*6  \*\*7**  IV. BACKGROUND AND NEED FOR LEGISLATION

As set forth in Article III of the Constitution, [2] the Framers established diversity jurisdiction to ensure fairness for all parties in litigation involving persons from multiple jurisdictions, particularly cases in which defendants from one state are sued in the local courts of another state. Interstate class actions which often involve millions of parties from numerous states–present the precise concerns that diversity jurisdiction typically involve more people, more money, and more interstate class actions which often involve millions of parties from numerous states–present the precise concerns that diversity jurisdiction was designed to prevent: frequently in such cases, there appears to be state court provincialism against out-of-state defendants or a judicial failure to recognize the interests of other states in the litigation. Yet, because of a technical glitch in the diversity jurisdiction statute (28 U.S.C. S 1332), such cases are usually excluded from federal court. This glitch is not surprising given that class actions as we now know them did not exist when the statute's concept was crafted in the late 1700s.

This Committee believes that the current diversity and removal standards as applied in interstate class actions have facilitated a parade of abuses, and are thwarting the underlying purpose of the constitutional requirement of diversity jurisdiction. S. 5 addresses these concerns by establishing "balanced diversity" a rule allowing a larger number of class actions into federal courts, while continuing to preserve primary state court jurisdiction over primarily local matters.

**Page 29**

A. A Brief History of Class Actions

Although class actions have some roots in common law, the general concept was first codified in 1849, when several states adopted the Field Code. [3] To successfully plead and prosecute class actions, the Field Code merely required that numerous parties demonstrate a common interest in law or fact.

Rule 23 of the Federal Rules of Civil Procedure, the rule governing federal court class actions, was initially adopted in 1938. [4] However, the concept of class actions that are a familiar part of today's legal landscape did not arise until 1966, when Rule 23 was substantially amended to expand the availability of the device. Under Rule 23, a class action can be brought in federal court if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, a proponent must show that the proposed class meets one of three additional requirements set forth in Rule 23(b). For example, for a Rule 23(b)(3) damages class actions to be certified, a proponent must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual **\*7** **\*8** members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [5]

As originally envisioned, class action lawsuits were to be primarily a tool for civil rights litigants seeking injunctions in discrimination cases. [6] Prof. John P. Frank, a member of the 1966 Advisory Committee on Civil Rules that proposed amending Rule 23 to its current form, testified that those who wrote the new class action rule thought it would rarely (if ever) apply to product liability or mass torts cases. [7] In the 1980s, however, some plaintiffs' lawyers successfully persuaded judges to expand class actions to the area of mass torts. [8] These courts began to expand the types of claims they were willing to certify as class actions because they feared that the large number of individual mass tort cases could slow or stop the judicial system. [9] Thus, class actions have evolved from their original primary purpose–to counter civil rights abuses–and have become a common tool for plaintiffs' attorneys bringing personal injury or product liability claims. Yet, while the landscape of class actions has changed dramatically, the procedural rules regarding which courts can hear class actions, and, consequently, which procedural law will apply to such cases, generally have reMained the same since 1966.

B. Federal Diversity Jurisdiction and Removal Provisions

1. The Basics of Diversity Jurisdiction

The Constitution extends federal court jurisdiction to cases of a distinctly federal character–for instance, cases raising issues under the Constitution or federal statutes, or cases involving the federal government as a party–and generally leaves to state courts the adjudication of local questions arising under state law. However, the Constitution specifically extends federal jurisdiction to encompass one category of cases involving issues of state law: "diversity" cases, or suits "between Citizens of different States." [10]

According to the Framers, the primary purpose of diversity jurisdiction was to protect citizens in one state from the injustice that **\*8** **\*9** might result if they were forced to litigate in out-of-state courts. [11] Quoting James Madison, Judge Henry Friendly explained that diversity jurisdiction is essential to a strong union because it "may happen that a strong prejudice may arise in some state against the citizens of others, who may have claims against them." [12] Justice Frankfurter expressed a similar understanding of Madison's concerns: "It was believed that, consciously or otherwise, the courts of a state may favor their own citizens. Bias against outsiders may become embedded in a judgment of the state court and yet not be sufficiently apparent to be made the basis of a federal claim." [13]

**Page 30**

In addition to protecting individual litigants, diversity jurisdiction has two other important purposes. In testimony several years ago before the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott of the Yale Law School expressed the view that diversity jurisdiction was designed not only to protect against actual discrimination, but also "to shore up confidence in the judicial system by preventing even the appearance of discrimination in favor of local residents." [14] In addition, several legal scholars have noted that the Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce. [15] As former Acting Solicitor General Walter Dellinger testified before the Committee, "diversity jurisdiction has served to guarantee that parties of different state citizenship have a means of resolving their legal differences on a level playing field in a manner that nurtures interstate commerce." [16] Both of these concerns–judicial integrity and interstate commerce–are strongly implicated by class actions.

Over the years since the First Congress enacted provisions in the Judiciary Act of 1789 setting forth the parameters of federal diversity jurisdiction, two statutory limitations on that jurisdiction have been constants. The first is the "amount in controversy" requirement (currently $75,000), which Congress enacted in order to ensure that federal diversity jurisdiction extends only to non-trivial **\*9  \*\*10** state-law cases. [17] The second is the "complete diversity" requirement, a rule that federal jurisdiction lies only when all plaintiffs are diverse as to all defendants. [18] It is important to recognize that these procedural limitations regarding interstate class actions were policy decisions, not constitutional ones. In fact, the U.S. Supreme Court has repeatedly acknowledged that the complete diversity and minimum amount-in-controversy requirements are political decisions not mandated by the Constitution. [19] Indeed, as Prof. Dellinger noted in testimony before this Committee, class action legislation expanding federal jurisdiction over class actions "would fulfill the intentions of the Framers because the rationales that underlie the diversity jurisdiction concept apply with equal–if not greater–force to interstate class actions." [20] It is therefore the prerogative of Congress to modify these technical requirements as it deems appropriate.

2. Removal: How Diversity Cases Arrive in Federal Court

The concept of "removing" cases from state courts to federal courts is based largely on the same core premise as diversity jurisdiction–i.e., that an out-of-state defendant in a state court proceeding should have access to an even-handed federal forum. [21] The general removal statute, 28 U.S.C. S 1441(a), provides that any civil action brought in a state court may be removed by the defendant(s) to federal court if the claim could have originally been brought in federal court. In other words, so long as a federal district court could exercise original jurisdiction over a claim, a defendant may remove the case to federal court.

Section 1446(b) of Title 28 outlines the procedure for removal. Under this provision, a defendant must file papers seeking removal to federal court within 30 days after receiving a copy of the initial pleading (or service of summons if a pleading has been filed in court and is not required to be served on the defendant). If the original complaint was not removable (or if it could not be determined from the face of the complaint that it was removable), but the plaintiff subsequently amends the pleadings in such a way that removal becomes proper, then the notice of removal must be filed within 30 days of receipt by the defendant of "a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case [is removable]." [22] The Committee notes that the purpose of this provision is to prevent plaintiffs from evading federal jurisdiction by hiding the true nature of their case. Thus, the Committee favors the broad interpretation of "other paper" adopted by some courts to include deposition transcripts, discovery responses, settlement offers and other documents or occurrences that reveal the removability of a case. [23]

**\*10   \*\*11**  C. How Diversity Jurisdiction and Removal Statutes Are Abused

The current rules governing federal jurisdiction have the unintended consequence of keeping most class actions out of federal court, even though most class actions are precisely the type of case for which diversity jurisdiction was created. [24] In addition,

**Page 31**

current law enables plaintiffs' lawyers who prefer to litigate in state courts to easily "game the system" and avoid removal of large interstate class actions to federal court.

This gaming problem exists for two reasons. The first is the "complete diversity" requirement. Although the Supreme Court has held that only the named plaintiffs' citizenship should be considered for purposes of determining if the parties to a class action are diverse, the "complete" diversity rule still mandates that all named plaintiffs must be citizens of different states from all the defendants. [25] In interstate class actions, plaintiffs' counsel frequently and purposely evade federal jurisdiction by adding named plaintiffs or defendants simply based on their state of citizenship in order to defeat complete diversity. One witness at the Committee's 2002 hearing on class actions testified that her drug store was named as a defendant in "hundreds of lawsuits" so that "the lawyers could keep the case in a place known for its lawsuit-friendly environment." [26] If all it takes to keep a class action in state court is to name one local retailer, it is no surprise that few interstate class actions meet the complete diversity requirement.

The second problem is created by the amount-in-controversy requirement. In interpreting 28 U.S.C. S 1332(a), some federal courts of appeals, relying on a 1974 Supreme Court decision, [27] have held that the amount-in-controversy requirement is normally met in class actions only if each of the proposed class members individually seeks damages in excess of the statutory minimum. [28] That means federal courts can often hear class actions in which each potential class member claims damages in excess of $75,000. [29] The Committee believes that requiring each plaintiff to reach the $75,000 mark makes little sense in the class action context. After all, class actions frequently involve tens of millions of dollars even though each individual plaintiff's claims are far less than that. Moreover, class action lawyers typically misuse the jurisdictional **\*11  \*\*12** threshold to keep their cases out of federal court. For example, class action complaints often include a provision stating that no class member will seek more than $75,000 in relief, even though they can simply amend their complaints after the removal to seek more relief and even though the class action seeks millions of dollars in the aggregate. Under current law, that is frequently enough to keep a major class action in state court.

This leads to the nonsensical result under which a citizen can bring a "federal case" by claiming $75,001 in damages for a simple slip-and-fall case against a party from another state, while a class action involving 25 million people living in all fifty states and alleging claims against a manufacturer that are collectively worth $15 billion must usually be heard in state court (because each individual class member's claim is for less than $75,000). Put another way, under the current jurisdictional rules, federal courts can assert diversity jurisdiction over a typical state law claim arising out of an auto accident between a driver from one state and a driver from another, or a typical trespass claim involving a trespasser from one state and a property owner from another, but they cannot assert jurisdiction over claims encompassing large-scale, interstate class actions involving thousands of plaintiffs from multiple states, defendants from many states, the laws of several states, and hundreds of millions of dollars–cases that have obvious and significant implications for the national economy.

There is a growing chorus of authoritative sources declaring that something is badly amiss with the manner in which federal diversity jurisdictional requirements are applied to class actions:

* The leading federal civil procedure law treatise has noted: "The traditional principles [regarding federal diversity jurisdiction over class actions] have evolved haphazardly and with little reasoning. They serve no apparent purpose." [30]

* In a recent Minnesota state appellate court decision upholding a grant of class certification, a concurring judge noted that the nationwide class action before it was a "poster child for national class action reform. We have here a Minnesota [state] district court, applying a New Jersey consumer fraud statute to a nationwide class of plaintiffs, with few of those plaintiffs residing in New Jersey. And, it is probably a fair assumption that the legislative authors of the New Jersey consumer protection scheme did not have in mind midwestern farmers purchasing agricultural chemicals as the protected class * * * This is not a recipe for uniformity or consistency, it is fair neither to claimants nor defendants and it is long past time for national policy makers to address class action procedures. [31]

\* The U.S. Court of Appeals for the Eleventh Circuit apologized for sending an interstate class action back to state court, noting that "an important historical justification for diversity jurisdiction is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court." Observing that the out-of-state defendant in that case was confronting "a state court system [prone to] produce[] gigantic awards against out-of-state corporate defendants," the court stated that **\*12** "[o]ne would think that this case is exactly what those who espouse the historical justification for [diversity jurisdiction] would have in mind \* \* \*"[32]

**\*\*13** \* In that same case, Judge John Nangle, the former chairman of the Judicial Panel for Multidistrict Litigation, concurred: "Plaintiffs' attorneys are increasingly filing nationwide class actions in various state courts, carefully crafting language \* \* \* to avoid \* \* \* the federal courts. Existing federal precedent \* \* \* [permits] this practice \* \* \*, although most of these cases \* \* \* will be disposed of through 'coupon' or 'paper' settlements \* \* \* virtually always accompanied by munificent grants of or requests for attorneys' fees for class counsel \* \* \* [T]his judge is of the opinion that the present [jurisdictional rules] do[] not accommodate the reality of modern class litigation and settlements."[33]

In another case, Judge Anthony Scirica (formerly the chair of the Judicial Conference's Standing Committee on Rules and Procedure and now the Chief Judge of the U.S. Court of Appeals for the Third Circuit) observed that although "national (interstate) class actions are the paradigm for federal diversity jurisdiction because \* \* \* they implicate interstate commerce, foreclose discrimination by a local state, and tend to guard against any bias against interstate enterprises, \* \* \* the current jurisdictional statutes [put] such class actions \* \* \* beyond the reach of the federal courts."[34]

\* And even though the Judicial Conference of the United States has historically opposed any expansion of federal jurisdiction over class actions, the Conference has more recently signaled a significant shift in position. In a March 26, 2003 letter to the Committee,[35] the Conference acknowledged "current problems with class action litigation."[36] Further, in that letter, the Conference for the first time "recognize[d] that the use of [expanded] diversity jurisdiction may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts."[37]

The Committee notes that several congressional hearing witnesses (including former Carter Administration Attorney General Griffin Bell and Clinton Administration Solicitor General Walter E. Dellinger) and other legal experts agree that if Congress were to draft an entirely new federal diversity jurisdiction statute and start over in deciding which cases should be subject to federal diversity jurisdiction Congress likely would conclude that interstate class actions are among the cases that most warrant access to the federal courts because they involve the most people, put the most money in controversy, and have the greatest implications for interstate commerce.[38] As Prof. Dellinger noted in his testimony before this Committee, "the rationales that underlie the diversity jurisdiction concept apply with equal–if not greater–force to interstate class actions."[39]

**\*13**  D. Other Abuses of the Class Action Rules

The ability of plaintiffs' lawyers to evade federal diversity jurisdiction has helped spur a dramatic increase in the number of class actions litigated in state courts–an increase that is stretching the resources of the state court systems. In testimony to the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott pointed out that the flood of class actions in our state courts is too well documented to warrant significant discussion, much less debate.[40] According to studies, federal class action **\*\*14** filings over the past ten years have increased by more than 300 percent. At the same time, class action filings in state courts have grown more than three times faster–by more than 1,000 percent.[41]

Notably, many of these cases are being filed in improbable jurisdictions. A study conducted in three venues with reputations as hotbeds for class action activity found exponential increases in the numbers of class actions filed in recent years. For example, in the Circuit Court of Madison County, Illinois, a mostly rural county that covers 725 square miles and is home to less than one

**Page 33**

percent of the U.S. population, the number of class actions filed annually grew from 2 in 1998 to 39 in 2000–an increase of 3,650 percent. [42] A follow-up study found that the number of class actions filed in the county continued to grow dramatically in 2001 and 2002. [43] And in 2003, class action filings there catapulted to 106, up more than 5,000 percent since 1998. [44] According to the president of the Illinois Trial Lawyers Association (an association representing plaintiffs' lawyers), the reason for the 2003 jump in filings was an effort to beat this legislation; plaintiffs' lawyers were "playing it safe" and rushing to get suits filed in case the legislation was enacted in 2004. [45] The same studies also found that most of the class actions brought in Madison County and other magnet courts had little–if anything–to do with the venues where they were brought. [46]

The reason for this dramatic increase in state court class actions cannot be found in variations in class action rules; after all, the rules governing the decision whether cases may proceed as class actions are basically the same in federal and state courts–and of course, they are the same within states, i.e., the same in "magnet" jurisdictions such as Madison County and St. Clair County, Illinois, as they are in more easily accessible jurisdictions such as Cook County, Illinois. In fact, thirty-six states have adopted the basic federal class action rule (Rule 23), sometimes with minor revisions. Of the remaining states, most have rules that are guided by federal court class action policy and contain similar requirements. (Two states, Mississippi and West Virginia, do not have rules or statutes **\*14** authorizing class actions.) Thus, there are no wide variations between federal and state court class action policies.

The Committee finds, however, that one reason for the dramatic explosion of class actions in state courts is that some state court judges are less careful than their federal court counterparts about applying the procedural requirements that govern class actions. In particular, many state court judges are lax about following the strict requirements of Rule 23 (or the state's parallel governing rule), which are intended to protect the due process rights of both unnamed class members and defendants. In contrast, federal courts generally scrutinize proposed settlements much more carefully and pay closer attention to the procedural requirements for certifying a matter for class treatment. [47]

**\*\*15** Another problem is that a large number of state courts lack the necessary resources to supervise proposed class settlements properly. [48] Many state judges do not have law clerks, and the explosion of state court class actions has simply overwhelmed their dockets. Not surprisingly, abuses are much more likely to occur when state court judges are unable to give class action cases and settlements the attention they need. Federal judges, in contrast, have access to magistrates and can appoint special masters when they are faced with complex litigation like class actions. Moreover, the average state court judge is assigned 1,568 new cases each year, compared to federal judges, who are assigned, on average, fewer than 500. [49]

The lack of a federal forum for most interstate class actions and the inconsistent administration of class actions in state courts have led to several forms of abuse. First, lawyers, not plaintiffs, may benefit most from settlements. Second, corporate defendants are forced to settle frivolous claims to avoid expensive litigation, thus driving up consumer prices. Third, constitutional due process rights are often ignored in class actions. Fourth, expensive and predatory copy-cat cases force defendants to litigate the same case in multiple jurisdictions, driving up consumer costs.

1. Lawyers receive disproportionate shares of settlements

The first such abuse involves settlements in which the attorneys receive excessive attorneys' fees with little or no recovery for the class members themselves. In the now infamous Bank of Boston class action settlement, [50] or example, the defendant bank was accused of over-collecting escrow monies from homeowners and profiting from the interest. The settlement, approved by an Alabama state court, awarded up to $8.76 each to individual class members, while the class counsel got more than $8.5 million in fees. To make matters worse, the fees were simply debited directly from individual class members' escrow accounts leaving many of them worse off than they were before the suit. In testimony before the Subcommittee on Administrative Oversight and the Courts, class member Martha Preston recounted how she received $4 from the settlement, **\*15** but was charged a mysterious $80 "miscellaneous deduction," which she later learned was an expense used to pay the class lawyers' $8.5 million

**Page 34**

settlement fee. Ms. Preston expressed her disbelief over how "people who were supposed to be my lawyers, representing my interests, took my money and got away with it." [51]

A few years ago, the National Law Journal reported on another similarly troubling state court case:

  When 75-year-old Olga Heaven received some legal papers in the mail a few weeks ago, she asked her daughter, a lawyer, to look them over. A good thing, too. If Ms. Heaven had misunderstood the notice or simply thrown it away, her daughter says, she might have been required to sell her house and property as part of a recent class action settlement. * * * Ms. Heaven [was]  **16  one of 60 class action plantiff homeowners–many of them unwitting parties to the litigation–who received a notice that a property damage suit against a local oil refinery had settled. * * * The unusual deal requires settling plaintiffs to sell their homes to [the defendant refinery owner] for two times their tax-assessed value. In addition, the plaintiffs are required to withdraw from the lawsuit * * * and release any property damage or personal injury claims against [the defendant], which was accused of polluting the area. The settlement was set up [as] a so-called opt-out class, meaning that homeowners would be included in the deal [and required to sell their homes] unless they sent in responses to the notice within 30 days. * * * The total payout by [the defendant] could be as much as $1.1 million. Plaintiffs' lawyers could earn as much as $200,000, depending on how many plaintiffs participate in the deal. [52]

Through several hearings over the past several years, the Committee has become aware of numerous class action settlements approved by state courts in which most–if not all–of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing. These settlements include many so-called "coupon settlements" in which class members receive nothing more than promotional coupons to purchase more products from the defendants. For example:

  * A recent lawsuit involved customers who had Firestone tires that were among those that the National Highway Traffic Safety Administration investigated or recalled, but who did not suffer any personal injury or property damage. After a federal appeals court rejected class certification, plaintiffs' counsel and Firestone negotiated a settlement, which has now been approved by a Texas state court. Under the settlement, the company has agreed to redesign certain tires (a move already underway irrespective of the suit) and to develop a three-year consumer education and awareness camp,  **16  but the members of the class received nothing. The lawyers will receive $19 million. [53]

  * In another state court class action settlement, in which a cruise line was accused of collecting "port charges" that exceeded the amount actually paid by the defendant. Under the terms of the settlement, the class members received $30 to $40 discounts from another cruise line on its two- and three-night cruises out of Port Canaveral, Florida because Premier was no longer in business. [54]  In other words, a company that had not even been sued and had absolutely no risk of liability agreed to offer coupons–no doubt because they recognize that such coupons are a promotional opportunity and not a penalty. Attorney for the plaintiffs received $887,000 in fees, costs, and expenses. [55]

  * Microsoft has settled antitrust class actions in ten states in which plaintiffs alleged that Microsoft used its monopoly to gouge consumers. Based on the terms of the settlement, consumers who bought Microsoft software will receive a $5 to $10 voucher  **17  good for future purchases of particular computer hardware or software products. To receive the voucher, consumers must download a form from www.microsoftproductsettlement.com/Kansas and then mail it in. To redeem the voucher, consumers must mail in the voucher, a photocopy of an original receipt, and an original UPC code. Half of the unclaimed settlement money will be used to donate Microsoft products to schools. A federal judge rejected a similar settlement in part on the ground that the school donations were intended to inflict further injury on Apple. Attorneys in these cases have sought hundreds of millions of dollars in fees. [56]

**Page 35**

\* Consumers in a state court class action alleged that the beer goblets served at a Chicago restaurant chain were misrepresented to be 12 ounces, when they held only 10.6 ounces. In settlement, the company will give away 50,000 coupons for $1 off every subsequent $5 purchase at its 22 Chicago-area restaurants. [57] All cash from the settlement goes to the lawyers.

\* To settle a state court class action alleging deceptive pricing practices on certain products, KB Toys agreed to hold a sale. [58] Under the settlement agreement, the toy retailer offered a 30 percent discount on selected products between October 8 and October 14, 2003. According to an independent analyst, "KB Toys will benefit from the settlement," because "they're driving traffic." [59] The **\*17** attorneys benefited too: they received all the cash–fees and costs of $1 million. [60]

\* In a recent class action where consumers alleged that a company was selling cribs that were unsafe for use by infants, the class members received either a crib repair kit or a coupon for $55 which could be used toward the future purchase of a Dorel Juvenile Group Product. [61] Of course, the coupon is only valuable for consumers who plan to have another baby and still trust the company.

\* Another recent suit involved allegations that Poland Spring water does not really come from a spring deep in the woods of Maine. The settlement calls for discounts or free water to Poland Spring customers over five years and contributions of $2.75 million to charities. In addition, the named plaintiff will receive $12,000. Plaintiffs' lawyers received $1.35 million. [62]

\* Plaintiffs alleged that GameStop Corp. misrepresented some of the video games it was selling as new, when they had actually been previously purchased and returned. [63] Under the settlement, GameStop agreed to post notices in stores stating: "All software for **\*\*18** video game consoles may have been used and returned in accordance with (the store's) return policy." Further, anyone who bought a game from particular stores on specified dates, and can produce their receipt, will receive a coupon for 5 percent off the price of any one game. In other words, customers would receive $1.25 off a $25 dollar game–as long as they kept receipts. The coupon can be redeemed at retail locations, but not on the defendant's website. [64] Lawyers for the plaintiffs were paid $125,000 in fees and costs. [65]

\* Plaintiffs alleged that Register.com delayed in switching purchased domains over to their customers and continued to display the company's "Coming Soon" page which promotes the company and its advertisers. Under the settlement, class members receive coupons to use with Register.com (assuming they ever plan to register one of the company's domains again). The lawyers for the class get $642,500. [66]

\* In a case involving customers who alleged that they were charged excessive late fees by Blockbuster, the class members received $1 off coupons for rentals–at the same time, their attorneys divided up a $9.25 million fee award. Experts have predicted that at most, only 20 percent of the class members will redeem the coupons. The settlement allows Blockbuster to continue its practice of charging customers for a new rental period when they return a **\*18** tape late. [67] In this settlement approved by a Texas state court, only the lawyers got cash.

\* To settle an Illinois state court class action in which it was accused of improperly including asbestos in its crayons, a manufacturer agreed to issue class members 75-cent coupons toward the purchase of new crayons. The attorneys got $600,000 in fees.

\* In another recent case, Food Lion settled a state court class action filed by a consumer group by offering 28-cent coupons to customers who held an MVP discount card between 1995 and 1998. The plaintiff class alleged that Food Lion charged too much sales tax on discounted products purchased with the discount card. [68] Only the lawyers got money.

\* A manufacturer offered consumers who bought a dozen Pinnacle golf balls free golf gloves. When the manufacturer ran out of the golf gloves and substituted a set of three free golf balls, it was hit with a class action. The settlement provided that the

manufacturer would send each class member three more free golf balls. Meanwhile, by order of a state court, the attorneys who brought the lawsuit received $100,000 in fees and the persons who served as class representatives each received $2,500.[69]

* Under the settlement in this state court case, which resulted from allegations regarding changes in the American Airlines frequent flyer program, members of the program received vouchers good for $25 to $75 off the price of future travel, or a similarly valued reduction in the number of miles required for an award. American also agreed to pay the lawyers up to $25 million in fees. One news article about the settlement **19 quoted travel experts saying that "the practical value of those discounts will be modest," and "American could end up generating enough extra revenue to more than offset the cost of the offer."[70]

* A class action alleged that certain "zip drives" contained a defect that sometimes caused the failure of the drives or the zip disks. The plaintiffs' attorneys received $4.7 million in fees, while the estimated 28 million purchasers of an Iomega Zip drive between 1995 and March 19, 2001 received coupons for rebate of between $5 and $40 on future purchases of Iomega products. In addition, the settlement called for the defendant to donate $1 million of its products to schools.[71] Virtually all of the cash paid in this state court-approved settlement went to lawyers.

* In a suit involving port charges, a sea cruise line agreed to give vouchers for a future cruise worth $25 to $55 off a future cruise to 4.5 million people who sailed on its cruises between April 19, 1992 and June 4, 1997. The vouchers can be used for a future cruise or redeemed for cash at 15 percent or 20 percent of face value.[72] In this state court class action settlement, only the lawyers received cash payments.

* In a case alleging flawed television sets, Thomson Consumer Electronics agreed to reimburse customers who had receipts documenting **19 repairs, to provide $50 rebates on the purchase of future products for consumers who did not repair their problems or did not have receipts, and to provide $25 rebates on future products to consumers who did not experience a problem. Under the terms of the settlement approved by an Illinois state court, the lawyers reportedly received $22 million in fees and costs.[73] According to news reports, more than 2,640 people opted out of the settlement; some said they opted out because the form was complicated and others said they opted out because the attorneys' fees were so high.[74]

* In the settlement of a state court class action involving allegations of overly aggressive fees and rates by a Minnesota credit card company, class members received discount coupons with a retail value of $19.95, an $8 dollar donation in their name to the Boys and Girls Clubs of America and the right to apply for a 9.9 percent interest credit card and to join a promotional travel discount club. They also had the potential to receive between $10 and $70 in cash. The company agreed to change its practices, and the lawyers received $5.6 million in fees.[75]

* In one state court class action involving faulty pipes, lawyers for a group of Alabama plaintiffs received more than $38.4 million in fees, and lawyers for a class of Tennessee plaintiffs received $45 million, or the equivalent of about $2,000 an hour. In contrast, the homeowners only received 8 percent rebates toward new plumbing–and to get those rebates, they had to first prove that they had suffered leaks and then go out and buy a new system.[76] The money in the settlement flowed primarily to class counsel.

**20 * In March 1995, a computer manufacturer settled multiple state court class actions alleging a chip flaw that would arise only once in 27,000 years for the average spreadsheet user. It essentially agreed to do what it was already doing: offer free replacements, maintain service centers, operate toll-free phone numbers, and provide diagnostic computer programs. Meanwhile, counsel received $4.27 million in fees.[77]

**Page 37**

* In a group of state court class actions settled in 2002, class members alleging that they were not fully advised of "energy surcharges" applied when they checked into hotels during California's electricity crisis were given $10 coupons. [78] Only the lawyers are receiving cash.

* In another case, an Illinois state court approved a coupon settlement of a class action filed against Southwestern Bell Mobile Systems, Inc., alleging that the company failed to fully disclose the fact that it rounded up customer calls to the next minute. Under the state court settlement, the class members received $15 vouchers **20** toward Cellular One products, while the lawyers took home more than $1 million in fees. [79]

* In a state court class action alleging that Coca-Cola improperly added sweeteners to apple juice, defendant agreed to distribute 50-cent coupons toward the purchase of apple juice. Meanwhile, class counsel received $1.5 million. [80]

* The Chicago Tribune reported that in a state court class action against a record company to recover the prices paid for albums by the group Milli Vanilli (that contained the voices of other performers), class members were given a settlement of $1 to $3 each. The Illinois state court awarded the lawyers $675,000, but the lawyers turned around and petitioned the court for an increase to $1.9 million.

* In a state court action alleging that General Mills treated oats with a nonapproved-pesticide, class members were offered coupons; the attorneys received $1.75 million. [81]

* In a settlement of a state court class action against Packard Bell alleging a product defect, class members were offered a six-month extended service contract for which they were each required to pay $25. Only the lawyers got cash.

* To settle a state court class action alleging collusion to fix cellular phone prices, wireless phone service providers agreed to provide coupons and discounts to customers in several California counties. [82] The lawyers, however, received cash.

* In a settlement of a similar state court antitrust class action involving cellular service in a different area, coupons and small service credits were offered. But counsel obtained agreement to be paid up to $9.5 million. [83] Virtually all the cash paid in the settlement went to lawyers.

* In another case, class action plaintiffs alleged that discount stores overstated the value of software bundles that came with computers. In a class settlement approved by a state court, consumers received coupons worth the lesser of a 7% or $25 discount off the future purchases of products from defendants' stores. The attorneys received $890,000 in fees. [84]

**21** 2. Judicial blackmail forces settlement of frivolous cases

* A second common abuse in state court class actions is the use of the class device as "judicial blackmail" in cases that border on frivolous. Because class actions are such a powerful tool, they can give a class attorney unbounded leverage, particularly in jurisdictions that are considered plaintiff-friendly. Such leverage can essentially force corporate defendants to pay ransom to class attorneys by settling–rather than litigating–frivolous lawsuits. This is a particularly alarming abuse because the class action device is intended to be a procedural tool and not a mechanism that affects the substantive outcome of a lawsuit. Nonetheless, state court judges often are inclined to certify cases for class action treatment **21** not because they believe a class trial would be more efficient than an individual trial, but because they believe class certification will simply induce the defendant to settle the case without trial. [85] As Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit has explained, "certification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability. * * * [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle." [86] Hence, when plaintiffs seek hundreds of

**Page 38**

millions of dollars in damages, basic economics can force a corporation to settle the suit, even if it is meritless and has only a five percent chance of success.

Not surprisingly, the ability to exercise unbounded leverage over a defendant corporation and the lure of huge attorneys' fees have led to the filing of many frivolous class actions.

As District of Columbia Insurance Commissioner Lawrence Mirel has testified before the Committee, insurance companies are often forced to settle lawsuits even though the challenged actions were fully in accordance with state law--or encouraged by state policies. [87]  For example, two automobile insurance companies, worried about mounting legal expenses and negative publicity, settled a lawsuit over a long-standing industry-wide practice of rounding insurance premiums up to the nearest dollar for nearly $36 million, even though the premiums were calculated according to specific instructions from the Texas Department of Insurance. [88]

Other brow-raising examples of frivolous suits are common. One such case was brought against Ford Motor Company in New York state court by the Milberg Weiss firm, one of the better known plaintiffs' class action firms in the country. The case involved an inadvertent mistake made by Ford--it had put a slightly overstated price on the window stickers on certain vehicles. As soon as Ford discovered the mistake, the company began sending letters to the affected customers apologizing for the error and enclosing checks that more than compensated them. Nonetheless, fully knowing that this refund program was already well underway, the Milberg Weiss law firm filed a class action lawsuit charging that Ford had committed fraud. Even worse, it asked the court immediately to enjoin Ford from continuing its refund efforts--presumably so that the lawyers could get a cut of the refund money. In this case, the court properly dismissed the  **22  action; nonetheless, Ford was required to waste time and corporate resources on a lawsuit that clearly served no legitimate purpose. [89]

3. Current class action rules can ignore due process rights

A third type of class action abuse occurs when state courts ignore the due process rights of out-of-state defendants by denying them  *22  the opportunity to contest the plaintiffs' claims against them. One witness who testified before the Subcommittee on Administrative Oversight and the Courts blamed this phenomenon on a "laissez faire" attitude of some state courts. [90]  The most egregious examples of this are the so-called "drive-by class certification" cases, in which a class is certified before the defendant has a chance to respond to the complaint, or in some cases, has even received the complaint. In one lawsuit filed against an auto manufacturer in a Tennessee state court, for example, the complaint was filed on July 10, 1996. Plaintiffs filed several inches of documents with their complaint. Amazingly, by the time the court closed that same day, the judge had entered a nine-page order granting certification of a nationwide class of 23 million members. The defendant was not even notified about the lawsuit before the certification and thus had no opportunity to tell its side of the story. [91]  And upon checking, the defendant discovered that a group of record companies had the same experience with the same judge in an antitrust class action filed several days earlier. [92]  Similarly, in one of the cases to develop out of the Firestone tire controversy, a Tennessee state court certified a nationwide class just four days after the defendants were served with the complaint (and obviously without benefit of any input from defendants). [93]  And in another case, a Kentucky state court ordered injunctive relief in favor of the class before the defendant was even notified of the lawsuit. [94]

4. Some magnet state courts easily certify national class actions

A fourth type of class action abuse that is prevalent in state courts in some localities is the "I never met a class action I didn't like" approach to class certification. [95]  Some state courts with this permissive attitude have even certified classes that federal courts had already found uncertifiable. In one case, for example, a state court judge certified a nationwide class of persons who claimed that the house siding they had purchased was defective. Later, a federal district court judge presented with the same

**Page 39**

case rejected any prospect of certifying a class in that manner, finding that affording class treatment in that case would clearly violate the due process rights of the defendants and the purported class members. [96]

 **23  Another example of this phenomenon is a spate of class actions against automobile manufacturers alleging that the paint on 20-year-old vehicles was discoloring or peeling. Federal and state courts across the country, including the Texas Supreme Court, have consistently rejected attempts to certify classes in these cases, recognizing that each claimant's facts vary such that a jury would have to consider separately the claims of each of the thousands of class members. [97] Most recently, on August 14, 2003, the Texas  *23  Court of Appeals rejected a proposed class, finding that a class trial would give a jury "the unmanageable task of separately examining numerous paint systems, assessing their different failure rates and making separate determinations about which combination of processes, if any, is defective." [98] Astoundingly, just one month after the most recent Texas court ruling, a Madison County, Illinois judge certified an even broader, more complex nationwide class asserting identical paint claims against Ford regarding vehicles in service for almost 25 years. [99]

5. Copy cat class actions clog the courts and permit forum shopping

   Yet another common abuse is the filing of "copy cat" class actions (i.e., duplicative class actions asserting similar claims on behalf of essentially the same people). Sometimes these duplicative actions are filed by lawyers who hope to wrest the potentially lucrative lead role away from the original lawyers. In other instances, the "copy cat" class actions are blatant forum shopping–the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class. When these similar, overlapping class actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The "competing" class actions must be litigated separately in an uncoordinated, redundant fashion because there is no state court mechanism for consolidating state court cases. The result is enormous waste–multiple judges of different courts must spend considerable time adjudicating precisely the same claims asserted on behalf of precisely the same people. [100] As a result, state courts and class counsel may "compete" to control the cases, often harming all the parties involved. In contrast, when overlapping cases are pending in different federal courts, they can be consolidated under one single judge to promote judicial efficiency and ensure consistent treatment of the legal issues involved.

 **24  E. National Class Actions Belong in Federal Court Under Traditional Notions of Federalism

   Many of the abuses taking place in state courts are magnified by the growing trend among plaintiffs' attorneys to bring huge class actions on behalf of hundreds of thousands or even millions of consumers. These cases, which generally involve overly broad claims, put any class members with real injuries at risk. The incentive for class lawyers to gather the largest class possible is clear: why sue on behalf of just 1,000 people when you can sue for 1 million claimants  *24  and increase your intake? The problem with such broad claims, however, is that the entire lawsuit proceeds on a lowest common denominator basis. As a result, persons with legitimate injuries will be lumped in with the "average," often meritless claims and will not be given individual attention for their grievances. [101]

   The effect of class action abuses in state courts is being exacerbated by the trend toward "nationwide" class actions, which invite one state court to dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles. [102] A recent study found that 77 percent of class actions brought in 2001 in a rural Illinois county known for its heavy class action docket sought to certify nationwide classes. [103] These cases challenged matters as diverse as MTBE in wells; telephone billing practices; chicken processing procedures; and insurance reimbursement policies. Clearly, a system that allows state court judges to dictate national policy on these and numerous other issues from the local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism. In one case, for example, plaintiffs filed suit in an Alabama county court on behalf of more than 20 million people alleging that the design of federally mandated airbags is faulty. [104] From

**Page 40**

the standpoint of federalism, this suit defies logic. Why should an Alabama state court tell 20 million people in all 50 states what kind of airbags they can have in their cars?

The most egregious of such cases are those in which one state court issues nationwide rulings that actually contradict the laws of other states. This problem is particularly prevalent in insurance cases, which are being filed in increasingly greater number. As District of Columbia Insurance Commissioner Lawrence Mirel has testified before this Committee, class actions "frequently go[] around or simply ignore[] the role of state regulators." [105]

One case reported in the New York Times, for example, involved a longstanding practice of the State Farm Insurance Companies (shared by other insurers) of using non-original equipment manufacturer (OEM) parts to repair cars. [106] The practice was fully disclosed to policyholders, and the majority of states expressly permit insurers to specify non-OEM parts. Indeed, two states, Hawaii and Massachusetts, actually require the specification of non-OEM parts. Nonetheless, plaintiffs brought suit in Illinois state court claiming that all non-OEM parts used by policyholders were inferior to OEM parts, and that State Farm had breached its contractual obligation to policyholders and committed fraud **\*\*25** each time it specified such parts. Even though the plaintiffs eventually dropped their claim that all non-OEM parts were inferior, and conceded that this could only be determined on a part-by-part basis, the trial court still permitted the jury to reach a group judgment on the class action. The court was not even deterred by the fact that the plaintiffs in the class came from states throughout the nation with **\*25** widely varying laws regarding the use of non-OEM parts, including the two states–Hawaii and Massachusetts–that strongly embraced the very practice condemned by plaintiffs. [107] Indeed, in affirming a $1.3 billion verdict against State Farm in this case, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [w]ho testified that the laws of many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts. [108]

The State Farm case is not unique. This state court interference with the laws of other jurisdictions is becoming disturbingly common. For example:

\* An appellate court in Illinois recently affirmed the certification of a class consisting of Illinois residents and residents of 16 other states. The plaintiffs alleged the defendant telecommunications company had collected, on behalf of municipalities, taxes from customers located in unincorporated areas in violation of the Illinois consumer protection law. The court noted that because "50-state class actions are not uncommon in Illinois" it was not problematic that "the laws of 17 states are potentially implicated here." [109] Similarly, a year earlier another Illinois appellate court affirmed the certification of a nationwide class of consumers alleging violations of the same Illinois law with no regard for the laws of the other states involved. [110]

\* The Supreme Court of Oklahoma recently affirmed the certification of a nationwide product liability class action, applying the laws of a single state to transactions that occurred in all 50 states. [111] Thus, in this case, a state court has decided effectively to override whatever policy determinations another state's legislature or courts may have made on warranty or product liability policy to protect their own residents.

\* Another recent class action filed in Oklahoma involved allegations that the defendants failed to account for slop oil in monthly accountings rendered to certain oil producers. The lawsuit sounded in tort and contract, involved "millions of dollars," and transactions that occurred in "more than twenty states." [112] The Supreme Court of Oklahoma affirmed the certification of a nationwide class, ignoring the fact that the case would require resolution of the laws of twenty states.

The Minnesota Court of Appeals and the Minnesota Supreme Court recently affirmed a nationwide class action, applying the laws of a single state to transactions that occurred in many different jurisdictions (and virtually none of which occurred in the state whose laws were applied) [113] One judge who decided the case openly acknowledged that the court was engaging in the "false federalism" that has become part of the state court class action game. [114]

**Page 41**

**\*26    \*\*26**  A few years ago, a state trial court in Minnesota approved for class treatment a case involving millions of claimants from 44 states that would have had the effect of dictating the commercial codes of all those states. [115] The specific issue in the case was whether individuals have a state law right to recover interest on refundable deposits paid to secure an automobile lease. In certifying a class in that case, the court adopted an understanding of Minnesota's version of the Uniform Commercial Code that was contrary to the interpretation of every other state to have considered the issue under their own versions of the UCC. And by certifying the class, the court decided that its unprecedented interpretation of the UCC would bind the remaining 43 states that had yet to decide the question (even though the " Uniform Commercial Code is not uniform" and is interpreted differently in different states [116] ). In essence, the action of the Minnesota court proposed to dictate the interpretation of 43 other states' UCC provisions even though the other states might well have reached a different conclusion in applying their own state's laws.

The sentiment reflected in these cases flies in the face of basic federalism principles by embracing the view that other states should abide by a deciding court's law whenever it decides that its own laws are preferable to other states' contrary policy choices. Indeed, such examples of judicial usurpation, in which one state's courts try to dictate its laws to 49 other jurisdictions, have been duly criticized by some congressional witnesses as "false federalism." [117] Moreover, they have posed serious problems for the courts of other states. For example, the Vermont Supreme Court recently Bified the settlement in the Bank of Boston case, holding that the Alabama court that approved the settlement failed to provide due process to the Vermont class members in that case, who ended up paying $30,000 in attorneys' fees. [118] In contrast, a Connecticut court recently found that a woman who had been part of an Alabama class action settlement on roofing shingles could not have her day in court because she was bound by the settlement she knew nothing about. [119]

Given the range and severity of class action abuse, it is not surprising that defendants find it necessary to remove actions against them to a federal forum–a forum where the threat of prejudice is significantly lower. Under current law, however, plaintiffs' lawyers can easily manipulate their pleadings to ensure that their cases remain at the state level. As noted above, the two most common tactics employed by plaintiffs' attorneys in order to guarantee a state court tribunal are: adding parties to destroy diversity and shaving off parties with claims for more than $75,000. It is not rare to see complaints in which plaintiffs sue several major corporations and then add one local supplier or dealer as a defendant merely to defeat diversity. [120] Other complaints seek $74,999 in damages on behalf  **\*27**  of each plaintiff or explicitly exclude from the proposed class anybody who has suffered $75,000 or more in damages. [121]

 **\*\*27**  The Committee believes that the federal courts are the appropriate forum to decide most interstate class actions because these cases usually involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy. By enabling federal courts to hear more class actions, this bill will help minimize the class action abuses taking place in state courts and ensure that these cases can be litigated in a proper forum.

## V. HOW S. 5 WORKS

S. 5 is a modest attempt to address a number of the problems and abuses in the current class action system. First, S. 5 implements a consumer bill of rights that requires greater scrutiny of both coupon and net loss settlements, regulates attorneys' fee awards in coupon settlements, prohibits extra compensation to class members who are geographically located near the court, and requires notice of proposed class settlements to appropriate state and federal officials.

Second, S. 5 includes a narrowly-tailored expansion of federal diversity jurisdiction to ensure that class actions that are truly interstate in character can be heard in federal court. S. 5 also includes modest amendments to current removal provisions that will make it harder for counsel to "game the system" and keep class actions in state court by naming local defendants who are not real parties to the controversy or by amending their pleadings after the deadline for removal. These provisions will create

**Page 42**

efficiencies in the judicial system by enabling overlapping and "copycat" cases to be consolidated in a single federal court, rather than proceeding simultaneously in numerous state courts under the current system.

At the same time, however, S. 5 leaves in state court: (1) class actions in which all the plaintiffs and defendants are residents of the same state; (2) class actions with fewer than 100 plaintiffs; (3) class actions involving less than $5 million; (4) class actions in which a state government entity is the primary defendant; (5) class actions brought against a company in its home state, in which 2/3 or more of the class members are also residents; and (6) class actions involving certain local controversies.

Finally, S. 5 addresses the problem of unfair settlements and excessive attorneys' fees by directing the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations to improve the system.

## CONSUMER BILL OF RIGHTS

S. 5 requires greater scrutiny of coupon settlements; such settlements are prohibited absent written findings by the court that they benefit the class members. In addition, S. 5 regulates attorneys' fees in class settlements in which coupons constitute all or part of the remedy provided to class members. S. 5 also prohibits extra compensation to members of a class simply because they live closer to the court. These provisions are intended to prevent some of the **\*28** more abusive class action settlement practices that came to the Committee's attention during hearings on class action abuses.

S. 5 would also amend the class action rules by requiring that class counsel serve appropriate state and federal officials with notice of a proposed settlement. This notice must occur no later than 10 days after the proposed settlement is filed in federal court.

The notice to the appropriate officials would include: (1) A copy of the complaint and amended complaints, unless those materials are available through the Internet and the **\*\*28** notice includes directions on how to access the materials on-line; (2) notice of any scheduled judicial hearing in the class action; (3) proposed or final notification to class members of the right to be excluded from the class; (4) any proposed or final class action settlement; (5) any settlement made between class counsel and defendants' counsel; (6) any final judgment or notice of dismissal; and (7) the names of the class members who reside in each respective state and the proportionate claims of such members. The designated officials would then have at least 90 days to review the proposed settlement before the court gives final settlement approval.

Nothing in this section creates an affirmative duty for either the state or federal officials to take any action in response to a class action settlement. Moreover, nothing in this section expands the current authority of the state or federal officials.

## DIVERSITY JURISDICTION AND REMOVAL

S. 5 would amend the diversity jurisdiction and removal statutes applicable to larger interstate class actions by modifying 28 U.S.C. 1332 to incorporate the concept of balanced diversity. The bill grants the federal courts original jurisdiction to hear interstate class action cases where (a) any member of the proposed class is a citizen of a different state from any defendant; and (b) the amount in controversy exceeds $5 million (aggregating claims of all purported class members, exclusive of interest and costs).

The bill, however, includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus. The first is the "Home State" exception. Under this provision, if two-thirds or more of the class members are from the defendant's home state, the case would not be subject to federal jurisdiction. Conversely, class actions filed in the home state of the primary defendant would automatically be subject to federal jurisdiction (assuming the other prerequisites are met) if less than one-third of the proposed class members are citizens of that state. For cases brought in a

defendant's home state in which between one-third and two-thirds of the class members were citizens of that state, federal jurisdiction would also exist; however, a federal judge would have the discretion, in the interests of justice, to decline to exercise that jurisdiction based on consideration of six factors designed to help assess whether the claims at issue are indeed local in nature.

In addition, S. 5 contains a "Local Controversy Exception" intended to ensure that state courts can continue to adjudicate truly local controversies in which some of the defendants are out-of-state corporations. In order to fall within the Local Controversy Exception, a class action must meet the following four criteria: (1) The class must be primarily local, meaning that more than two-thirds **\*29** of class members must be residents of the state in which the action was filed; (2) at least one real defendant (whose alleged conduct is central to the class's claims and from whom the class seeks significant relief) must also be local; (3) the "principal injuries" caused by the defendants' conduct must have occurred in the state where the suit was brought; and (4) no other similar class actions have been filed against any of the defendants (by the same or other proposed classes) in the preceding three years. If all of these four criteria are satisfied, the case will not be subject to federal jurisdiction under the bill.

S. 5 also excludes from its federal jurisdiction grant: (1) Class actions involving fewer than 100 plaintiff class members; (2) class actions in which the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; (3) any securities class actions covered by the Securities Litigation Reform Act; and (4) corporate governance cases.

In order to enable more class actions to be removed to federal court, S. 5 would also **\*\*29** create three new rules regarding the removal of class actions filed in state court. First, any defendant would be able to remove a class action to federal court without the consent of any other defendant. Second, any defendant would be able to remove a class action to federal court, even if that defendant is a citizen of the state in which the action was brought. And third, the current ban on removal of a class action to federal court after one year would be eliminated, although the current requirement that removal occur within 30 days of notice of grounds for removal would be retained.

## REPORT ON CLASS ACTION SETTLEMENTS

S. 5 would direct the Judicial Conference of the United States, with the assistance of the Federal Judicial Center and Administrative Office of the United States Courts, to prepare a report on class action settlements to be transmitted to the House and Senate Judiciary Committees. The report will include (1) recommendations on best practices to ensure the fairness of settlements for class members and to ensure the appropriateness of attorneys' fees and expenses, and (2) a discussion of any actions taken or planned by the Judicial Conference to implement the report recommendations.

## VI. SECTION-BY-SECTION ANALYSIS

Section 1.–Section 1 establishes the "Class Action Fairness Act of 2005" as the short title of the bill.

Section 2.–Section 2 sets forth findings and purposes. The Committee is concerned that there have been abuses of the class action device over the last decade that have hurt consumers, adversely affected interstate commerce, and undermined public respect for our judicial system. In particular, the Committee is concerned about class actions that do little to benefit–and sometimes actually harm–the class members who are supposed to be the beneficiaries of such cases, while enriching their lawyers. The Committee is also concerned that this problem is exacerbated by confusing notices that make it difficult for class members to understand and effectively exercise their rights. Taken together, the Committee believes **\*30** that such abuses hurt consumers by resulting in higher prices and less innovation, and that they undermine the principles of diversity jurisdiction, which were established by the Framers to promote interstate commerce.

**Page 44**

The purposes of the Act are therefore to assure fair and prompt recoveries for class members with legitimate claims; to restore the intent of the Framers by expanding federal jurisdiction over interstate class actions; and to benefit society by encouraging innovation and lowering consumer prices.

Section 3.–Section 3 sets forth a "Consumer Class Action Bill of Rights" to help ensure that class actions do not hurt their intended beneficiaries. This section is intended to address a number of common abuses that were discussed by witnesses at class action hearings and have been reported on in the press–and to encourage greater judicial scrutiny of proposed class action settlements.

New section 28 U.S.C. 1711 defines the term "class action" to include representative actions filed in federal district court under Rule 23 of the Federal Rules of Civil Procedure, as well as actions filed under similar rules in state courts that have been removed to federal court. It also defines the following terms: class counsel, class members, plaintiff class action and proposed settlement.

New section 28 U.S.C. 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially **30 valueless coupons, while the class counsel receive substantial attorneys' fees. For example, in a recent settlement of a class action against a video rental chain, customers received coupons toward video rentals and purchases, while the plaintiffs' class counsel were paid $9.25 million in fees and expenses. One commentator observed that "the real winners in the settlement are the lawyers who sued the company," who will be paid "in cash, not coupons." [122]

In order to address such inequities, Section 1712(a) states that in class action settlements in which it is proposed that an attorney fee award be based solely on the purported value of the coupons awarded to class members, the fee award should be based on the demonstrated value of coupons actually redeemed by the class members. Thus, if a settlement agreement promises the issuance of $5 million in coupons to the putative class members, but only 1/5 of potential class members actually redeem the coupons at issue, then the lawyer's contingency fee should be based on a recovery of $1 million–not a recovery of $5 million.

In some cases, the proponents of a class settlement involving coupons may decline to propose that attorney's fees be based on the value of the coupon-based relief provided by the settlement. Instead, the settlement proponents may propose that counsel fees be based upon the amount of time class counsel reasonably expended working on the action. Section 1712(b) confirms the appropriateness of determining attorneys' fees on this basis in connection with a settlement based in part on coupon relief. As is stated on its face, nothing in this section should be construed to prohibit using the "lodestar with multiplier" method of calculating attorney's fees. By the same token, nothing in this section expands the authorization **31 for the use of a multiplier; a multiplier may be used only to the extent authorized by existing law.

In some class action settlements, the terms may be a combination of coupon relief, plus some form of equitable relief, including an injunction. In such circumstances, the settlement may also include fees for obtaining the equitable relief. Thus, if a proposed settlement provides for both coupons and equitable relief, then the portion of the award that is a contingent fee based on the value of the coupons must be calculated based on the value of redeemed coupons, and the portion not based on the value of the coupons should be based on the time spent by class counsel on the case.

The Committee wishes to make clear that nothing in Section 1712 is intended to change current law regarding the circumstances under which an award of attorneys' fees is appropriate. In particular, the Committee stresses that this section is not intended to change in any respect current law governing the circumstances under which fee shifting is permitted in cases that are resolved through full litigation (that is, cases that are not settled). Moreover, the Committee wishes to make clear that it does not intend to change current law in any respect regarding the circumstances under which the parties may justifiably agree to fee awards in connection with settlements. Section 1712 is intended solely to regulate the manner in which fees otherwise authorized by existing law should be calculated.

**Page 45**

Section 1712( d) allows a court to hear expert testimony from a witness on the actual value of redeemed coupons to assist the court in determining the proper contingent fee. This provision addresses the situation where the actual value of the coupons differs from their face value. For example, a coupon for $250 off a vehicle purchase may not really be worth $250.

**\*\*31**  Section 1712(e) provides that a federal judge may not approve a coupon settlement without first conducting a hearing and determining that the settlement terms are fair, reasonable, and adequate for class members. In making that determination, the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement. The section further provides that a federal court may, in its discretion, require that a proposed settlement provide for the distribution of a portion of the value of unclaimed coupons to a charitable organization or governmental entity; however, any such distribution shall not be used as the basis for the award of any attorneys' fees. So, for example, if a proposed settlement provided for the distribution of one million $1 coupons, but only 250,000 were claimed and used, the federal court supervising the settlement could require that 500,000 of the unclaimed coupons be made available to the U.S. Army for distribution to enlisted personnel serving in the military. However, in determining an appropriate fee award for class counsel, counsel would be able to rely only on the value of the 250,000 coupons actually redeemed by class members. The fee award could not be based on the value of the 250,000 unused coupons or the 500,000 coupons that might be used by military personnel.

The Committee wishes to make clear that it does not intend to forbid all non-cash settlements. Such settlements may be appropriate where they provide real benefits to consumer class members **\*32** (e.g., where coupons entitle class members to receive something of actual value free of charge) or where the claims being resolved appear to be of marginal merit. However, where such settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting this provision, it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members. [123]

New section 28 U.S.C. 1713 prohibits federal courts from approving a proposed settlement under which class members would be required to pay class counsel a sum of money that results in a net loss (as occurred in the Bank of Boston case, discussed above), unless the court makes a written finding that nonmonetary benefits to the class members substantially outweigh the monetary loss.

New section 28 U.S.C. 1714 prohibits federal courts from approving proposed settlements that provide for payment of greater sums to certain class members based on where they reside. The Committee wishes to emphasize that this provision is intended solely to prohibit circumstances in which the preferential payments have no legitimate legal basis. For example, it may be perfectly appropriate for a settlement of an environmental class action to differentiate settlement payment amounts based on a claimant's proximity to an alleged chemical spill, if it appears that those persons in closer proximity have suffered greater injury. This provision is not intended to affect such a determination. But where putative class members' claims are legally and factually indistinguishable, it is inappropriate to give one class member extra settlement benefits merely because he or she resides in (or closer to) the county where the court sits.

**\*\*32**  New section 28 U.S.C. 1715 sets forth requirements for notification to appropriate federal and state officials of proposed class action settlements. New section 1715 is designed to ensure that a responsible state and/or federal official receives information about proposed class action settlements and is in a position to react if the settlement appears unfair to some or all class members or inconsistent with applicable regulatory policies. Section 1715 requires each defendant, within 10 days after a proposed class action settlement is filed in federal court, to provide notice of the proposed settlement to: (1) the U.S. Attorney General (or for banks and thrifts, the entity with primary regulatory or supervisory responsibility over the defendant); and (2) the state official that has primary regulatory or supervisory responsibility over the defendant or who licenses or otherwise authorizes the defendant to conduct business in the state (or for state depository institutions, the state bank supervisor in the state in which the defendant is incorporated or chartered). If there is no state official that meets the requirements **\*33** set forth in the Act, notice must be provided to the state attorney general. The notice must include: (1) a copy of the complaint and attached

**Page 46**

materials; (2) the date and time of any scheduled judicial hearing; (3) proposed or final notification to the class members; (4) the proposed settlement; (5) any other agreement between class counsel and the defendant; (6) any final judgment or notice of dismissal; (7) the names of class members who reside in each state and their proportional share of the settlement, or if that is not feasible, a reasonable estimate of the number of class members in the state and their share of the settlement; and (8) any written judicial opinion related to the proposed settlement. A federal court cannot issue a final order approving a settlement until 90 days after the appropriate federal and state officials are served. If the defendants do not comply with this provision, a class member can refuse to comply with–or be bound by–the settlement agreement.

The Act also clarifies that it should not be construed to impose any obligations, duties or responsibilities on the federal and state officials who receive notice of a class action settlement pursuant to this provision. Thus, federal and state officials will be notified about proposed settlements and have an opportunity to get involved if they think it is appropriate but will not be required to do so.

Abusive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace. The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the litigation. As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become "clientless litigation," in which the plaintiff attorneys and the defendants have "powerful financial incentives" to settle the "litigation as early and as cheaply as possible, with the least publicity." [124] These financial incentives create inequitable outcomes. "For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case.* * * For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious), and–over the long run–increasing amounts of frivolous litigation as the attraction of such lawsuits becomes apparent to an ever-increasing number of plaintiff lawyers." [125]

**33** New 28 U.S.C. 1715 requires defendants to provide notice of proposed settlements to the appropriate federal official and to the appropriate state official of each state in which a class member resides. Under new section 1715(a), the appropriate federal official is the Attorney General of the United States, or in the case of depository institutions and other banks, the person who has primary federal regulatory supervisory responsibility over the defendant if some or all of the matters at issue in the litigation are subject to regulation or supervision by that person. Thus, for example, if a national bank were sued over its lending practices, notice would **34** have to be provided to the Comptroller of the Currency. If it were sued in a nationwide lawsuit regarding the food in its cafeterias, notice would be provided to the Attorney General.

Under new section 28 U.S.C. 1715(a), the appropriate state official is defined as the person in the state who has primary regulatory or supervisory responsibility with respect to the defendant or licenses the defendant, if some or all of the matters alleged in the class action are subject to regulation by that person. If no such regulatory or licensing authority exists, or the matters are not subject to regulation by that person, then notice should be given to the state attorney general. Thus, for example, in a case against an insurance company involving insurance practices, such as how premiums are calculated, notice would be required to the state insurance commissioner in each state where the company is licensed and where class members reside. If some class members reside in states where the company does not do business and therefore is not subject to regulation, then notice would be given to those states' attorneys general. Similarly, if the company at issue were a toy manufacturer, which is not licensed by a particular regulatory body, then notice would have to be given to the state attorney general of each state where plaintiffs reside.

New section 1715(c) clarifies that in the case of federal depository institutions and other non-state depository institutions, the notice requirements are satisfied by notifying the person who has primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person. No notice is required to state officials in these circumstances. Thus, for example, if a national bank were sued

over its depository or lending practices, notice would have to be given to the Comptroller of the Currency, who has regulatory authority over the institution. However, no notice would be required to state officials.

With regard to state depository institutions, the notice requirements are satisfied by notifying the state banking supervisor in the state where the defendant is incorporated, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate federal official. Thus, no notice is required to state officials in other states even if some class members reside in those states.

This provision is intended to combat the "clientless litigation" problem by adding a layer of independent oversight to prohibit inequitable settlements. Under Section 1715(b), class counsel must provide the notice within 10 days after the proposed settlement is filed in court. Such notice must include, according to 28 U.S.C. 1715(b)(1)(8): a copy of the complaint; any scheduled judicial hearings; any final judgment or notice of settlement; any proposed or final notice to the class; and the names of class members who reside in each state, if feasible. The notice would also include any written judicial decision related to settlement, a final judgment, or notice of dismissal. If disagreement arises over the feasibility of providing the names of class members and their proportional share of the proposed settlement under 28 U.S.C. 1715(b), it is the intent of the Committee that class counsel bear the burden of proving that it is not feasible to provide any of this required information.

**\*35  \*\*34**  Once the appropriate state and federal officials have received notice under 28 U.S.C. 1715(b), they would then have at least 90 days to review the proposed settlement and decide what (if any) action to take to protect the interests of the plaintiff class. The state and federal officials are not required to take any affirmative action once they receive the proposed settlement according to new section 28 U.S.C. 1715(f); nor does this section expand their current authority in any respect.

Section 28 U.S.C. 1715(e)(1) instructs that in cases where the appropriate state and federal officials are not provided notice of the potential settlement, plaintiffs can choose not be bound by that settlement. The Committee wishes to make clear that this provision is intended to address situations in which defendants have simply defaulted on their notification obligations under this provision; it is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., notification of the wrong person, failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred. In particular, the Committee wishes to note that where the appropriate officials received notification of a proposed settlement from at least one defendant, section 1715(e) should not be operative. New subsection 1715(e)(2) specifically states that a class member may not refuse to comply with a settlement if the notice was directed to the appropriate federal official and to the state attorney general or the primary licensing authority. This provision reflects the overall intent of section 1715 that a settlement should not be undermined because of a defendant's innocent error about which federal or state official should have received the required notice in a particular case.

The Committee believes that notifying appropriate state and federal officials of proposed class action settlements will provide a check against inequitable settlements in these cases. Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties.

Section 4.–Section 4 amends 28 U.S.C. S 1332 to re-designate current subsection 1332(d) as subsection (e) and create a new subsection 1332(d).

The definitional provisions of Section 4–as reflected in the new section 1332(d)(1)–are self-explanatory. However, the Committee notes that as with the other elements of section 1332(d), the overall intent of these provisions is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications. In that regard, the Committee further notes that the definition of "class action" is to be interpreted liberally. Its application should not be confined solely to lawsuits that are labeled "class actions" by the named plaintiff or the state rulemaking authority. Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions.

**Page 48**

The new subsection 1332(d)(2) gives the federal courts original jurisdiction over class action lawsuits in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and either (a) any member of a class of plaintiffs is a citizen of a different state from any defendant; (b) any member of a class of plaintiffs is **\*36** a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a state; or (c) any member of a class of plaintiffs is a citizen of a state and any defendant is a foreign state or a citizen or subject of a foreign state.

The Committee notes that for purposes of the citizenship element of this analysis, S. 5 does not alter current law regarding how the citizenship of a person is determined, including the provisions of 28 U.S.C. S 1332(c) specifying that "a corporation shall be **\*\*35** deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

While the core concept of the bill is that class actions filed against defendants outside their home state are subject to federal jurisdiction if citizens from different states are on opposing sides and more than $5 million is at issue, new subsections 1332(d) (3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against a defendant in its home state, dividing such cases into three categories.

First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the state in which the suit was filed, subsection 1332(d)(4)(B) states that federal jurisdiction will not be extended by S. 5. Such cases will remain in state courts under the terms of S. 5, since virtually all of the parties in such cases (both plaintiffs and defendants) would be local, and local interests therefore presumably would predominate.

Second, cases in which more than two-thirds of the members of the plaintiff class or one or more of the primary defendants are not citizens of the state in which the action was filed will be subject to federal jurisdiction, pursuant to the provisions of subsection 1332(d)(2). Federal courts should be able to hear such lawsuits because they have a predominantly interstate component–they affect people in many jurisdictions, and the laws of many states may be at issue.

Finally, there is a middle category of class actions in which more than one-third but fewer than two-thirds of the members of the plaintiff class and the primary defendants are all citizens of the state in which the action was filed. In such cases, the numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3) therefore gives federal courts discretion, in the "interests of justice," to decline to exercise jurisdiction over such cases based on the consideration of six factors:

\* Whether the claims asserted are of "significant national or interstate interest".–If a case presents issues of national or interstate significance, that argues in favor of the matter being handled in federal court. For example, if a nationally distributed pharmaceutical product is alleged to have caused injurious side-effects and class actions on the subject are filed, those cases presumably should be heard in federal court because of the nationwide ramifications of the dispute and the probable interface with federal drug laws (even if claims are not directly filed under such laws). Under this factor, the federal court should inquire whether the case does present issues of national or interstate significance of this sort. If such issues are identified, that point favors the exercise of federal jurisdiction. If such issues are not identified and the matter appears **\*37** to be more of a local (or intrastate) controversy, that point would tip in favor of allowing a state court to handle the matter.

\* Whether the claims asserted will be governed by laws other than those of the forum state.–As noted previously, the Committee believes that one of the significant problems posed by multi-state state court class actions is the tendency of some state courts to be less than respectful of the laws of other jurisdictions, applying the law of one state to an entire nationwide controversy and thereby ignoring the distinct, varying state laws that should apply to various claims included in the class depending on where they arose. Under this factor, if the federal court determines that multiple state laws will apply to aspects of the class action, that determination would favor having the matter heard in the federal court system, which has a record of being more respectful of the laws of the various states in the class action context. Conversely, if the court concludes that the

laws of the state in which the action was filed will apply to the entire controversy, that factor will favor allowing the state court to handle the matter.

**36** * Whether the class action has been pleaded in a manner that seeks to avoid federal jurisdiction.–The purpose of this inquiry is to determine whether the plaintiffs have proposed a "natural" class–a class that encompasses all of the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid federal jurisdiction by leaving out certain potential class members or claims. If the federal court concludes evasive pleading is involved, that factor would favor the exercise of federal jurisdiction. On the other hand, if the class definition and claims appear to follow a "natural" pattern, that consideration would favor allowing the matter to be handled by a state court.

* Whether there is a "distinct" nexus between: (a) the forum where the action was brought, and (b) the class members, the alleged harm, or the defendants.–This factor is intended to take account of a major concern that led to this legislation–the filing of lawsuits in out-of-the-way "magnet" state courts that have no real relationship to the controversy at hand. Thus, for example, if the majority of proposed class members and the defendant reside in the county where the suit is brought, the court might find distinct nexus exists. The key to this factor is the notion of there being a distinct nexus. If the selected forum's nexus to the controversy is shared by many other forums (e.g., some allegedly injured parties live in the locality, just as allegedly injured parties live in many other localities), the nexus is not distinct, and this factor would in that circumstance weigh heavily in favor of the exercise of federal jurisdiction over the matter.

* Whether the number of citizens of the forum state in the proposed plaintiff class(es) is substantially larger than the number of citizens from any other state, and the citizenship of the other members of the proposed class(es) is dispersed among a substantial number of states.–This factor is intended to look at the geographic distribution of class members in an effort to gauge the forum state's interest in handling the litigation. To be subject to this inquiry, between one-third and two-thirds of the class members are citizens of the state in which the class action was filed and all of the primary defendants are also citizens of that state. If all of the **38** other class members (that is, the class members who do not reside in the state where the action was filed) are widely dispersed among many other states (e.g., no other state accounted for more than five percent of the class members), that point would suggest that the interests of the forum state in litigating the controversy are preeminent (versus the interests of any other state). The Committee intends that such a conclusion would favor allowing the state court in which the action was originally filed to handle the litigation. However, if a court finds that the citizenship of the other class members is not widely dispersed, the opposite balance would be indicated. A federal forum would be favored in such a case because several states other than the forum state would have a strong interest in the controversy.

* Whether one or more class actions asserting the same or similar claims on behalf of the same or other persons have been filed in the last three years.–The purpose of this factor is efficiency and fairness: to determine whether a matter should be subject to federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Committee intends that this consideration would strongly favor the exercise of federal jurisdiction so that the claims of all proposed classes could be handled efficiently on a coordinated basis pursuant to the federal courts' multidistrict litigation process as established by 28 U.S.C. S 1407. Under that process, it is likely that all class actions filed on an issue will be handled by a single tribunal that will, in any event, be facing the challenge of interpreting the varying state laws and assessing how they should be applied to the purported state claims. Thus, allowing a case to remain in federal court **37** so that it may become part of that coordinated multi district litigation proceeding makes good sense. On the other hand, if other courts are unlikely to have to undertake the burden of handling the class claims and the state court appears positioned to handle the case in a manner that is respectful of state law variations, that consideration would favor remand of the matter to state court.

It is the Committee's intention that this factor be interpreted liberally and that plaintiffs not be able to plead around it with creative legal theories. If a plaintiff brings a product liability suit alleging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of federal jurisdiction over the later-filed claim.

**Page 50**

The following examples are intended to be illustrative of how these factors would work.

\* If a California state court class action were filed against a California pharmaceutical drug company on behalf of a proposed class of 60% California residents and 40% Nevada residents alleging harmful side effects attributable to a drug sold nationwide, it would make sense to leave the matter in federal court. The state laws that would apply in all of these cases would vary depending on where the drug was prescribed and purchased, such that allowing a single court to sort out such issues and handle the balance of the litigation would make sense both from an efficiency and federalism standpoint. These concerns would be even greater and the **\*39** arguments for asserting jurisdiction stronger if another class action alleging similar side-effects has been filed in the last three years.

\* On the other hand, if a checking account fee disclosure class action were filed in a Nevada state court against a Nevada bank located in a border city and the class consisted of 65% Nevada residents and 35% California residents (who crossed the border to conduct transactions in the Nevada bank), it might make sense to allow that matter to proceed in state court. It is likely that Nevada banking law would apply to all claims (even those of the California residents), since all of the transactions occurred in Nevada. And there is less likelihood that multiple actions will be filed around the country on the same subject, so as to give rise to a coordinating federal multidistrict litigation proceeding. Thus, the federalism concerns would be substantially diminished.

In sum, the Committee intends that these factors would permit a federal court, in its discretion, to allow a class action asserting primarily local claims under local law for what is primarily a local group of claimants to proceed in state court, particularly where the action has not been pleaded manipulatively to avoid federal jurisdiction and the case is not likely to become an "orphan" that cannot be coordinated with similar class actions that are or, in the future, may be pending in federal court.

New subsection 1332(d)(4)(A) is the "Local Controversy Exception" to the foregoing provisions that otherwise expand federal diversity jurisdiction over class actions. This subsection requires that federal diversity jurisdiction over a class action under the foregoing provisions be declined if the proponents of that view clearly demonstrate that each and every of the following criteria are satisfied in the case at issue: (1) more than # of class members are citizens of forum state; (2) there is at least one in-state defendant from whom significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims; (3) the principal injuries resulting from the alleged conduct, or related conduct, of each defendant were incurred in the state where the action was originally filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

**\*\*38** This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, the Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy–a controversy that uniquely affects a particular locality to the exclusion of all others.

\* The first criterion–that greater than two-thirds of all class members in the aggregate are citizens of the State in which the action was originally filed–is a critical inquiry for determining whether the matter is a local controversy. The proponents of applying the exception thus must demonstrate that a supermajority of **\*40** the class members are local in the sense that they all reside in the forum state.

\* Under the second criterion, there must be at least one real local defendant. By that, the Committee intends that the local defendant must be a primary focus of the plaintiffs' claims–not just a peripheral defendant. The defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class. For example, in a consumer fraud case alleging that an insurance company incorporated and based in another state misrepresented its policies, a local agent

of the company named as a defendant presumably would not fit this criteria. He or she probably would have had contact with only some of the purported class members and thus would not be a person from whom significant relief would be sought by the plaintiff class viewed as a whole. Obviously, from a relief standpoint, the real demand of the full class in terms of seeking significant relief would be on the insurance company itself. Similarly, the agent presumably would not be a person whose alleged conduct forms a significant basis for the claims asserted. At most, that agent would have been an isolated role player in the alleged scheme implemented by the insurance company. [126] In this instance, the real target in this action (both in terms of relief and alleged conduct) is the insurance company, and if that company is not local, this criterion would not be met.

* The third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant. However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states, the case would not qualify for this exception, even if it were brought only as a single-state class action.

**39  * The fourth and final criterion is that no other class action involving similar allegations has been filed against any of the defendants over the last three years on behalf of the same or other persons. In other words, if a controversy results in the filing of multiple class actions, it is a strong signal that those cases may not be of the variety that this exception is intended to address. As such, it is a test for assessing whether a controversy is localized. The Committee wishes to stress that another purpose of this criterion  *41  is to ensure that overlapping or competing class actions or class actions making similar factual allegations against the same defendant that would benefit from coordination are not excluded from federal court by the Local Controversy Exception and thus placed beyond the coordinating authority of the Judicial Panel on Multidistrict Litigation. The Committee also wishes to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. The inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of actions were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

The following two examples are intended to illustrate how the Committee intends this provision to work:

* A class action is brought in Florida state court against a Florida funeral home regarding alleged wrongdoing in burial practices. Nearly all the plaintiffs live in Florida (about 90 percent). The suit is brought against the cemetery, a Florida corporation, and an out-of-state parent company that was involved in supervising the cemetery. No other class action suits have been filed against the cemetery. This is precisely the type of case for which the Local Controversy Exception was developed. Although there is one out-of-state defendant (the parent company), the controversy is at its core a local one, and the Florida state court where it was brought has a strong interest in resolving the dispute. Thus, this case would remain in state court.

* A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer. Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members. Second, the case falls outside the Local Controversy Exception because the "principal injuries resulting from the alleged conduct,"–i.e., selling a vehicle with a defective transmission–were incurred in all fifty states. The fact that the suit was brought as a single-state class action does not mean that the principal injuries were local. In other

**Page 52**

words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct–not just where the proposed class members were injured. Thus, any defendant could remove this case to federal court.

New subsection 1332(d)(5)(A) and (B) specify, respectively, that S. 5 does not extend federal diversity jurisdiction to class actions in which (a) the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief ("state action" cases) or (b) the **40 number *42 of members of all proposed plaintiff classes in the aggregate is fewer than 100 class members ("limited scope" cases). The purpose of the "state action" cases provision is to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief. This provision will ensure that cases in which such entities are the primary targets will be heard in state courts that do not face the same constitutional impediments to granting relief. The "limited scope" cases provision is intended to allow class actions with relatively few claimants to remain in state courts. [127]

Federal courts should proceed cautiously before declining federal jurisdiction under the subsection 1332(d)(5)(A) "state action" case exception, and do so only when it is clear that the primary defendants are indeed states, state officials, or other governmental entities against whom the "court may be foreclosed from ordering relief." In making such a finding, courts should apply the guidance regarding the term "primary defendants" discussed below. The Committee wishes to stress that this provision should not become a subterfuge for avoiding federal jurisdiction. In particular, plaintiffs should not be permitted to name state entities as defendants as a mechanism to avoid federal jurisdiction over class actions that largely target non-governmental defendants. Similarly, the subsection 1332(d)(5)(B) exception for "limited scope" cases (actions in which there are fewer than 100 class members) should also be interpreted narrowly. For example, in cases in which it is unclear whether "the number of members of all proposed plaintiff classes in the aggregate is less than 100," a federal court should err in favor of exercising jurisdiction over the matter.

Pursuant to new subsection 1332(d)(6), the claims of the individual class members in any class action shall be aggregated to determine whether the amount in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs). The Committee intends this subsection to be interpreted expansively. If a purported class action is removed pursuant to these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident (i.e., that the applicable jurisdictional requirements are not satisfied). And if a federal court is uncertain about whether "all matters in controversy" in a purported class action "do not in the aggregate exceed the sum or value of $5,000,000," the court should err in favor of exercising jurisdiction over the case.

By the same token, the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief). The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed *43 from the viewpoint of the defendant. For example, a class action seeking an injunction that would require a defendant to restructure its business in some fundamental way might "cost" a defendant well in excess of $75,000 under current law, but might **41 have substantially less "value" to a class of plaintiffs. Some courts have held that jurisdiction does not exist in this scenario under present law, because they have reasoned that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages. Because S. 5 explicitly allows aggregation for purposes of determining the amount in controversy in class actions, that concern is no longer relevant.

The Committee also notes that in assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often "cost" the defendant in excess of $5,000,000. Or a declaration that a standardized product sold throughout the nation is "defective" might well put a case over the $5,000,000

threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product.

Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.

As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are citizens of the forum state). Allocating the burden in this manner is important to ensure that the named plaintiffs will not be able to evade federal jurisdiction with vague class definitions or other efforts to obscure the citizenship of class members. The law is clear that, once a federal court properly has jurisdiction over a case removed to federal court, subsequent events generally cannot "oust" the federal court of jurisdiction. [128] While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court.

For purposes of class actions that are subject to subsections 1332(d)(3) and (d)(5)(A), the Committee intends that "primary defendants" be interpreted to reach those defendants who are the real "targets" of the lawsuit–i.e., the defendants that would be expected to incur most of the loss if liability is found. Thus, the term "primary defendants" should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

*44 It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded under section 1332(d)(4)(A) on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home state, that plaintiff shall have the burden of demonstrating that these criteria are met by the lawsuit. Similarly, if a plaintiff seeks to have a purported class action remanded for lack of federal diversity jurisdiction under subsection 1332(d) (5)(B) ("limited scope" class actions), that plaintiff should have the burden of demonstrating that "all matters in controversy" do not "in the aggregate exceed **42 the sum or value of $5,000,000, exclusive of interest and costs" or that "the number of all proposed plaintiff classes in the aggregate is less than 100."

The Committee understands that in assessing the various criteria established in all these new jurisdictional provisions, a federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes. The Committee further understands that in some instances, limited discovery may be necessary to make these determinations. However, the Committee cautions that these jurisdictional determinations should be made largely on the basis of readily available information. Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of federal jurisdiction over class actions. For example, in assessing the citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified. Less burdensome means (e.g., factual stipulations) should be used in creating a record upon which the jurisdictional determinations can be made.

New subsection 1332(d)(7) clarifies that the citizenship of members of proposed classes would be determined as of the date the action was filed. Thus, questions about whether two-thirds of the members of a proposed class were citizens of a particular state would be determined as of that date. The only exception is where the original complaint does not indicate the existence of federal jurisdiction and plaintiffs later serve paper (particularly an amended complaint) that creates such citizenship or makes it evident. Then, consistent with the approach in existing section 1446(b), the "snapshot" of class membership citizenship is taken as of the date on which that new paper is served.

New subsection 1332(d)(8) clarifies that the diversity jurisdiction provisions of this section shall apply to any class action before or after the entry of a class certification order by the court. The purpose of this provision is to confirm that both pre- and post-certification class actions shall be subject to the jurisdictional and removal provisions of S. 5. The Committee wishes to make clear that this provision is not intended to alter the deadlines for removal in the current Judicial Code or as are established by this legislation. This section is merely intended to indicate that the status of a **\*45** class action (certified or uncertified) should not affect the removability of a case as otherwise permitted by the applicable removal statutes.

Pursuant to new subsection 1332(d)(9), the Act excepts from new subsection 1332(d)(2)'s grant of original jurisdiction those class actions that solely involve claims that relate to matters of corporate governance arising out of state law. The purpose of this provision is to avoid disturbing in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation class action context by the enactment of the Securities Litigation Uniform Standards Act of 1998 (P.L. 105–353).

The Committee intends that this exemption be narrowly construed. By corporate governance litigation, the Committee means only litigation based solely on (a) state statutory law regulating the organization and governance of business enterprises such as corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and business trusts; (b) state common law regarding the duties owed between and among owners and managers of business enterprises; and (c) the rights arising out of the terms of the securities issued by business enterprises.

This exemption would apply to a class action relating to a corporate governance claim filed in the court of any state. Consequently, it would apply to a corporate governance class action regardless of the forum in which it may be filed, and regardless of whether the law to be applied is that of the State in which the claim is filed.

**\*\*43** For purposes of this exemption, the phrase "the internal affairs or governance of a corporation or other form of business enterprise" is intended to refer to the internal affairs doctrine defined by the U.S. Supreme Court as "matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders. * * *"[129] The phrase "other form of business enterprise" is intended to include forms of business entities other than corporations, including, but not limited to, limited liability companies, limited liability partnerships, business trusts, partnerships and limited partnerships.

The subsection 1332(d)(9) exemption to new section 1332( d) jurisdiction is also intended to cover disputes over the meaning of the terms of a security, which is generally spelled out in some formative document of the business enterprise, such as a certificate of incorporation or a certificate of designations. The reference to the Securities Act of 1933 contained in new subsection 1332(d)(8)(A) is for definitional purposes only. Since that law contains an already well-defined concept of a "security," this provision simply imports the definition contained in the Securities Act.

New subsection 1332(d)(10) provides that for purposes of this new section and section 1453 of title 28, an unincorporated association shall be deemed to be a citizen of a state where it has its principal place of business and the state under whose laws it is organized. This provision is added to ensure that unincorporated associations **\*46** receive the same treatment as corporations for purposes of diversity jurisdiction. The U.S. Supreme Court has held that "[f]or purposes of diversity jurisdiction, the citizenship of an unincorporated association is the citizenship of the individual members of the association."[130] This rule "has been frequently criticized because often * * * an unincorporated association is, as a practical matter, indistinguishable from a corporation in the same business."[131] Some insurance companies, for example, are "inter-insurance exchanges" or "reciprocal insurance associations." For that reason, federal courts have treated them as unincorporated associations for diversity jurisdiction purposes. Since such companies are nationwide companies, they are deemed to be citizens of any state in which they have insured customers.[132] Consequently, these companies can never be completely or even minimally diverse in any case. It makes no sense to treat an unincorporated insurance company differently from, say, an incorporated manufacturer for purposes of diversity jurisdiction. New subsection 1332(d)(10) corrects this anomaly.

New subsection 1332(d)(11) expands federal jurisdiction over mass actions–suits that are brought on behalf of numerous named plaintiffs who claim that their suits present common questions of law or fact that should be tried together even though they do not seek class certification status. Mass action cases function very much like class actions and are subject to many of the same abuses.

**44** Under subsection 1332(d)(11), any civil action in which 100 or more named parties seek to try their claims for monetary relief together will be treated as a class action for jurisdictional purposes. Thus, if such a civil action met the other diversity jurisdictional prerequisites set forth for class actions in this legislation, that civil action would be subject to federal jurisdiction, subject to several exceptions. A mass action meeting the other applicable federal diversity jurisdiction criteria would not be eligible for federal jurisdiction if any of the following criteria are satisfied by the action:

* All the claims asserted in the action arise out of an event or occurrence in the state where the suit is filed and the injuries were incurred in that state and contiguous states (e.g., a toxic spill case);

* The defendants (not the plaintiffs) sought to join the claims;

* The claims are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a state statute specifically authorizing such an action; or

* The claims have been consolidated or coordinated solely for pretrial purposes.

Subsection 1332(d)(11)(B)(i) includes a statement indicating that jurisdiction exists only over those plaintiffs whose claims in a mass **47** action satisfy the jurisdictional amount requirements under section 1332(a). The Committee notes that the intent of this proviso is as follows. If a mass action satisfies the criteria set forth in the section (that is, it involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the claims involve common questions of law or fact and it meets the tests for federal diversity jurisdiction otherwise established by the legislation), it may be removed to a federal court, which is authorized to exercise jurisdiction over the action. Under the proviso, however, it is the Committee's intent that any claims that are included in the mass action that standing alone do not satisfy the jurisdictional amount requirements of Section 1332(a) (currently $75,000), would be remanded to state court. Subsequent remands of individual claims not meeting the section 1332 jurisdictional amount requirement may take the action below the 100-plaintiff jurisdictional threshold or the $5 million aggregated jurisdictional amount requirement. However, so long as the mass action met the various jurisdictional requirements at the time of removal, it is the Committee's view that those subsequent remands should not extinguish federal diversity jurisdictional over the action.

Under subsections 1332(d)(11)(C) and (D), respectively, a mass action removed to a federal court under this provision may not be transferred to another federal court under the MDL statute (28 U.S.C. S 1407) unless a majority of the plaintiffs request such a transfer, and the statute of limitations for any claims that are part of a mass action will be tolled while the mass action is pending in federal court.

The Committee find that mass actions are simply class actions in disguise. They involve a lot of people who want their claims adjudicated together and they often result in the same abuses as class actions. In fact, sometimes the abuses are even worse because the lawyers seek to join claims that have little to do with each other and confuse a jury into awarding millions of dollars to individuals who have suffered no real injury.

For these reasons, it is the Committee's intent that the exceptions to this provision be interpreted strictly by federal courts. The first exception would apply only to a truly local single event with no substantial interstate effects. The purpose of this exception was to allow cases involving environmental torts such as a chemical spill to remain in state court if both the event and the injuries were truly local, even though there are some out-of-state defendants. By contrast, this exception would not apply to a product liability or insurance case. The sale of a product to different people does not qualify as an event. And the alleged

**Page 56**

injuries in such a case would be spread out over more than one state (or **45 contiguous states)–even if all the plaintiffs in the particular case come from one state.

The third exception addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows individuals to bring a suit on behalf of the general public. Such a suit would not qualify as a mass action. However, the vast majority of cases brought under other states' consumer fraud laws, which do not have a parallel provision, could qualify as removable mass actions.

  *48 The final exception would apply to claims that are consolidated or coordinated solely for pretrial proceedings. If a number of individually filed cases are consolidated solely for pretrial proceedings–and not for trial–those cases have not truly been merged in a way that makes them mass actions warranting removal to federal court. On the other hand, if those same cases are consolidated exclusively for trial, or for pretrial and trial purposes, and the result is that 100 or more persons' claims will be tried jointly, those cases have been sufficiently merged to warrant removal of such a mass action to federal court.

In addition, this provision is in no way intended to abrogate 28 U.S.C. 1367 or to narrow current jurisdictional rules in any way. Thus, if a federal court believed it to be appropriate, the court could apply supplemental jurisdiction in the mass action context as well.

The following example is intended to illustrate how this provision would work.

* Two hundred people jointly file a mass action in West Virginia against a Pennsylvania drug manufacturer and also name a local drugstore. Three of them assert claims for $1 million each, and the rest assert claims of $20,000. The federal court would have jurisdiction over the mass action because there are more than 100 plaintiffs, there is minimal diversity, the total amount in controversy exceeds $5 million and a product liability case does not qualify for the "local" occurrence exception in the provision. The Committee then intends for the judge to consider closely which claims meet the $75,000 minimum, noting that plaintiffs often seek to minimize what they are seeking in a complaint so they can stay in state court. For example, sometimes plaintiffs leave their claim for punitive damages off the original complaint to make it seem like their claims are smaller than they really are. It is the Committee's expectation that a federal judge would read a complaint very carefully, and only remand claims that clearly do not meet the amount-in-controversy threshold. If it is likely that a plaintiff is going to turn around in a month and add a claim for punitive damages, the federal court should obviously assert jurisdiction over that individual's claims.

Section 5.–Section 5 establishes the procedures for removal of interstate class actions over which the federal court is granted original jurisdiction in new section 1332(d).

The general removal provisions currently contained in Chapter 89 of Title 28 would continue to apply to class actions, except where they are inconsistent with the provisions of the Act. For example, like other removed actions, matters removable under this bill may be removed only "to the district court of the United States for the district and division embracing the place where such action is pending." [133] However, the general requirement contained in section 1441(b) that an action be removable only if none of the defendants is a citizen of the state in which the action is brought would not apply to the removal of class actions under the jurisdictional provisions of section 1332(d). Imposing such a restriction on removal of class actions would subvert the intent of the Act because it would essentially allow a plaintiff to defeat removal jurisdiction *49 **46 by suing both in-state and out-of-state defendants. Such a restriction on removal of class actions would perpetuate the current " complete diversity" rule for class actions that new section 1332(d) rejects. The Act does not, however, disturb the general rule that a case can only be removed to the district court of the United States for the district and division embracing the place where the action is pending. [134] In addition, the Act does not change the application of the Erie Doctrine, which requires federal courts to apply the substantive law dictated by applicable choice-of-law principles in actions arising under diversity jurisdiction. [135]

New subsection 1453(b) provides that removal may occur without the consent of any other defendant. This revision to the removal rules will prevent a plaintiffs' attorney from recruiting a "friendly" defendant (e.g., a local retailer) who could refuse to

**Page 57**

join in a removal to federal court and thereby thwart the legitimate efforts of the primary corporate defendant to seek a federal forum in which to litigate the pending claims. By this provision, it is the Committee's intent to overrule caselaw developed by the federal courts requiring the consent of all parties, [136] to the extent that such precedents might be applied to class actions subject to the expanded jurisdictional and removal provisions of S. 5.

New subsection 1453(c) provides that an order remanding a class action to state court is reviewable by appeal at the discretion of the reviewing court. The purpose of this provision is to develop a body of appellate law interpreting the legislation without unduly delaying the litigation of class actions. As a general matter, appellate review of orders remanding cases to state court is not permitted, as specified by 28 U.S.C. 1447(d). New subsection 1453(c) provides discretionary appellate review of remand orders under this legislation but also imposes time limits. Specifically, parties must file a notice of appeal within seven days after entry of a remand order. In addition, the appeals court must issue a final decision on appeal within 60 days. However, the parties may agree to give the court more time, and the court may, on its own, avail itself of one ten-day extension.

The Committee notes that the current prohibition on remand order review was added to section 1447 after the federal diversity jurisdictional statutes and the related removal statutes had been subject to appellate review for many years and were the subject of considerable appellate level interpretive law. The Committee believes it is important to create a similar body of clear and consistent guidance for district courts that will be interpreting this legislation and would particularly encourage appellate courts to review cases that raise jurisdictional issues likely to arise in future cases.

In order to be consistent with the exceptions to federal diversity jurisdiction granted under new section 1332(d), new subsection 1453(d) provides that the class action removal provisions shall not apply to claims involving covered securities or corporate governance litigation. In addition, claims concerning a covered security, as defined in section 16(f)(3) of the Securities Act of 1933 or section **\*50** 28(f)(5)(E) of the Securities Exchange Act of 1934, are excepted from the class action removal rule as well. These are essentially claims against the officers of a corporation for a precipitous drop in the value of its stock, based on fraud. Because Congress has previously enacted legislation governing the adjudication of these claims, [137] it is the **\*\*47** Committee's intent to not disturb the carefully crafted framework for litigating in this context. Thus, claims involving covered securities are excluded from the new section 1332(b) jurisdiction. The parameters of this subsection are intended to be conterminous with new subsection 1332(d)(9).

Section 5 also amends Section 1446(b) to clarify that the provisions in that section prohibiting the removal of cases more than one year after their commencement do not apply to class actions. Thus, removals taken under these revised provisions for class actions may be taken more than one year after commencement of the action at issue. This change is intended to prevent attorneys from engaging in the type of gaming that occurs under the current class action system. In the most extreme example, a plaintiffs' attorney could file suit under current law against a friendly defendant, triggering the start of the one-year limitation after which removal may not be sought under any condition. One year and one day after filing suit, the plaintiff's attorney could then serve an amended complaint on an additional defendant, at which time it would be too late for that new defendant to remove the case to federal court–regardless of whether diversity jurisdiction exists and irrespective of the practical merits of the case. The same unfair result would also occur if plaintiffs' counsel dismisses non-diverse parties or increases the amount of damages being pled after the one-year deadline. By allowing class actions to be removed at any time when changes are made to the pleadings that bring the case within section 1332(d)'s requirements for federal jurisdiction, this provision will ensure that such fraudulent pleading practices can no longer be used to thwart federal jurisdiction. It is not the intention of the Committee to change section 1446(b)'s requirements that an action must be removed within thirty days of being served with the initial pleading or thirty days after receipt of an amended pleading, motion, order or other paper from which it may be ascertained that the case is one which is or has become removable.

Section 6.–Section 6 directs the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, to prepare and transmit to the Committees on the Judiciary of the Senate and House of Representatives a report on class action settlements. The report shall contain recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the

class members that these settlements are supposed to benefit. In addition, the report shall contain recommendations on the best practices that courts can use to ensure that fees and expenses awarded to attorneys in connection with a class action settlement appropriately reflect the extent to which counsel obtained full redress for the injuries alleged in the complaint, and the time, expense and risk devoted  **\*51**  to the litigation. Finally, the report shall identify the actions that the Judicial Conference has taken and intends to take toward having the federal judiciary implement the recommendations in the report.

Section 6 contains a provision stating that nothing in the Act shall be construed to alter the authority of the federal courts to supervise the award of attorneys' fees. It is the Committee's intent not to disrupt the federal courts' broad discretion to approve attorneys' fees based on fairness determinations, notwithstanding contractual arrangements between attorneys and their clients.

Section 7.–Section 7 provides that the enactments of the Judicial Conference recommendations shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first. This provision is a relic from an earlier version of this legislation and is of no effect since the recommendations have already been enacted.

**\*\*48**  Section 8.–Section 8 clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions. Section 8 is intended to ensure that the bill not be interpreted as restricting in any way the ongoing efforts of the federal Judicial Conference's Advisory Committee on Civil Rules and Standing Committee on Rules and Procedure to promulgate improved rules governing class actions.

Section 9.–Section 9 provides that the amendments made by the Act shall apply to any civil action commenced on or after the date of enactment.

VII. CRITICS CONTENTIONS AND REBUTTALS

Critics' Contention No. 1: S. 5 would transfer nearly every class action from state to federal court and would add to the overwhelming workload faced by our federal courts.

Response:

During Committee debate on previous versions of this bill, the most frequently expressed concern was that its jurisdictional provisions would overload the federal judiciary. That argument, however, ignores three key facts. First, the bill will not move most class actions to federal court. Second, many state courts, where the critics apparently would like to confine all interstate class actions, are more burdened than the federal courts, and are less equipped to deal with complex cases like class actions. Indeed, many state courts have comparatively crushing caseloads. Third, federal courts can handle duplicative class actions more efficiently through multidistrict litigation proceedings.

First, a recent study debunked the myth promoted by some of the bill's critics that S. 5 will move nearly all class actions to federal court. [138] The study looked at the only six states that had data readily available on on-line databases and found that more than 50 percent of the class actions for which there were rulings during a five-year period would not be removable to federal court under the  **\*52**  Class Action Fairness Act. [139]  By contrast, the study found that in Madison County, Illinois, more than 85 percent of the cases would be removable to federal court under the bill. [140]  Put simply, the study found that The Class Action Fairness Act is a narrowly tailored bill that will not overwhelm the federal judiciary. Rather, the bill leaves most legitimately local disputes in state court, while ensuring that large, interstate class actions like those typically brought in Madison and St. Clair counties and other magnet courts can be heard in federal court.

Second, contrary to critics' contentions, the average state court judge is assigned three times as many cases as his or her federal counterparts. State court judges are assigned (on average) 1,568 new cases each year. [141]  For example, in California, the average judge was assigned 1,546 cases in 2003. In Florida, the average was 2,206. In New Jersey, the average was 2,810

cases. And in Texas, it was 1,701 cases. In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003. [142]

  **49**  Critics of the bill also ignore the fact that many state courts are tribunals of general jurisdiction–they hear all sorts of cases, including divorce matters, custody disputes, name change petitions, traffic violations, small claims contract disputes, minor misdemeanors, and major felonies. Thus, when a class action is filed before those courts, it diminishes the court's ability to provide a broad array of very basic legal services for the local community. The judges presiding over those state courts have far fewer resources for dealing with huge, complex cases, like class actions.

  Federal court judges usually have two or three law clerks; state court judges often have none. And federal court judges usually can delegate aspects of their cases (e.g., discovery issues) to magistrate judges or special masters; state court judges typically lack such resources.

  Third, critics also overlook the fact that even if both court systems were similarly burdened, federal courts could still deal with class actions more efficiently for two reasons. First, federal courts can coordinate "copy cat" or overlapping class actions. The record before the Committee indicates that it is not uncommon to see twenty, thirty, or even 100 class actions filed on the same subject matter. Sometimes, competing lawyers file these cases; other times, they are filed by the same lawyers who are simply forum-shopping for the most receptive judge. When these similar, overlapping class actions are filed in state courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The result is enormous waste, to say nothing of the unfairness. Defendants are forced to defend the same case in many different courts. And class members are harmed because the various class counsel compete with each other to achieve the best settlement for the lawyers. In contrast, if overlapping or similar class actions are filed against the same defendant in two or more different federal courts, the multidistrict litigation process (established by 28 U.S.C. S 1407) permits the transfer and consolidation of those cases to a single judge. The  **53** federal court multidistrict litigation system regularly consolidates multiple overlapping class actions in this manner, preventing the waste that occurs in state courts.

  Finally, critics who focus on the federal courts' workload are missing the point–class actions are precisely the kind of cases that should be heard in federal court. Class actions usually involve the most people, most money, and most interstate commerce issues. They also usually involve issues of nationwide implications. Interstate class actions are certainly no less deserving of a federal forum than the 2,525 cases heard in federal court each year to recover a few thousand dollars in defaulted student loans, or the 17,952 federal personal injury cases (e.g., single person medical malpractice cases). [143]  Ultimately, regardless of the impact on the federal court caseload, large interstate class actions belong in federal court.


Critics' Contention No. 2: Abuses of class actions exist in both federal and state courts, and allowing more interstate class actions to be heard in federal court thus will not solve any problems.

Response:

  At congressional hearings on the subject of class actions, witness after witness provided compelling evidence that serious abuses of the class device are occurring primarily in state courts. [144]

  **50**  Moreover, several studies also indicate that the class action abuse problem, particularly with respect to class settlements, is primarily a state court issue. For example, a detailed Federal Judicial Center study concluded that "[i]n most [class actions handled by federal courts subject to the study], net monetary distributions to the class exceeded attorneys' fees by substantial margins." [145]  In stark contrast, an Institute for Civil Justice/RAND study indicated that in state court consumer class action settlements not involving personal injuries, class counsel typically walk off with more money than all of the class members combined. [146]  The ICJ/RAND study offered three compelling rationales for allowing more interstate class actions to be heard by federal courts:

**Page 60**

(1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;"

(2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and

(3) "if a single judge is to be charged with deciding what law will apply in a multi state class action, it is more appropriate that this take place in federal court than in a state court." [147]

While some abuses do occur in federal court, the extent to which they take place in no way even approaches the level of abuse evidencing **\*54** itself in state court. Indeed, it is interesting that while few state court systems have attempted to address class action abuses, the federal court system, which has far less of a problem in the first place, has invested considerable effort in developing new rules reflecting best practices that courts should follow in handling class litigation, particularly in the settlement context. Those revisions, enacted last year, [148] will dovetail with the "consumer bill of rights" provisions in S. 5 to bolster federal court safeguards in the proper handling of class action cases.

Critics' Contention No. 3: To date, the only mechanism that has been successful in imposing liability on some industries, such as the tobacco or firearms industries, has been class action lawsuits. Allowing removal of state class actions to federal court will destroy the impact that class actions are having on these socially irresponsible businesses. Therefore, we should exempt certain industries from the diversity and removal provisions of S. 5.

Response:

Opponents of S. 5 would prohibit federal courts from exercising jurisdiction over those class actions brought against certain industries, including HMOs, tobacco companies, nursing homes, and firearms manufacturers. In addition, opponents have suggested that claims arising from state consumer protection statutes or state environmental protection laws should be exempt from the bill as well.

However, industry-specific exemptions from federal jurisdiction make no sense. Like bills of attainder, such exemptions irrationally single out a specific industry and slam the federal courthouse door in its face. The proposal to carve out certain legitimate, yet presently unpopular, industries contradicts the constitutional purposes of federal diversity jurisdiction–to allow interstate businesses to have claims against them heard in federal **\*\*51** court under diversity so as to avoid local biases and to promote and enhance, rather than hamper, interstate commerce. The notion that certain industries are less entitled to federal court protection is utterly inconsistent with the purpose and goals of diversity jurisdiction. Simply put, there should not be one set of rules for one category of defendants and another for another group of defendants.

Moreover, there is no evidence that plaintiffs will be less successful in litigating their class action claims in federal court. [149] Class **\*55** actions against unpopular corporate defendants, such as the firearms and tobacco industry have successfully proceeded in Federal court, and have resulted in beneficial judgments and settlements for the plaintiff classes. For example, the class action that is touted as the **\*\*52** only real success the class counsel have had against the firearms industry [150] turns out to be a federal court class action. [151] Assuming that a case is a meritorious class action asserting meritorious claims, there is no reason to believe such a case heard by a federal court would have an outcome different from a state court case, particularly given that the federal court normally would apply the same state substantive law as a state court considering the same case.

Critics' Contention No. 4: S. 5 should exclude civil rights cases, in order to ensure that civil rights plaintiffs have maximum access to our courts.

**Page 61**

Response:

Critics who would exclude civil rights cases from the scope of S. 5 have it backwards.

First, an amendment that would affirmatively exclude civil rights cases from federal jurisdiction would be contrary to a long tradition of encouraging the availability of our federal courts to address civil rights claims. Indeed, Congress has already enacted several statutes that are intended to ensure that civil rights cases can be heard in federal courts. For example, one statute permits removal **\*56** to federal court of a broad range of civil rights actions. [152] And more importantly, one general jurisdiction statute–28 U.S.C. S 1343–provides broad federal jurisdiction over a whole host of civil rights claims (e.g., any action "for injury to person or property or because of the deprivation of any right or privilege of a citizen of the United States," any action "to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights"). Indeed, that section provides original federal jurisdiction over any action "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens."

Second, the assumption of the amendment that federal courts are clogged and unable to handle civil rights cases has no basis. Indeed, as discussed above, the federal court workload issue is overblown, ignoring the burdens that class actions place on ill equipped state courts. Several of our federal judicial districts may need additional resources. Wherever that need has been confirmed, additional resources should be provided (as they were in 1999 and again in 2002, when new permanent and temporary federal district court judgeships were added). But those spot shortages are no excuse for continuing to deny both consumers and corporations their due process rights by keeping interstate class actions a state court monopoly.

Third, federal courts have a long record of certifying discrimination class actions and approving hefty settlements in such cases. The most generous racial discrimination class action settlements in recent years–like the Home Depot gender discrimination case settlement (which paid class members about $65 million) and the $192 million Coca-Cola race discrimination settlement (in which each class member was guaranteed a recovery of at least $38,000)–were achieved in and approved by federal courts. These cases stand in stark contrast to the typical state court class action, in which consumers are lucky if they get a $5 coupon.

**\*\*53** Finally, civil rights litigants have nothing to fear from federal judges. Federal judges, under Article III of the Constitution, are appointed for life. One reason the Framers designed the federal judiciary that way was to protect federal judges from political pressure and ensure that they would provide equal treatment to minority groups with less political power. It is thus no accident that federal courts have issued decisions like Brown v. Board of Education that, although unpopular at the time, paved the way for future civil rights laws like Title VII and Section 1983.

Critics' Contention No. 5: S. 5 would unfairly tilt the playing field by providing an advantage to defendant corporations at the expense of consumers.

Response:

This concern mischaracterizes the content and intent of the bill. S. 5 is court reform–not tort reform. It would simply allow federal courts to handle more interstate class actions. It makes no changes in substantive law whatsoever. Critics of S. 5 erroneously argue **\*57** that the bill would reverse the ordinary presumption that a plaintiff chooses his or her own court. Yet, in this context, there is no such presumption. In fact, the whole purpose of diversity jurisdiction is to preclude any such presumption by allowing state-law based claims to be removed from local courts to federal courts, so as to ensure that all parties can litigate on a level playing field and thereby protect interstate commerce interests. [153]

**Page 62**

Article III of the Constitution ensures that there will be a fair, uniform, and efficient forum (a federal court) for adjudicating interstate commercial disputes, so as to nurture interstate commerce. Some scholars have persuasively argued that diversity jurisdiction, of all the powers exercised under the Constitution, has had the greatest influence in melding the United States into a single nation, by fostering interstate commerce, communication and the uninterrupted flow of capital for investment into various parts of the Union, and sustaining the public credit and the sanctity of private contracts. [154]

S. 5 promotes these important constitutional norms. The statutory "gatekeeper" for federal diversity jurisdiction–28 U.S.C. S 1332–generally allows federal courts to hear cases that are large (that is, cases with large "amounts in controversy") and that have interstate implications (that is, cases involving citizens from multiple jurisdictions). These requirements were intended to ensure that diversity jurisdiction is preserved for those cases with significant interstate and economic impacts. Class actions would normally satisfy these requirements because they usually involve big dollar amounts and parties from multiple jurisdictions. Yet, because section 1332 was enacted prior to the existence of the modern-day class action, it does not take into account the unique circumstances presented by class actions. Consequently, section 1332, as presently drafted, tends to exclude the overwhelming majority of class actions from federal courts, while inviting into federal courts much smaller single-plaintiff cases having few (if any) interstate ramifications. Such a result is inconsistent with the federal judiciary's proper jurisdictional role. S. 5 would correct this technical problem and thereby promote the underlying goals of diversity jurisdiction.

**\*\*54** As former Clinton Administration Acting Solicitor General Walter Dellinger has testified in congressional hearings, if Congress were to now re-write the federal diversity jurisdiction statute, interstate class actions undoubtedly would be one of the first categories of cases to be included within the scope of the statute. [155] This makes plain sense insofar as class action lawsuits typically involve more people, more money, and more interstate commerce issues than any other type of case. S. 5 will simply fix the technical problem in section 1332 and judicial interpretation of the diversity requirements that keep most class actions in state court.

**\*58** Critics' Contention No. 6: S. 5 will limit the capacity to use class actions as private attorneys general actions to deter corporate wrongdoing.

Response:

During past Committee debates, some members have opposed expanding federal jurisdiction over class actions on the ground that doing so would limit the use of class actions as private attorney general actions–as a deterrent to corporate wrongdoing. As one member stated, the purpose of a class action is to "dissuade. It is the same reason that we have treble damages." [156] In the view of that member, "the most important function that class actions serve is to allow private attorneys general to step forward and hold corporations accountable for decisions that affect the public safety." [157]

The problem with this argument is that for all of the reasons discussed above, S. 5 will not limit the legitimate use of class actions at all. But more fundamentally, there is no historical basis for the assertion that class actions were intended to create this private attorney general device.

Although a few courts have over the years referred to the deterrent effects of class actions, the promulgation history of the current Rule 23 of the Federal Rules of Civil Procedure reflects no intent to create a private attorney general device. In recent years, members of the Advisory Committee on Civil Rules that developed the current version of the rule have testified that Rule 23 was not intended to serve that purpose. In testimony before the Advisory Committee on Civil Rules in 1996, the Hon. William T. Coleman, Jr., specifically denounced the proposition that "a purpose of Rule 23 is to hand a private attorney general's badge to any counsel who wants it." [158] He also stated that

back in 1966, that was not the intended purpose of Rule 23(b)(3). If there is interest in deputizing all attorneys everywhere to enforce our laws, that's a matter that should be decided by Congress, not through the class action provisions in the Federal

**Page 63**

Rules of Civil Procedure. The courts' tolerance for this vigilante-style use of class actions is a root cause of the abuses that must be correct. [159]

In congressional testimony several years ago, Prof. John P. Frank, another 1966 Advisory Committee member, sounded similar sentiments:

**55** What I wish to call to your attention is what I think is a serious problem here: that the class action rule, wholly without regard to its original purpose, has become something of a device for social administration, which should never have been the product of the rules at all. These are matters which should be handled by the Congress and by administrative agencies, and not attempted efforts to govern various parts of the economy by lawsuits which give **59** more to the counsel * * * that they do to those who should benefit from them.

I particularly adopt the statement of the chair of the [Advisory Committee on Civil Rules] at the present time, Judge Paul Niemeyer * * * in which he says: "I believe that Rule 23 was never intended to be a rule to enhance enforcement of substantive claims. Such legitimization should, in my judgment, be effected by Congress, and congress might well conclude * * * that it is too anarchical to authorize private attorneys to self-appoint themselves as enforcers of law without adequate accountability to the lawmakers or the public." [160]

Even if the critics were correct that deterrence was an intended purpose of class actions, that assertion is self-defeating because, in the Committee's view, the concept of class actions serving a "private attorney general" or other enforcement purpose is illegal. If the intended purpose of Rule 23 was to empower private attorneys to act as "attorneys general," the rule plainly bestows substantive rights not otherwise available under common or statutory law. Interpreted in this way, the rule runs afoul of the Rules Enabling Act, [161] which forbids federal courts from adopting "rules of practice and procedure" that may "abridge, enlarge or modify any substantive right." To the extent that class actions are characterized as having a private attorney general purpose, there are strong arguments that Rule 23 is simply B and void. [162]

Critics' Contention No.7: S. 5 will result in delays for injured consumers.

Response:

This criticism stems from baseless concerns about the federal courts' caseload and the possible impact of this legislation on the ability of the federal courts to resolve these cases in a timely manner. However, as noted above, the average state court judge is assigned three times as many cases as his or her federal counterpart. Thus, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. For all of the reasons set forth previously, there is no basis for arguing that S. 5 would overwhelm the federal courts with class action cases and thereby adversely affect the ability of consumers to find timely redress for their injuries in federal court.

**60** **56** Notably, the evidence available shows that federal courts move more quickly than state courts. A study conducted last year by the Federal Judicial Center found that state courts are far more likely than federal courts to let class actions linger without ruling on class certification. [163] (The study also found that federal courts certify classes at approximately the same rate as state courts.) Moreover, the median time for final disposition of a civil claim filed in federal court is just 9.3 months, and the median time to trial in a civil matter in federal court is 22.5 months. [164] There is no evidence that on average, state courts proceed more quickly, even though most state court cases are less complicated than federal court cases.

In addition, there is no basis for the claim that the bill's appeal provision would slow down litigation. To the contrary, the bill includes strict time limits to ensure that appeals of remand orders will not meaningfully delay litigation of class actions.

**Page 64**

Finally, as noted above, federal courts can also resolve duplicative class actions more efficiently by consolidating them. Plaintiffs' lawyers frequently file copycat class actions in various state courts around the country, clogging judges' dockets and forcing judges to duplicate each other's work. Unlike state courts, federal courts can take advantage of multi-district consolidation procedures that enable one judge to consolidate dozens of class actions and resolve them far more efficiently. This is yet another way in which The Class Action Fairness Act will speed up justice–not slow it down.

In sum, there simply is no basis to the claims that consumers will be worse off in federal court, or that the resolution of class actions will be delayed because of the federal judiciary's workload.

Critics' Contention No. 8: S. 5 will trample on the rights of states to manage their legal systems, thus undermining the principles of federalism that our system of government is built upon.

Response:

While some critics have alleged that this bill will somehow undermine federalism principles, exactly the opposite is true. S. 5 has been carefully crafted to correct a problem in the current system that does not promote traditional concepts of federalism. In fact, it is the current system and the wave of state court class actions that has trampled on the rights of states to manage their legal systems by allowing state court judges to interpret and apply the laws of multiple jurisdictions. When state courts preside over class actions involving claims of residents of more than one state, they frequently dictate the substantive laws of other states, sometimes over the protests of those other jurisdictions (as discussed previously). When that happens, there is little those other jurisdictions can do, since the judgment of a court in one state is not reviewable by the state court of another jurisdiction.

It is far more appropriate for a federal court to interpret the laws of various states (a task inherent in the constitutional concept of diversity jurisdiction), than for one state court to dictate to other **\*61** states what their laws mean or, even worse, to impose its own state law on a nationwide case. Why should a state court judge elected by the several thousand residents of a small **\*\*57** county in Alabama tell New York or California the meaning of their laws? Why should an Illinois state court judge interpret decisions by Virginia or Wisconsin courts? Why should a state court judge be able to overrule other state laws and policies? Why should state courts be setting national policy?

S. 5 simply allows more class action cases filed in state court to be removed to federal court. S. 5 does not change substantive law–it is, in effect, a procedural provision only. As such, class action decisions rendered in federal court should be the same as if they were decided in state court–under the Erie doctrine, federal courts must apply state substantive law in diversity cases. Moreover, if federal court judges are not familiar with state law on a particular issue, they have the authority to ask a state court to "certify" a question of law e.g., to advise them how a state's laws should be applied in an uncharted situation. This procedure allows the federal courts to apply state law appropriately and gives states the ability to manage their legal systems without becoming bound by other states' interpretations of their laws.

In short, contrary to critics' contentions, the real harm to federalism is the status quo–leaving the bulk of class action cases in state court. Federal courts are the appropriate forum to decide interstate class actions involving large amounts of money, many plaintiffs and interstate commerce disputes, and these matters of interstate comity are more appropriately handled by federal judges appointed by the President and confirmed by the Senate. S. 5 simply restores this proper balance by resolving an anomaly of diversity jurisdiction. True to the concept of federalism, S. 5 appropriately leaves certain "intrastate" class actions in state court: cases involving small amounts in controversy; cases with a class of 100 plaintiffs or less; cases involving plaintiffs, defendants and governing law all from the same state; cases against states and state officials; and certain securities and corporate governance cases. As such, S. 5 promotes the concept of federalism and protects the ability of states to determine their own laws and policies for their citizens.

**Page 65**

Critics' Contention No. 9: S. 5 assumes that federal courts will not engage in the same "false federalism" that state courts are accused of fostering. There really is no evidence that in the class action context, federal courts will intrude less on the states' rights to interpret their own laws than have state courts.

Response:

A principal purpose of the Class Action Fairness Act is to correct what former Acting Solicitor General Walter Dellinger has labeled a wave of "false federalism." As he testified before the Senate Judiciary Committee last July, the problem is that "many state courts faced with interstate class actions have undertaken to dictate the substantive laws of other states by applying their own laws to * * * other states, resulting in a breach of federalism principles. * * *"

**\*62** As discussed previously, a prime example of this situation is the Avery case, [165] in which defendant State Farm allegedly breached auto insurance policies nationwide by requiring the use of less expensive non-original equipment manufacturer parts ("non-OEM parts") in repairing accident-damaged vehicles. The Illinois state court certified a nationwide class, and at trial, a jury rendered a $1.3 billion verdict against State Farm.

The case is noteworthy on the "false federalism" issue because the court applied Illinois consumer protection law to all class claims in the case. It did so even though **\*\*58** Illinois law on this subject contravened the laws and policies of other states in which some class members lived–laws and policies encouraging (or even requiring) insurers to use less expensive, non-OEM parts in making accident repairs as a means of containing auto insurance costs. In affirming the verdict, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [who] testified that the laws in many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts. [166] The New York Times reported that the decision effectively "overturn[ed] insurance regulations * * * in New York, Massachusetts, and Hawaii, among other places" establishing "what amounts to a national rule on insurance." [167] As discussed previously, Avery is not an isolated occurrence. Numerous state courts have trampled on these federalism principles, all in an effort to certify classes that should not be certified. [168]

A premise of the Class Action Fairness Act is that this problem can be corrected by expanding federal jurisdiction over interstate class actions, the theory being that federal courts will not engage in "false federalism" games. But what proof is there that the federal courts will not similarly botch these critical choice-of-law issues?

In reality, there is ample evidence that the federal courts will not engage in the "false federalism" that is so rampant in state court class actions. To start, it should be noted that the lead federal court–the U.S. Supreme Court–has repeatedly warned that courts should not attempt to apply the laws of one state to behaviors that occurred in other jurisdictions:

* "Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of the other States." Huntington v. Attrill, 146 U.S. 657,669 (1892).

* "[I]t would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State * * * without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." New York Life Ins. Co. v. Head, 234 U.S. 149, 161 (1914).

**\*63** * "A state does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that state." Bigelow v. Virginia, 421 U.S. 809, 824 (1975).

* States should not apply their own laws to matters with which they have no significant contact. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821–22 (1985).

**Page 66**

And on April 7, 2003, the U.S. Supreme Court again warned state courts on this issue, striking down one state's effort to apply its laws to conduct that occurred elsewhere: "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." State Farm Mut. Auto. Ins. Co. v. Campbell, 2003 WL 1791206 (U.S. Apr. 7, 2003).

Unlike many state courts, federal courts have consistently heeded the Supreme Court's admonitions. The record shows that in the class action context, federal courts have **59 been extremely respectful of the interests of each state in having its laws applied (as appropriate) to its own residents, particularly in recognizing the substantial variations of those laws in the class action context.

In recent years, numerous federal courts (applying the choice-of-law doctrines of various jurisdictions) have considered which laws should apply in proposed nationwide class actions asserting state law-based claims. Those courts have consistently concluded that in a nationwide or multi-state class action, the choice-of-law of the state in which the action was originally filed must be applied. [169] Further, they have consistently concluded that those choice-of-law rules must be applied to "each plaintiffs claims." [170] Based on those principles, federal courts have consistently concluded that the laws of all states where purported class members were defrauded, injured, or purchased the challenged product or service must come into play. [171] And in those very few instances in which a federal district court has toyed with the idea of engaging in "false federalism" (i.e., applying a single state's law to all asserted claims), that notion has been reversed on appeal almost immediately. [172]

 *64 The bottom line is that over the past ten years, the federal court system has not produced any final decisions–not even one–applying the law of a single state to all claims in a nationwide or multi-state class action. And there are hundreds of federal court decisions (examples of which are set forth above) flatly rejecting arguments to use such a "false federalism" choice-of-law approach–applying the laws of a single state to all claims in a multi-state case. That's the record that confirms that the passage of the Class Action Fairness Act will end the "false federalism" game that is occurring in the state court class action arena.

Critics' Contention No. 10: S. 5 could deny plaintiff class members any meaningful ability to recover damages for their injuries.

Response:

 * In arguing that this bill would hurt consumers, some opponents have gone so far as to list several state court class actions which supposedly have served consumers well, inferring that removal of such cases to federal court is tantamount to a denial of justice. **60 This argument assumes that the federal courts are inferior to state courts–that a federal court cannot arrive at a just outcome. If the cases cited by S. 5's opponents would not have had the same outcome in federal court as they did in state court, it is because the federal courts may have been more careful to avoid the abuses of the system that occur in state courts. The only thing that would be denied when an interstate class action is removed to federal court is the plaintiffs' lawyers' ability to strike it rich on class actions that should not be certified by any court because they do not meet the requirements of a proper class.

Moreover, the claim that federal courts never certify class actions is unfounded. A study last year by the Federal Judicial Center found that federal courts certify classes at approximately the same rate as state courts. According to the study, class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time. [173] The study also found that consumers fare better in federal court class actions. According to the report, the average recovery per class member was higher in federal court: $517 vs. $350. [174]

In fact, federal courts invented class actions and have led the way in using the device to redress grievances, particularly in the civil rights and consumer protection context. Federal courts certify numerous class actions for a broad range of claims including

securities fraud, antitrust violations, and discrimination every year. [175] In addition, many of the cases in which federal courts certify classes involve state law claims (even though relatively few state law-based class actions can make it into federal court under current jurisdictional law. [176] For example:

**\*65** \* Recently a federal court in New York certified a class of New York residents and a nationwide class of plaintiffs who alleged that they were overcharged when they used their credit cards abroad. [177] Plaintiffs' claims were based on violations of New York law and common law fraud.

\* A federal district court in Massachusetts certified a class consisting of Massachusetts plaintiffs who were employed as auto damage appraisers. [178] The plaintiffs alleged that they were not properly paid for overtime and sought recovery under Massachusetts law.

\* A federal district court in Texas certified a product liability class of plaintiffs whose infants had been administered the drug E-Ferol and alleged that they should have been warned of the risk of death associated with the drug. [179] Plaintiffs also alleged that the testing and approval process for the drug was flawed.

\* A federal district court in New York recently certified a statewide class of plaintiffs alleging violations of New York's consumer protection law in a case involving diamond pricing. [180]

**\*\*61** \* A federal court certified a class of Tennessee residents who claimed defendants had violated various state consumer protection laws by failing to properly disclose the requirements for obtaining benefits under a long-term care insurance policy. [181]

\* The federal court in this case certified a class of commercial lobstermen from New York and Connecticut who brought claims under various state laws, alleging that the use of certain insecticides by defendants caused massive lobster die-off. [182]

\* A federal court recently certified a class of parking lot customers in Washington state who asserted claims against a collection agency under federal and state law. [183]

\* A federal court in Florida certified a class of consumers who entered into sales contracts with a funeral home. The class members alleged claims under federal and state law. [184]

\* A federal court in Minnesota certified a nationwide class of plaintiffs who sought medical monitoring under various state laws for their allegedly defective heart valves. [185]

\* A federal court certified a class of Montanans who alleged that their automobile insurer acted in bad faith. [186]

\* In Massachusetts, a federal court certified a six-state class action on behalf of homeowners who alleged their heating systems were defective. [187]

\* The federal district court for Rhode Island certified a nationwide class action brought on behalf of credit cardholders alleging that Fleet Bank violated federal and state laws in the manner in **\*66** which it set payment due dates and posted payments to credit cards. [188]

\* In Michigan, a federal court certified a nationwide class of consumer borrowers alleging that Central Clearing's "payday loan" transactions violated federal and state laws. [189]

* A federal district court certified a class of automobile insurance policy holders in the District of Columbia alleging violations of federal and state law. [190]

* A federal court certified a class of Pennsylvanians in a case brought on behalf of consumer debt holders alleging that the defendant sent out false and deceptive debt collection letters. The complaint alleged violations of federal and state laws. [191]

* A federal court certified a class action brought on behalf of former employees at a Pennsylvania plant, alleging that Tyson Foods failed to fully pay its employees. The complaint alleged violations of federal and state laws. [192]

 **62  While opponents of the bill cite cases that allegedly achieved greater justice in state court than they would have received if they had been removed to federal court, it is clear that this is pure speculation. In fact, federal courts have certified hundreds of cases for class treatment in recent years, and the rules governing the decision of whether cases may proceed as class actions are basically the same in federal and state courts. Further, under the Erie doctrine, federal courts apply state substantive law in diversity cases. Consequently, a removed class action should have the same substantive law applied to it, regardless of whether it is in federal or state court.

Additionally, strict analysis by courts in deciding whether a group of plaintiffs can proceed on a class basis should be encouraged, rather than discouraged. The purpose of the current requirements in Rule 23 and similar state court class action rules is to protect the due process rights of both plaintiffs and defendants. When judges indiscriminately certify class actions, unnamed plaintiffs lose important legal rights and can be denied appropriate awards for their injuries, and defendants become more vulnerable to frivolous and unjustifiably magnified class actions.

Allowing individual states to certify classes for their own citizens on particular issues could result in a denial of relief for the citizens of other states, particularly given the limited resources available to some defendants to satisfy all pending claims. For example, some hailed the now reversed punitive damages verdict in the Engle tobacco class action that continues to proceed in Florida Supreme Court. There, a Florida jury awarded $135 billion in punitive damages to a class of Florida residents. But if that verdict were upheld, citizens of other states might be denied any relief whatsoever on their claims against tobacco companies because the Florida residents (through their single state class action) would have taken all available money to pay their punitive damages claims. In short, Florida residents would have been paid billions of dollars in excess of what they claim for their real personal injury damages, while  **67  residents of all other states would not have even received what they claim to be owed for the basic personal injuries that they allege. As one commentator has noted.

    This is what fuels the [state court class action] litigation lottery. If you are the first in line to demand punitive damages, you may receive awards in the billions. Injured parties in later [class actions] are likely to receive less. * * * They may receive nothing if the first award killed the company or the industry. None of this makes much sense. There is no reason why one group of litigants should, solely on the basis of residency in a particular state, receive the lion's share of damages to the deprivation of hundreds of thousands of other injured parties. Moreover, there is no reason why one state should be able to impose this result on other states when a problem and its victims are shared by the nation as a whole. [193]

Of course, this situation would not arise if S. 5 were passed, since all qualifying interstate class actions on a particular subject could be removed to federal court and consolidated before a single federal court judge under the multidistrict litigation mechanism described previously. That judge would be able to manage the proceeding to ensure that no group of litigants gained advantage over the others by virtue of their residency (or any other irrelevant factor).

 **63  A large quantity of class actions in state court, like the Broin tobacco case in Florida, results in millions of dollars for plaintiffs' counsel but nothing of any value for plaintiffs. An Institute for Civil Justice/RAND study has confirmed this pattern, finding that class counsel in state court consumer class action settlements, typically walk off with more money than all of the

class members combined.[194] The ICJ/RAND study provides three compelling rationales for allowing more interstate class actions to be heard by federal courts: (1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;" (2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and (3) " if a single judge is to be charged with deciding what law will apply in a multistate class action, it is more appropriate that this take place in federal court than in a state court."[195] S. 5 would help assure fairer settlements by allowing the federal courts to review more class action lawsuits, as well as by providing notice to state Attorneys General so they can better protect their citizens against unfair settlement agreements.

Moreover, in contrast to many state courts, which have demonstrated a willingness to approve class action settlements where the bulk (if not all) of the benefits go to the lawyers, federal courts have certified numerous settlement classes in cases that involved alleged violations of state law. These cases typically result in real relief for the class members. Following are a few examples:

 **\*68** \* A federal district court in Texas certified a nationwide settlement class alleging violations of federal lending law and state consumer protection law.[196] The court approved a class settlement in which the defendants agreed to forgive $52 million in debt incurred by class members and establish a settlement fund totaling $11 million for monetary payments to plaintiffs who had repaid their loans. In addition, the defendants agreed to substantial restrictions on future lending activities.

 \* A federal district court in Ohio approved a nationwide settlement class in a products liability suit involving allegedly defective orthopedic implants.[197] The settlement fund, which provided for medical monitoring and research, totaled more than $1 billion.

 \* In another case, a federal district court in Pennsylvania certified a nationwide settlement class of plaintiffs alleging consumer fraud and personal injuries related to two prescription diet drugs, fenfluramine and dexfenfluramine.[198] The settlement provided $3.75 billion for personal injury claims, medical monitoring and research. The class counsel agreed to limit their fees to about 9 percent of that.

Critics' Contention No. 11: S. 5 will cause delay and mass confusion because of (a) the difficulty of assessing compliance with jurisdictional requirements at the outset and (b) the potential that class membership and definitions will change over time.

Response

 The contention that S. 5 (particularly its differing treatment of categories of cases when a suit is filed in the defendant's home state) would complicate and delay the final  **\*\*64** resolution of jurisdictional inquiries is absolutely groundless. In reality, the jurisdictional standards in S. 5 will simplify–not complicate–a court's jurisdictional inquiries. The critics forget that under the current standards, many (and possibly most) newly-filed state court class actions are removed to federal court to test whether the class counsel's efforts to evade federal jurisdiction have been successful (even though those removal attempts normally fail and the cases are remanded to state court). Those inquiries are often quite complicated and can create significant delays.

 For example, as noted previously, counsel often include in their complaint extraneous parties in order to prevent the complaint from complying with the current "complete diversity" requirement. Our federal courts have ruled that those arguably extraneous parties can be ignored in the jurisdictional analysis if their claims are meritless,[199] and quite frequently, the claims of those parties are  **\*69** challenged in class actions as part of the jurisdictional analysis, requiring the court to take time to engage in the complicated process of assessing the merits of their claims. Under current law, this time-consuming "fraudulent joinder" issue arises in many purported class actions that are removed to federal court.[200]

**Page 70**

Similarly, the process of assessing whether a class action complies with the current jurisdictional amount requirement is also often "an expensive and time consuming process," [201] requiring discovery on the nature and value of the named plaintiffs' claims. As noted previously, in some federal Circuits, the jurisdictional amount requirement in a class action is satisfied by showing that any member of the proposed class is asserting damages in excess of $75,000, and in other Circuits, the question is whether each and every member of the putative class has individually an amount in controversy exceeding $75,000." [202] Again, this time-consuming issue, often requiring significant amounts of **65 record review and fact-finding, is litigated very frequently in the many class actions that are removed to federal court under current law. [203]

In sum, S. 5 will make the resolution of class action jurisdictional issues easier–not harder. The need to deal with the bona fides of counsel's efforts to use dubious parties to avoid diversity will evaporate. In short, it will be much easier to figure out whether any class member is diverse as to any defendant (the "minimal diversity" inquiry established by S. 5) than resolving the fraudulent joinder issues regularly presented under the current rule ("complete **70 diversity"). Likewise, it will be much easier to determine whether the amount in controversy presented by a purported class as a whole (that is, in the aggregate) exceeds $5 million than it is to assess the value of the claim presented by each and every individual class member, as is required by the current diversity jurisdictional statute.

The critics' concerns that events might occur after a complaint is filed or removed that would either create federal jurisdiction in a way never intended or would remove federal jurisdiction in an arbitrary manner are similarly unfounded. While questions regarding events occurring after a complaint is filed or removed to federal court will, of course, arise under S. 5, those same (or, at least, very similar) questions arise in current practice on jurisdictional issues. Well-established law exists to resolve these questions, and S. 5 does not change–or even complicate–the answers to these questions. In short, the "rules of the road" on such issues are already established, and S. 5 does not change them.

Under existing law (which S. 5 would not change), "diversity" of citizenship between the parties must exist both at the time a complaint is filed and at the time a complaint is removed to federal court. [204] For this reason, the federal court would generally only need to measure the diversity of the parties at the outset of the litigation. For example, in a case filed on behalf of a class of California citizens against a California company, there would be no minimal diversity when the case was filed–and thus the case could not be removed simply because one named plaintiff or class member later moved to Nevada. Similarly, if a class action against a California company were filed in California and more than 66% of the class members were California citizens at the time the case was **66 filed, changes in those class members' residences would not alter the jurisdictional analysis. In other words, no court would be required to engage in a residency play-by-play after the time the complaint was filed.

If, however, the plaintiff in the above example of her or her own volition filed an amended complaint in state court that added Nevada plaintiffs (or that brought the percentage of Nevada plaintiffs above 33% in a suit in the defendant's home state), jurisdiction would exist at the time that complaint was filed. Accordingly, as dictated by current law, the defendant could remove the case to federal court. [205]

Current law (that S. 5 does not alter) is also clear that, once a complaint is properly removed to federal court, the federal court's jurisdiction cannot be "ousted" by later events. Thus, for example, changes in the amount in controversy after the complaint has been removed would not subject a lawsuit to be remanded to state court. The Supreme Court established this principle in St. Paul Mercury Indem. Co. v. Red Cab Co., [206] stating that "events occurring subsequent to removal which reduce the amount recoverable, whether **71 beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." The same would be true if a case was removed to federal court because minimal diversity existed at the time and, because of a later event, minimal diversity was eliminated. This would occur if, for example, the federal court dismissed the claims of out-of-state plaintiffs, leaving only the claims of in-state plaintiffs against an in-state defendant intact. "It uniformly has been held that in a suit properly begun in federal court the change of citizenship does not oust the jurisdiction. The same rule governs a suit brought in a state court and removed to federal court." [207]

**Page 71**

Sound policy reasons support this rule. If a federal court's jurisdiction could be ousted by events occurring after a case was removed, plaintiffs who believed the tide was turning against them could simply always amend their complaint months (or even years) into the litigation to require remand to state court. "If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election. [208] Similarly, a defendant prevailing on the merits always shows that the amount in controversy, at the end of the day, is zero. Thus, if subsequent events could unravel a federal court's jurisdiction, a defendant could prevail on the merits, only to have the federal court conclude that it lacks jurisdiction to enter a judgment. [209]

**67** It is also clear under existing law that even if a case is not originally removable, it can become removable because of subsequent events (other than changes in the citizenship of the original parties, which, as noted above, do not effect jurisdiction). Thus, as applied under S. 5, if a plaintiff, through amendment or otherwise, increased the amount in controversy, created minimal diversity, or changed the class definition in a case filed in the defendant's home state to include more than 33% of out-of-state plaintiffs, a complaint filed in state court–and previously not subject to federal jurisdiction–could properly be removed. [210] Otherwise, the plaintiff could simply file a complaint not subject to removal and then later amend it, thereby circumventing federal jurisdiction. Similarly, if a plaintiff defines a class so as to allow diverse parties to become members of a class as the case proceeds, removal may be appropriate if diverse parties actually enter the class. For example, if a class action is filed in state court against an Indiana company on behalf of all persons affected by a chemical spill and it is initially thought that all class members are Indiana citizens, the case may become removable later in the litigation if it emerges that citizens of other states fall within the class definition or have become members of the class as the effects of the chemical spill spread. If this **72** were not the rule, major interstate controversies could evade federal jurisdiction because counsel filed a class action before the parameters of the controversy were fully developed. Any alternative rule would allow class counsel to urge rejection of federal jurisdiction on the grounds that only non-diverse Indiana citizens were in the class and then turn around months later and purport to represent thousands of persons residing outside of Indiana. It should be noted that class counsel can limit the potential for removal as the case proceeds by defining the class to encompass only parties that were injured as of the date on which the action was filed or only parties who are citizens of a certain state.

Critics' Contention No. 12.: S. 5's provisions expanding federal jurisdiction over class actions are invalid because they exceed the jurisdictional authorization of Article III of the Constitution.

Response:

This concern is groundless. As viewed by many Circuits, a federal court may exercise diversity jurisdiction over a purported class action only if none of the plaintiffs named in the complaint share state citizenship with any defendant. In other words, no named plaintiff may be a citizen of the same state as any defendant. This so-called "complete diversity" prerequisite for federal jurisdiction is wholly a policy creation of Congress, establishing a scope of federal diversity jurisdiction narrower than what is authorized by Article III. [211] Broader definitions of diversity jurisdiction would be wholly consistent with Article III. "[I]n a variety of contexts, [federal courts] have concluded that Article III poses no obstacle to the legislative extension of federal [diversity] jurisdiction * * * so long as any two adverse parties are not co-citizens." [212]

**68** Critics suggest that S. 5 is constitutionally suspect because it would authorize federal jurisdiction over purported class actions in which there is "minimal (but not complete) diversity"–that is, cases in which any member of the purported class (whether or not explicitly named in the caption of the complaint) has state citizenship that differs from any defendant (using the definitions already in 28 U.S.C. S 1332). Citing no precedents whatsoever, the critics allege that there is an absolute bar on considering unnamed class members to be "parties" to a purported class action. They contend that those unnamed persons must be ignored completely in determining whether the two sides meet the applicable diversity requirement.

**Page 72**

But the premise of this challenge–that unnamed class members cannot be deemed parties to an action–is flatly inconsistent with the fact that in a variety of contexts over the years, federal court have treated unnamed class members as parties to class actions. For example:

* In Zahn v. International Paper Co., [213] the U.S. Supreme Court considered whether federal diversity jurisdiction existed over a purported Rule 23(b)(3) class that had not been certified. The district **\*73** court declined to exercise federal jurisdiction (or to allow the matter to proceed as a class action) because even though "[t]he claim of each of the named plaintiffs was found to satisfy the * * * jurisdictional amount," "not every individual owner in the class has suffered * * * damages in excess of" the amount-in-controversy threshold. [214] The Supreme Court concurred, holding that in determining whether the amount-in-controversy prerequisite for diversity jurisdiction is satisfied, a trial court is obliged to look at whether each purported claimant, even if unnamed, meets the $75,000 jurisdictional amount requirement. [215] Thus, in this respect, the federal courts have for many years treated unnamed class members as "parties."

* Similarly, in Devlin v. Scardelletti, [216] the Supreme Court recently held that unnamed class members are considered "parties" for purposes of mounting an appeal. Thus, Devlin rejects the contention that unnamed class members cannot be considered "parties" to the litigation.

* Earlier, the Supreme Court ruled that normally, the filing of a class action immediately tolls the statute of limitations as to all unnamed class members. [217] In short, all unnamed class members are treated as parties–treated as if they had filed the litigation themselves. Significantly the American Pipe Court declared that "the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue.") [218]

* Along these same lines, many courts have held that under Fed. R. Civ. P. 23(e), a court must ensure that unnamed class members' interests are protected if class claims are dismissed. [219] In other words, the court is obliged (at least at some level) to treat the unnamed class members as parties to the litigation.

**\*\*69** S. 5 proposes that Congress declare unnamed class members to be " parties" to the litigation for purposes of the "minimal diversity" jurisdictional requirement. As evidenced by the foregoing examples, such a congressional determination about who is a class action "party" would be wholly consistent with long-standing practice. For years, Congress and the courts have made practical determinations about how various categories of parties should be treated in assessing compliance with diversity jurisdiction prerequisites and specifically about the circumstances in which unnamed class members should be treated as parties to a lawsuit. The enactment of the "minimal diversity" provisions of S. 5 would be merely another such practical determination a determination that for purposes of the "minimal diversity" jurisdictional inquiry established by the legislation, unnamed class members (as well as any named class members) shall be considered "parties." Congress is certainly empowered to establish such a definition in this instance.

The critics are also wrong to suggest that The Class Action Fairness Act "dictate[s] * * * state court [rules of civil] procedure" and **\*74** thus impinges upon the sovereignty of the state. [220] Critics quote Prof. Larry Tribe as saying that "for Congress directly, regulate the procedures used by state courts in adjudicating state-law tort claims * * * would raise serious questions under the Tenth Amendment and principles of Federalism." [221] Of course, when Professor Tribe made that statement, he was not referring to The Class Action Fairness Act. That is because The Class Action Fairness Act does not regulate the procedures "used by state courts" at all. Rather, it simply changes the federal jurisdiction statute to expand the diversity jurisdiction of federal courts to encompass more class action.

If cases subject to that broader jurisdictional grant are removed to federal court (or brought there in the first place), it is of course permissible for Congress to regulate the procedures by federal courts to resolve such cases. Indeed, if Congress cannot

**Page 73**

specify laws and procedures to be used by federal courts, then all of the federal rules of civil procedure (which are transmitted to Congress for final approval) would be unconstitutional.

The critics' contention that The Class Action Fairness Act "overstep [s] [Congress's] specific constitutional power to regulate interstate commerce"[222] is equally baseless. This final "serious" constitutional argument is another red herring. In the first place, it is difficult to imagine why The Class Action Fairness Act–which by its text regulates only very large interstate class actions involving at least two (and sometimes up to 50) states–could be unconstitutional when there is no debate that a $75,001 slip and fall case involving citizens of only two states can appropriately be heard by a federal court.

Thus, the critics would have to concede that their view of the Commerce Clause abolishes all diversity jurisdiction, in direct contravention of Article III, Supreme Court precedent, and Congressional authority exercised literally since the year of our nation's founding.

Even if the critics' attack on the Commerce Clause were not so obviously misguided given the separate authority Congress has to regulate federal courts, The Class Action Fairness Act targets activity with substantial effects on interstate commerce. It targets **70 only those lawsuits involving parties from different states, is limited to very large lawsuits involving at least $5 million, and regulates economic activity (the transfer of resources through litigation) that collectively has substantial effects on interstate commerce. As the legislative history makes abundantly clear, abusive state court class action practices exact a staggering toll on interstate commerce. The Class Action Fairness Act is thus not only constitutional, it is necessary as a matter of public policy.

In sum, the Committee notes that the exercise of this expanded jurisdiction can be grounded on a Commerce Clause rationale as well. In that regard, the Committee notes that the legislation contains findings that the state court class action abuses identified in the record before the Committee are having a serious adverse effect on interstate commerce and that the legislation (particularly its jurisdictional **75 provisions) is intended to ameliorate those adverse effects.

Critics' Contention No. 13: S. 5 will make it harder for consumers to bring class action lawsuits against pharmaceutical manufacturers and should be amended to exclude drug cases.

S. 5 poses no barrier for consumers seeking to bring suits against pharmaceutical manufacturers. All the bill does is move certain class actions to federal court. Moreover, an industry-specific exemption from federal jurisdiction, such as the carve-out proposed by this critique, makes no sense, since it irrationally slams the federal courthouse door on one industry–the very kind of treatment that the Framers sought to avoid by creating diversity jurisdiction. Such an approach is ill-advised for several reasons.

First, such an amendment would unfairly single out the pharmaceutical industry and deny defendants a fair, even-handed federal court forum. Moreover, this contention is inconsistent with what the Framers had in mind in establishing diversity jurisdiction in Article III of the Constitution. They wanted to allow interstate businesses to have claims against them heard in federal court so as to avoid local biases. Nowhere in this concept is the idea that certain industries should be exempted from this right–i.e., that certain kinds of businesses are less entitled to federal court protection. In short, such an exclusion would fly in the face of the Constitution, as well as the basic purpose of the bill.

Second, the flood of litigation surrounding recent drug withdrawals demonstrates the need for class action reform. Under the current system, plaintiffs' lawyers frequently file hundreds of overlapping class action lawsuits in various state court jurisdictions around the country. And since we have 50 different state court systems, these cases cannot be coordinated or consolidated before one judge. As a result, both sides have to engage in duplicative discovery, the judges end up duplicating each others' work, and different courts often reach different decisions on the same pretrial issues. To make matters worse, the current system encourages plaintiffs' lawyers to compete against each other–vying to achieve the first nationwide settlement that will eviscerate the remaining class actions involving similar claims.

In contrast, when numerous duplicative class actions are brought in federal court, the federal multi district litigation (MDL) mechanism allows all the cases to be coordinated for pretrial proceedings in one federal court. That means all the parties in all the cases typically set up one document depository, the court issues consistent rulings on discovery issues and summary judgment motions, and the court can preside over settlement negotiations that address the concerns of all the plaintiffs in all the cases–rather than just strike a deal with one group of plaintiffs' lawyers. Put simply, MDL proceedings are fairer, more efficient, and less expensive.

Third, federal courts have demonstrated their effectiveness in handling nationwide class actions against pharmaceutical companies. Federal court proceedings have resulted **\*\*71** in numerous pro-consumer settlements in pharmaceutical cases. For example, the settlement in In re Diet Drugs (Fen-Phen) provided $3.75 billion for **\*76** personal injury claims, medical monitoring and research. [223] Similarly, in In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, an MDL court approved a $150 million settlement for consumers. [224] And in Bowling v. Pfizer,, the federal court approved a settlement providing approximately $200 million in medical monitoring for plaintiffs who had received allegedly defective heart valves. [225]

Fourth, regulatory decisions regarding which pharmaceutical drugs are available to the American public should not be shifted away from the Food and Drug Administration into the hands of plaintiffs' lawyers, judges and juries. Many class actions against pharmaceutical manufacturers are filed in spite of the fact that the FDA has investigated an alleged problem and concluded that the drug should remain on the market. Class action lawyers borrow from the factual work undertaken by the agency and use the class action vehicle as a way to relitigate the agency's decisions. The authority to decide whether consumers should have access to pharmaceuticals should remain with the FDA. And if there are problems with FDA, the solution is to fix the agency–not to transfer its power to self-interested class action lawyers.

Finally, the claims of some critics that it is more difficult to have a class certified in federal court than in state court have been disproved. As noted previously, a study by the Federal Judicial Center found that class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time. [226] The study also debunked another myth often repeated by opponents of The Class Action Fairness Act–that state courts move more quickly than federal courts. According to the study, federal courts are much more speedy in resolving class action issues: state courts, in contrast, are more likely to let class actions linger without ruling on class certification. Finally, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. State court judges are assigned (on average) 1,568 new cases each year. [227] In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003. [228]

## VIII. CBO COST ESTIMATE

S. 5 would expand the types of class-action lawsuits that would be initially heard in federal district courts and would provide guidelines for the award of attorney's fees in certain types of settlements. CBO estimates that implementing the bill would cost the federal district courts about $7 million a year, subject to appropriation of the necessary funds. Enacting the bill would not affect direct spending or revenues. S. 5 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal **\*\*72** governments. **\*77** S. 5 would impose private-sector mandates, as defined in UMRA, but CBO estimates that the direct cost of those mandates would fall below the annual threshold established by UMRA ($123 million in 2005, adjusted annually for inflation).

Under S. 5, most class-action lawsuits would be heard in a federal district court rather than a state court. Therefore, CBO estimates that the bill would impose additional costs on the federal district court system. While the number of cases that would be filed in federal court under this bill is uncertain, CBO expects that a few hundred additional cases would be heard in federal court each year. According to the Administrative Office of the United States Courts, class-action lawsuits tried in federal court cost

**Page 75**

the government, on average, about $23,000. That figure includes salaries and benefits for clerks, rent, utilities, and associated overhead expenses but excludes the costs of the salaries and benefits of judges. CBO estimates that implementing S. 5 would cost about $7 million annually.

CBO also estimates that enacting this bill could increase the need for additional district judges. Because the salaries and benefits of district court judges are considered mandatory, adding more judges would increase direct spending. However, S. 5 would not–by itself–affect direct spending because separate legislation would be necessary to authorize an increase in the number of district judges. In any event, CBO expects that enacting the bill would not require a significant increase in the number of federal judges, so that any potential increase in direct spending from subsequent legislation would probably be less than $500,000 a year.

S. 5 would require the Judicial Conference of the United States to transmit a report on class-action settlements to the Congress no later than one year after the bill's enactment. CBO estimates that this provision would cost less than $500,000 in 2005.

S. 5 would impose a private-sector mandate by possibly limiting the size of awards that attorneys could receive in certain class-action settlements. If a proposed class-action settlement provides coupons to a class member, the bill would require the attorneys' fees to be based on the value of the coupons that are redeemed or on the amount of time reasonably expended working on the case by class counsel. In current practice, the attorney's fee is sometimes based on the total value of the settlement. According to information from industry representatives and academic studies, settlements with coupons account only for about 10 percent of all class-action settlements. Moreover, according to those sources, attorneys' fees correlate very closely with the amount of time spent on such cases by class counsel. Therefore, because attorneys' fees would still be negotiated as part of any settlement, CBO estimates that the direct cost of the mandate, as measured by loss of income for attorneys in class-action settlements, would be small, if any.

In addition, S. 5 would impose a private-sector mandate on defendants participating in a proposed class-action settlement. The bill would require defendants to make certain notifications and disclosures to the appropriate state official of each state in which a class member resides and the appropriate federal official within 10 days after a proposed settlement is filed in court. The bill defines a proposed settlement as an agreement regarding a class action that is subject to court approval and would be binding on the class.  **78**  The required notices and disclosures would include a copy of the suit, a copy of the proposed settlement, a statement of class members' rights, and certain other materials. In effect, the defendants would have to provide copies of documents and materials related to information that they usually already possess about the case. Further, the provision would  ***73**  allow for the use of the Internet in making such disclosures. Thus, CBO estimates that the costs of complying with this mandate would be small.

The CBO staff contacts for this estimate are Gregory Waring (for federal costs), and Paige Piper/Bach (for the private-sector impact). This estimate was approved by Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

## IX. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 5 will not have a significant regulatory impact.

## *79  X. ADDITIONAL VIEWS OF SENATOR PATRICK LEAHY

The circulation and filing of this report occurred after passage of the legislation for Senate consideration of the underlying bill. Indeed, it was filed after the House of Representatives passed this legislation and on the same day that the President signed the measure into law. Committee reports, like Committee consideration of measures, are intended to assist the Senate in its consideration of the matter. Committees tend to have Members with expertise and experience that help shape legislation for

**Page 76**

Senate consideration. In this case, that did not occur. Instead, at the insistence of the Republican leadership, this bill was rushed through the Judiciary Committee and then forced through the Senate without amendment.

The Republican leadership's timetable was so short that there was no opportunity to prepare a Committee report before final passage. There was no time for Senators to review a cost estimate from the Congressional Budget Office. There was no evaluation of the regulatory impact of the bill. That this report is being filed after Senate consideration means that it did not serve the principal purpose for which Committee reports are intended.

Several days ago, the Senate had pending before it for a few days the so-called "Class Action Fairness Act." In lockstep mode, bill supporters rejected every effort to clarify or improve the bill. During the few days it was pending, a few modest amendments were offered to clarify some ambiguous provisions and to respond to serious concerns raised by the National Conference of State Legislatures, the National Association of State Attorneys General, prominent legal scholars, consumer and environmental groups and civil rights organizations. All these efforts were rejected. Anyone who watched the Senate on C–SPAN or reviews the Congressional Record will see ample evidence that the "fix was in". Thus, despite legitimate concerns acknowledged by some of this legislation's sponsors and supporters, the bill was not improved in any regard on its short journey through the Senate.

I am disappointed that the Senate has been reduced to taking its marching orders on major legislation from corporate special interests and the White House. The Senate could have made limited but important improvements to the bill but, instead, the majority of Senators refused to even consider minor improvements let alone the major flaws in this legislation.

This legislation will make it harder for American citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these cases out of local state courts. Aside from being convenient, state courts have experience with the legal and factual issues involved in these important cases. This bill will sweep these cases into federal courts **\*80  \*\*74** and, thereby, erect new barriers to lawsuits and place new burdens on plaintiffs.

The biggest concern raised by legal scholars and agreed to by several Senate sponsors of the bill would have addressed the recent trend in the federal courts not to certify class actions if multi-state laws are involved. Given this development, what this bill may result in doing is removing class actions to federal court where they will likely be dismissed for involving multiple state laws and where they will not be considered on the merits because the federal court will choose not to consider a case involving the laws of the states. Cynics might even speculate that is what the business groups behind this purported "procedural" change are really seeking, the dismissal of meritorious cases on procedural grounds by the federal courts.

Many Senators understand that this bill could deny justice to consumers and others in class actions who band together to seek relief in state court. Senator Feinstein and Senator Bingaman worked together on an amendment to alleviate this legal Catch–22. It is unfortunate that the wisdom of their common-sense solution was rejected.

Anyone who reads this bill will notice that despite its title, it affects more than just class actions. Individual actions, consolidated by state courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the last Congress, mass actions reappeared in this bill this Congress. Federalizing these individual cases will no doubt delay, and possibly deny, justice for victims suffering real injuries. Senator Durbin's amendment would have clarified the bill's effect on these cases but it was not adopted.

Prominent civil rights organizations and labor advocates requested that the bill be modified to acknowledge the fact that many of our states have their own protective civil rights and employment laws. Senator Kennedy's amendment to exempt civil rights and wage and hour cases from this bill was a sensible solution. I was proud to cosponsor it and regret that this amendment was also rejected.

**Page 77**

This class action legislation has also been criticized by nearly all of the state Attorneys General in this country. They expressed a specific concern that S. 5 could limit their official powers to investigate and bring actions in their state courts against defendants who have caused harm to their citizens because in certain instances they file suit as the class representative for the consumers of their state. Not even this minor clarification, requested by nearly every state's highest law enforcement officer, was acceptable to the bill's supporters as they to adopt Senator Pryor's amendment.

It is disappointing to me that the Senate has refused to listen to the wise counsel of our state legislatures, our state law enforcement officers, our state judges and even the views expressed by our federal judiciary. They serve in the institutions that we are affecting by enacting this legislation.

This bill contains language to reduce the delay parties can experience when a case is removed to federal court by setting a time limit for appeals of remand orders. However, no measure is included in the bill that would set a timeline for the district court **\*81** to rule on the actual remand motion. This means that plaintiffs' claims may be removed from state court, just to languish on the federal docket for years, without any recourse. Senator Feingold offered a modest amendment to set a reasonable time limit for the district court to rule on remand orders. This solution received praise from one of the sponsors of the legislation, yet the amendment was rejected.

I predict this legislation will be manipulated by well-paid corporate defense lawyers to create complex, expensive and lengthy litigation over the criteria and factors in the bill and whether they apply to a particular case. Unfortunately, one of the great boons–or **\*\*75** more properly boondoggles–of this legislation, to the extent it does not simply deter meritorious class actions that would otherwise have been brought by consumers, is that it will make them more costly, burdensome and complicated.

The so-called Class Action Fairness Act falls short of the expectation set by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to the ordinary Americans who look to us to represent them in the United States Senate.

Patrick Leahy.

**\*82** XI. MINORITY VIEWS OF SENATORS LEAHY, KENNEDY, BIDEN, FEINGOLD, AND DURBIN

I. INTRODUCTION

We strongly oppose S. 5, the "Class Action Fairness Act of 2005." Although the legislation is described by some of its proponents as a "modest bill" not effecting "a substantive change in the law", in reality it will cause a radical revision of the class action rules and diversity jurisdiction requirements. We believe it would bar most state class actions from being heard in state courts and prevent many nationwide class actions from being heard in either state or federal court.

This legislation and previous versions have been opposed by the federal [1] and state [2] judiciaries, as well as, state legislatures. [3] S. 5 is also opposed by dozens of civil rights, consumer, environmental **\*83** and public interest advocates [4] and **\*\*76** several state Attorneys General. [5]

By providing plaintiffs access to the courts in cases where a defendant may have caused small injuries to a large number of persons, class action procedures have traditionally offered a valuable mechanism for aggregating small claims that otherwise might not warrant individual litigation. This legislation will undercut that important principle by making it far more burdensome, expensive, and time-consuming for groups of injured persons to obtain access to justice. Thus, it would be more difficult for citizens to seek redress for violations of civil rights, employment discrimination, and consumer health, safety and environmental laws, to name but a few important laws. The legislation will prevent state courts from considering class action cases which involve solely violations of state laws, such as state consumer protection laws.

"The Class Action Fairness Act of 2005" will force most state class action cases into federal courts. It will provide automatically for both original jurisdiction and the removal of state class action claims to federal court at the request of either party in cases involving violations of state law if any member of the plaintiff class and at least one primary defendant are citizens of different states. [6]

**\*84** As part of the expanded diversity jurisdiction, the bill also provides for the removal of state class actions to federal court at the request of either party if fewer than one-third of the plaintiff class members are citizens of a different state than any primary defendant, even if the primary defendant conducts substantial business in that state. [7] The legislation would allow removal of a class action to federal court in cases where between one-third and two-thirds of the plaintiffs are citizens of the same state as the primary defendants. [8]

**\*\*77** Under the legislation, federal courts are directed to abstain from hearing a class action only where (1) more than two-thirds of the plaintiffs are citizens of the same state as at least one of the primary defendants; (2) the principal injuries occurred in that state; (3) the matters in controversy are less than $5,000,000 or the membership of the proposed class is less than 100; or (4) the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief. [9]

In the context of the "Local Controversy Exception", the Committee Report erroneously conflates the concepts of citizenship and residence. [10] Contrary to the Committee report, the legislation provides that the touchstone for this exception is citizenship not residence. This more narrow exception will no doubt result in many more class actions being removed to federal court.

This bill contains a "Consumer Class Action Bill of Rights." This section includes some safeguards that we agree will improve class action litigation for all parties, such as protection against a proposed settlement that would result in a net loss to a class member and protection against discrimination based on geographic location. [11] We also recognize that improvements were made to the bill in the last Congress such as: restricting use of coupon settlements; allowing civil rights and consumer plaintiffs to be compensated for the particular hardships they endure as a result of initiating and pursuing litigation as named plaintiffs; eliminating the notification burden; prohibiting retroactivity and providing for greater judicial discretion. [12]

We object to the fact that S. 5 is written to favor corporate defendants at the expense of victims. Before even considering S. 5, the Committee and the full Senate should have insisted on receiving objective and comprehensive data justifying such a dramatic intrusion into state court prerogatives. Nothing in the way of such information now exists. Before the Committee considered this bill, a hearing on class action litigation would have helped the Committee **\*85** develop consensus reforms to better serve both defendants and plaintiffs before the Committee proceeded to a markup on S. 5.

We had hoped that the Committee would undertake a deliberate and careful review of information from parties actually involved in class action litigation to provide a realistic picture of the benefits and problems with class actions. But, instead, the Committee has simply decided that the time is now for federalizing nearly all class actions where most of plaintiffs' claims will take longer and be more expensive.

We recognize that there are some genuine problems with some class action litigation that should be addressed by federal legislation for the benefit of both defendants and plaintiffs. This legislation, however, is heavily biased in favor of defendants. Rather than address the system's real failings, S. 5 will make it more difficult for the vast majority of legitimate, well-intentioned class actions to move forward, by placing cumbersome restrictions on citizens' rights to seek redress for their injuries.

**\*\*78** In short, we agree with the position of the National Conference of State Legislatures when they urged us to "remember that state policy choices should not be overridden without a showing of compelling national need. We should await evidence demonstrating that states have broadly overreached or are unable to address the problems themselves. There must be evidence

of harm to interests of national scope that require a federal response, and even with such evidence, federal preemption should be limited to remedying specific problems with tailored solutions, something that S. 5 does not do." [13]

For these and other reasons set forth herein, we strongly oppose S. 5.

## II. S. 5 WILL HURT CONSUMERS, VICTIMS, AND THE ENVIRONMENT

Proponents of this legislation claim that S. 5 will protect consumers while remedying the worst abuses of the class action system, yet consumer advocates overwhelmingly oppose these alleged "reforms." [14]

A. Federal courts' refusal to certify class actions will leave victims in limbo

There can be little doubt that S. 5 will have a serious adverse impact on the ability of consumers and victims to obtain compensation in cases involving widespread harm. At a minimum, the legislation will force most state class action claims into federal courts where it is generally more expensive for plaintiffs to litigate cases and where defendants could force plaintiffs to travel long distances to attend proceedings. It is also typically more difficult and time consuming to certify a class action in federal court. By pushing cases from state to federal court, S. 5 creates more problems than it solves.

**\*86** Fourteen states, representing nearly one-third of the nation's population, [15] have adopted different criteria for class action rules than Rule 23 of the Federal Rules of Civil Procedure. [16] In addition, with respect to those states which have enacted an analog to Rule 23, the federal courts are likely to represent a more difficult forum for class certification to occur. This ratcheting up of the standard is the result of a series of several federal cases, such as Castano v. American Tobacco Co. [17], In re Rhone-Poulenc Rorer, **\*\*79** Inc., [18] In re American Medical Systems, Inc., [19] Georgine v. Amchem Products, Inc., [20] Broussard v. Meineke Discount Mufflers, [21] and Ortiz v. Fibreboard, [22] which have made it more difficult to establish the 'predominance requirement' necessary to establish a class action under the federal rules.

Plaintiffs removed to Federal courts are subject to the Federal Rules of Civil Procedure. In accordance with Rule 23(b)(3), their cases will not be certified by the Federal court if they cannot show that a common question of law predominates. As this rule has been interpreted by many Circuit [23] and District Courts, [24] Federal courts are not certifying class actions involving the laws of multiple states. In fact, six Circuit Courts and 26 District Courts have consistently denied certification of multi-state consumer cases. Only **\*87** one court has granted certification of these cases and even that case, from the Third Circuit, has been distinguished on its facts. [add footnote: See In re School Asbestos Litig., 789 F.2d 996, 1011 (3d Cir. 1986)]

Not only are the courts concerned with the federalism implications of such action, but recognize that by doing so, cases become simply unmanageable as courts try to apply the laws of each plaintiff's state to the plaintiff. Scholars who track multi-state class action suits have found that if a case involves too many state laws, then Federal court judges can and do dismiss the case. [25] In fact, the U.S. Chamber of Commerce has recognized this stating, "federal courts have consistently refused to certify nationwide class actions in product defect cases because the need to apply the laws of many different states would make such a sprawling class action unmanageable." [26]

Federalizing class action cases creates an incentive for violators to break the laws of multiple states, as any collective action to hold them accountable will likely be dismissed. And, consumers, workers and victims will be prevented from having many important multi-state class actions heard in either the state or Federal courts. As a result, we will likely begin to see fewer dangerous and ineffective products and devices removed from the marketplace.

**Page 80**

**\*\*80**  Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts."[27]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow–and in some cases thwart–the continual interpretation of state law."[28]

To solve this significant problem, S. 5 should be amended to ensure that cases which are removed from state courts are at least not immediately dismissed by the Federal judge on choice of law grounds. One solution to this loophole in the legislation is the subject of Senator Bingaman's amendment. Quite simply, a Federal judge presented with a case that involves a choice of law issue should be able to apply the state law that has a sufficient connection to the case. In this way, not only are citizens' rights and access to the courts preserved, but the Federalism concerns that the removal creates are undercut because state laws are being enforced.[29]  This sensible solution to a glaring deficiency in the bill also had the support of Chairman Specter, as he noted during the Committee's markup.

**\*88**  B. One-sided delays of justice must be avoided

Last Congress, Senators Dodd, Schumer and Landrieu were able to improve the legislation by adding a provision to the class action bill to require that any appeal of a motion to remand be ruled on by the court of appeals within 60 days. However, before a motion to remand can be appealed it first needs to be ruled on by the lower district court. S. 5 overlooks this step and creates another loophole which defendants can exploit to delay trials. The bill contains no deadline on how long district courts can take to rule on a motion to remand. By simply removing all class actions to Federal court, defendants can exploit this lack of a statutory deadline; and therefore benefit from the delay, which inevitably increases the costs of trials and leaves the plaintiffs in limbo.

Since the bill already addressed the need for speedy resolution of remand appeals, it should similarly require speedy resolution for motions to remand at the district court level. Senator Feingold proposed an amendment that would have simply required district courts to work within the same timeframe as the appeals courts. Under his proposal, any motion for remand to a state court would need to be decided by a district court within 60 days, which tracks the 60 days timeframe afforded to the appeals court. Sen. Feingold's amendment, which he withdrew at the request of Chairman Specter, also provided an automatic additional 10 days for review of the remand motion, and the ability to seek more time for review, if necessary.

C. Barriers to justice for consumers and victims of mass torts

This legislation will also severely limit the ability of consumers to pursue class action in state court, even when state consumer protection laws are implicated. Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the  **\*\*81**  potential to overwhelm state courts."[30]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow–and in some cases thwart–the continual interpretation of state law."[31]

As the American Bar Association Task Force on Class Action Legislation's recent report noted, "any expansion [of Federal court jurisdiction] should preserve a balance between legitimate state-court interests and Federal-court jurisdictional benefits." [32] The current legislation clearly fails this test.

Proponents of S. 5 argue that while many class actions will be removed to federal courts, plaintiffs can still bring their individualized claims in state courts. This is not an adequate solution because  **\*89** state judges often consolidate cases to ease their dockets. This procedure allows cases with similar questions of law and fact to be consolidated for all or part of the proceedings. Consolidation does not make the case a class action. However, S. 5 reaches not only class actions, but these consolidated cases as well, through a new term of art called "mass actions." [33] For example, the plaintiffs who have brought individual claims against Merck for injuries sustained by Vioxx have had their actions consolidated in the courts. Federalizing these cases would seriously delay not only the victims' compensation but would also prevent victims from holding the drug companies accountable. S. 5 places state court judges in a considerable Catch–22: either do not consolidate the cases and be overloaded with work, or consolidate and cede control of an issue relating to their state laws to the federal courts.

Senator Durbin proposed an amendment to rectify this Catch–22 by narrowing the scope of mass tort cases that would be affected by S. 5. Despite the fact that a similar provision was unanimously struck from the bill during the mark-up of class actions legislation in the Judiciary Committee in the last Congress, mass torts are again included in S. 5.

The net result of these various changes is that under the proposed legislation, it will be far more difficult for consumers and other injured individuals to obtain justice in class action cases at the state or Federal level.

D. Special punishment for the environment and civil rights

By removing many important environmental class actions from state to federal court, S. 5 not only denies to state courts the opportunity to interpret their own state's environmental protection laws, it hampers and deters plaintiffs from pursuing important environmental litigation. The well-documented backlog in the federal courts and the need for attorneys to engage in choice of law debates will significantly increase the time and cost of environmental litigation. Ultimately, environmental class actions may not get litigated and the incentive polluters have to keep our environment clean will be reduced.

 **\*\*82**  Moreover, by failing to carve out an exception in S. 5 to protect the environment, the majority ignores the advice of the Judicial Conference of the United States, chaired by Chief Justice Rehnquist. In its March 26, 2003, letter, the Judicial Conference noted that even if the Congress adopts class action removal legislation, there should be certain exceptions such as "a class action in which plaintiff class members suffered personal injury or physical property damage within the state, as in the case of a serious environmental disaster." [34]

Just as S. 5 turns a blind eye toward the environment and to the advice of Chief Justice Rehnquist, the proposed legislation will make it much more difficult to use class actions as a means of protecting civil rights. [35] Class actions are the most effective means to  **\*90**  change a policy of discrimination and to bring claims for small amounts of individual wage loss. State laws offer more extensive protections for low wage workers and for many members of minority groups, as well as for the disabled. Several civil rights organizations have argued that S. 5 and its "additional, substantial and costly noticing requirements and built-in delays are not a matter of due process, but are overly burdensome and improperly assume that federal and state officials have proper interest in, and a capacity to respond to, each and every class action." [36]

Indeed, class action litigation has been essential to vindicating basic civil rights through our courts. For example, the landmark Supreme Court decision in Brown v. Board of Education was the culmination of appeals from four class action cases, three from federal court decisions in Kansas, South Carolina and Virginia and one from a decision by the Supreme Court of Delaware. Only the Supreme Court of Delaware, the state court, got the case right by deciding for the African-American plaintiffs. The state court justices understood that they were constrained by the existing Supreme Court law, but nonetheless held that the

**Page 82**

segregated schools of Delaware violated the Fourteenth Amendment. Before any federal court did so, a state court rejected separate and unequal schools.

S. 5 sets up several new hurdles for plaintiffs who file class actions. These requirements will be especially burdensome for many civil rights claimants.

The bill's requirement to provide "notice" to state officials, such as a state attorney general, will certainly lead to delays in the proceedings. As a result, some of the critical evidence of malice or discriminatory intent required to prevail in civil rights and discrimination cases could be lost while this additional step is taken. In addition, this added hurdle will likely be redundant because many of these plaintiffs will have already gone through an administrative proceeding before being allowed to file a discrimination claim.

**\*\*83**  As a consequence of the assault that S. 5 would launch on the defense of civil liberties, many civil rights advocates–including the Lawyers' Committee for Civil Rights Under Law, the Leadership Conference on Civil Rights, the Mexican American Legal Defense and Education Fund, and the National Asian Pacific Legal Consortium–have concluded that this legislation "would discourage civil rights class actions, impose substantial barriers to settling class actions and render Federal courts unable to provide swift and effective administration of justice." [37]

This legislation would have been greatly improved if amended by a carve-out proposed by Senator Kennedy for civil rights and employment law cases. The bill indiscriminately applies to all multi-state class action suits, without pausing to consider the implications on important civil rights abuse challenges. States have  **\*91**  strengthened their civil rights laws after years of federal encouragement to do so, but now S. 5 will take away the states' means of enforcing those laws. If violators are allowed to side-step these protections by removing cases to the federal courts, those efforts will have been for naught.

Even if Federal courts take up the claims, state judicial interpretations of civil rights laws will be full of holes due to a lack of state-level adjudication of issues. The bill's additional notice requirement will not only lead to significant delays affecting plaintiffs' ability to gain critical evidence of malice or discriminatory intent, but also would likely be redundant as most plaintiffs already have gone through an administrative proceeding. Taken together, these barriers will certainly result in worthy claimants being discouraged from filing class action suits and civil rights violators going unpunished.

We all agree that some reform is needed to improve the efficiency and fairness of our nation's class action procedures. At the same time, many state legislatures have worked hard to develop a system of laws that defend and protect all citizens' civil rights so it is unfortunate that this bill seeks to gut those efforts through a clumsy reform effort. Senator Kennedy proposed a refined approach that would have enabled victims of civil rights violations to have their day in court. This amendment would have exempted civil rights, as well as wage and hour state law cases, from S. 5 and therefore maintain the status quo for these claims.

E. Improvements made on coupon settlements

This class action bill makes an improvement on the use of worthless coupon settlements, which provide little or no tangible benefits to class action plaintiffs. Typically, these settlements involve an agreement by plaintiffs' and defendants' counsel that fully pay for the attorney fees and expenses of the plaintiffs' counsel while class members are left holding coupons to buy the defendants' products. For example, in a federal class action case alleging a price-fixing conspiracy between major airlines, class members were awarded $400 million in flight coupons. However, the coupons were restricted to certain dates and small increments of travel making them virtually unusable to consumers. [38]

This version of the class action bill creates incentives for class members' attorneys to seek a remedy for their clients by tying the attorneys' compensation to the value of coupons which are actually redeemed. [39]  To help the court make a determination of this value, the judge may hear from expert witnesses. [40]  If the coupons are not used to determine counsel's compensation,

then the award fee must at least be "based upon the  **84  amount of time class counsel reasonably expended working on the action," subject to approval by the court. [41]  If the plaintiffs' attorneys secure a mixed award, i.e. coupons and an injunction, then part of their fee will be based on the coupons redeemed and part will be based on the reasonable expenditure  *92  of time. [42]  Any settlement based on coupons will be subject to a hearing before the judge who will determine if the proposed settlement if "fair, reasonable and adequate." [43]

### III. S. 5 WILL DAMAGE THE FEDERAL AND STATE COURT SYSTEMS

By expanding federal class action jurisdiction to include almost all state class actions, S. 5 will inevitably result in a significant increase in the federal courts' workload. In its letter to the Judiciary Committee concerning a prior version of this bill, the Judicial Conference warned that:

[T]he effect of the class action provisions of [S. 353] would be to move virtually all class action litigation into the Federal courts, thereby offending well-established principles of Federalism [and] * * * hold[ing] the potential for increasing significantly the number of [class action] cases currently being litigated in the Federal system. [44]

In addition to overwhelming the federal courts with new time-intensive class actions, S. 5 will undermine state courts' independent authority. State Attorneys General recently wrote to Senate leaders objecting to this "federalizing" of most class actions under this legislation:

S. 5 would vastly expand federal diversity jurisdiction, and thereby would result in most class actions being filed in or removed to federal court. This transfer of jurisdiction in cases raising questions of state law will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws. [45]

Even more troublesome than these potential workload problems, S. 5 raises serious constitutional issues by challenging the vision of our founders and the intent of the Constitution. This legislation undermines James Madison's vision of a federal government "limited to certain enumerated objects, which concern all the members of the republic." [46]

This bill does not merely operate to preempt state laws; rather, it unilaterally strips the state courts of their ability to use the class action procedural device to resolve state law disputes. As the Lawyers' Committee for Civil Rights Under Law observes, citing Bank of the United States v. Deveaux:

**85  For over 200 years, Federal diversity jurisdiction has been exercised with care and hesitation, demonstrating that Congress believed, with few exceptions "tribunals of  *93  the state * * * administer justice as impartially as those of the nation, to parties of every description." [47]

The courts have previously found that efforts by Congress to dictate such state court procedures implicate important Tenth Amendment Federalism concerns and should be avoided. For example, in Fielder v. Casey the Supreme Court observed that it is an "unassailable proposition * * * that States may establish the rules of procedure governing litigation in their own courts." [48]

Similarly, in Johnson v. Fankell, the Court reiterated what it termed "the general rule bottomed deeply in belief in the importance of State control of State judicial procedure * * * that Federal law takes State courts as it finds them" [49] and observed that judicial respect for the principal of Federalism "is at its apex when we confront a claim that Federal law requires a State to undertake something as fundamental as restructuring the operation of its courts" and "it is a matter for each State to decide how to structure its judicial system." [50]

**Page 84**

These same constitutional concerns were highlighted by Professor Laurence Tribe in his testimony regarding the constitutionality of a proposed federal class action rule applicable to state courts included in tobacco legislation proposed during the 105th Congress. Professor Tribe observed: "[f]or Congress directly to regulate the procedures used by state courts in adjudicating state-law tort claims–to forbid them, for example, from applying their generally applicable class action procedures in cases involving tobacco suits–would raise serious questions under the Tenth Amendment and principles of Federalism." [51]

The Supreme Court's most recent decisions further indicate that S. 5 is an unacceptable infringement upon state sovereignty. In United States v. Morrison, [52] the Court invalidated parts of the Violence Against Women Act, claiming that Congress overstepped its specific constitutional power to regulate interstate commerce. Despite vast quantities of data illustrating the effects that violence against women has on interstate commerce, the Court essentially warned Congress not to extend its constitutional authority to "completely obliterate the Constitution's distinction between national and local authority." S. 5, introduced and considered in Committee without a hearing and without any convincing data, ignores the **\*94  \*\*86** Court's admonitions and subverts the federal system by hindering the states' ability to adjudicate class actions involving important and evolving questions of state law. S. 5 not only obliterates the distinction between national and local authority, it effectively annihilates local authority over state class actions.

Responding to these significant constitutional concerns, proponents of this legislation argue that state courts will not give fair hearings to out-of-state defendants, but support for their assertion is bereft of evidence. First, the Supreme Court has already made clear that the state courts are constitutionally required to provide due process and other fairness protections to the parties in class action cases. In Phillips Petroleum Co. v. Shutts, [53] the Supreme Court held that in class action cases, state courts must ensure that: (1) the defendant receives notice plus an opportunity to be heard and participate in the litigation; [54] (2) an absent plaintiff must be provided with an opportunity to remove himself or herself from the class; (3) the named plaintiff must at all times adequately represent the interests of the absent class members; and (4) the forum state must have a significant relationship to the claims asserted by each member of the plaintiff class. [55]

Secondly, as fears of local court prejudice have subsided and concerns about diverting federal courts from their core responsibilities have increased, the policy trend in recent years has been towards limiting Federal diversity jurisdiction. [56] For example, Congress enacted the Federal Courts Improvement Act of 1996, [57] which increased the amount in controversy requirement needed to remove a diversity case to federal court from $50,000 to $75,000. This statutory change was based on the Judicial Conference's determination that fear of local prejudice by state courts was no longer relevant [58] and that it was important to keep the federal judiciary's efforts focused on federal issues. [59]

## IV. CONCLUSION

Contrary to its supporters' assertions, S. 5's provisions are much broader than merely prohibiting nationwide class actions from being pursued in state court. In fact, this bill will override the current state laws governing class actions in the fifty states. And, in practice, it will bar many, if not most, state class actions filed solely on behalf of residents of a single state, solely involving matters of that state's law from being heard in that state court, so long as one plaintiff or one primary defendant is a citizen of a different **\*95  \*\*87** state. This is clearly an extreme and distorted change to the diversity jurisdiction standards in our court system.

As a result, these drastic changes to longstanding federal procedural rules will make it harder for citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these class action cases out of convenient state courts into federal courts, with significant new barriers and burdens on plaintiffs.

**Page 85**

For these reasons, and until we reach consensus on improvements to class action litigation for the benefit of defendants and plaintiffs, we remain strongly opposed to S. 5.

Patrick J. Leahy.

Edward M. Kennedy.

Joseph R. Biden.

Russell D. Feingold.

Richard J. Durbin.

## *96   **0   XII. CHANGES IN EXISTING LAW

The Committee has determined that it is necessary, in order to expedite the business of the Senate, to dispense with the requirements of rule XXVI, paragraph 12, of the Standing Rules of the Senate, with respect to comparing the proposed changes and existing provisions of the United States Code.

1 Davis v. Carl Cannon Chevrolet-Olds, Inc. 182. F.3d 792, 797 (11th Cir. 1999).

2 In the words of Article III, "[t]he judicial power shall extend to * * * controversies in between citizens of different states."

3 See Newberg on Class Actions 3d S S 13–14 to 13–17 (1997).

4 For a more comprehensive history of Rule 23 see e.g., The Class Action Fairness Act of 1999: Hearings on S. 353 Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 106th Cong. (1999) (hereinafter "Hearings on S. 353"), Prepared Statement of John P. Frank.

5 Fed. R. Civ. P. 23(b)(3). Alternatively for a Rule 23(b)(1) class, the class proponent must show that the prosecution of separate actions by or against individual members of the class would create a risk of either (i) inconsistent or varying adjudication which would establish incompatible standards of conduct for the party opposing the class or (ii) adjudications which, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or which would substantially impair or impede their ability to protect their ability to protect their interests. To obtain certification of a Rule 23(b)(2) class, the proponent is required to show that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

6 See Hearings on S. 353, Prepared Statement of John P. Frank ("If there was a single, undoubted goal of the committee, the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights and, explicitly, segregation.").

7 Administrative Office of the U.S. Courts, Working Papers of the Advisory Committee on Civil Rules on Proposed Amendments to Civil Rule 23 (Vol. 2) ("Advisory Committee Working Papers"), at 260 (1997). Prof. Frank passed away late in 2002. The only surviving member of the 1966 Advisory Committee–Hon. William T. Coleman, Jr.–has testified to a similar effect Id.(Vol. 3), 11/22/96 Public Hearing Tr. at 204 ("I assure you that what the courts have done with respect to Rule 23(b)(3) is far beyond what we * * * ever intended. To the extent that there's difficulty [with class actions, it] is not because of anything that was drafted in 1966, but [because] of how the rule has been handled since that time.").

8 See John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1358 (1995).

**Page 86**

9 Id. at 1356–58, 1363–64.

10 U.S. Const. art. III, sec. 2.

11 See Pease v. Peck, 59 U.S. (18 How) 518, 520 (1856) ("The theory upon which jurisdiction is conferred on the court of the United States, in controversies between citizens of different States, has its foundation in the supposition that, possibly, the State tribunal might not be impartial between their own citizens and foreigners."); see also Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 347 (1816); Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809); Barrow S.S. Co. v. Kane, 170 U.S. 100, 111 (1898) ("The object of the provisions of the constitution and statutes of the United States in conferring upon the circuit courts of the United States jurisdiction of controversies between citizens of different States of the Union * * * was to secure a tribunal presumed to be more impartial than a court of the state in which one litigant resides."); The Federalist No. 80, at 537–38 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961) ("In order to [ensure] the inviolable maintenance of that equality of privileges and immunities to which citizens of the union will be entitled, the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspicious to the principles on which it is founded.")

12 H. J. Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L. Rev. 483, 492–93 (1928).

13 Burford v. Sun Oil Co., 319 U.S. 315, 326 (1943) (Frankfurter, J., dissenting).

14 Hearings on S. 353, Prepared Statement of E. Donald Elliott; see also, Adrienne J. Marsh, Diversity Jurisdiction: Scapegoat of Overcrowded Federal Courts, 48 Brooklyn L. Rev. 197, 201 (1989).

15 See generally John P. Frank, Historical Bases of the Federal Judicial System, 13 Law & Contemp. Probs. 3, 22–28 (1948); Friendly, supra n. 12.

16 See Class Action Litigation: Hearing on Class Actions Before the Senate Comm. on the Judiciary, 107th Cong. (2002) (hereinafter "Hearing on Class Actions"), Prepared Statement of Walter E. Dellinger, III.

17 See 28 U.S.C. S 1332(a).

18 See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806).

19 See, e.g., Newman-Green Inc. v. Alfonzo-Larrain, 490 U.S. 826, 829 n.1 (1989) (noting that "[t]he complete diversity requirement is based on the diversity statute, not Article III of the Constitution."); Owen Equip. & Co. v. Kroger, 437 U.S. 365, 373 n. 13 (1978) (to the same effect).

20 See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger, III.

21 See David P. Currie, Federal Jurisdiction 140 (3d ed. 1990).

22 28 U.S.C. S 1446(b).

23 A broad interpretation of "other paper" is "consistent with the purpose of the removal statute to encourage prompt resort to federal court when a defendant first learns that the plaintiff is alleging a federal claim * * * [and] discourages disingenuous pleading by plaintiffs in state court to avoid removal." Addo v. Globe Life & Accident Ins. Co., 230 F.3d 759, 762 (5th Cir. 2000) (holding a post-complaint settlement letter qualifies as "other paper" under 28 U.S.C. 1446(b)). See also S.W.S. Erectors v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996) (holding that deposition testimony qualifies as "other paper" under 28 U.S.C. 1446(b)).

24 See generally, Victor E. Schwartz, Mark A. Behrens & Leah Lorber, Federal Courts Should Decide Interstate Class Actions: A Call for Federal Class Action Diversity Jurisdiction Reform, 37 Harv. J. Legis. 485 (Summer 2000).

25 See Snyder v. Harris, 394 U.S. 332 (1969).

26 See Hearing on Class Actions, Prepared Statement of Hilda Bankston.

27 See Zahn v. International Paper Co., 414 U.S. 291 (1973).

28 See Trimble v. Asarco, Inc., 232 F.3d 946 (8th Cir. 2000); Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214 (3d Cir. 1999); Leonhardt v. Western Sugar Co., 160 F.3d 631 (10th Cir. 1998).

29 Other federal courts of appeals have held that for a class action to be heard in federal court only one or more named plaintiffs must have claims exceeding $75,000. See, e.g., Rosmer v. Pfizer, Inc., 263 F.3d 110 (4th Cir. 2001); Gibson v. Chrysler Corp., 261 F. 3d 927 (9th Cir. 2001); Stromberg Metal Works Inc. v. Press Mechanical Inc., 77 F.3d 928 (7th Cir. 2000); In re Abbott Labs., Inc., 51 F.3d 524 (5th Cir. 1995), aff'd by an equally divided Court, 529 U.S. 333 (2000); Allapattah Servs. v. Exxon Corp., 333 F.3d 1248 (11th Cir. 2003), cert. granted, 125 S. Ct. 317 (2004). In the view of these courts, the value of the claims of the other class members is irrelevant–they are deemed to be part of the class as a matter of supplemental jurisdiction. The Committee stresses, however, that even in those Circuits following this rule, relatively few class actions find their way into federal court because plaintiffs offer named plaintiffs who do not have $75,000 claims or name a non-diverse plaintiff or defendant in order to prevent removal of the case to federal court.

30 14B Charles A. Wright, et al., Federal Practice and Procedure S 3704, at 127 (3d ed. 1998).

31 Peterson v. BASF Corp., 657 N.W.2d 853, 875 (Minn. Ct. App. 2003), aff'd, 675 N.W. 2d 57 (Minn. 2004).

32 Davis v. Cannon Chevrolet-Olds, Inc., 182 F.3d 792, 797 (11th Cir. 1999).

33 Id. at 798.

34 In re Prudential Ins. Co. America Sales Practice Litig., 148 F.3d 283, 305 (3d Cir. 1998).

35 Letter to then Chairman Orrin G. Hatch, Comm. on the Judiciary, U.S. Senate, from Leonidas Ralph Mecham, Secretary, Judicial Conference of the United States (dated March 26, 2003).

36 Id. at 2.

37 Id.

38 See generally Hearing on Class Actions; Hearings on S. 353; Hearing on H.R. 1875.

39 See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger III.

40 Hearings on S. 353, Prepared Statement of E. Donald Elliott.

41 See Analysis: Class Action Litigation–A Federalist Society Survey, Class Action Watch at 5 (Vol. 1, No. 1 1998); Deborah Hensler, et al., Preliminary Results of the RAND Study of Class Action Litigation 15 (May 15, 1997); see also Advisory Committee Working Papers (Vol. 1) at ix–x (May 1, 1997) (memorandum of Judge Paul V. Niemeyer to members of the Advisory Committee on Civil Rules).

42 See John H. Beisner and Jessica Davidson Miller, They're Making A Federal Case Out Of It * * * In State Court, 25 Harv. J. L. & Pub. Pol'y 1 (2001) ("Federal Case").

43 See John H. Beisner and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).

44 Trisha L. Howard, Class Actions Set Record Last Year In Madison County/ Possible Change In Law Prompted Rush In Filing, St. Louis Post Dispatch, Jan. 11, 2004.

45 Id.

46 See generally Federal Case.

47 See Hearings on S. 353, Oral Statement of Senator Charles E. Grassley.

48 See Hearings on S. 353, Prepared Statement of Stephen G. Morrison ("I think it is clear that the explosion of class action filings can only be attributed to the fact that certain members of the plaintiffs' bar have discovered that some of our state courts can be a fertile playing field for class litigation.").

49 Compare B. Ostrom, et al., Examining the Work of State Courts 12 (Court Statistics Project 2003) ("Examining the Work of State Courts"), with Administrative Office of U.S. Courts, 2003 Federal Court Management Statistics (2004) ("Federal Court Management").

50 Kamilewicz v. Bank of Boston, 92 F.3d 506 (7th Cir. 1996).

51 Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees: Hearings Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 105th Cong. (1997), Prepared Statement of Martha Preston.

52 Kansas Case In Class By Itself, National Law Journal, Mar. 15, 1999. This settlement ultimately did not proceed, but only because the attorney daughter of one of the settlement class members happened to read her mother's mail, as noted in the article.

53 Shields et al. v. Bridgestone/Firestone Inc. et al. (No. E–0167637, Jefferson County, Texas, 2003); Miles Moor, BFS Settles Nationwide Class Action Suit; Tire Maker to Modify Certain Models, Launch Education Program, Rubber & Plastics News, August 4, 2003.

54 Premier Cruise Lines, (No. 96–06932 CA–FN, Fla. Cir. Ct., Brevard County, Florida, 2003); The Law Offices of Douglas Bowdoin, for Plaintiffs, and Todd Pittenger of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., for Defendant, Announce a Proposed Class Action Settlement, Business Wire, Inc., July 2, 2003.

55 Premier Cruise Line Reaches Settlement, Mealey's Litigation Report: Class Actions, July 17, 2003.

56 In Re Microsoft Litigation Settlement (No. 99 CV 17089, Johnson County, Kansas, 2003); Dan Voorhis, Here's How to Claim Your Share of Microsoft Settlement, The Wichita Eagle, December 28, 2003.

57 Ross and Lambert v. Portillo's Restaurant Group, Inc. (00 Ch 13612, Circuit Court of Cook County, Illinois, Chancery Division, 2003); Judge Approves Portillo's Class Action Settlement Over Mislabeled Beer, PR Newswire, Nov. 26, 2003.

58 DeGradi v. KB Holdings, Inc. (No. 02 CH 15838, Circuit Court of Cook County, Illinois, Chancery Division, 2003).

59 Betty Lin-Fisher, Shoppers Win In Suit; Customers Get a Jump on Holidays, Akron Beacon Journal, Oct. 14, 2003.

60 Stephanie Zimmerman, KB Toys Settles Lawsuit Over "Low" Prices By Offering Discount, Chicago Sun-Times, Oct. 11,2003.

61 Dorel Juvenile Group, Inc. (2003); Dorel Juvenile Group Settles Class Action Lawsuit, PR Newswire, Oct. 6, 2003.

62 Ramsey v. Nestle Waters North America, Inc. d/b/a Poland Spring Water Co. (No. 03 CHK 817, Kane County, Illinois, 2003); Edward D. Murphy, et al., Conflict and Change; Maine's Employment and Price Levels ReMained Stable Last Year, but its Economy Experienced Plenty of Turmoil, Portland Press Herald, January 4, 2004; see also www.noticeclass.com/springwatersettlement/LongFormNoticev2.pdf

63 Chavez v. GameStop Corp. (No. CGC–02–406658, San Francisco Superior Court, California, 2003).

64 Big Class Action: Settlements and Verdicts: Consumer Goods, available at http://www.bigclassaction.com/settlements/consumer.html.

65 http://www.gamestop.com/gs/help/classaction.asp.

66 Zurakov v. Register.com. Inc. (No. 2301, N.Y. Sup. Ct., App. Div., 2003); Tom Perrotta Panel Revives Case Over Domain Name Registry, Internet Newsletter, May 14, 2003.

67 Scott v. Blockbuster Inc. (No. DI62–535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.

68 Attention Shoppers: Food Lion Rebate Due, Greensboro News & Record, Feb. 25, 2002.

69 Enough Already With the Lawsuits, Kansas City Star, July 10, 1999.

70 American Airlines Settles Lawsuits Over Frequent Flier Program, Fort Worth Star-Telegram, June 22, 2000.

71 Rinaldi v. Iomega Corp. (No. 98C–09–064–RRC, Delaware); Utah-Based Tech Company Settles Lawsuit With Rebate Offer, Standard-Examiner, Apr. 14, 2001.

72 Carnival Cruise Settles Lawsuit, Florida Today, Mar. 16, 2001.

73 Thomson Antes Up $100 Million Settlement, Mar. 12, 2001.

74 Baird v. Thomson Consumer Electronics, Inc. (No. 00–L–00761, Madison County, Illinois); 2,640 Television Owners Tune Out Class Action Suit, Belleville (Ill.) News-Democrat, Aug. 19, 2001.

75 Fischl v. Direct Merchants Credit Card Bank, N.A. (CT 00–007129, Hennepin County, Minnesota); Soft Firm: Too Often, The SF Law Firm Of Lieff, Cabraser, Heimann & Bernstein Strikes Settlements That Give The Firm Millions Of Dollars In Legal Fees–And Its Class Action Clients Too Little, SF Weekly, May 29, 2002.

76 See Richard B. Schmitt, Leaky System: Suits Over Plastic Pipe Finally Bring Relief, Especially for Lawyers, Wall St. J., Nov. 20, 1995, at A1.

77 See The (San Francisco) Recorder, Jan. 4, 1996.

78 Hotel Chains Settle Class-Action Suit Over Energy Surcharges, San Diego Union-Tribune, July 4, 2002.

79 See Michelle Singletary, Coupon Settlements Fall Short, Wash. Post, Sept. 12, 1999, at 1. For more examples of coupon settlements, see Hearings on S. 353, Prepared Testimony of Stephan G. Morrison.

80 Lawyers Get $1.5 Million, Clients Get 50 Cents Off, Fulton County Daily Report, Nov. 21, 1997.

81 Cereal Plan Called Soggy, National Law Journal, May 22, 1995.

82 Cellular Carriers Settle Price-Fixing Allegations, Seattle Times, July 26, 1997.

83 Judge OK's Plan For Class Members, The Recorder, Feb. 24, 1998.

84 Los Angeles Times, June 8, 1998, at D3.

85 See E. Donald Elliott Managerial Judging and the Evolution of Procedure, 53 U. Chi. I. Rev. 306, 323–24 (1986).

86 In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293,1299 (7th Cir. 1995). See also Blair v. Equifax Check Servs. Inc., 181 F.3d 832, 834 (7th Cir. 1999) ("a grant of class status can put considerable pressure on the defendant to settle, even when the plaintiffs probability of success on the merits is slight").

87 See Hearing on Class Actions, Statement of Lawrence Mirel.

88 Id.

89 See Faden-Bayes Corp. v. Ford Motor Co., Index No. 97–601076 (N.Y. Sup. Ct. County of New York) (filed Feb. 28, 1997).

90 See Hearings on S. 353, Prepared Statement of John H. Beisner.

91 Hearings on S. 353, Prepared Statement of Stephen G. Morrison.

92 Id.

93 See Order of National Class Certification, Davison v. Bridgestone/Firestone, Inc., Case No. 00C2298 (Eighth Cir. Ct., 20th Jud. Dist., Nashville, Tenn.) (dated Aug. 18, 2000).

94 See Order, Farkas v. Bridgestone/Firestone, Inc., Case No. 00–CI–5263 (Cir. Ct., Jefferson County, KY) (dated Aug. 18, 2000).

95 See Hearings on S. 353, Prepared Statement of Stephen Morrison.

96 Compare Naef v. Masonite Corp., No. CV–94–4033 (Cir. Court, Mobile County, Alabama), with In re Masonite Hardboard Siding Prods. Litig., 170 F.R.D. 417, 424 (E.D. La. 1997).

97 See, e.g., In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D. La. 1998); Sanneman v. Chrysler Corp, 191 F.R.D. 441 (E.D. Pa. 2000); Ford Motor Co. v. Sheldon, 22 S.W. 3d 444 (Tex. 2000); Schurk v. DaimlerChrysler Corp., No. 97-2–04113–9 (Wash. Sup. Ct., Feb. 24, 2000).

98 See Ford Motor Co. v. Sheldon, 113 S.W. 3d 839 (Tex. App. 2003).

99 Phillips v. Ford Motor Co., No. 99–L–1041 (Cir. Ct., Madison County, Illinois Sept. 15, 2003).

100 For example, in the litigation concerning Firestone tires, approximately 100 virtually identical class actions seeking to represent the same purported class members were filed in courts all over the country. And in the recently publicized HMO cases, multiple overlapping class actions were filed against each of the major health insurance companies. No less than 17 class actions have been filed against Humana, most of which assert similar allegations and claims on behalf of similarly defined nationwide classes. In the Humana situation, the federal cases were consolidated for pretrial proceedings before a single judge. See In re Humana Inc. Managed Care Litig., 2000 U.S. Dist. LEXIS 5099 (J.P.M.L. Apr. 13, 2000). There is no parallel methodology for consolidating state court class actions. In the 12 months ending September 30, 2002, over 7,000 cases were centralized for pretrial proceedings through the MDL process. See http:// www.uscourts.gov/judbus2002/tables/s19sep02.pdf.

101 See Hearings on S. 353, Prepared Statement of John H. Beisner.

102 See Hearings on S. 353, Prepared Statement of John H. Beisner.

103 See John H. Beisner, and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).

104 See Smith v. General Motors Corp., et al., Civ. A. No. 97–39 (Cir. Ct. Coosa County, AL).

105 See Hearing on Class Actions, Prepared Statement of Lawrence Mirel.

106 Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, at 29.

107 See Snider v. State Farm Mutual Automobile Insurance Co., Cir. Ct. for Williamson City, IL, Docket No. 97–L–114 (1999).

108 Avery v. State Farm Mut. Auto. Ins. Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).

109 PJ's Concrete Pumping Serv. v. Nextel W. Corp., 803 N.E.2d 1020, 1030 (Ill. Ct. App. 2004), appeal denied, 813 NE.2d 223 (Ill. 2004), cert. denied, 125 S. Ct. 410 (2004).

110 Clark v. TAP Pharm. Prods., Inc., 798 N.E.2d 123 (Ill. Ct. App. 2003).

111 Ysbrand v. DaimlerChrysler Corp., 81 P.3d 618 (Okla. 2003).

112 Black Hawk Oil Co. v. Exxon Corp., 1998 Okla. LEXIS 82 (Okla. 1998).

113 Peterson v. BASF Corp., 657 N.W. 2d 853 (Minn. Ct. App. 2003), affd., 675 N.W. 2d 57 (Minn. 2004).

114 Id. at 875.

115 Rosen v. PRIMUS Automotive Fin. Servs., Inc., No. CT 98–2733 (Minn. D. Ct., 4th Jud. Dist., May 4, 1999).

116 Walsh v. Ford Motor Co., 807 F.2d 1000, 1016–17 (D.C. Cir. 1986).

117 See Interstate Class Action Jurisdiction Act of 1999: Hearing on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. (1999) (hereinafter "Hearing on H.R. 1875), Prepared Statement of Walter E. Dellinger III.

118 See State of Vermont v. Homeside Lending, Inc. and Bank Boston Corporation, 826 A.2d 997 (Vt. 2003).

119 Rigat v. GAF Materials Corp., 2002 Conn. Super. LEXIS 272 (Conn. Super. Jan 25, 2002).

120 See Hearings on S. 353, Prepared Statement of Stephen G. Morrison.

121 Id.

122 Scott v. Blockbuster Inc., (No, DI62–535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.

123 See, e.g., Cope v. Duggins, 2001 WL 333102 (E.D. La. 2001) (rejecting proposed class settlement because attorneys' fees were disproportionate to class benefits); Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (same); Sheppard v. Consolidated Edison Co., 2000 WL 33313540 (E.D.N.Y. 2000) (same); Polar Int'l Brokerage Corp. v. Reeve, 187 F.R.D. 108 (S.D.N.Y. 1999) (same).

124 Deborah Hensler, et al., Class Action Dilemmas, Pursuing Public Goals for Private Gain ("Class Action Dilemmas"), at 10 (1999) (executive summary).

125 Id.

126 The Committee wishes to stress that the presence of conspiracy allegations should not alter this inquiry. For example, if in the hypothetical discussed here, the class alleges that the agent conspired with the insurance company with respect to the alleged scheme, it theoretically would expose the agent to potential liability to the entire class. But that would not change the relatively minor role that the agent played in the overall misconduct that is alleged and would not change the fact that the agent is not the real target of the litigation, which is the inquiry contemplated by this criterion.

127 Under federal law, a purported class action may involve as few as 21 class members. See, e.g., Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (l1th Cir. 1986) (noting that classes encompassing fewer than 21 persons normally are not subject to class certification); Tietz v. Bowen, 695 F. Supp. 441,445 (C.D. Cal. 1987) (certifying class with 27 class members).

128 See, e.g., St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 293 (1938).

129 Edgar v. MITE Corp., 457 U.S. 624, 645 (1982). See also Draper v. Paul N. Gardner Defined Plan Trust, 625 A.2d 859, 865–66 (Del. 1993); McDermott, Inc. v. Lewis, 531 A.2d 206, 214–15 (Del. 1987); Ellis v. Mutual Life Ins. Co., 187 So. 434 (Ala. 1939); Amberjack Ltd. Inc. v. Thompson, 1997 WL 613676 (Tenn. App. 1997); NAACP v. Golding, 679 A.2d 554,559 (Ct. App. Md. 1996); Hart v. General Motors Corp., 517 N.Y.S.2d 490, 493 (App. Div. 1987).

130 United Steelworkers of America v. R.H. Bouligny, Inc., 382 U.S. 145 (1965).

131 See, e.g., 14 A.L.R. Fed. 849 (2004) (noting dissatisfaction with the prevailing rule and citing one leading authority that commented that "many unincorporated associations bear functional resemblances to corporations * * * [and] the diversity citizenship status of such associations [i]s 'anomalous' in view of the fictional citizenship accorded to corporations and in view of the fact that many states treat these associations as juridical entities, and has emphatically called upon Congress to provide that where unincorporated associations have entity status under state law, they should be treated analogously to corporations for purposes of diversity jurisdiction").

132 See Tuck v. United Services Automobile Ass'n, 859 F.2d 842 (10th Cir. 1988); Baer v. United Services Automobile Ass'n, 503 F.2d 393 (2d Cir. 1974); Truck Insurance Exchange v. The Dow Chemical Co., 331 F. Supp. 323 (W.D. Mo. 1971).

133 See 28 U.S.C. S 1441(a).

134 Id.

135 See Erie Railroad Co. v. Thompkins, 304 U.S. 64 (1938).

136 See e.g., Hewitt v. City of Stanton, 798 F.2d 1230 (9th Cir. 1986); Mitchell v. Kentucky-American Water Co., 178 F.R.D. 140, 142 (E.D. Ky. 1997).

137 See Public Law 104–67, the "Private Securities Litigation Reform Act of 1995," and Public Law 105–353, the "Securities Litigation Uniform Standards Act of 1998."

138 John H. Beisner & Jessica Davidson Miller, There will be no Exodus: An Empirical Study of S. 2062's Effects on Class Actions, Mealey's Tort Reform Update (April 2004).

139 Id. at 16.

140 Id. at 20.

141 Examining the Work of State Courts at 12.

142 See Federal Court Management.

143 See Administrative office of the U.S. Courts, Judicial Business of the United States Courts 2003 (2004) ("Judicial Business"), at 129–31.

144 See generally Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees, Hearings Before the Subcommittee on Administrative Oversight and the Courts of the Senate Committee on the Judiciary, 105th Cong. (1997); Hearings on Mass Torts and Class Actions Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong. (1998), Hearing on H.R. 1875, The Class Action Jurisdiction Act of 1999 Before the House Committee on the Judiciary, 106th Cong. (1999).

145 Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts 68–69 (1996).

146 Class Action Dilemmas, at 19.

147 Id. at 28.

148 See Amendments to Federal Procedural Rules, 71 U.S.L.W. 4253, 4254–55 (U.S. Apr. 1, 2003) (Supreme Court order amending rules pursuant to Rules Enabling Act).

149 Indeed, there is no evidence that plaintiffs' counsel believe that they must file in state court in order to succeed. Tobacco class actions prove this point. Of the purported class actions on tobacco issues initiated in recent years, many were originally filed in federal courts. Moreover, there is no evidence that classes are more likely to be certified in state courts. The reality is that the vast majority of courts–both federal and state courts–that have considered the issue have denied certification of proposed tobacco classes. The state court certification denials include: In re Tobacco Cases II, No. JCCP–4042, slip op. (Md. Ct. App. May 16, 2000); Reed v. Philip Morris, Inc., No. 96–5070, slip op. (D.C. Super. Ct. July 23, 1999); Philip Morris, Inc. v. Angeletti, No. 961450501 CE212596, slip op. (Md. Ct. App. May 16, 2000); Taylor v. American Tobacco Co., No. 97715975, slip op. (Mich. Cir. Ct. Jan. 20, 2000); Constentino v. Philip Morris, Inc., No. MID–L–5135–97, slip op. (N.J. Super. Ct. Oct. 26, 1998); Small v. Lorilard Tobacco Co., 6791 N.Y.S.2d 593 (App. Div. 1998), aff'd, 698 N.Y.S.2d 615 (1999); and Geizer v. American Tobacco Co., 696 N.Y.S.2d 345 (1999). At least three federal courts have certified tobacco-related classes: In re Simon II Litig., 212 F. Supp. 2d 57 (E.D.N.Y. 2002) (certifying nationwide punitive damages class of smokers' claims against tobacco companies) (appeal pending); Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc., 182 F.R.D. 523 (N.D. Ohio 1998); Northwest Laborers-Employers Health & Security Trust Fund v. Philip Morris Inc., 1997 U.S. Dist. LEXIS 21299 (W.D. Wash. Dec. 24, 1997). In addition, a U.S. Magistrate Judge recommended certification of a class in Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 188 F.R.D. 365 (D. Or. 1998), but that recommendation was never acted upon by the district court judge. Three state courts (two in Florida and one in Louisiana) have certified tobacco-related classes: R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. Ct. App. 1996) (affirming the trial court's certification of tobacco class); Broin v. Philip Morris Cos., 641 So. 2d 888 (Fla. Ct. App. 1996) (ordering trial court to certify tobacco class); Scott v. American Tobacco Co., 725 So. 2d 10 (La. Ct. App. 1998) (affirming trial court certification of tobacco class). However, a Florida appeals court has decertified the Engle classe see Liggett Group, Inc. v. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), and the matter is under review by the Florida Supreme Court, see 873 So. 2d 1222 (Fla. 2004). Thus, the scorecard is basically even; there is no evidence that class members will be treated differently in state court.

While critics have pointed to the two Florida tobacco class actions as evidence that state courts will somehow be tougher on the tobacco industry, there is no real support for this contention. In the first tobacco class action to reach conclusion after a class was certified and the matter was tried (Broin, a Florida state court case), the matter ultimately settled. But the class members received no money at all. Under the terms of settlement, they obtained only a "right to sue" individually. Meanwhile, the class counsel were awarded $49 million (on the basis of a medical research contribution made by defendants). Counsel for one of the class members who protested the settlement reportedly commented: "It's mind-boggling that a court would permit this kind of settlement to go ahead. What is the class getting out of this? Nothing." The Legal Intelligencer, Sept. 22, 1999, at 4. The second case, Engle v. R.J. Reynolds Tobacco Co., received a lot of publicity because the jury awarded a $145 billion verdict to the class of Florida smokers. However, as noted above, the verdict was vacated after an appeals

**Page 94**

court found that trying the plaintiffs' claims on a classwide basis was improper. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), review granted, 873 So. 2d 1222 (Fla 2004).

Moreover, there is no evidence that tobacco cases would be tried more quickly in state courts. It took six years to get the first tobacco class action to trial in state court; the second took more than four years. The average time to trial in federal court civil cases is shorter.

Finally, it is clear that certain opponents of the bill are trying to single-out certain unpopular industries, such as the firearms industry, because they are unpopular. But that is exactly what the Framers of the Constitution were trying to avoid. They were trying to ensure a fair, even-handed federal court forum for defendants that may otherwise be haled into a local court less concerned about protecting the rights of an out-of-state company.

150 145 Congo Rec. H8577 (Sept. 23, 1999 (floor debate on H.R. 1789) (Rep. Nadler asserting that a "1995 class action against Remington Arms * * * settled for $31.5 million * * * [and] led to the implementation of greater safety protections or owners of shotguns").

151 See Garza v. Sporting Goods Properties, Inc., 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) (approving class settlement).

152 28 U.S.C. S 1443.

153 See, e.g., Peaset v. Peck, 59 U.S. (18 How.) 518, 520 (1856).

154 See John J. Parker, The Federal Constitution and Recent Attacks Upon It, 18 A.B.A. J. 433, 437 (1932).

155 See Hearings on H.R. 1875, statement of Walter E. Dellinger.

156 See transcript of markup, Senate Judiciary Committee on S. 353, p. 19:2–17 (June 29, 2000) (statement of Joseph R. Biden, Jr., U.S. Senate).

157 Id.

158 Advisory Committee Working Papers (vol. 4), at 456.

159 Id.

160 Mass Torts and Class Action Lawsuits: Hearing before the Subcom. On Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong., 2d Sess. 20–21 (March 5, 1998) (statement of John P. Frank, Esq.).

161 28 U.S.C. S 2072(b).

162 The federal courts have frequently rejected efforts to use the Federal Rules of Civil Procedure to expand substantive rights. See e.g., In re Baldwin-United Corp. 770 F.2d 328, 335 (2d Cir. 1985) (rejecting arguments that Fed. R. Civ. P. 23 could be used as authorizing issuance of an injunction to protect class members); Synanon Church v. United States, 557 F. Supp. 1329, 1330 n.2 (D.D.C. 1983) (rejecting argument that Fed. R. Civ. P. 57 creates right to jury trials in declaratory judgment actions). Cf. Douglas v. NCNB Nat'l Bank, 979 F.2d 1128, 1130 & n.2 (5th Cir. 1992) (declining to apply Fed. R. Civ. P. 13(a) where doing so would "abridge as lender's substantive rights and enlarge the debtor's substantive rights"). Similar views have been expressed by state courts. See, e.g., Southwestern Refinery Co. v. Bernal, 22 S.W. 3d 425, 432 (Tex. 2000) ("[C]lass actions do not exist in some sort of alternative universe outside our normal jurisprudence. Our procedural rules provide otherwise: the form of an action under the rules must not 'enlarge or diminish any substantive rights or obligations of any parties to any civil action.'") (quoting Tex. R. Civ. P. 815).

163 Federal Judicial Center, The Impact of Amchem and Ortiz on Choice of a Federal or State Forum in Class Action Litigation: A Report to the Advisory Committee on Civil Rules Regarding a Case-Based Survey of Attorneys (April 2004) (2004 Federal Judicial Center Study).

164 See Judicial Business.

165 Avery v. State Farm Mut. Auto Insurance Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).

166 Id. at 1254.

167 See Matthew J. Wald, Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, S 1, at 29.

168 See, e.g., Ysbrand v. DaimlerChrysler Corp., 81 P. 3d 618 (Okla. 2003) (affirming certification of nationwide product liability class, applying the law of one state to all claims); Peterson v. BASF Corp., 657 N.W.2d 853 (Minn. Ct. App. 2003), aff'd, 675 N.W.2d 57 (Minn. 2004) (affirming nationwide consumer protection act case, applying the law of one state to all claims).

169 See, e.g., In re Bridgestone/Firestone, Inc. Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002), cert. denied sub nom.Gustafton v. Bridgestone/Firestone, Inc., 537 U.S. 1105 (2003).

170 See, e.g., Georgine v. Amchem Prods., 83 F.3d 610, 627 (3d Cir. 1996), aff'd sub nom.Amchem Prods. v. Windsor, 521 U.S. 591 (1997).

171 See, e.g., Georgine, 83 F.3d at 627; Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187–90 (9th Cir. 2001); Zapka v. Coca-Cola Co., No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *11–13 (N.D. Ill. Oct. 26, 2000); Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 369 (N.D. Ill. 1998); Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520, 532–34 (N.D. Ill. 1998); Jones v. Allercare, Inc., 203 F.R.D. 290, 307 (N.D. Ohio 2001); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 346–54 (D.N.J. 1997); Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc., 181 F.R.D. 331, 338–39 (N.D. Miss. 1998); In re Ford Motor Co. Bronco II Prods. Liab. Litig., 177 F.R.D. 360, 369–71 (E.D. La. 1997); In re Stucco Litig., 175 F.R.D. 210, 214, 215–217 (E.D.N.C. 1997); Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613, 619–20 (S.D. Ohio 1996); Harding v. Tambrands Inc., 165 F.R.D. 623, 629–30, 631–32 (D. Kan. 1996); Walsh v. Ford Motor Co., 130 F.R.D. 260, 271–75 (D.D.C. 1990); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 608 (S.D.N.Y 1982).

172 See, e.g., In re Bridgestone/Firestone, Inc., 288 F.3d at 1024; Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 674–75 (7th Cir. 2001); Spenc v. Glock, GES.m.b.H., 227 F.3d 308, 313–15 (5th Cir. 2000); In re AM. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996); Castano v. American Tobacco Co.. 84 F.3d 734, 741–43, 739–50 (5th Cir. 1995); In re Rhome-Poulenc Rorer, Inc., 51 F.3d 1293, 1302 (7th Cir. 1995); Walsh v. Ford Motor Co., 807 F.2d 1000, 1017–19 (D.C. Cir. 1990).

173 See 2004 Federal Judicial Center Study.

174 Id.

175 See Responses To Written Questions From Senators Orrin G. Hatch and Charles E. Grassley to Walter Dellinger, Attachment A (list of exemplar cases in which federal courts have certified classes since 2001).

176 Under current law, a purely state law-based class action normally can be heard in federal court only if each and every class members demands at least $75,000 in damages and none of the named plaintiffs have the same state citizenship of any of the named defendants. Since at least some class members in nearly all class actions seek less than $75,000 per class member or sue at least one non-diverse defendant, there are currently very few class action cases in federal court that involve exclusively state law claims.

177 In re Currency Conversion Fee Antitrust Littg., 2004 U.S. Dist. LEXIS 24134 (S.D.N.Y. Dec. 2, 2004).

178 McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304 (D. Mass. 2004).

179 Klein v. O'Neal, Inc. 222 F.R.D. 564 (N.D. Tex. 2004).

180 Leider v. Ralfe, 2004 U.S. Dist. LEXIS 15345 (S.D.N.Y. 2004).

**Page 96**

181 Bradbery v. John Hancock Mutual Life Insurance Co., 217 F.R.D. 408 (W.D. Tenn. 2003).

182 Fox v. Cheminova, Inc., 213 F.R.D. 113 (E.D.N.Y. 2003).

183 Hansen v. Ticket Track, Inc., 213 F.R.D. 412 (W.D. Wash. 2003).

184 Brown v. Funeral Services of Florida, Inc., 212 F.R.D. 602 (S.D. Fla. 2003).

185 In Re St. Jude Medical Inc. Silzone Heart Valves Products Liability Litigation, 2003 U.S. Dist. LEXIS 5188 (D. Minn. March 27, 2003).

186 Burton v. Mountain West Farm Bureau Mutual Insurance Co., 2003 WL 1740461 (D. Mont. March 31, 2003).

187 Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21 (D. Mass. 2003).

188 Bond v. Fleet Bank (RI) N.A., 2002 U.S. Dist. LEXIS 22324 (D.R.I. October 10, 2002).

189 Gilkey v. Central Clearing, 202 F.R.D. 515 (E.D. Mich. 2001).

190 Wells v. Allstate Insurance Company, 210 F.R.D. 1 (D.D.C. 2002).

191 Oslan v. Collection Bureau of Hudson Valley, 206 F.R.D. 109 (E.D. Pa. 2002).

192 DeAsencio v. Tyson Foods, 2002 U.S. Dist. LEXIS 13038 (E.D. Pa. July 17, 2002).

193 Jonathan Turley, A Crisis of Faith: Tobacco and the Madisonian Democracy, 37 Harv. J. on Legis. 433, 475 (2000).

194 See Class Action Dilemmas, at 23.

195 Id. at 28.

196 Purdie v. Ace Cash Express, Inc., 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. 2003).

197 In Re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation, 2002 U.S. Dist. LEXIS 21693 (N.D. Ohio 2002).

198 In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).

199 See, e.g., Whitaker v. American Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001) ("'In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity [jurisdiction], the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court.'") (citations omitted); Morris v. Princess Cruises, Inc., 236 F.3d 1061,1067 (9th Cir. 2001) ("Joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.'") (citations omitted); Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11th Cir. 2001) ("it is appropriate for a federal court to dismiss * * * [nondiverse] defendant and retain diversity jurisdiction if the complaint shows that there is no possibility that the plaintiff can establish any cause of action against [the] defendant"); Heritage Bank v. Redcom Laboratories, Inc., 250 F.3d 319 (5th Cir. 2001) (to similar effect).

200 In recent years, many federal courts have been required to address fraudulent joinder issues in the context of class actions removed to federal court. See, e.g., Jamison v. Purdue Pharma CO., 251 F. Supp. 1315 (S.D. Miss. 2003) (mass action matter); Hardy v. Ducote, 246 F. Supp. 2d 509 (E.D. La. Jan. 20, 2003) Burns v. Friedli, 241 F. Supp. 2d 519 (D. Md. 2003); Moore v. Wyeth-Ayerst Labs., 236 F. Supp. 2d 509 (D. Md. 2002); Shields v. Bridgestone/Firestone, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Little v. Purdue Pharma, L.P., 227 F. Supp. 2d 838 (S.D. Ohio 2002) In re Diet Drugs Prods. Liab. Litig., 220 F.

**Page 97**

Supp. 2d 414 (E.D. Pa. 2002); Doherty v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 9596 (N.D. Cal. May 15, 2002); Garcia v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 15122 (W.D. Wash. Apr. 22, 2002); Ohler v. Purdue Pharma L.P., 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); Mead v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 25645 (D. Or. Jan. 7, 2002).

201 See C.A. Wright, A.R. Miller et aI., Federal Practice and Procedure S 3707, at 225 (1998).

202 Id.S 3705, at 65 (2003 Supp.).

203 In recent years, many feral courts have had to resolve jurisdictional amount issues in resolving motions to remand class actions. See, e.g., In re Bridgestone/Firestone lnc Tires Prods. Liab. Litig., 256 F. Supp. 2d 884 (S.D. Ind. 2003); Adans v. Nationwide Mutual Ins. Co., 2003 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar. 31, 2003); Kary v. Exxon/Mobil Corp., 2003 U.S. Dist. LEXIS 4599 (D.N.D. Mar. 19, 2003); Faircloth v. National Home Loan Corp., 313 F. Supp. 2d 544 (M.D.N.C. 2003), aff'd, 2004 US. App. LEXIS 1039 (4th Cir. 2004) Carric v. Sears, Roebuck and Co., 252 F. Supp. 2d 116 (M.D. Pa. 2003); Dash v. FirstPlus Home Loan Trust, 248 F. Supp. 2d 489(M.D.N.C. Mar. 6, 2003); Harris v. Physicians Mut. Ins. Co., 240 F. Supp. 3d 715 (N.D. Ohio 2003); Radlo v. Rhone-Poulenc, S.A., 241 F. Supp. 2d 61 (D. Mass. 2002); Shields v. Bridgestone/Fireston, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Tremblay v. Philip Morris, Inc., 231 F. Supp. 2d 411 (D.N.H. 2002); Mentzel v. Comcast Cable Communications, 222 F. Supp. 2d 923 (E.D. Mich. 2002); Trapazzo v. Prudential Property & Casualty Ins. Co., 220 F. Supp. 2d 628 (E.D. Tex. 2002); Perotti v. Black & Decker, Inc., 205 F. Supp. 2d 813 (N.D. Ohio 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); City of University City, Missouri v. AT&T Wireless Services, Inc., 229 F. Supp. 2d 927 (E.D. Mo. 2002); Mehlenbacher v. Akzo Nobel Salt, Inc., 207 F. Supp. 2d 71 (W.D.N.Y. 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); Gavriles v. Verizon Wireless, 194 F. Supp. 2d 674 (E.D. Mich. 2002); Bethea v. St. Paul Guardian Ins. Co., 2002 U.S. Dist. LEXIS 15780 (E.D. La. Aug. 21, 2002); Nabal v. BJ's Wholesale Club, Inc., 2002 U.S. Dist. LEXIS 15106 (E.D. Pa. Aug. 1, 2002); Pope v. Independent Order of Foresters, 2002 U.S. Dist. LEXIS 13550 (W.D. Ky. July 23, 2002); Post v. General Motors Corp., 2002 U.S. Dist. LEXIS 9968 (S.D.N.Y. May 31, 2002); Sylvester v. Daimler Chrysler Corp., 2002 U.S. Dist. LEXIS 17989 (N.D. Ohio May 30, 2002); Green v. Party City Corp., 2002 U.S. Dlst. LEXIS 7750 (C.D. Cal. Apr. 9, 2002); Cigna Healthcare of St Louis Inc., v. Kaiser, 181 F. Supp. 2d 914 (N.D. Ill. 2002)aff'd and modified in part, 294 F.3d 849 (7th Cir. 2002).

204 Coury v. Prot, 85 F.3d 244, 249 (5th Cir. 1996); Kanzelberger v. Kanzelberger, 782 F.2d 774, 776 (7th Cir. 1986).

205 See Caterpillar, Inc. v. Lewis, 519 U.S. 61 69 (1996) ("In a case not originally removable, a defendant who received a pleading or other paper indicating the postcommencement satisfaction of federal jurisdictional requirements–for example, by reason of the dismissal of a nondiverse party–may remove the case to federal court within 30 days of receiving such information.").

206 303 U.S. 283, 293 (1938).

207 Id. at 294–95.

208 Id. at 294.

209 Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998) (holding that the jurisdictional test is "not whether the plaintiff is actually entitled" to $75,000, "[o]therwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction").

210 See Caterpillar, Inc., 519 U.S. at 69.

211 See Strawbridge v. Curtiss, 3 Cranch 267 (1806) (complete diversity requirement derives from "[t]he words of the act of Congress," not the Constitution).

212 State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530–31 (1967) (citing Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 10 n.3 (1951); Wichita R. & Light Co. v. Pub. Util. Comm'n. 260 U.S. 48 (1922); Barney v. Latham, 103 U.S. 205, 213 (1881)).

213 414 U.S. 291 (1973).

214 Zahn v. International Paper Co., 53 F.R.D. 430 (D. Vt. 1971).

215 Zahn v. International Paper Co., 414 U.S. at 301 ("Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case–'one plaintiff may not ride in on another's coattails."').

216 536 U.S. 1 (2002).

217 See, e.g., American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).

218 Id. at 550 (emphasis added).

219 See Diaz v. Trust Territory of Pacific Islands, 876 F.2d 1401, 1408 (9th Cir. 1989); Glidden v. Chromalloy American Corp., 808 F.2d 621, 626–28 (7th Cir. 1986).

220 S. Rep. 108–123, at 77–78 (2002) (Minority views).

221 S. Rep. 108-123, at 77–78 (2003) (Minority views).

222 Id.

223 In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).

224 In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, 1 F. Supp. 2d 1407 (D. Wyo. 1998).

225 Bowling v. Pfizer Inc., 922 F. Supp. 1261 (S.D. Ohio 1996).

226 See 2004 Federal Judicial Center Study.

227 Examining the Work of State Courts at 12–13.

228 See Federal Court Management.

1 See Letter from Ralph Mecham, Secretary, Judicial Conference of the United States (Mar. 26, 2003) (in 2003, the Conference voted to oppose the jurisdictional provisions that remain in S. 5 because the provisions "would add substantially to the work of the Federal courts and are inconsistent with principles of Federalism").

2 See Letter from Annice M. Wagner, President, Conference of Chief Justices (Mar. 28, 2002) ("Absent hard evidence of the inability of the state judicial systems to hear and decide fairly class actions brought in state courts, we do not believe that such a procedure is warranted.").

3 See Letter from Sen. Michael Balboni, Chair, National Conference of State Legislatures (Feb. 2, 2005) ("The effect of S.5 on state legislatures is that state laws in the areas of consumer protection and antitrust which were passed to protect citizens of a particular state against fraudulent or illegal activities will almost never be heard in state courts.").

4 See Letters to Committee Members in opposition to similar class action measures from the AARP, ADA Watch/ National Coalition for Disability Rights, AFL–CIO, Alliance for Healthy Homes, Alliance for Justice, Alliance for Retired Americans, American Association of People with Disabilities, American Association of University Women, American Cancer Society, American Heart Association, American Federation of Government Employees, American Federation of State, County and Municipal Employees, American Lung Association, American-Arab Anti-Discrimination Committee, Americans for Democratic Action, Bazelon Center for Mental Health Law, Brady Campaign to Prevent Gun Violence, United with the Million Mom March, Campaign For Tobacco-Free Kids, Center for Disability and Health, Center for Justice and Democracy,

Center for Responsible Lending, Center for Women Policy Studies, Civil Justice, Inc., Clean Water Action, Coalition to Stop Gun Violence, Commission on Social Action of Reform Judaism, Communication Workers of America, Consumer Federation of America, Consumers for Auto Reliability and Safety, Consumers Union, Disability Rights Education Fund, Earthjustice, Education Law Center, Environmental Working Group, Epilepsy Foundation, Families USA, Federally Employed Women, Friends of the Earth, Gray Panthers, Greenpeace, Homeowners Against Deficient Dwellings, Jewish Labor Committee, Lawyers' Committee For Civil Rights Under Law, Leadership Conference on Civil Rights, Mexican American Legal Defense and Educational Fund, Mineral Policy Center, NAACP Legal Defense and Education Fund, National Alliance of Postal and Federal Employees, National Asian Pacific American Legal Consortium, National Association for the Advancement of Colored People, National Association for Equal Opportunity in Higher Education, National Association of Consumer Advocates, National Association of Consumer Agency Administrators, National Association of the Deaf, National Association of Protection and Advocacy Systems, National Bar Association, National Campaign for Hearing Health, National Center on Poverty Law, National Coalition on Black Civic Participation, National Committee on Pay Equity, National Consumer Law Center, National Consumers Coalition, National Consumers League, National Council of La Raza, National Employment Lawyers Association, National Fair Housing Alliance, National Gay and Lesbian Task Force, National Law Center on Homeless & Poverty, National Legal Aid and Defender Association, National Organization for Women, National Partnership for Women and Families, National Resources Defense Council, National Workrights Institute, National Women's Health Network, National Women's Law Center, North Carolina Justice Center, NOW Legal Defense Fund, People for the American Way, Pride at Work, Project Equality, Public Citizen, Religious Coalition for Reproductive Choice, Sargent Shriver National Center of Poverty Law, Service Employees International Union, Sierra Club, Tobacco Control Resource Center, Tobacco Products Liability Project, UNITE!, United Food and Commercial Workers International Union, United Policyholders, United Steelworkers of America, USAction, U.S. Public Interest Research Group, Violence Policy Center, and Women Employed (May 21, 2004).

5 See Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).

6 See The Class Action Fairness Act of 2005, S. 5, 109th Cong. S 4(a)(2) (2005) (adding 28 U.S.C. S 1332(d)(2)). Current law requires complete diversity before a state law case is eligible for removal to Federal court, meaning all of the defendants must be citizens residing in different states than the plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). In Snyder v. Harris, 394 U.S. 332 (1969), the Supreme Court held that the court should only consider the citizenship of named plaintiffs for diversity purposes, and not the citizenship of absent class members.

7 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(3)).

8 Id.

9 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(4)). The legislation also excludes securities-related and corporate governance class actions from coverage and makes a number of other procedural changes, such as easing the procedural requirements for removing a class action to Federal court (i.e., permitting removal to be sought by any plaintiff or defendant and eliminating the one-year deadline for filing removal actions) and tolling the statute of limitation periods for dismissed class actions. See Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(9)).

10 See Committee Report at p. 44.

11 Senate Bill 5 S 3.

12 Id.

13 National Conference of State Legislatures Letter, supra note 3.

14 See Letter in Opposition to S. 274 from the Consumer Federation of America, Consumers Union, and U.S. Public Interest Research Group (Feb. 5, 2003).

15 Three states still use their common law rules, rather than statutes, to permit class actions (Mississippi, New Hampshire, and Virginia); four states use Field Code-based rules based on the "community of interest" test (California, Nebraska, South Carolina, and Wisconsin); and seven states use class action rules modeled on the original Federal Rule 23 (1938) which creates a distinction among class members which depends on the substantive character of the right asserted (Alaska, Georgia, Louisiana, New Mexico, North Carolina, Rhode Island, and West Virginia). See 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions S 13.04 (3d ed. 1992 & Supp. 1997).

16 Fed. R. Civ. P. 23(a) (stating four factual prerequisites that must be met before a court will certify the lawsuit as a class action: (1) size–the class must be so large that joinder of all of its members is not feasible; (2) common questions–there must be questions of law or fact common to the class; (3) typical claims–the claims or defenses of the representatives must be "typical" of those of the class; and (4) representation–the representatives must fairly and adequately represent the interests of the class).

17 84 F.3d 734 (5th Cir. 1996) (preventing the certification of a nationwide class action brought by cigarette smokers and their families for nicotine addiction where there was found to be too wide a disparity between the various state tort and fraud laws for the class action vehicle to be superior to individual case adjudication).

18 51 F.3d 1293 (7th Cir. 1995) (decertifying, under the Erie doctrine, a nationwide negligence class action brought on behalf of hemophiliacs infected with the AIDS virus through use of defendants' blood clotting products because of diversity of state laws).

19 75 F.3d 1069 (6th Cir. 1996) (decertifying a proposed plaintiff settlement class comprising all U.S. residents implanted with defective or malfunctioning inflatable penile prostheses that were manufactured, developed, or sold by defendant company because common questions of law or fact did not predominate the action to such an extent that warranted class certification).

20 521 U.S. 591 (1997) (overturning consensual settlement between a class of workers injured by asbestos and a coalition of former asbestos manufacturers because of disparate levels of the class members' knowledge of their injuries and class members' large amount at stake in the litigation).

21 155 F.3d 331 (4th Cir. 1998) (rejecting class certification brought by Meineke franchisees alleging violations of franchise, tort, unfair trade, and other laws).

22 527 U.S. 815 (1999) (finding mandatory limited fund class treatment under Rule 23(b)(1)(B) is not appropriate unless the maximum funds available are clearly inadequate to pay all claims).

23 See, e.g., Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996) (refusing to certify a nationwide asbestos suit because the laws of multiple states would have to be applied), Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing the district court's certification because "it erred in its choice of law analysis"), In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir. 1996) (denying class certification due to variances in state laws), In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002) (refusing certification because the district court would have to apply the laws of several states according to Indiana's choice of law rules), and Zinser v. Accufix Research Inst., 253 F.3d 1180 (9th Cir. 2001) (holding the plaintiffs with pacemakers made of lead had not demonstrated which state's laws apply under California choice of law rules).

24 See, e.g., Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998), In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 170 F.R.D. 417 (E.D. La. 1997), Lyon v. Caterpillar, Inc., 194 F.R.D. 206 (E.D. Pa. 2000).

25 Letter from Arthur R. Miller, Bruce Bromley Professor of Law, Harvard Law School (Jun. 17, 2004).

26 Id.(quoting Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Appellants, In re Simon II Litigation, No. 03–7141 (2nd Cir. June 3, 2003).

27 See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).

28 Id.

29 See id.

30 See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).

31 Id.

32 ABA Task Force on Class Action Legislation, Report of the ABA Task Force on Class Action Legislation at 3 (Feb. 2003). See also Letter in Opposition to S. 274, The Class Action Fairness Act of 2003, from the Consumers Union (Apr. 2, 2003).

33 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(11)).

34 See Judicial Conference Letter, supra note 1.

35 See Letter in Opposition to S. 5 from the Leadership Conference on Civil Rights, AFL–CIO, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific American Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, Women Employed and others (Feb. 2, 2005).

36 See Letter in Opposition to S. 274 from the Leadership Conference on Civil Rights, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, and Women Employed (Mar. 20, 2003).

37 Id.

38 See In re Domestic Air Transportation Antitrust Litigation, 137 F.R.D. 677 (N.D. Ga. 1991).

39 Senate Bill 5 S 3 (adding 28 U.S.C. 1712 (a)).

40 Id.(adding 28 U.S.C. 1712 (d)).

41 Id.(adding 28 U.S.C. 1712 (b) (1–2)).

42 Id.(adding 28 U.S.C. 1712 (c)).

43 Id.(adding 28 U.S.C. 1712 (e)).

44 See Letters from Judicial Conference (Jul. 26, 1999 and Aug. 23, 1999).

45 Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).

46 The Federalist No. 14 (James Madison).

47 See Letter from Lawyers' Committee for Civil Rights Under Law (Apr. 9, 2003) (quoting Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809)); see also City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 76 (1941).

48 487 U.S. 131, 138 (1988) (finding Wisconsin notice-of-claim statute to be preempted by 42 U.S.C. S 1983, which holds anyone acting under color of law liable for violating constitutional rights of others).

49 520 U.S. 911, 919 (1997) (holding that Idaho procedural rules concerning appealability of orders are not preempted by 42 U.S.C. Sec. 1983) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954)).

50 Id. at 922. See also Howlett v. Rose, 296 U.S. 356, 372 (1990) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev 489, 508 (1954) for the proposition that Federal law should not alter the operation of the state courts); New York v. United States, 505 U.S. 144, 161 (1992) (stating that a law may be struck down on Federalism grounds if it "commandeer[s] the legislative processes of the States by directly compelling them to enact and enforce a Federal regulatory program").

51 The Global Tobacco Settlement: Hearings Before the Senate Comm. on the Judiciary, 105th Cong. (1997) (statement of Laurence H. Tribe, Tyler Professor of Law, Harvard Law School). Indeed, Former-Chairman Hatch praised Professor Tribe at the Committee's June 4, 2003, hearing on asbestos litigation as "known here and throughout the country as one of the most respected constitutional scholars and practitioners."

52 529 U.S. 598 (2000).

53 472 U.S. 797 (1985).

54 Id. at 812 (stating that the notice must be the "best practicable, reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections") (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314–315 (1950)).

55 Id. at 806–810. These findings were reiterated by the Supreme Court in 1995 in Matsushita Elec. Indust. Co. v. Epstein, 516 U.S. 367 (1995) (holding that state class actions are entitled to full faith and credit so long as, inter alia: the settlement was fair, reasonable, adequate and in the best interests of the settlement class; notice to the class was in full compliance with due process; and the class representatives fairly and adequately represented class interests).

56 Ironically, during the 104th Congress, the Republican Party was extolling the virtues of state courts in the context of their efforts to limit habeas corpus rights, which permit individuals to challenge unconstitutional state law convictions in Federal court.

57 28 U.S.C 1332(a) (West Supp. 1998).

58 See Judicial Conference of the United States, Long Range Plan for the Federal Courts, Recommendation 7 at 30 (1995).

59 See id.

S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.)

    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JEREMY COLEMAN, DWAYNE WATSON, SAMUEL ADAMSON, ETHNA LYNCH,<br><br>    Plaintiffs,<br><br><br><br>    vs.<br><br><br>RECONTRUST COMPANY, N.A., et al.<br><br>    Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br><br><br>Case No. 2:10-cv-1099<br><br>Judge Dee Benson |

Before the court is Defendants ReconTrust Company, N.A., Mortgage Electronic Systems, Inc., Bank of America, N.A., BAC Home Loan Servicing, LP, HSBC Bank USA, N.A., Wells Fargo Bank, N.A., and Bank of New York Mellon's (collectively referred to as "Defendants") Motion to Dismiss Plaintiff's Amended Complaint. (Dkt. No. 45.) The court heard oral argument on the motion. E. Craig Smay and John Christian Barlow represented the plaintiffs. J. William Boland and Philip Dracht represented the Defendants. After considering the memoranda, including the exhibits on file, and the oral arguments, the court enters the following order.

1

**Page 104**

Defendants claim the Plaintiffs have failed to allege that MERS, HSBC, Wells Fargo, and Bank of New York Mellon were involved in the conduct giving rise to any claims. "A claim has facial plausibility when the [plaintiff pleads] factual content that allows the Court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The only specific factual statements about MERS, HSBC, Wells Fargo, and Bank of New York Mellon are in the section of the Amended Complaint describing the Defendants' organizational status and stating they conduct business in the state of Utah. Thereafter, the only references are general statements regarding all of the Defendants. The allegations do not reference a specific property, plaintiff, or foreclosure proceeding and are insufficient to give MERS, HSBC, Wells Fargo, and Bank of New York Mellon "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007). For these reasons, the Motion to Dismiss as it pertains to MERS, HSBC, Wells Fargo, and Bank of New York Mellon is GRANTED. Regarding ReconTrust, Bank of America, N.A., and BAC Home Loans Servicing, LP, the court finds that the Plaintiffs have plead sufficient allegations against them to survive a motion to dismiss.

In support of its motion to dismiss, Defendants contend that ReconTrust may properly foreclose on properties located in Utah pursuant to 12 U.S.C. § 92a. Defendants argue that for purposes of § 92a the laws of the state of Texas apply, not Utah law. The court does not agree. Instead, the court agrees with the reasoning applied in *Cox v. ReconTrust Company, N.A.*, 2011 WL 835893 (March 3, 2011 D. Utah). In that case, the court stated:

> Under a straight forward reading of § 92a(b), this court must look to Utah law
> in its analysis of whether ReconTrust's activities in Utah exceed ReconTrust's trustee

2

powers. The powers granted to ReconTrust under federal law in this case are limited by the powers granted by Utah state law to ReconTrust's competitors. Accordingly, the extent of ReconTrust's federal powers must be determined by reference to the laws of Utah, not by reference to the laws of some other state. Under Utah law, the power to conduct a non-judicial foreclosure is limited to attorneys and title companies. The scope of the powers granted by federal law is limited to the same power Utah statute confers on ReconTrust's Utah competitors. The federal issue, therefore, is whether ReconTrust is a competitor of Utah attorneys or title insurance companies.

*Id.* at *6.

Because the parties did not brief the issue of whether ReconTrust competes with Utah attorneys or title insurance companies, the court will not rule on that matter at this time.

For the reasons mentioned above, Defendants' Motion to Dismiss Plaintiff's Amended Complaint is DENIED in part and GRANTED in part.

DATED this 3rd day of ~~September~~ October, 2011.

Dee Benson
United States District Judge

3

2011 WL 835893
Only the Westlaw citation is currently available.
United States District Court,
D. Utah,
Central Division.

Peni COX, an individual, Plaintiff,

v.

RECONTRUST COMPANY, N.A., et al., Defendants.

No. 2:10−CV−492 CW.    |    March 3, 2011.

**Attorneys and Law Firms**

John Christian Barlow, St. George, UT, E. Craig Smay, Salt Lake City, UT, for Plaintiff.

Richard F. Ensor, Vantus Law Group, Salt Lake City, UT, Amir Shlesinger, Reed Smith LLP, Los Angeles, CA, Roy W. Arnold, Reed Smith LLP, Pittsburgh, PA, for Defendants.

### ORDER and MEMORANDUM DECISION

CLARK WADDOUPS, District Judge.

**\*1** Now before the court are Plaintiff Peni Cox's motion for partial summary judgment on claims one and two (Dkt. No. 26), her motion to amend her complaint (Dkt. No. 49), and her motion for a preliminary injunction pending appeal (Dkt. No. 71). Also before the court is certain Defendants' motion to dismiss (Dkt. No. 52). For the reasons discussed below, Ms. Cox's motion for summary judgment and her motion for a preliminary injunction are DENIED with prejudice as to her claim that ReconTrust Company, N.A. is required to register with the relevant Utah agency before conducting business in Utah. On the other hand, those motions are DENIED without prejudice as to her claim that ReconTrust does not have authority as a trustee to conduct non-judicial foreclosure sales. Ms. Cox's motion to amend is DENIED with prejudice as to the registration claim, but without prejudice to her trustee power claim. The court will also discuss other aspects of that motion below. Defendants' motion to dismiss is GRANTED with prejudice as to the registration claim, but without prejudice as to the trustee power claim.

### ANALYSIS

The court will first discuss Ms. Cox's claim under Utah Code § 16–10a–1501, and rule on the parts of the parties' motions dealing with that claim. The court will then analyze Ms. Cox's Utah Code § 57–1–21 claim and rule on the parts of the parties' motions relating to that claim. Finally, the court will rule on Ms. Cox's motion to amend.

The facts relevant to the motions before the court are set forth in the fact section of the court's memorandum decision of June 18, 2010, Docket Number 45.

#### I. Ms. Cox's State Registration Statute Claim

In their motion to dismiss, Defendants first seek to dismiss Ms. Cox's claim under § 16–10a–1501. Ms. Cox also seeks summary judgment and injunctive relief on this claim. In this claim, Ms. Cox asserts that § 16–10a–1501 prohibits ReconTrust from transacting business in Utah without first registering with the relevant Utah agency. Defendants argue that this claim is

**Page 107**

2011 WL 835893

preempted by the National Banking Act ("NBA"), and that ReconTrust does not need to register with any Utah state agency to do business in Utah.

Defendants prevail on their motion to dismiss this claim. First, the court has already ruled that Ms. Cox's § 16–10a–1501 claim meets the standard for complete preemption. The court explained that the NBA demonstrates Congress's intent to federalize state claims relating to a national bank's ability to commence business in any state. *See* Memo. Dec. of 6/18/2010, Dkt. No. 45 at pp. 9–13.As a result, the court allowed removal based on federal question jurisdiction based on that claim. Moreover, the court found that under the NBA, once the Office of the Comptroller of the Currency ("OCC") has granted a certificate to a national bank, the national bank may do business nationwide without further permission by any particular state. Accordingly, § 16–10a–1501 does not apply to ReconTrust, and Ms. Cox's claim based on that state statute has no merit and should be dismissed with prejudice.

**\*2** Ms. Cox's arguments otherwise do not prevail. First, Ms. Cox contends that the court erred in interpreting 12 U.S.C. §§ 26, 27, and 42 as constituting authorization by Congress for a national bank to commence business in any state, free from any additional state requirements to do so. Ms. Cox argues that those federal statutes are more properly construed as having the narrow effect of (1) conferring on national banks the designation of national bank and (2) subjecting national banks to federal oversight and, when applicable, allowing them to be governed exclusively by federal regulation. But Ms. Cox offers no compelling reason to accept her narrow reading of §§ 26, 27, and 42. Both § 26 and § 27 clearly allow a national bank to commence the business of banking once a certificate has been issued. Neither of those statutes contain any language that would suggest that a national banking certificate is merely to confer a designation of national bank, rather than both conferring that designation and granting permission to start banking activities nationwide.

Moreover, other parts of the NBA confirm that receiving a national banking certificate is not the same as a designation. Under 12 U.S.C. § 24, "[u]pon duly making and filing articles of association and an organization certificate," a national bank, "as from the date of the execution of its organization certificate," as "a body corporate." As of the date of execution of the organization certificate, a national bank is granted various broad powers, most importantly the power to exercise of "all such incidental powers as shall be necessary to carry on the business of banking ..."12 U.S.C. § 24, para. 7. This immediate grant of powers upon obtaining a certificate rebuts the assertion that the certificate merely confers a designation.

Ms. Cox further interprets *Cuomo v. Clearing House Ass'n, L.L.C .,* 557U.S. 519, —— – ——, 129 S.Ct. 2710, 2720–21, 174 L.Ed.2d 464 (2009) as holding that state laws affecting national banks are not preempted unless federal statutes preempt such laws expressly. Ms. Cox therefore concludes that even after the OCC issues a certificate allowing a national bank to commence the business of banking, the national bank must then comply with any additional state law hurdles to commencing business in each state. This reading of *Cuomo* overreaches. *Cuomo* indeed acknowledges longstanding precedents that certain general state laws may be enforced against national banks. *See*129 S.Ct. at 2720–21.But there is nothing in *Cuomo* that supports the proposition that to completely preempt a state law, the NBA must do so expressly. To the contrary, complete preemption may be implied. As explained by the Supreme Court, national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter *or the general purposes* of the NBA."*Watters v. Wachovia Bank, N.A.,* 550 U.S. 1, 11, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) (emphasis added, citations omitted). Accordingly, the Supreme Court has "interpret[ed] grants of both enumerated *and incidental* 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law."*Id.* (emphasis added, quoting *Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)).

**\*3** For example, in *Beneficial National Bank v. Anderson,* 539 U.S. 1, 9–11, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003), the Supreme Court held that the NBA's rate of interest provisions for national banks completely preempted state causes of action for usury against national banks. In doing so, the Supreme Court did not point to any words in the NBA's rate of interest provisions that expressly stated that state usury claims against national banks are completely preempted. Instead, the Court examined the language of the relevant NBA section, determined the Congressional intent, and reviewed its previous rulings on similar issues. *See id.*

2011 WL 835893

In any event, the Utah statute requiring registration by foreign corporations directly conflicts with the NBA. For example, under § 24, once a national bank has been granted its organizational certificate, it is granted the power "[t]o sue and be sued, complain and defend, *in any court of law and equity,* as fully natural persons."12 U.S.C. § 24, para. 4 (emphasis added). But under Utah Code § 16–10a–1502(1)–(3), one of the penalties a foreign corporation or its successor faces for failure to register is not being allowed to maintain a suit in Utah state court.

For these reasons, and for the reasons explained in the memorandum decision of June 18, 2010, the court reaffirms its ruling that Ms. Cox's § 16–10a–1501 claim gives rise to complete preemption .[1] Accordingly, Ms. Cox's claim under that state statute is DISMISSED. To the extent that Ms. Cox's motion for summary judgment in her favor is predicated on that claim, it is DENIED. Further, to the extent that Ms. Cox's motion for an injunction is based on that claim, it is DENIED.


**II. Ms. Cox's Claim Regarding ReconTrust's Trustee Powers**

The second part of Defendants' motion to dismiss goes to Ms. Cox's claim that ReconTrust has no authority to conduct a non-judicial trustee's sale of her foreclosed property under § 57–1–21. Ms. Cox also seeks summary judgment and an injunction on this claim. The court previously held that this state statutory claim is completely preempted by the NBA. For the reasons discussed below, the court is still convinced that this holding is correct. Unlike Ms. Cox's § 16–10a–1501 claim, however, it appears that Ms. Cox has the at least potential to state this claim under a federal statute. That is, it seems that Ms. Cox's § 57–1–21 could be cast as a claim under 12 U.S.C. § 92a(b). As explained below, however, the court is unsure of the merits of the claim, and will rule accordingly.

Ms. Cox claims in her complaint and briefing that under § 57–1–21, ReconTrust has no authority under Utah law to conduct a non-judicial trustee's sale of her foreclosed property. Specifically, § 57–1–21(3), entitled "Trustees of trust deeds—Qualifications," allows only attorneys and title insurance companies to conduct non-judicial trustee's sales. Utah Code § 57–1–21(3). All other trustees who are qualified to act as trustees of a trust deed, including depository institutions, insurance companies, trust companies, and so on, may not conduct such sales. *See id.*The logic behind Ms. Cox's claim is that because ReconTrust is not an attorney or a title insurance company, ReconTrust should not be permitted to sell her foreclosed property in a non-judicial trustee's sale. The court previously held that 12 U.S.C. § 92a completely preempted Ms. Cox's claim under § 57–1–21.

 **\*4**  To continue to accept the theory that Ms. Cox's claim under § 57–1–21 is completely preempted, the court must find that it was Congress' intent that a state law claim alleging that a national bank has acted beyond its trustee powers should be a federal claim. A thorough analysis of § 92a convinces the court that although Congress adopted state law limits on the powers that a national bank can exercise in a state, Congress nonetheless intended that the question of what trustee powers a bank may exercise should be governed by federal law. The relevant portions of § 92a state as follows:

 (a) Authority of Comptroller of the Currency

The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

 (b) Grant and exercise of powers deemed not in contravention of State or local law

Whenever the laws of such State authorize or permit the exercise of any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this section.

**Page 109**

Cox v. ReconTrust Co., N.A., Not Reported in F.Supp.2d (2011)

2011 WL 835893

12 U.S.C. § 92a(a) & (b).

Reading these provisions closely, the court is satisfied that under § 92a(a), a state law claim challenging a national bank's ability to serve as a trustee is completely preempted. The OCC, a federal agency, decides whether a national bank may receive a permit to act as a trustee. In determining whether to grant the permit, the OCC looks to both state and federal statute. Given this scheme, it is clear that Congress intended that state claims challenging the validity of the OCC's grant of trustee status to a national bank could be removed to federal court.

It further appears that Congress intended that state law challenges to the authority of national banks to carry out specific trustee powers could be removed to federal court. Under § 92a(b), Congress grants national banks the authority to exercise trustee powers. The source of this grant itself is significant to the question of preemption. That is, Congress, not the states, grants national banks the authority to act as trustees and to exercise trustee powers.

Moreover, the form in which Congress granted those trustee powers confirm that the issue of whether a national bank can validly exercise a trustee powers is a federal one. The NBA confers on national banks the same state law trustee powers that a state grants to "State banks, trust companies, or other corporations which compete with national banks."12 U.S.C. § 92a(b). When a national bank purports to exercise a power as a trustee, the question of whether it may validly do so may thus logically be broken down into two parts. First, does state law provide for such a trustee power at all, and second, is that trustee power one that state law grants to state banks, trust companies, or "other corporations which compete with national banks."*Id.*

 **\*5**  It is the second part of this test that confirms complete preemption. In the second part, a court must determine if a state trustee power is granted to one of three entities: state banks, trust companies, or "other corporations which compete with national banks."*Id.* If a state gives one of those three entities trustee power, Congress mandates that the national bank is also allowed that power in that state. While the question of whether a trustee power has been granted to the first two entities will usually be obvious on its face, making that determination with respect to "other corporations which compete with national banks" is not. And the latter question cannot be resolved by looking at state law. Instead, it must be answered by looking to the meaning of that term as it is used in § 92a(b), a federal statute. [2]

In light of this analysis, two things are clear. First, Congress intended that state law should define the limits of the trust powers that a national bank may exercise in a state. Second, even though state law sets the limits, federal statute will ultimately be the source of the answer to the question of whether a national bank is properly exercising a state law trustee power in a state. Because federal statute answers the controlling question, and because Congress granted the trustee powers in the first place, the court concludes that Congress intended that challenges to a national bank's activities as a trustee should be heard in federal court. This proposition is true even if the challenge is facially made under a state statute, as is the case here. Accordingly, though Ms. Cox has brought an action under § 57–1–21 challenging ReconTrust's power to conduct a non-judicial foreclosure sales, this claim sounds in federal law and is properly removed to federal court.

Unlike Ms. Cox's claim under the registration statute, however, the court hesitates to dismiss Ms. Cox's claim that ReconTrust has exceeded its trustee powers. As noted above, because Congress gave the OCC the power to decide whether a national bank may commence business, any additional state law impediments to commencing business do not apply. Since Ms. Cox's registration claim was based solely on the theory that ReconTrust had to register with Utah, it is appropriate to dismiss that claim at this stage. On the other hand, it is not clear that Congress necessarily intended to disallow any action based on the theory that a national bank has exceeded its trustee powers. But, as discussed below, the parties have not provided enough information about this potential claim for the court to confidently pass on its merits.

First, it is not clear that a private right of action is implied on this type of claim. Under 12 U.S.C. § 92a(k), the sole express remedy for a national bank exceeding its trust powers is the OCC revoking the trustee permit. Second, even if Ms. Cox can bring such a claim, the parties have not convinced the court that either side can or should prevail on the merits. For Ms. Cox's

**Page 110**

2011 WL 835893

part, her argument assumes that ReconTrust does not compete with Utah attorneys or title insurance companies. But Ms. Cox has not alleged or proffered facts allowing the court to test this proposition on dismissal or summary judgment.

**\*6**  Defendants similarly miss the mark. Defendants argue that ReconTrust may act as a trustee under § 92a(a) because Utah statute allows depository institutions to act as trustees. Ms. Cox does not dispute this conclusion. But this proposition stops short of answering the pertinent question, which is whether federal law allows ReconTrust to conduct a trustee's sale in Utah. If Utah depository institutions compete with ReconTrust and were allowed by Utah law to conduct trustee's sales, ReconTrust would also have that power. No one except attorneys and title insurance companies, however, are granted this power by § 57–1–21. It is thus immaterial whether Utah law allows depository institutions to act as trustees.

Moreover, the court is unconvinced by ReconTrust's argument that § 92a(b) dictates that the court look to some state law other than Utah state law to evaluate ReconTrust's foreclosure activities in Utah. The materials ReconTrust cites in support of this assertion do not apply here. The authorities on which Defendants rely contemplate a bank providing trust services to banking customers in a certain state, but acting in several states as part of providing those services. Here, in contrast, ReconTrust is conducting foreclosure activities on behalf of Bank of America in several states, including Utah. Defendants's authorities are therefore not persuasive.

Under a straight forward reading of § 92a(b), this court must look to Utah law in its analysis of whether ReconTrust's activities in Utah exceed ReconTrust's trustee powers. The powers granted to ReconTrust under federal law in this case are limited by the powers granted to ReconTrust's competitors. Accordingly, the extent of ReconTrust's federal powers must be determined by reference to the laws of Utah, not by reference to the laws of some other state. Under Utah law, the power to conduct a non-judicial foreclosure is limited to attorneys and title companies. The scope of the powers granted by federal law is limited to the same power Utah statute confers on ReconTrust's Utah competitors. The federal issue, therefore, is whether Recontrust is a competitor of Utah attorneys or title insurance companies.

As neither Defendants nor Ms. Cox make a strong case on the merits of the trustee power claim, the court will rule as follows. First, Ms. Cox's motions for summary judgment and preliminary injunction on this claim are DENIED, but without prejudice. Defendants' motion to dismiss this claim is GRANTED, but, assuming that she has a private right of action, Ms. Cox is granted leave to amend to attempt to properly state this claim.

### III. Ms. Cox's Motion to Amend

Ms. Cox has also moved to amend her complaint. She seeks to amend in several ways, including removing a Defendant, striking her state law tort claims, and adding fictitious plaintiffs and class allegations. Ms. Cox purported to file the amended complaint on June 26, 2010, but the court will deem that filing as her proposed amended complaint. Based on the proposed amended complaint and for the reasons set out above, the court denies Ms. Cox's motion to amend without prejudice.

**\*7**  The court grants leave for Ms. Cox to remove the relevant Defendant and to remove Ms. Cox's state law tort claims without further discussion. As for the remainder of the proposed complaint, the court has identified several problems. First, Ms. Cox's attempt to add unnamed Plaintiffs and class allegations is clearly an attempt to plead a class action. At this stage, the court has no opinion on the propriety of this action being certified as a class action. But as pointed out by Defendants, Ms. Cox's proposed complaint makes no attempt to plead the requirements of Fed.R.Civ.P. 23. Moreover, the court has ruled herein that Ms. Cox's state law registration claim cannot be validly brought in this action, so it would be futile for her to plead it here.

For these reasons, the court DENIES Ms. Cox's motion to file the proposed amended complaint, but without prejudice. She will have 30 days from the date of this Order to move to amend again. For the court to consider granting that motion, Ms. Cox's proposed amended complaint attached to that motion must account for the court's rulings in this Order.

**Page 111**

2011 WL 835893

## CONCLUSION AND ORDER

For the reasons stated above, the court rules as follows:

Ms. Cox's motion for summary judgment (Dkt. No. 26) is DENIED with prejudice with respect to her claim under § 16–10a–1501, but without prejudice to her claim that ReconTrust has exceeded the scope of the trustee powers granted to ReconTrust;

Ms. Cox's motion to amend (Dkt. No. 49) is DENIED without prejudice, and with leave to move to amend again within 30 days of this Order;

Defendants' motion to dismiss (Dkt. No. 52) is GRANTED with prejudice with respect to Ms. Cox's claim under § 16–10a–1501, but without prejudice as to the trustee power claim [3]; and

Ms. Cox's motion for an injunction (Dkt. No. 71) is DENIED with prejudice with respect to Ms. Cox's claim under § 16–10a–1501, but without prejudice as to the trustee power claim

Footnotes

1    Ms. Cox also asks this court to consider the remand order of December 16, 2009 in *Jensen v. Recontrust Company, N.A.,* 2:09cv927 TC, in which the court remanded a case against ReconTrust bringing the same state statutory claims as those brought here. The order in *Jensen,* however, did not discuss the complete preemption issue, which lessens its persuasive value in this case.

2    From what the court can glean from the docket in the state court proceedings in the *Jensen* case after it was remanded, the Utah state court has also identified the question of what "other corporations" compete with national banks as one that is crucial to determining whether ReconTrust is allowed to conduct foreclosure sales in Utah.

3    Ms. Cox's motion for a hearing on the motion to dismiss (Dkt. No. 62) is DENIED as moot, since a hearing was held on all issues relevant to the motion on August 31, 2010.

End of Document                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Page 112**

2009 WL 3156693

2009 WL 3156693
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

CUNNINGHAM CHARTER CORPORATION, on behalf of itself and all others similarly situated, Plaintiff,

v.

LEARJET, INC., Defendant.

No. 07–cv–233–DRH.   |   Sept. 29, 2009.

**Attorneys and Law Firms**

James F. Bennett, John D. Comerford, Dowd Bennett LLP, Clayton, MO, for Plaintiff.

James C. Sullivan, Polsinelli Shughart PC, Kansas City, MO, Ron A. Sprague, Gendry & Sprague, P.C., San Antonio, TX, Thomas R. Frenkel, Feirich, Mager Et Al., Carbondale, IL, for Defendant.

*ORDER*

HERNDON, Chief Judge.

## I. INTRODUCTION

**\*1**  This cause is before the Court on Plaintiff's Renewed Motion to Remand. (Doc. 77). Defendant timely filed a Response opposing remand. (Doc. 78). Plaintiff timely filed a Reply. (Doc. 83). On April 27, 2009, the Court denied class certification. (Doc. 76). In the Renewed Motion to Remand, Plaintiff argues that the denial of class certification undermines the Court's subject matter jurisdiction over this matter. This is not the first time this issue has arisen in the Southern District of Illinois. *See Ronat, et al. v. Martha Stewart Living Omnimedia, et al.,* **05–cv–520–GPM (S.D.IL. November 12, 2008).** Defendant removed this case pursuant to 28 U.S.C. § 1332(d)(2), 28 U.S.C. § 1332(d)(5) and 28 U.S.C. § 1453(a), all part of the Class Action Fairness Act of 2005 ("CAFA"). Neither the Parties nor the Court has identified any other basis for federal subject matter jurisdiction over this case.

## II. LEGAL STANDARDS

CAFA defines a class action as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar state statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."**28 U.S.C. § 1332(d)(1)(B); 28 U.S.C. § 1453(a).** Further, CAFA states that it "shall apply to any class action before or after entry of a class certification order by the court with respect to that action."**28 U.S.C. § 1332(d)(8).** The statute defines the term "class certification order" as "an order issued by a court *approving* the treatment of some or all aspects of a civil action as a class action."**28 U.S.C. § 1332(d)(1)(C) (emphasis added).** The jurisdictional component of CAFA states, in relevant part, that "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action ..."**28 U.S.C. § 13312(d)(2).**

Plaintiff, citing a number of district court cases both within the Seventh Circuit and outside thereof, maintains that the Court's denial of class certification divests the Court of subject matter jurisdiction. The principal argument in those cases is that a denial of class certification is a finding of law stating that this case is not a class action, and more importantly, never was a

**Page 113**

2009 WL 3156693

class action. Thus, so the argument goes, because the case was never a class action, it was not so at the time of removal and diversity jurisdiction is defeated. *See e.g., Ronat, et al. v. Martha Stewart Living Omnimedia, et al.,* **05–cv–520–GPM (S.D.Il. November 12, 2008);** *Jones v. Jeld–Wen, Inc.,* **No. 07–22328–CIV, 2008 WL 4541016 (S.D.Fla. Oct. 2, 2008);** *Clausnitzer v. Federal Express Corp.,* **No. 06–21457–CIV, 2008 WL 4194837 (S.D. Fla. June 18, 2008);** *Arabian v. Sony Elecs., Inc.,* **No. 05cv1741 WQH (NLS), 2007 WL 2701340 (S.D.Cal. Sept. 13, 2007);** *Giovanniello v. New York Law Publ'g Co.,* **No. 07 Civ.1990(HB), 2007 WL 2244321 (S.D.N.Y.Aug.6, 2007);** *Falcon v. Philips Elecs. N. Am. Corp.,* **489 F.Supp .2d 367 (S.D.N.Y.2007);** *Gonzalez v. Pepsico, Inc.,* **No. 06–2163–KHV, 2007 WL 1100204 (D.Kan. Apr.11, 2007);** *McGaughey v. Treistman,* **No. 05 Civ. 7069(HB), 2007 WL 24935 (S.D.N.Y.Jan.4, 2007).** [1]

   **\*2** Defendant, on the other hand, argues that the denial of class certification is not an obstacle to this Court's subject matter jurisdiction. There is an equally lengthy list of district court opinions supporting that position. *See, e.g., Colomar v. Mercy Hosp., Inc.,* **No. 05–22409–CIV, 2007 WL 2083562 (S.D.Fla. July 20, 2007);** *Garcia v. Boyar & Miller, P.C.,* **Nos. 3:06–CV–1936–D, 3:06–CV–1937–D, 3:06–CV–1938–D, 3:06–CV–1939–D, 3:06–CV–2177–D, 3:06–CV–2206–D, 3:06–CV–2236–D, 3:06–CV–2241–D, 2007 WL 1556961 (N.D .Tex. May 30, 2007);** *Genenbacher v. CenturyTel Fiber Co. II, LLC,* **500 F.Supp.2d 1014 (C.D.Ill.2007).** The principal argument under those cases begins by pointing out that CAFA jurisdiction is fundamentally a variety of diversity jurisdiction. From that starting point, the courts equate a denial of class certification to a change in jurisdictional facts, such as the diversity of citizenship of parties, after a case is removed. Such a change does not undermine a district court's subject matter jurisdiction. *See Rising–Moore v. Red Roof Inns, Inc.,* **435 F.3d 813, 816 (7th Cir.2006).**

## III. ANALYSIS

The Court finds more persuasive the line of cases finding that a denial of class certification divests federal district courts of subject matter jurisdiction. The federal courts are of limited jurisdiction and possess only that power authorized by the Constitution or Congress. *Bowles v. Russell,* **551 U.S. 205, 212, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007);** *Kokkonen v. Guardian Life Insurance Co. of America,* **511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).** It is not the job of federal judges "to speculate upon Congressional motives" when examining a statute. *Riegel v. Medtronic, Inc.,* **552 U.S. 312, 128 S.Ct. 999, 1008–1009, 169 L.Ed.2d 892 (2008).** Starting with that premise, the Court finds that any doubt as to subject matter jurisdiction should be resolved in favor of remand. In this case, there are more than mere doubts regarding the Court's jurisdiction.

In the case at bar, the Court found that the case cannot proceed as a class action under **Federal Rule of Civil Procedure 23(a)** because (a) the proposed class was not sufficiently precise to enable the Court to ascertain the identity of the class members; (b) it was unclear whether Plaintiff was a member of the proposed class; and (c) the proposed class failed to meet the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy. In short, the case failed to meet *any* of the prerequisites necessary to define it as a class action. The findings in the Court's denial of class certification also reflect that there is no reasonable chance that the defects in the class could ever be cured.

By its title and terms, CAFA only applies to "class actions." While that concept is easy enough to grasp, the statute defines a "class action" in terms of the allegations of the Complaint and not based upon actual certification of the case as a class action. **28 U.S.C. § 1332(d)(1)(B); 28 U.S.C. § 1453(a).** Further, the "before and after" language at **28 U.S.C. § 1332(d)(8)** demonstrates that Congress recognized that at the time of removal or filing, the case will not be certified as a class action. The jurisdictional part of the statutory scheme adds only the requirements of minimal diversity and a $5,000,000 amount in controversy. Thus, it could not have been Congress' intent that certification is necessary for the case to be removed to or filed in federal court pursuant to CAFA. Certainly, the practice in federal district courts does not reflect such a statutory scheme. All that is required are class allegations sufficient to establish a putative class action. Thus, certification is not a jurisdictional fact that needs to be established from the outset in order for the Court to exercise subject matter jurisdiction. Further, certification is not a jurisdictional fact that can change without the court losing jurisdiction. Instead, class certification or the denial thereof is a finding of law similar to that in a summary judgment order.

**Page 114**

2009 WL 3156693

**\*3**  Even if certification was a "jurisdictional fact," an order denying certification of a class is essentially a finding that the civil action is not and never was a class action. Thus, the Court finds that equating this situation to a post-removal change in jurisdictional facts is a false analogy. This situation is more akin to a finding, after removal, that subject matter jurisdiction *never* existed because the jurisdictional facts were not as initially believed. A post-removal change in jurisdictional facts does not defeat diversity jurisdiction. ***Rising–Moore v. Red Roof Inns, Inc.,* 435 F.3d 813, 816 (7th Cir.2006).** However, a discovery that diversity jurisdiction never existed, including at the time of removal, obviously does. *See***FED. R. CIV.P. 12(h)(3).**

While certification is not necessary to remove or file a case pursuant to CAFA, it is apparent that Congress intended certification to be a necessary step. Equally obvious is that CAFA ceases to apply if the case is not certified as a class action. One need only look at the definition of "class certification order" at **§ 1332(d)(1)(C)** and the applicability clause at **§ 1332(d) (8).** Reading those two sections in combination with the definition of a "class action," *supra,* makes it clear that if the district court does not enter a certification order *approving* of the case as a class action, then CAFA ceases to apply to the case once the certification order is entered. Because CAFA provides the statutory basis of the Court's subject matter jurisdiction, it follows that if it ceases to apply, then the Court loses that jurisdiction in the absence of an independent basis. The Court then must dismiss the case or remand it to state court regardless of the procedural stage. **FED. R. CIV.P. 12(h) (3).** That is precisely the result reached in this case.

### IV. CONCLUSION

In sum, the Court's Order denying class certification divests it of subject matter jurisdiction over this matter. Accordingly, the Court **GRANTS** Plaintiff's Renewed Motion to Remand. (Doc. 77) and **REMANDS** this case to the **First Judicial Circuit, Union County, Illinois.**The Court, in its discretion, declines to award Plaintiff's costs and expenses, including attorney fees, pursuant to Section 1447(c). Any other pending motions are **DENIED** as **MOOT .**

**IT IS SO ORDERED.**

Footnotes

1         At the time of this order, this Court was unable to locate any federal appellate court that has decided the issue.

End of Document                                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5509004
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

Victor DUNN, et al., Plaintiffs,

v.

ENDOSCOPY CENTER OF SOUTHERN NEVADA, et al., Defendants.

No. 2:11–cv–00560–RLH–PAL.    |    Nov. 7, 2011.

**Attorneys and Law Firms**

Artemus W. Ham, IV, Robert T. Eglet, Mainor Eglet, LLP, Las Vegas, NV, for Plaintiffs.

David M. MacDonald, Macdonald Devin, PC, Dallas, TX, Michael M. Edwards, Wilson Elser Moskowitz Edelman & Dicker, Matthew C. Wolf, Max E. Corrick, Michael E. Stoberski, James R. Olson, Olson, Cannon, Gormley & Desruisseaux, Christine M. Booze, Douglas M. Rowan, Atkin Winner & Sherrod, Leann Sanders, Chelsea Hueth, Alverson, Taylor, Mortensen & Sanders, Scott R. Cook, David P. Pritchett, Gordon & Rees LLP, Las Vegas, NV, Brett Schoel, Schuering Zimmerman Scully & Doyle, Sacramento, CA, for Defendants.

**ORDER**

**(Motion to Remand—# 18)**

ROGER L. HUNT, District Judge.

**\*1**  Before the Court is Plaintiffs' **Motion to Remand** (# 18, filed May 13, 2011) based on a lack of jurisdiction. The Court has also considered Defendants' Oppositions (29, 30, filed May 31, and June 6), and Plaintiffs' Replies (32, 70, filed June 6, and June 10).

**BACKGROUND**

This consolidated action arises out of the alleged misuse of syringes and Propofol vials at the Endoscopy Center of Southern Nevada and at Desert Shadow Endoscopy Center (collectively, the "Endoscopy Centers"). In December 2007, the Southern Nevada Health District (the "Health District") received several independent reports of Hepatitis C infections from physicians and hospitals. The Health District investigated the situation and eventually determined that the infected patients had been treated at the Endoscopy Centers. The Health District contacted the federal Center for Disease Control ("CDC"), which sent assistance for further investigation.

During the joint investigation, investigators observed Certified Registered Nurse Anesthetists reusing syringes on a single patient to draw anesthesia form a vial of Propofal and then reusing the vial of Propofol on a subsequent patient. The Health District reported:

> The reuse of single-use vials of Propofol for multiple patients was identified through clinic documents, and was documented to have occurred on the days of known transmission. It was also observed at the time of investigation in January 2008, and was reported by staff members as a common practice of the client. The reuse of syringes to access vials of Propofol was observed by investigators in January of

**Page 116**

Dunn v. Endoscopy Center of Southern Nevada, Not Reported in F.Supp.2d (2011)

2011 WL 5509004

2008, and was described by staff members as a common practice of the client at the time of the identified disease transmission.

(Dkt. # 18, Ex. 1, Southern Nevada Health District Report, 51.) The Health District also stated that unsafe injection practices have been the cause of infections in hundreds of other disease outbreaks around the world since 1992.(*Id.*) The Health District, based on its investigation, sent out notices to patients who had undergone procedures at the Endoscopy Centers between March 2004 and January 2008, that they should be tested for Hepatitis B, Hepatitis C, and HIV.

These events have led to multiple lawsuits, some of which have been consolidated to form this case. This case was brought as 88 separate suits in Nevada State Court on behalf of 3,630 different Plaintiffs who did not contract a disease from the Endoscopy Centers. These Plaintiffs allege various causes of action based on exposure to blood borne diseases at the Endoscopy Centers and products liability related claims against the Propofol manufacturers and distributors. Almost two years after filing their complaints in state court, Plaintiffs moved to consolidate all 88 cases for trial under the basis that the various suits were all based on the same facts. The State Court granted the motion and consolidated cases for trial. Once the cases were consolidated, Defendants removed the case to this Court asserting jurisdiction under the Class Action Fairness Act ("CAFA"), specifically claiming "mass action" jurisdiction under 28 U.S.C. § 1332(d)(11)(B)(i). Now before the Court is Plaintiffs' motion to remand for lack of jurisdiction. For the reasons discussed below, the Court denies Plaintiffs' motion.

## DISCUSSION

 **\*2**  Plaintiffs claim that the Court lacks jurisdiction under CAFA for three reasons: (1) the Plaintiffs' claims arise from a single event or occurrence which excepts this matter from the definition of a "mass action"; (2) the "local controversy exception" applies; and (3) Defendants have not shown that the amount in controversy requirements are met. The Court disagrees with each of Plaintiffs' arguments and will address them in turn.

### I. Analysis

Federal district courts have subject matter jurisdiction over a "mass action" originally brought in state court if: (1) the action involves monetary claims of 100 or more persons; (2) the claims are proposed to be tried jointly on the ground that plaintiffs' claims involve common questions of law or fact; (3) at least one plaintiff seeks recovery in excess of $75,000; (4) the aggregate amount in controversy exceeds $5 million; and (5) any plaintiff is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2); *Serran v. 180 Connect, Inc.,* 478 F.3d 1018, 1020–21 (9th Cir.2007). The proponents of federal jurisdiction bear the burden of establishing a "prima facie case of removal jurisdiction."*Serrano,* 478 F.3d at 1021. However, the burden of establishing an exception to subject matter jurisdiction under the CAFA lies with the party seeking remand. *Id.* at 102.

### A. Event or Occurrence

Plaintiffs first argue that the Court lacks subject matter jurisdiction because this action is not a "mass action" as defined by 28 U.S.C. § 1332(d)(11)(B)(ii)(I). That statute states:

    (ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which—

    (I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State.

28 U.S.C. § 1332(d)(11)(B)(ii)(I). Specifically, Plaintiffs argue that this action arises out of a single event or occurrence in Nevada, thus excluding it from the definition of a "mass action.". This is simply not so.

Federal district courts interpreting this provision "have consistently construed the 'event or occurrence' language to apply only in cases involving a single event or occurrence, such as an environmental accident, that gives rise to the claims of all

**Page 117**

2011 WL 5509004

plaintiffs."*Lafalier v. Cinnabar Serv. Co., Inc.,* No. 10–cv–0005, 2010 WL 1486900, at *4 (N.D.Okla. Apr. 13, 2010); *see also Galstaldi v. Sunvest Cmtys USA, LLC,* 256 F.R.D. 673, 676 (S.D .Fla.2009). However, the Court need not rest its opinion on the decisions of other district courts. The plain language of the statute, which obviously controls, says "an event or occurrence" not "events or occurrences." The use of the singular in the statutory language is important and sufficient. Nevertheless, the Court's decision is further supported by CAFA's legislative history. Congress expressly contemplated that "this [event or occurrence] exception would not apply to a product liability" case because "[t]he sale of a product to different people does not qualify as an event."S.Rep. No. 109–14, at 47, *reprinted in* 2005 U.S.C.C.A .N. 3, 44. Rather, this exception is supposed to apply to a "truly local single event" like "environmental torts such as a chemical spill."*Id.*

  **\*3** While Plaintiffs try to analogize this case to an environmental tort like a chemical spill, it simply isn't. Though the Court does not necessarily endorse a blanket exception for products liability cases, this products liability case does not involve a single event or occurrence, but alleged conduct occurring over a period of multiple years. Such allegations simply cannot be construed to be a single event or occurrence. This is doubly true as the allegations are based both on the various injections and the entirely separate design of the Propofol vials. Thus, Plaintiffs' arguments fail and the Court declines to remand the case on this faulty basis.


### B. The Local Controversy Exception

Plaintiffs also argue that the Court must remand this case because the "Local Controversy Exception" to CAFA jurisdiction applies. To establish the applicability of the Local Controversy Exception, the party seeking remand must establish, by a preponderance of the evidence, each of the Local Controversy Exception's four conjunctive parts. *Serrano v. 180 Connect, Inc.,* 478 F.3d 1018, 1024 (9th Cir.2007). One of these requirements is that "during the 3–year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons."28 U.S.C. § 1332(d)(4)(A)(ii). The Local Controversy Exception does not apply in this case because another class action was filed within the preceding three years, specifically, *Rader v. Teva Parenteral Medicine, Inc.,* 2:10–cv–00818–JCM–LRL also pending in this district.

Plaintiffs did not contend in their motion that there was no other class action "asserting the same or similar facts," instead, they contend that there was no class action "of which Plaintiffs are members and that asserts claims for the same or similar damages."(Dkt.18, Mot.13:8–10.) Plaintiffs' assertion misses the mark. For *Rader* to make the Local Controversy Exception inapplicable in this case, it must: (1) have been brought within three years preceding this case; (2) assert the same or similar factual allegations as asserted here; (3) be brought against any of the defendants in this action; and (4) be brought on behalf of the Plaintiffs in this action or other persons. 28 U.S.C. § 1332(d)(4)(A)(ii).*Rader* meets all of these requirements. First, this action became a mass action on March 14, 2011 and *Rader* was filed in February 2010, well within the three year period. Second, *Rader* is based on the same underlying facts (improper injection practices at the Endoscopy Centers and creation and distribution of a defective product).[1] Third, the defendants in *Rader* are some of the Defendants in this case (more specifically, the products Defendants). And fourth, Plaintiffs in this case are members of the proposed *Rader* class. Thus, Plaintiffs have not meet their burden of showing that the Local Controversy Exception applies and the Court cannot remand on this ground.


### C. The Amount in Controversy Requirement

  **\*4** Lastly, Plaintiffs argue that Defendants have not met their burden to establish a sufficient amount in controversy. CAFA requires a minimum aggregate amount in controversy of $5 million and that at least one Plaintiff's claim must exceed $75,000 (the general diversity jurisdiction minimum).*Abrego Abrego v. Dow Chemical Co .,* 443 F.3d 676 (9th Cir.2006).[2] Plaintiffs do not contend that the jurisdictional minimums are not met, merely that Defendants have failed to establish that they are met. Nor do Plaintiffs even attempt in the alternative to meet their own burden of proof by showing to a legal certainty that Plaintiffs cannot obtain the jurisdictional amounts assuming the Court were to determine that Defendants met their initial burden. Here, Defendants have sufficiently shown in both their Notice of Removal (Dkt. # 1) and in their response to the motion that the amount in controversy requirement is met.

2011 WL 5509004

"[I]f the complaint alleges damages in *excess* of the federal amount in controversy requirement, the amount in controversy requirement is presumptively satisfied unless 'it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum.' " *Lowdermilk v. U.S. Bank Nat'l Ass'n,* 479 F.3d 994, 998 (9th Cir.2007) (quoting *Abrego Abrego,* 443 F.3d at 683 n. 8). But where the complaint does not "plead a specific amount of damages, the defendant seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met.' " *Id.* (quoting *Abrego Abrego,* 443 F.3d at 683.) This burden may be proven with extrinsic evidence. *See id.*

Here, Plaintiffs' complaint (the Court refers to the *Dunn* complaint, though the complaints in each of the 88 cases are nearly identical) asserts damages in excess of $10,000 (the Nevada pleading standard) for each of 13 claims and punitive damages in excess of $10,000 from each of the seven remaining defendants in the lead *Dunn* case. Adding together these requests, the complaint simply requests more than $75,000 in damages for *at least* one Plaintiff (and likely each Plaintiff). Further, considering that there are 3,630 total Plaintiffs, each individual Plaintiff need only request $1,378 to meet the $5 million total amount requirement. However, each Plaintiff requests in excess of $50,000 from the face of the complaint. This is because the complaint asserts exemption from mandatory arbitration. This exemption requires that the "probable jury award" exceed "$50,000 per plaintiff." Nevada Arbitration Rule 3(a). Thus, the Court may presume that each Plaintiff seeks more than $50,000, far more than necessary to reach the $5 million aggregate amount requirement. Thus, Defendants have met their prima facie burden without the Court even addressing their other explanations and arguments.

Notwithstanding Defendants multiple, well-founded arguments for why the jurisdictional requirements are met, Plaintiffs' reply only addresses one side-argument. Rebutting this single, unnecessary side-argument is in no way sufficient to carry Plaintiffs' burden to show to a legal certainty that the amount in controversy has not been satisfied. As Plaintiffs have not met their burden, the amount in controversy requirement is satisfied and the Court is left with no reason to remand this mass action to State Court. Accordingly, the Court denies the motion.

## CONCLUSION

**\*5** Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Remand (# 18) is DENIED.

Footnotes

1    Plaintiffs' only argument that the Local Controversy Exception does apply is that this case asserts additional claims and seeks different damages than *Rader.* However, this is irrelevant. The Local Controversy Exception does not require the same or similar claims or the same or similar requests for damages. It requires only the assertion of the same or similar facts. Even though this case asserts additional causes of action (the claims against the medical providers) and claims by additional parties (the spouses of Endoscopy Center patients) it doesn't change what the underlying facts of the two cases are. In sum, *Rader* is a subset of the claims and parties here, but based on the exact same events and, therefore, the same facts giving rise to this action.

2    The *Abrego Abrego* court refused to reach the question of whether each of the plaintiffs' claims would need to exceed $75,000, but did determine that at least one plaintiff's claim would need to exceed CAFA's $75,000 jurisdictional minimum. 443 F.3d at 689. Unfortunately, the Ninth Circuit has not otherwise addressed this issue, but the Eleventh Circuit has, *Lowery v. Ala. Power Co.,* 483 F.3d 1184 (11th Cir.2007), and the Court finds the Eleventh Circuit's analysis persuasive. The *Lowery* court determined that if each of the 100 plaintiffs necessary for CAFA jurisdiction needed to claim damages in excess of $75,000, the "$5 million aggregate amount in controversy threshold would be rendered mere surplusage" since a requirement exceeding $75,000 for each of 100 plaintiffs would create a practical aggregate requirement exceeding $7.5 million. *Id.* at 1204–05. Therefore, "it seems clear that the $75,000 provision was not intended to bar district courts from asserting jurisdiction over the entire case if each individual plaintiff's claims do not exceed $75,000." *Id.* Also, Plaintiffs do not argue this issue in their motion, and thereby waive it.

**Dunn v. Endoscopy Center of Southern Nevada, Not Reported in F.Supp.2d (2011)**

2011 WL 5509004

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7657381

2011 WL 7657381
Only the Westlaw citation is currently available.
United States District Court,
D. Utah,
Central Division.

Garry Franklin GARRETT, Plaintiff,

v.

RECONTRUST COMPANY, N.A., Defendant.

No. 2:11CV00763 DS.    |    Dec. 21, 2011.

**Attorneys and Law Firms**

John Christian Barlow, St. George, UT, for Plaintiff.

Chandler P. Thompson, Robert H. Scott, Akerman Senterfitt LLP, Salt Lake City, UT, for Defendant.

## ORDER

DAVID SAM, Senior Judge.

### I. INTRODUCTION

**\*1** The motion before the court is Defendant ReconTrust Company, N.A.'s (ReconTrust) motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Defendant claims Plaintiff Garrett fails to state a claim against ReconTrust as a matter of law.

Plaintiff Garry Garrett brought claims against Defendants concerning a $271,100.00 loan Mr. Garrett obtained that was secured by a deed of trust recorded on September 12, 2007 in Utah County against the property. Garrett defaulted on this loan in August 2010. Upon default, ReconTrust, as substitute trustee on the deed of trust, recorded a notice of default and election to sell in the Utah County recorder's office on November 4, 2010 indicating Garrett had failed to make his payment on the underlying note from August 2010 through November 2010. On June 2, 2011, ReconTrust sold the property at a foreclosure sale to Federal National Mortgage Association (Fannie Mae) and subsequently recorded a Trustee's Deed and a corporate assignment of deed of trust to Fannie Mae.

Plaintiff's claim is that ReconTrust is unauthorized to conduct foreclosure sales in the State of Utah as they are not a qualified trustee pursuant to UTAH CODE ANN. § 57–1–21(3). Plaintiff's second claim is that ReconTrust slandered title to the property by conducting the nonjudicial foreclosure sale without being qualified to do so, again pursuant to UTAH CODE ANN. § 57–1–21(3). The Court finds that all of Plaintiff's arguments are without merit and therefore grants the Motion to Dismiss.

### II. STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving party. [1] Plaintiffs' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " [2] However, the court "need not accept ... conclusory allegations without supporting factual averments." [3]

**Page 121**

2011 WL 7657381

### III. ANALYSIS

Plaintiff's claim that ReconTrust conducted an unauthorized sale because it is not a qualified trustee under Utah Code Ann. § 57–1–21(3) fails because ReconTrust is a national banking association operating under the federal National Bank Act (NBA) and is regulated by the Office of the Comptroller of the Currency (OCC). NBA specifies under 12 U.S.C. § 92a(a) that the state law applicable to ReconTrust's authority to act as trustee is the state law where the bank is "located," which in this case is Texas, rather than Utah, rendering UTAH CODE ANN. § 57–1–21(3) inapplicable.

Section 92a of the NBA ties the state law at issue in this case to where the national bank is "located." Additionally, the OCC has interpreted that phrase to mean a national bank is "located" only where it "acts in a fiduciary capacity." 12 C.F.R. §§ 9.7(b) and (e)(1). ReconTrust performs all fiduciary duties at issue in this case in Texas. The OCC regulations define acting in a fiduciary capacity as "the state in which it accepts the fiduciary appointment, executes the documents that create the fiduciary relationship, and makes discretionary decisions regarding the investment or distribution of fiduciary assets."12 C.F.R. § 9.7(d).

**\*2** Here, ReconTrust performs the functions specified in this regulation for Utah properties in Texas. Therefore, the state laws that apply to ReconTrust by virtue of Section 92a are those of Texas, rather than Utah. Since Texas law permits national banks to act as trustee under the deeds of trust and to exercise the power of sale with regard to such deeds of trust (*See*TEX. FIN.CODE ANN. §§ 32.001, 182.001; TEX. PROP.CODE ANN. §§ 51.0001, 51.0074.), ReconTrust is not "acting in contravention of State Law" of the state in which it is "located" for purposes of 12 U.S .C. § 92a and 12 C.F.R. § 9.7 when it performs trustee sales with respect to Utah properties.

Therefore, because all Plaintiffs claims rely on the theory that ReconTrust was unauthorized to conduct foreclosure sales in the State of Utah and this court finds this argument has no merit as a matter of law, Defendants' Motion to Dismiss is granted with prejudice.

### VI. CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' Motion to Dismiss with prejudice.

SO ORDERED.

Footnotes

1       *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997).

2       *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (U.S.2009).

3       *S. Disposal, Inc., v. Tex. Waste,* 161 F.3d 1259, 1262 (10th Cir.1998).

**End of Document**                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Page 122**

2010 WL 1486900

2010 WL 1486900
Only the Westlaw citation is currently available.
United States District Court,
N.D. Oklahoma.

Johnny and Patty LAFALIER, et al. Plaintiffs,

v.

CINNABAR SERVICE COMPANY, INC, et al., Defendants.

No. 10–CV–0005–CVE–TLW.    |    April 13, 2010.

**Attorneys and Law Firms**

Emily N. Kitch, John Edward Wiggins, Wiggins Sewell & Ogletree, Jeff D. Marr, Marr Law Firm, Oklahoma City, OK, for Plaintiffs.

David Michael Vonhartitzsch, Joe Martin Fears, Robert Joseph Bartz, Barber & Bartz, Tulsa, OK, Scott David Boughton, Office of the Attorney General, Benjamin Gayle Kemble, David V. Jones, Jones Andrews & Ortiz, Oklahoma City, OK, Joseph A. Cancila, Jr., Sondra A. Hemeryck, Schiff Hardin LLP, Chicago, IL, Dennis Clarke Cameron, Mia Vahlberg, Gable & Gotwals, Tulsa, OK, Jennifer A. Vessells, Mark A. Johnson, Rodger L. Eckelberry, Baker & Hostetler LLP, Columbus, OH, for Defendants.

*OPINION AND ORDER*

CLAIRE V. EAGAN, Chief Judge.

**\*1** Defendant State Farm Fire and Casualty Company (State Farm) removed this case to federal court on December 29, 2009 and the Court *sua sponte* directed the parties to address whether the Court has subject matter jurisdiction over this case under the Class Action Fairness Act of 2005 (CAFA). The parties have fully briefed their arguments on the issue of subject matter jurisdiction and the Court held a hearing on February 19, 2010. The parties have also submitted supplemental briefing and evidence as requested by the Court at the hearing.

**I.**

On April 2, 2009, 52 plaintiffs filed this case in Tulsa County District Court alleging that the Lead–Impacted Communities Relocation Assistance Trust (the Trust) colluded with insurance companies to defraud Oklahoma residents participating in the buyout of homes in or near the Tar Creek Superfund Site. Dkt. # 3–2, at 1–5. Plaintiffs allege that the Trust used artificially low appraisals by Cinnabar Service Company, Inc. (Cinnabar) and Van Tuyl and Associates (Van Tuyl) to reduce payments to homeowners eligible to participate in the buyout. Plaintiffs allege that a tornado on May 10, 2008, damaged many homes in Picher, Oklahoma, and the Trust improperly reduced payments under the buyout by the amount paid by homeowner's insurers for property damage claims. Plaintiffs also brought claims against the insurers for breach of contract and bad faith concerning the handling of insurance claims following the tornado.*Id.* at 6–7.However, the Trust was not named as a party. Instead, the original petition alleged that defendants J.D. Strong, Secretary of the Environment for the State of Oklahoma, Larry Roberts, the Operations Manager for the Trust, Van Tuyl, and Cinnabar [1] violated the Oklahoma Open Meetings Act, OKLA. STAT . tit. 25, § 302 *et seq.* (OMA). Plaintiffs alleged that "[d]efendants Cinnabar and Van Tuyl willfully and recklessly carry out cursory appraisals and maliciously treat plaintiffs unfairly and prejudicially," and plaintiffs may intend to assert other state law claims against Cinnabar and Van Tuyl. [2] Dkt. # 3–2, at 5–6. Plaintiffs also allege that the Insurer Defendants conspired with

**Page 123**

the Trust to reduce payment on property damage claims following the tornado, and the Insurer Defendants breached the subject insurance policies and acted in bad faith. *Id.*

On the same day, the same attorneys filed a putative class action in Ottawa County District Court (the Ottawa County case) against the Trust only. [3] Plaintiffs Johnny and Patty Lafalier allege in the Ottawa County case that the Trust violated the OMA and improperly reduced payments to affected residents using amounts paid by homeowners insurers following the tornado. Dkt. # 3–7, at 1–6. They requested certification of a class of:

> [c]itizens or former citizens of Picher, Oklahoma, who had their property undervalued in assessment by [the Trust] and/or who had reductions in their Trust assessments or payments equal to monies received from private insurance or the Federal Emergency Management Agency (FEMA) due to property damage caused by a tornado occurring on May 10, 2008.”

> **\*2** *Id.* at 5–6.The plaintiffs in the Ottawa County case also requested certification of two subclasses within this broader class definition. The first subclass would consist of all persons who had their property appraised by the Trust and participated in the buyout, and the second subclass would contain all persons whose payments under the buyout were reduced by the amount those persons received from insurance companies following the May 10, 2008 tornado.*Id.* at 6.

In this case, plaintiffs filed an amended petition adding 44 new plaintiffs, bringing the total to 96 plaintiffs. Dkt. # 3–2, at 11. This was not enough plaintiffs for the case to qualify as a mass action under CAFA, because there were not at least 100 persons who proposed to jointly try claims involving a common question of law or fact. *See*28 U.S.C. § 1332(d)(11)(B)(i). On October 30, 2009, plaintiffs filed a second amended petition asserting the same claims as in the original petition and naming a total of 207 plaintiffs. *Id.* at 22.

State Farm removed this case to federal court under CAFA, stating that this case is a “mass action” involving 100 or more plaintiffs and the amount in controversy exceeds $5 million. Dkt. # 3, at 8. State Farm argues that the plaintiffs “clearly propose that their claims be tried jointly on the ground that they involve common questions of law or fact ... [they] purport to assert their claims pursuant to Oklahoma's permissive joinder statute....” Dkt. # 3, at 9. State Farm notes that plaintiffs allege that the Insurer Defendants colluded with each other and the Trust to reduce payments on property damage claims following the May 10, 2008 tornado and payouts by the Trust:

> The plaintiffs purported claims involve asserted common questions of law and fact. For example, plaintiffs allege that the Insurer Defendants “individually *and in concert* embarked on a course of ‘low balling’ and cheating policyholder plaintiffs on property damage claims.”Plaintiffs also allege that the Insurer Defendants “*engage in a concerted practice* of failing to reveal all coverages available to plaintiff policy holders and failing to properly adjust and pay personal property or contents claims which are either improperly denied or low balled.”

*Id.* at 10 (internal citations omitted). State Farm relies solely on the value of plaintiffs' claims against the Insurer Defendants to establish that the amount in controversy exceeds $5 million, and assumes that each of the 207 plaintiffs has a claim against one of the Insurer Defendants. *Id.* at 12–21.State Farm did not argue that plaintiffs' claims against the Insurer Defendants were fraudulently misjoined with plaintiffs' claims against the Trust Defendants.

The Court *sua sponte* asked the parties to brief whether this case was subject to remand under the local controversy exception to the CAFA. Dkt. # 15. State Farm filed a response to the Court's order, but plaintiffs did not file a response. State Farm argued that the local controversy exception does not apply and that the Trust Defendants were fraudulently misjoined as parties to prevent removal of the case to federal court. State Farm also argued, and the Court agreed, that plaintiffs had the burden to show that any exception to CAFA applied. The Court advised plaintiffs that the Court would retain jurisdiction over the case, without considering the applicability of any exception to jurisdiction under CAFA, if plaintiffs failed to respond to the Court's prior order. Dkt. # 21. Plaintiffs subsequently filed a response asking the Court to remand the case and asserted five arguments in support of this request: (1) the local controversy exception to CAFA applies; (2) the home state exception to CAFA applies; (3) the Trust Defendants were not fraudulently misjoined; (4) this case is not a mass action under CAFA; and (5) the Court should remand the case in the “interests of justice” as permitted by 28 U.S.C. § 1332(d)(3).

2010 WL 1486900

**\*3**  The Court held a hearing on February 19, 2010 to consider the parties' arguments concerning the applicability of the local controversy and other exceptions to CAFA. State Farm argued that plaintiffs had not met their initial burden to show that at least two-thirds of the plaintiffs were citizens of Oklahoma on the date this case became removable to federal court. Dkt. # 43, at 14–15. The Court directed plaintiffs to submit affidavits from each plaintiff establishing their citizenship as of December 21, 2009.[4] *Id.* at 17–18.State Farm argued that the local controversy exception does not apply, because a class action concerning similar factual allegations against the Trust was filed within the three years preceding the filing of this case. Plaintiffs responded that their attorneys did file a class action against the Trust asserting similar claims, but the Trust is not a party in this case and the Ottawa County case was filed after this case. *Id.* at 23–29.State Farm also asserted that plaintiffs fraudulently misjoined their claims against the Trust Defendants and the Insurer Defendants with the purpose of preventing removal of this case to federal court. State Farm asked the Court to sever the claims against each group of defendants, remand the claims against the Trust Defendants, and retain jurisdiction over the claims against the Insurer Defendants. *Id.* at 41–42.The Court permitted the parties to file supplemental briefing and evidentiary material on State Farm's argument that there is no common issue of law or fact allowing joinder of plaintiffs' claims against the Trust Defendants and the Insurer Defendants.

## II.

Plaintiffs ask the Court to remand this case to Tulsa County District Court on three grounds: (1) this case is not a mass action as defined by CAFA; (2) the case falls within the "local controversy" exception; and (3) the case should be remanded in the interests of ustice.[5] State Farm argues that plaintiffs' claims against the Trust Defendants may be subject to remand. However, State Farm asks the Court to find that plaintiffs fraudulently misjoined claims against the Insurer Defendants to defeat federal subject matter jurisdiction, and requests that the Court sever the claims against the Insurer Defendants under Fed.R.Civ.P. 21 and remand plaintiffs' claims against the Trust Defendants only.

### A.

State Farm removed this case to federal court on the basis that it is a "mass action" under CAFA. Congress permitted removal of mass actions, as opposed to just class actions, to "prevent[ ] plaintiffs' counsel from avoiding CAFA's expanded federal jurisdiction by simply choosing not to seek class certification."*Lowery v. Alabama Power Co.,* 483 F.3d 1184, 1198 n. 32 (11th Cir .2007). A mass action is defined as:

> any civil action ... in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under [28 U.S.C. § 1332(a) ].

**\*4**  28 U.S.C. § 1332(d)(11)(B)(i). However, CAFA excludes a case meeting these requirements from the definition of a mass action if "all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State."*Id.* at § 1332(d)(11)(B)(ii)(I). Although there are not many cases interpreting this language, courts have consistently construed the "event or occurrence" language to apply only in cases involving a single event or occurrence, such as an environmental accident, that gives rise to the claims of all plaintiffs. *Aburto v. Midland Credit Management, Inc.,* 2009 WL 2252518, \*4 (N.D.Tex. July 27, 2009); *Galdasti v. Sunvest Communities USA, LLC,* 256 F.R.D. 673, 676 (S.D.Fla.2009); *Cooper v. R.J. Reynolds Tobacco Co.,* 586 F.Supp.2d 1312, 1316 (M.D.Fla.2008).

Plaintiffs argue that this case is not a mass action because the claims arise out of a single event or occurrence that occurred in Oklahoma and the alleged injury occurred solely in Oklahoma. Dkt. # 27, at 14–15. Based on the second amended petition, it

**Page 125**

2010 WL 1486900

is reasonable to treat the events giving rise to this case as occurring in Oklahoma. The Trust was formed under Oklahoma law and provides funds to Oklahoma residents living near the Tar Creek Superfund Site to assist those residents with relocation. However, State Farm argues that the "single event or occurrence" language was not intended to apply to insurance cases, and was primarily designed to keep environmental cases involving a single incident in the courts of the state where the event occurred. Dkt. # 38, at 9. The language of the statute is plain and even the case cited by State Farm, *Galdasti,* 256 F.R.D. 673, does not exclude insurance cases from the "single event or occurrence" exception. Other courts have applied the "single event or occurrence" exception to any case in which all of the claims arise from an event or occurrence in the forum state. *See Mobley v. Cerro Flow Prods., Inc.,* 2010 WL 55906 (S.D.Ill. Jan. 5, 2010); *Clayton v. Cerro Flow Prods, Inc.,* 2010 WL 55675 (S.D.Ill. Jan. 4, 2010). The Court rejects State Farm's argument that insurance cases are categorically excluded from the "single event or occurrence" exception, and will consider whether this exception to the definition of "mass action" applies.

In this case, plaintiffs' claims do not arise out of a single event or occurrence and this case qualifies as a mass action under CAFA. Based on the second amended petition, plaintiffs allege that various insurance companies denied or reduced payments on insurance claims following the May 10, 2008 tornado and the Trust subsequently devalued each plaintiff's home for the purpose of the buyout based on the amount of the insurance payments. Plaintiffs' claims are based on a series of events, including the tornado, numerous alleged denials or reductions of insurance claims following the tornado, and subsequent reductions of payments by Trust based on the insurance claims. There is no single event or occurrence giving rise to plaintiffs' claims but, instead, there is a series of potentially related events. This is not the type of case that was intended to be excluded from coverage under CAFA, and the case falls within the definition of a mass action. *Galdasti,* 256 F.R.D. at 676–77; *Cooper,* 586 F.Supp.2d at 1316–17.

### B.

**\*5** Plaintiffs argue that this case should be remanded to state court under the local controversy exception to CAFA, because the vast majority of the parties are citizens of Oklahoma and the case concerns events that occurred solely in Oklahoma. Dkt. # 27, at 13. State Farm responds that the Ottawa County case precludes application of the local controversy exception and, even it does not, plaintiffs have not met their burden to establish each element of the local controversy exception.

In the order to show cause, the Court cited the local controversy exception as the basis for questioning the existence of subject matter jurisdiction over this case. Dkt. # 15. Under this exception to jurisdiction under CAFA:

A district court shall decline to exercise jurisdiction under paragraph (2)—

(A)(i) over a class action in which—

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant—

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**Page 126**

(ii) during the 3–year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons on behalf of the same or other persons....

28 U.S.C. § 1332(d)(4). There are four requirements that must be satisfied for the local controversy exception to apply: (1) more than two-thirds of the plaintiffs are citizens of the state where the case was filed; (2) the principal injury occurred in the forum state; (3) at least one of the primary defendants qualifies as a "local defendant;" and (4) no other similar class action was filed during the three years preceding the filing of the case. *See Coffey v. Freeport McMoran Copper & Gold,* 581 F.3d 1240, 1243 (10th Cir.2009). The "local controversy" exception is treated as exception to jurisdiction, and the party seeking remand has the burden to show that the local controversy exception applies. *Evans v. Walter Indus., Inc.,* 449 F.3d 1159, 1164 (11th Cir.2006); *Cox v. Allstate Ins. Co.,* 2008 WL 2167027 (W.D.Okla. May, 22, 2008).

For the first element, plaintiffs must establish that at least two-thirds of the plaintiffs were citizens of Oklahoma on the date this case became removable. 28 U.S.C. §§ 1332(d)(4) and (d)(7). Some courts have adopted a "reasonable probability" standard to determine if at least two-thirds of the plaintiffs are from the forum state. *Dunham v. Coffeyvill Resources, LLC,* 2007 WL 3283774 (D.Kan.2007); *Mattera v. Clear Channel Communications, Inc .,* 239 F.R.D. 70, 80 (S.D.N.Y.2006). State Farm asks the Court to impose a much heavier burden on plaintiff, and argues that plaintiffs' affidavits are insufficient to establish plaintiffs' citizenship on the date this case became removable. [6] While the Court cannot make a "leap of faith" and assume that plaintiffs are citizens of Oklahoma, most courts that have addressed this issue have not imposed a heavy burden on plaintiffs in a class or mass action to establish their citizenship for the purpose of the local controversy exception. *In re Spring Nextel Corp.,* 593 F.3d 669, 673 (7th Cir.2010) (applying a preponderance of the evidence standard to determine if the plaintiffs established their citizenship for the purpose of the home state exception); *Preston v. Tenet Healthsystem Memorial Medical* Center, Inc., 485 F.3d 793, 797 (5th Cir.2007) (same). Mere allegations that plaintiffs are citizens of Oklahoma will not suffice, and plaintiffs must come forward with some evidence establishing their citizenship. *McMorris v. TJX Cos., Inc.,* 493 F.Supp.2d 158, 165 (D.Mass.2007).

**\*6** In response to defendants' request and the Court's order, plaintiffs have submitted affidavits from individual plaintiffs stating that 176 plaintiffs were citizens of Oklahoma on December 21, 2009. Each affidavit states the plaintiff's name and provides the plaintiff's address as of December 21, 2009. *See* Dkt. # 51–3, at 1. The affidavits also state that the plaintiff has "continuously resided in Oklahoma since December 21, 2009," and that the plaintiff "intend[s] on remaining a resident and citizen of Oklahoma."*Id.* The second amended petition identifies 207 plaintiffs and, for the first element of the local controversy exception to apply, at least 139 plaintiffs must have been citizens of Oklahoma on December 21, 2009. State Farm claims that plaintiffs' affidavits are inconsistent with prior address lists provided by plaintiffs' counsel, and the affidavits are not reliable evidence of plaintiffs' citizenship. Dkt. # 65, at 4. State Farm has conducted its own investigation into the citizenship of certain plaintiffs, and claims that the addresses listed for 13 plaintiffs are unoccupied homes or vacant lots. *Id.* at 2. State Farm also states that two of the plaintiffs who submitted affidavits stating that they were citizens of Oklahoma on December 21, 2009 have been living in California since September 2008, and the Court should not consider these plaintiffs as citizens of Oklahoma. *Id.* at 2–3.

The Court finds that plaintiffs' affidavits are sufficient to establish their domicile and their intent to remain residents of Oklahoma on the date the case became removable to federal court, and plaintiffs have met their burden to prove by a preponderance of the evidence that at least two-thirds of the plaintiffs were citizens of Oklahoma on December 21, 2009. Assuming that State Farm's independent investigation calls into question the citizenship of certain plaintiffs, State Farm has not shown that the affidavits are unreliable as to the plaintiffs as a whole. Of the 207 total plaintiffs, 176 plaintiffs have submitted affidavits that they resided in Oklahoma on December 21, 2009 and they intended to remain residents of Oklahoma for an indefinite period. [7] State Farm questions whether 15 of these 176 plaintiffs should be treated as citizens of Oklahoma. *Id.* at 2. Even if these 15 plaintiffs are excluded, this leaves 161 plaintiffs who are citizens of Oklahoma and this exceeds the requirement that two-thirds, or 139, of the plaintiffs were citizens of Oklahoma on December 21, 2009.

2010 WL 1486900

The parties do not dispute that the second element of the local controversy exception is satisfied, as it is clear that plaintiffs' alleged principal injury occurred in Oklahoma. Each plaintiff owned property in or near the Tar Creek Superfund Site and participated in the buyout, and the tornado giving rise to the disputed insurance claims occurred in Picher, Oklahoma. Thus, there is no dispute that plaintiffs' principal injury occurred in Oklahoma.

 **\*7**  The parties dispute whether one of the primary defendants qualifies as a "local defendant" under the local controversy exception. Plaintiffs have named Strong, the Secretary of the Environment for the State of Oklahoma, Roberts, the Operations Manager for the Trust, Cinnabar, and Van Tuyl, as defendants, and plaintiffs allege that these defendants are citizens of Oklahoma. Of these defendants, Cinnabar originally took no position on the applicability of the local controversy exception (Dkt.# 20), Strong and Roberts asked the Court to remand the case to state court (Dkt.# 16), and Van Tuyl has not been served. Plaintiffs argue that each plaintiff has a claim against Strong, Roberts, Cinnabar and Van Tuyl, but not all plaintiffs have claims against one of the Insurer Defendants. State Farm argues that plaintiffs' claims against the Trust Defendants were fraudulently misjoined with plaintiffs' claims against the Insurer Defendants, and the Court should sever the claims against the Insurer Defendants and retain jurisdiction over these claims, while remanding the claims against the Trust Defendants to state court under the local controversy exception. The Court allowed the parties to submit additional evidence and briefing on the issue of fraudulent misjoinder following the February 19, 2010 hearing. *See* Dkt. # 41, at 1; Dkt. # 43, at 56–58.

To qualify as a local defendant, the defendant must be a citizen of the forum state whose conduct forms a significant basis for the plaintiffs' claims and the plaintiffs must seek "significant relief" from this defendant. 28 U.S.C. § 1332(d)(4)(A)(II). The Court must focus on the allegations of the complaint and determine whether plaintiffs seek significant relief from the local defendant, and the defendant's ability to satisfy a judgment is irrelevant.*Coffey,* 581 F.3d at 1244–45. The Court must also compare the local defendant's conduct with the alleged conduct of all defendants to determine if the actions and the relief sought from the defendant is significant in view of the entire wrong alleged in the complaint. *Kaufman v. Allstate New Jersey Ins. Co.,* 561 F.3d 144, 157 (3d Cir.2009); *Evans,* 449 F.3d at 1167; *Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co.,* 592 F.Supp.2d 522, 528 (S.D.N.Y.2008). It is also relevant whether plaintiffs seek relief against defendants jointly and severally. *Coffey,* 581 F.3d at 1244–45. The Court may consider only those defendants "presently" involved in the case, and may not consider the relief sought against unserved defendants or defendants proposed to be joined in an amended pleading. *Kaufman,* 561 F.3d at 153.

Plaintiff's allege that Strong, Roberts, and Cinnabar [8] conspired to reduce the appraisals of plaintiffs' homes during the buyout and violated the OMA in an attempt to cover up their conduct. Dkt. # 3–2, at 27–29. Each plaintiff asserts a claim against Strong, Roberts, and Cinnabar and, as will be discussed in connection with State Farm's fraudulent misjoinder argument, many plaintiffs do not have claims against the Insurer Defendants. *See infra* at 16.Plaintiffs ask the Court to focus on the number of claims against the Trust Defendants and compare that number to the smaller number of claims against the Insurer Defendants. Dkt. # 27, at 13. This is a factor the Court should consider when determining if Strong, Roberts, or Cinnabar qualify as local defendants under the statute. *Anderson v. Hackett,* 646 F.Supp.2d 1041 (S.D.Ill .2009) ("the Court finds [defendant] to be a significant defendant because the allegations against it form the basis for a right to relief for most or all of the members of the proposed plaintiff class"). At the February 19, 2010 hearing, plaintiffs' counsel argued that the relief sought against the Trust Defendants was the primary basis for the relief sought by plaintiffs, and the relief sought against the Insurer Defendants was "collateral." Dkt. # 43, at 30 ("It's our belief and opinion at this point that the insurance claims are more collateral in nature to the primary claims which we believe are Cinnabar and Van Tuyl, Strong and this [sic] Oklahoma State defendants."). Although plaintiffs backed off from this position when arguing against fraudulent misj oinder, a review of the second amended petition and plaintiffs' filings supports plaintiffs' initial argument that they primarily seek relief against the Trust Defendants. The second amended petition shows that each plaintiff asserts claims against the Trust Defendants for allegedly undervaluing their property and improperly decreasing payments under the buyout. Dkt. # 3–2, at 27–29. It is not clear how many plaintiffs are asserting claims against the Insurer Defendants, but it is clear that not all plaintiffs have claims against the Insurer Defendants. *Id.* at 26 (stating that "numerous" plaintiffs, but not all plaintiffs, collected money from the Insurer Defendants for property damage claims following the tornado).

**Page 128**

2010 WL 1486900

 **\*8**  The Court finds that Strong, Roberts, and Cinnabar satisfy the local defendant requirement for the local controversy exception. Plaintiffs allege that Strong, Roberts, and Cinnabar are citizens of Oklahoma and their conduct forms a significant basis for plaintiffs' claims, and State Farm does not dispute plaintiffs' allegations on these two issues. Every plaintiff asserts a claim against Strong, Roberts, and Cinnabar, and the primary basis for plaintiffs' requested relief is the alleged undervaluing of their property for distribution of funds from the buyout. The Insurer Defendants have confirmed that many fewer than 207 plaintiffs submitted insurance claims following the May 10, 2008 tornado and, in relation to plaintiffs' claims as a whole, the claims against the Insurance Defendants are collateral to the buyout issues. Dkt. # 46, at 8 n. 8 (State Farm cites evidence showing that not all plaintiffs had homeowner's insurance or did not submit insurance claims following the tornado); Dkt. # 48, at 1–2 (two plaintiffs were insured by defendant American Modern Home Insurance Company) Dkt. # 62, at 1 (defendant American Western Home Insurance Company states that only two plaintiffs had an insurance policy with this defendant). State Farm has not offered any argument in opposition to plaintiffs' claim that they are seeking significant relief from the Trust Defendants. Dkt. # 18, at 16–17; Dkt. # 43, at 40. Instead, State Farm argues that plaintiffs cannot show any relationship between plaintiffs' claims against the Insurer Defendants and the Trust Defendants, and asserts that the local controversy exception does not apply to plaintiffs' claims against the Insurer Defendants, even if Strong, Roberts, or Cinnabar are local defendants within the meaning of the local controversy exception. In fact, State Farm's fraudulent misjoinder argument relies heavily on State Farm's position that plaintiffs' claims focus on the conduct of the Trust Defendants, and State Farm asks the Court to remand the claims against the Trust Defendants only. State Farm's position impliedly acknowledges that plaintiffs seek significant relief from the Trust Defendants, and the Court finds that plaintiffs have met their burden to show that Strong, Roberts, and Cinnabar are local defendants under the local controversy exception.

State Farm argues that plaintiffs have fraudulently misjoined the Trust Defendants in this case in an attempt to defeat the Court's jurisdiction under CAFA, and the Court should sever plaintiffs' claims against the Insurer Defendants and retain jurisdiction over that part of the case. It asserts that plaintiffs have improperly joined claims against the Insurer Defendants when joinder is not permissible under Fed.R.Civ.P. 20, and there was no reasonable basis for plaintiffs to believe that such joinder was proper. Dkt. # 18, at 17–18. Plaintiffs respond that the second amended petition includes allegations that the Insurer Defendants colluded with the Trust Defendants, and plaintiffs have alleged a common issue of law or fact permitting joinder of plaintiffs' claims in one lawsuit. Dkt. # 27, at 18–19.

 **\*9**  Fraudulent joinder is the joinder of a non-diverse defendant "having no real connection to a case," while fraudulent misjoinder is the misjoinder of entirely distinct claims against two or more groups of defendants in violation of Rule 20 in attempt to defeat diversity jurisdiction. *Tapscott v. MS Dealer Serv. Corp.,* 77 F .3d 1353, 1360 (11th Cir.1996). Only the Eleventh Circuit Court of Appeals has expressly adopted the doctrine of fraudulent misjoinder, and that decision, *Tapscott,* was abrogated on other grounds. *See Cohen v. Office Depot, Inc.,* 204 F.3d 1069 (11th Cir.2000). Other federal courts have considered whether fraudulent misjoinder is a basis for removal, but no other federal circuit court of appeals has adopted fraudulent misjoinder. *In re Prempro Products Liability Litigation,* 591 F.3d 613, 622 (8th Cir.2010); *In re Benjamin Moore & Co.,* 309 F.3d 296, 298 (5th Cir.2002); *California Dump Truck Owners Assoc. v. Cummins Engine Co., Inc.,* 24 Fed. Appx. 727 (9th Cir.2001). Courts have generally declined to entertain arguments concerning fraudulent misjoinder when reviewing subject matter jurisdiction under CAFA. *Bankcroft v. Bayer Corp.,* 2009 WL 3156706 (S.D.Ill. Sep. 29, 2009); *Nichols v. Progressive Direct Ins. Co.,* 2007 WL 1035014 (E.D.Ky. Mar. 31, 2007). The Tenth Circuit has not expressly adopted the doctrine of fraudulent misjoinder in any setting.

Even if the Court were inclined to apply the doctrine of fraudulent misjoinder, this would not be an appropriate case for application of the doctrine, because it is not clear from the second amended petition whether the Court would have an independent basis for subject matter jurisdiction over the severed claims against the Insurer Defendants. Defendants have argued that very few plaintiffs actually assert claims against the Insurer Defendants and State Farm's argument is consistent with the statements of plaintiffs' counsel at the February 19, 2010 hearing. Thus, it is not clear that at least one hundred plaintiffs with claims totaling $5 million have claims against the Insurer Defendants, and the Court would be speculating if it determined that it had an independent basis for subject matter jurisdiction over the severed claims. State Farm's fraudulent misjoinder argument is also contrary to the notice of removal because, in the notice of removal, State Farm acknowledged that plaintiffs alleged joint

**Page 129**

2010 WL 1486900

conduct among all defendants named in the second amended petition. Dkt. # 3, at 9 (arguing that this case was a mass action due to the proper joinder of claims by 100 or more plaintiffs). The notice of removal accurately states that plaintiffs' second amended petition alleges a conspiracy between the Trust and Insurer Defendants. Dkt. # 3–2, at 30 (the second amended complaint alleges that the Insurer Defendants "coupled and in concert with" Cinnabar and Van Tuyl conspired to reduce insurance payments and payments under the buyout). The second amended complaint includes sufficient allegations to establish that joinder of claims against the Trust Defendants and Insurer Defendants is proper and State Farm did not contest this issue in the notice of removal, and the Court will not consider fraudulent misjoinder as a basis to retain jurisdiction over part of this case.

**\*10**  Finally, State Farm argues that the local controversy exception does not apply because plaintiffs' counsel filed a separate class action in Ottawa County asserting similar allegations on the same day this case was filed. Dkt. # 18, at 12. Plaintiffs respond that the Ottawa County class action was filed on the same day but after this case was filed, and there was no class action filed in the three years "preceding" the filing of this case. Dkt. # 27, at 14. State Farm has provided a copy of the petition in the Ottawa County case, but it is not time-stamped and it is not possible to tell from the face of the petitions which case was filed first. Dkt. # 3–7, at 1.

As the Court noted at the hearing, the time the petitions were filed is a red-herring and it has no bearing on the applicability of the local controversy exception.[9] Dkt. # 43, at 21. The plain statutory language is that the local controversy exception does not apply if a class action asserting the "same or similar factual allegations against any of the defendants" has been filed within 3 years preceding the filing of the case. The factual allegations in both cases are certainly "similar," but the Trust was not named as a defendant in this case. Thus, the Ottawa County case does not constitute a class action that would prevent remand of the case under the local controversy exception. State Farm argues that it not necessary for the plaintiffs in both cases to bring claims against the same defendants, because plaintiffs served both petitions on Roberts in his capacity as Operations Manager of the Trust and both petitions contain numerous factual allegations about Roberts. However, the plain language of the statute shows that similar factual allegations must be made against the same "defendant" in both cases. While Roberts was served with process in his capacity as operations manager of the Trust in the Ottawa County case, he was not named as a defendant in the Ottawa County Case and there was no class or mass action against any defendant in this case concerning the same or similar factual allegations pending at the time this case was filed.

The Court finds that plaintiffs have established each element of the local controversy exception under § 1132(d)(4), and this case should be remanded to Tulsa County District Court.

**IT IS THEREFORE ORDERED** that the Court lacks subject matter jurisdiction over this case, and the Court Clerk is directed to **remand** this case to the District Court of Tulsa County.

Footnotes

1     The Court will refer to these defendants as the "Trust Defendants." Plaintiff has also brought claims against ten insurance companies—State Farm, Allstate Insurance Company, America First Insurance Company, American Bankers Insurance Company of Florida, American Modern Home Insurance Company, National Security Fire and Casualty Company, Oklahoma Farm Bureau Mutual Insurance Company, Shelter Insurance Company, American Farmers and Ranchers Mutual Insurance Company, and American Western Home Insurance Company—and the Court will refer to these defendants as the "Insurer Defendants."

2     The petition is not clear as to the legal basis for all claims against any defendant, and it is likely that plaintiffs intend to assert numerous claims against the Trust Defendants.

3     Plaintiffs stated that this case was filed before the Ottawa County case, but State Farm questioned whether this was possible. Plaintiffs filed this case in Tulsa County District Court at 3:23 p .m. on April 2, 2009, and the Ottawa County District Court closes at 5:00 p.m. It is approximately 100 miles from Tulsa, Oklahoma to Miami, Oklahoma. Before the hearing on February 19, 2010, an Oklahoma Highway Patrol trooper asked to speak to the Court and stated that he *attempted* to conduct a traffic stop of plaintiffs' counsel that morning. The trooper stated that plaintiff's counsel "was driving so fast ... that they couldn't catch him."Dkt. # 43, at 28–29. The Court accepted plaintiffs' counsel's statement that he filed this case before the Ottawa County case. *Id.* at 29.

**Page 130**

Lafalier v. Cinnabar Service Co., Inc., Not Reported in F.Supp.2d (2010)

2010 WL 1486900

4     The second amended petition was filed on October 30, 2009, but the case did not become removable until December 21, 2009. Plaintiffs' filed the second amended petition without leave of court and Cinnabar objected to the filing of an amended pleading. Dkt. # 3, at 5. The state court denied Cinnabar's motion to strike the second amended petition, and it became the operative pleading for this case on December 21, 2009. *Id.* at 7.

5     If the Court determines that more than two-thirds of the plaintiffs are citizens of Oklahoma, the interests of justice exception does not apply and the Court will not reach that issue.

6     The Court notes that State Farm did not believe that such a heavy burden applied when it filed its notice of removal. The notice of removal states that plaintiffs' second amended petition does not expressly allege the citizenship of any plaintiff. However, State Farm asks the Court to infer that at least one plaintiff is a citizen of Oklahoma because the events alleged in the second amended petition occurred in Picher and that each plaintiff allegedly owned property in Picher. Dkt. # 3, at 11–12. Under the standard State Farm seeks to impose on plaintiffs, the case could never have been removed to federal court.

7     State Farm objects to the consideration of the affidavits of plaintiffs who did not live in Oklahoma on December 21, 2009, but stated that they intended to return to Oklahoma in the future. *Id* . at 3–4.For the purpose of determining whether the first element of the local controversy exception is satisfied, the Court is considering only the 176 affidavits of plaintiffs who resided in Oklahoma on December 21, 2009, and will not consider the four affidavits objected to by State Farm.

8     Van Tuyl has not been served and has not entered an appearance in this case, and the Court may not consider whether Van Tuyl is a "local defendant" under CAFA. *See Kaufman,* 561 F.3d at 153.

9     Even though the timing issue is a red-herring, the Court finds that this case was filed before the Ottawa County case, and there was no class action concerning the same or similar allegations on file at the time plaintiffs' filed this case. The original petition is time-stamped and shows that this case was filed in Tulsa County District Court at 3:23 p.m. on April 2, 2009. Dkt. # 3–2, at 1. Defense counsel questioned whether plaintiff's counsel could drive to Miami, Oklahoma in time to file the Ottawa County case before the close of business. The statements of an Oklahoma Highway Patrol (OHP) officer who conducted a traffic stop of plaintiffs' counsel before the February 19, 2010 hearing establish that plaintiffs' counsel has a history of driving very fast. Dkt. # 43, at 29 (the OHP officer informed the Court that plaintiffs' counsel was driving so fast that the OHP officer could not pull plaintiffs' counsel over until he reached the city limits of Tulsa). Plaintiffs' counsel Jeff D. Marr stated that he did file the Ottawa County case just before the close of business on April 2, 2009, and his co-counsel, Emily N. Kitch, confirmed his statements. *Id.* at 26–27.The Court accepts the representations of plaintiffs' counsel, and finds that he did file the Ottawa County case after filing this case.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Page 131**

2007 WL 24935
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lawrence H. McGAUGHEY, individually and on behalf of all others similarly situated, Plaintiff,

v.

Richard C. TREISTMAN, Defendant.

No. 05 Civ. 7069(HB).    |    Jan. 4, 2007.

### *OPINION AND ORDER*

Hon. HAROLD BAER, JR., District Judge.

**\*1** Plaintiff Lawrence McGaughey ("Plaintiff" or "McGaughey") has brought this putative class action against Defendant Richard Treistman ("Defendant" or "Treistman") pursuant to the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227*et. seq.,* that provides for statutory damages against those who send unsolicited "junk" faxes. Plaintiff has moved for class certification. Defendant has cross-moved for summary judgment.

Because Plaintiff does not meet the requirements of Fed.R.Civ.P. 23(a) for class certification, I am denying Plaintiff's motion for class certification. Because denial of class certification leaves this Court without subject matter jurisdiction, it is unnecessary to decide Defendant's motion for summary judgment and dismissal for lack of subject matter jurisdiction is mandated.

### I. BACKGROUND

#### A. *Factual Background*

The following facts are taken from Defendant's Statement of Undisputed Material Facts pursuant to Local Rule 56.1, except where otherwise noted. Because Plaintiff never responded to Defendant's Local Rule 56.1 submission, Defendant's Statement of Undisputed Material Facts will be deemed admitted as uncontroverted for the purpose of both motions. *See Dunkin' Donuts Inc. v. Barr Donut, LLC,* 242 F.Supp.2d 296, 298 (S.D.N.Y.2003) (Baer, J.).

Essex Temporary Services ("NY Essex") is a temporary staffing agency based in New York. Defendant's Statement of Material Facts, ¶ 3 ("Def.Facts"). Defendant Treistman, a New Jersey resident, is the President and CEO of N.Y. Essex. Def. Facts ¶ 8. Plaintiff Lawrence McGaughey is an attorney residing and practicing in New York. Plaintiff's Amended Class Action Complaint, ¶ 6 ("Pl.Complaint").

Shortly before August 27, 2004, Plaintiff placed a "help wanted" advertisement in the New York Law Journal requesting resumes to be faxed to him. Declaration of Lawrence H. McGaughey, November 20, 2006, ¶ 3 ("McGaughey Decl.") Plaintiff now avers that he does not possess a copy of the original advertisement Plaintiff faxed, nor does Defendant. Def. Facts, ¶ 15.

In response to Plaintiff's job advertisement, on August 27, 2004, N.Y. Essex sent a two-page fax to Plaintiff's home fax number. Def. Facts, ¶ 2, 3; McGaughey Decl., ¶ 4. [1] The first page, entitled "Re: Advertisement," contained a general letter explaining N.Y. Essex's hiring practices. The second page contained three "mini-resumes" for available temporary workers and their qualifications. Def. Facts, ¶ 17, 18; Declaration of Todd C. Bank, November 20, 2006, Exhibit B. This fax is the only fax by N.Y. Essex to Plaintiff that Plaintiff has produced. Def. Facts, ¶ 2.

**Page 132**

Defendant Treistman has stated that he had no direct involvement with the fax at issue, nor any faxes sent by N.Y. Essex. Def. Facts, ¶ 19-24. Treistman did approve N.Y. Essex's fax policy in general. That policy was that faxes should only be sent to a third party where a third party invited a fax in response to a help wanted advertisement, where a third party authorized a fax during a telephone conversation, or where there existed a prior business relationship with a third party. Def. Facts, ¶ 25.

### B. *Procedural History*

 **\*2**  On August 9, 2005, Plaintiff originally filed a complaint against Essex Temporary Services of New Jersey ("New Jersey Essex"), a corporation also owned by Treistman. New Jersey Essex filed a motion to dismiss, and limited jurisdictional discovery ensued. After taking Treistman's deposition on March 20, 2006, Plaintiff amended his complaint the next day, on March 21, 2006, to substitute Treistman individually for New Jersey Essex.

Defendant Treistman, on May 12, 2006, then filed a motion to dismiss for failure to join an indispensable party (i.e. N.Y. Essex). I held oral argument on that motion on July 13, 2006, and denied the motion from the bench. I ordered that discovery conclude by October 1, 2006, and that any motions (including motions for class certification) be fully briefed by November 27, 2006. At Plaintiff's request, I subsequently extended discovery through the fully briefed motion deadline of November 27.

Defendant Treistman has tendered two Offers of Judgment to Plaintiff, on September 28, 2006 and October 10, 2006. Def. Facts ¶ 43, 49; *see* Fed.R.Civ.P. 68. The second Rule 68 Offer offered $1,750, costs and disbursements, reasonable attorney's fees, and injunctive relief.[2] Def. Facts ¶ 50. Plaintiff accepted neither offer. *Id.* at ¶ 44, 51.

## II. STANDARD OF REVIEW

"Fed.R.Civ.P. 23 permits certification of a class action only if the following four prerequisites have been met: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *See, e.g., Weiss v. Fein, Such, Kahn & Shepard, P.C.,* 2002 U.S. Dist. LEXIS 4783, at \*4-5 (S.D.N.Y.2002) ( *"Weiss"), citing* Fed.R.Civ.P. 23(a); *see also In re Initial Pub. Offering Sec. Litig.,* 2006 U.S.App. LEXIS 29859, at \*23 (2d Cir. Dec. 5, 2006). Once these criteria have been satisfied, a class will be certified if it meets one of the following additional conditions imposed by Fed.R.Civ.P. 23(b). *Weiss,* 2002 U.S. Dist. LEXIS 4783, at \*5, *citing Marisol A. v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997). A plaintiff proposing to be a class representative bears the burden of showing that class treatment is appropriate. *Id., citing General Tel. Co. v. Falcon,* 457 U.S. 147, 160 (1982).

## III. DISCUSSION

### A. *Motion for Class Certification*

Plaintiff's motion for class certification fails because Plaintiff has not met the numerosity requirement of Rule 23(a). Plaintiff asserts in his complaint that Defendant has "willfully and knowingly authorized and approved the transmission of more than 10,000 unsolicited advertisements through facsimile." Pl. Complaint, ¶ 11. Following the Second Circuit's recent clarification of the standards to be employed in determining Rule 23 motions, I must make individualized determinations for each Rule 23 category, and I may look beyond the pleadings in doing so. *See In re Initial Pub. Offering Sec. Litig.,* 2006 U.S.App. LEXIS 29859, at \*52 ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement is met.).

 **\*3**  However, on the pleadings or otherwise, Plaintiff here appears to be a potential class of one. Although Plaintiff has been given the opportunity to conduct discovery regarding class certification-as well as an extension of discovery on that issue, at Plaintiff's request-Plaintiff has provided no evidence that either Defendant or N.Y. Essex has ever sent more than one fax

**Page 133**

2007 WL 24935

arguably in violation of the TCPA, and that one to this Plaintiff. *See Weiss v. Fein, Such, Kahn & Shepard, P.C.,* 2002 U.S. Dist. LEXIS 4783, at *5-6 (S . D.N.Y.2002) (denying class certification on grounds of numerosity, stating, "there is nothing in the record to indicate that anyone besides plaintiff received a letter from defendants containing the allegedly violative language."). [3] Plaintiff has failed to even submit a Statement of Facts pursuant to Local Rule 56.1 rebutting Defendant's assertion that one, and only one, fax to one and only one plaintiff is at issue in this litigation.

Plaintiff has failed to meet his burden to satisfy the Rule 23(a) requirement of numerosity. Because Plaintiff has failed to meet this burden, it is unnecessary for me to consider the remaining Rule 23 requirements. [4]

**B.** *Subject Matter Jurisdiction*

Plaintiff originally asserted that this Court possessed subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). Pl. Complaint, ¶ 3. This Court would alternatively possess subject matter over this action pursuant to the general federal diversity statute, 28 U.S.C. § 1332(a). Plaintiff is required to rely on § 1332 for subject matter jurisdiction because the TCPA is the rare federal statute that does not provide federal question jurisdiction. *Gottlieb v. Carnival Corp.,* 436 F.3d 335, 337 (2d. Cir.2006), *citing Foxhall Realty Law Offices, Inc. v. Telecommunications Premium Services, Ltd.,* 156 F.3d 432 (2d Cir.1998).

However, Plaintiff's two possible grounds for establishing subject matter jurisdiction over this action no longer exist. Because Plaintiff's motion for class certification must be denied, Plaintiff's action is no longer a class action, and this Court cannot retain subject matter jurisdiction in diversity over Plaintiff's action pursuant to the Class Action Fairness Act. [5] *See* 28 U.S.C. § 1332(d) (2). Because Plaintiff has failed to put forth a single fact relevant to his remaining individual action against Defendant that meets the $75,000 amount-in-controversy requirement of 28 U.S.C. § 1332(a), this Court loses subject matter jurisdiction over Plaintiff's individual action pursuant to the general federal diversity statute. *See Gottlieb v. Carnival Corp.,* 436 F.3d 335, 343 n.10 ("In order to meet the amount-in-controversy requirement, a single plaintiff would have to receive either 150 faxes from a single defendant, assuming $500 in statutory damages per fax, or 50 faxes from that defendant, assuming treble damages.").

**\*4** Plaintiff's action therefore must be dismissed for lack of subject matter jurisdiction. [6]

### IV. CONCLUSION

Because Plaintiff does not meet the numerosity requirement of Fed.R.Civ.P. 23(a), I must deny Plaintiff's motion for class certification. Because denial of class certification leaves this Court without subject matter jurisdiction, the complaint is dismissed.

The Clerk of the Court is instructed to close this matter and remove it from my docket.

**SO ORDERED.**

Footnotes

1       Plaintiff avers that he did not provide his home fax number to Defendant in the "help wanted" advertisement. McGaughey Decl., ¶ 4.

2       The maximum statutory penalty for a violation under the TCPA is $500, which can be trebled in cases of willfulness. *See* 47 U.S.C. § 227(b)(3) (2006).

3       *Weiss* is particularly apposite. In *Weiss,* plaintiff received one debt collection letter from Defendant and sued for class action relief pursuant to the Fair Debt Collection Practices Act. *Weiss,* 2002 U.S. Dist. LEXIS 4783, at * 1. The Court similarly denied class certification under F.R.C.P. 23 for lack of numerosity. Plaintiff argued that "upon information and belief, Defendants have mailed hundreds of letters similar to the letter sent Plaintiff." *Id.* The Court responded, "These arguments amount to little more than bare

2007 WL 24935

speculation. Plaintiff appears to have no factual basis for his assertion that 'hundreds' of people received letters similar to the one he received ...") *Id.*

4    Defendant cites authority suggesting that TCPA class actions generally fail to meet the commonality and typicality requirements of Rule 23, as the court would be required to conduct individual inquiries with regard to each potential class member as to whether he or she had invited or given permission for the faxes at issue to be sent. *See Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403-04 (E.D.Pa.1995); *Kenro, Inc. v. Fax Daily,* 962 F.Supp. 1162, 1169-70 (S.D.Ind.1997). Because Plaintiff fails to meet the numerosity requirement of Rule 23, it is unnecessary for me to consider these other Rule 23 requirements here.

5    Some recent authority has held that, pursuant to *Erie* doctrine, class action plaintiffs in New York cannot invoke federal diversity jurisdiction under CAFA. *See Bonime v. Avaya Corp.,* 2006 U.S. Dist LEXIS 91964 (E.D.N.Y. Dec. 20, 2006), *citing Erie Rwy. Co. v. Tompkins,* 304 U.S. 64 (1938); N.Y. C.P.L.R. 901(b) (2006). Because I am denying class certification, it is unnecessary to reach this issue.

6    Defendant, prior to Plaintiff's motion for class certification, had made a Rule 68 offer of judgment to Plaintiff for an amount over and above the maximum possible individual recovery. *See* Def. Facts ¶ 43, 49, 50; *see* Fed.R.Civ.P. 68. If Plaintiff were suing under a statute that independently provided subject matter jurisdiction to Plaintiff's action, it would be appropriate for me to now compel Plaintiff's acceptance of the Rule 68 offer, having denied Plaintiff's motion for class certification. *See Weiss,* 2002 U.S. Dist. LEXIS 4783, at *7-10; *see also Morgan v. Account Collection Tech., LLC,* 2006 U.S. Dist. LEXIS 64528 (S.D.N.Y.2006) (collecting Second Circuit caselaw regarding Rule 68 offers made in the context of class actions), *citing, e.g., Abrams v. Interco Inc .,* 719 F.2d 23, 32 (2d Cir.1983).

    However, unlike *Weiss,* where plaintiff sued under the Fair Debt Collection Practices Act, the TCPA does not provide for federal question jurisdiction. This Court now lacks subject matter jurisdiction even to compel Plaintiff's acceptance of the Rule 68 offer.

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.



58 of 77 DOCUMENTS


Comptroller of the Currency
Washington, DC 20219


Release Date: December 1995
Interpretive Letter No. 695


*1995 OCC Ltr. LEXIS 194*


December 8, 1995

**CORE TERMS:**  fiduciary, national bank, state law, out-of-state, State Law Condition, contravention, deposit, local law, authorize, in-state, interstate, host, state-by-state, conducting, executor, main office, geographic, banking, discriminate, compete, legislative history, fiduciary capacity, interstate commerce, state-chartered, preemption, statutory language, administrator, headquartered, customers, state approval

 [*1]
Re: Authority of a National Bank to Conduct Fiduciary Activities on a Nationwide Basis through Trust Offices in Various States


Steven Alan Bennett, Esq.
Senior Vice President and General Counsel
Banc One Corporation
100 East Broad Street
Columbus, Ohio 43271-0158

Dear Mr. Bennett:

This is in reply to your letter of August 28, 1995, requesting the opinion of the Office of the Comptroller of the Currency ("OCC") on your position that *12 U.S.C. § 92a* authorizes a national bank that has been granted fiduciary powers to conduct fiduciary activities through limited purpose trust offices in multiple states, on a parity with the state-chartered institutions in each state. You also ask our views on the manner in which the requirement for the deposit of securities in *12 U.S.C. § 92a*(f) would apply to such a national bank.

As set out below, in our opinion section 92a authorizes a national bank that has been granted fiduciary powers to exercise those powers in any state, provided that within each state, the state may bar the exercise of such fiduciary powers as the state also does not allow for its own state-chartered institutions. In essence, with respect to national bank fiduciary [*2]  powers in a given state, we believe section 92a applies the same standards to all national banks, both

**Page 136**

1995 OCC Ltr. LEXIS 194, *2

those headquartered in that state and those that are "out-of-state banks" with respect to that state. Hence, we are in general agreement with your conclusion regarding the scope of section 92a(a) & 92a(b). We also agree with your view that, for a national bank administering trust assets at offices in more than one state, the securities deposit requirements of section 92a(f) apply on a state-by-state basis, i.e., for each state, only on the basis of those trust assets the bank administers from offices in that state.

## BACKGROUND

### I. The Proposal.

BANC ONE CORPORATION ("Company") is a registered, multi-bank holding company headquartered in Columbus, Ohio, that has a total of 65 bank subsidiaries in eleven states. Currently, the Company conducts fiduciary business in these states through two limited purpose trust companies and the trust departments of several of the Company's banks. The Company wishes to combine all its fiduciary business in one entity. The present structure prevents the Company from taking full advantage of economies of scale and creates obstacles [*3] to centralized management and administration. You also believe you could serve customers better as one integrated fiduciary operation. You propose consolidating all of your fiduciary activities nationwide under a single national bank charter (the "Trust Bank"). The Trust Bank may be one of the Company's existing national banks, or you may organize a new bank for that purpose. You propose initially to seek approval to conduct fiduciary business and operate trust offices in each of the eleven states in which the Company currently has one or more bank subsidiaries and conducts fiduciary business: Arizona, Colorado, Illinois, Indiana, Kentucky, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. You also contemplate seeking approval to conduct fiduciary business and operate trust offices in Louisiana and New York. In the future, Trust Bank may also seek approval for operations in other states.

You relate that many states -- including several of the states in which the proposed Trust Bank would have trust offices -- have statutes that would prohibit, limit, or condition certain national banks (namely, national banks headquartered in other states) from conducting fiduciary business [*4] in their states, either in general or with respect to various specific kinds of fiduciary appointments. You also state that some states require that a national bank seeking to conduct fiduciary business or accept fiduciary appointments in those states first register or make filing with, or obtain the approval or certification of, state officials. And the laws of some states at least appear to require that an out-of-state national bank qualify to do business as a foreign corporation before conducting fiduciary business there.

You request the OCC's confirmation of your views on the following positions: (1) A national bank may conduct fiduciary business and have trust offices in more than one state under *12 U.S.C. § 92a;* and such offices, if limited to fiduciary services, are not covered by the McFadden Act. (2) Section 92a authorizes a national bank, including an out-of-state national bank, to conduct fiduciary business in a state on a parity with that state's own state-chartered institutions. (3) Section 92a preempts any state laws that deny or restrict the right of national banks to conduct fiduciary business on this basis, and national banks' exercise of fiduciary powers under [*5] section 92a is not subject to state approval requirements. And (4) any securities deposit a national bank must make in any state under section 92a(f) is based on the trust assets the bank administers from offices in that state, and not on the bank's total trust assets nationwide.

### II. Statutes.

The basic authority for national banks to exercise fiduciary powers is contained in *12 U.S.C. §§ 92a*(a) & 92a(b):

> (a) Authority of Comptroller of the Currency

> The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as

trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

(b) Grant and exercise of powers deemed not in contravention of State or local law

Whenever the laws of such State authorize or permit the exercise of [*6]  any or all of the foregoing powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this section.

*12 U.S.C. §§ 92a*(a) & 92a(b). As discussed in Part II-B below, in subsection (a), by the clause "when not in contravention of State or local law," Congress has conditioned the grant of fiduciary powers to national banks. In our discussion, this clause is referred to as the "State Law Condition." Then, in subsection (b) Congress has limited the State Law Condition in the manner set out.

Section 92a also imposes a number of administrative requirements. Among them is:

Whenever the laws of a State require corporations acting in a fiduciary capacity to deposit securities with the State authorities for the protection of private or court trusts, national banks so acting shall be required to make similar deposits and securities so deposited shall be held for the protection of private or court trusts, as provided by the State law.

*12 U.S.C. § 92a*(f)(first sentence).

**DISCUSSION** [*7]

**I. Authority for a National Bank to Exercise Fiduciary Powers in Different States.**

**A. Federal law does not place geographic limits on where a national bank may offer fiduciary services or have trust offices.**

Section 92a does not contain any language that limits where a national bank may conduct its fiduciary business. (For some states, the State Law Condition may have the effect of creating a geographic limit. That is discussed in section B below. Here we are considering whether the fiduciary power as granted by federal law is itself geographically limited). That is, if a national bank is authorized under section 92a to act in any or all of the listed fiduciary capacities, there is nothing in section 92a that imposes any limitations on the places where, or the customers for whom, the bank may so act. n1 If there is a federally-imposed geographic limit on national banks' fiduciary powers it must lie elsewhere.

n1 Indeed, in 1921 the Federal Reserve Board opined that a national bank with fiduciary powers could exercise those powers in other states. See *7 Fed. Res. Bull. 816 (1921)* (state law aspects of this opinion are discussed further at note 12 below). See also In re: *Armijo's Will, 57 N.M. 649, 261 P.2d 833, 838-40 (1953)* (national bank from Illinois may be appointed ancillary administrator of estate in New Mexico).

[*8]

The only provision in the national banking laws that arguably could impose a geographic limit is the McFadden Act, *12*

1995 OCC Ltr. LEXIS 194, *8

*U.S.C. § 36.* The McFadden Act limits where national banks may have branches. However, in order to be a branch and so subject to the McFadden Act, a bank facility must, among other things, be a branch as defined in *12 U.S.C. § 36*(j): it must perform at least one of the core banking functions of receiving deposits, paying checks, or lending money. The locational limitations of *12 U.S.C. §§ 36* and 81 are not intended to reach all activities in which national banks are authorized to engage, but only core banking functions. See *Clarke v. Securities Industry Association, 479 U.S. 388 (1987)* ("Clarke v. SIA"). Fiduciary activities under section 92a are not such core banking functions. Indeed, the treatment of the trust function in section 92a as something segregated from the "commercial side" of the bank reflects this. Thus, a national bank office that provided only fiduciary services would not be subject to geographic limitations under the McFadden Act. OCC staff have consistently taken this position. See, e.g., Letter from William B. Glidden, Assistant [*9] Director (January 28, 1992) (unpublished); Letter from James M. Kane, District Counsel (June 5, 1990) (unpublished).

One court reached the opposite result and found that a trust office was subject to the McFadden Act. See *St. Louis County National Bank v. Mercantile Trust Company, N.A., 548 F.2d 716 (8th Cir. 1976)*, cert. denied, *433 U.S. 909 (1977)*. The court based this conclusion on the position that what could be a branch for McFadden Act purposes was not limited to offices performing the functions in section 36(j) but could include other functions. We believe this analysis has been superseded by the Supreme Court's decision in Clarke v. SIA, emphasizing the centrality of the core banking functions in the definition of branch under section 36(j). Similarly, another earlier case that ruled a national bank from Missouri could not have a trust office in Illinois because the office would be a branch and therefore impermissible under the McFadden Act is also superseded. See *Boatmen's National Bank of St. Louis v. Hughes, 385 Ill. 431, 53 N.E.2d 403 (1944).*

Therefore, just as with the securities brokerage powers at issue in Clarke v. SIA, there is no inherent [*10] geographic limitation to the fiduciary powers granted by federal law under section 92a. Accordingly, solely as a matter of federal law without regard to the State Law Condition, a national bank (such as the proposed Trust Bank) with its main office in one state may offer fiduciary services to customers anywhere, including at trust offices in other states.

**B. The States have only a limited authority to restrict the geographic scope of national banks' fiduciary powers: a State may prevent national banks from offering fiduciary services in the State only if it also does not permit its own state institutions to offer those fiduciary services.**

Thus, a national bank with fiduciary powers is authorized to offer those services without geographic limit, both in the state of its main office and in other states. You point out that many states have laws prohibiting or restricting out-of-state fiduciaries, including out-of-state national banks, from providing fiduciary services or having trust offices within their state. You ask whether those laws would apply to prohibit an out-of-state national bank from offering fiduciary services in such a state or whether the national bank may offer [*11] such services, and have trust offices, under section 92a.

This question hinges upon the scope and effect of the State Law Condition in section 92a (the clause, "when not in contravention of State or local law"). In this clause, Congress has conditioned national banks' exercise of fiduciary powers on state law, thereby giving the states a power to limit national banks that the states would not otherwise have. n2 It might be argued that this provision allows a state to prohibit or limit out-of-state national banks from exercising fiduciary powers in that state. However, as set forth below, the statutory language, legislative history, and circumstances surrounding the adoption of the language make it absolutely clear that, if a state permits its own state institutions to exercise certain fiduciary powers, then national banks are authorized to exercise those fiduciary powers in that state, and the state may not limit them. Section 92a does not limit the application of this principle only to national banks whose main office is in the state in question. We discern no basis in the statutory language to apply section 92a in a different manner to a national bank's proposed trust office [*12] or other proposed fiduciary business in a state depending upon whether the national bank also has its main office in that state or not.

**Page 139**

1995 OCC Ltr. LEXIS 194, *12

n2 If Congress has authorized national banks to engage in a certain activity, it is axiomatic that the states may not prohibit or reduce that power. See, e.g., *Farmers & Mechanics' National Bank v. Dearing, 91 U.S. 29, 33-34 (1875); Davis v. Elmira Savings Bank, 161 U.S. 275, 283 (1896); First National Bank of Eastern Arkansas v. Taylor, 907 F.2d 775, 778* (8th Cir.), cert. denied, *498 U.S. 972 (1990); Bank of America National Trust & Savings Ass'n v. Lima, 103 F.Supp. 916, 917-18 (D. Mass. 1952); Indiana National Bank v. Roberts, 326 So.2d 802, 803 (Miss. 1976).* See generally Decision on the Applications of Bank Midwest of Kansas, N.A. and Bank Midwest, N.A. (OCC Corporate Decision No. 95-05, February 16, 1995), reprinted in *Fed. Banking. L. Rep. (CCH) P 90,474* (Part III-A).

Thus, the effect of section 92a is that in any specific state, the availability of fiduciary powers is the same for out-of-state national banks or for in-state national banks and is dependent upon what the state permits for its [*13] own state institutions. A state may limit national banks from exercising any or all fiduciary powers in that state, but only if it also bars its own institutions from exercising the same powers. Therefore, a national bank with its main office in one state (such as the proposed Trust Bank) may conduct fiduciary business in that state and other states, depending upon -- with respect to each state -- whether each state allows its own institutions to engage in fiduciary business.

**1. The language, legislative history, and statutory development of section 92a show how the State Law Condition is limited.**

As originally enacted in 1913, the State Law Condition was apparently unlimited in scope. But in 1918 Congress added the second paragraph (now codified at section 92a(b)) with the express intention of specifically limiting it. Whenever a state permits its state institutions to exercise fiduciary powers, then by the rule of law set out in section 92a(b), the exercise of fiduciary powers by national banks shall not be deemed in contravention of state or local law and therefore automatically meets the State Law Condition for the exercise of powers. Any other laws of the state that [*14] would prevent national banks from exercising those powers therefore conflict with section 92a and are preempted. *Burnes National Bank v. Duncan, 265 U.S. 17 (1924).*

National banks were first authorized to engage in fiduciary activities in 1913. Congress included this power in section 11(k) of the Federal Reserve Act. See Act of December 23, 1913, Pub. L. No. 63-43, § 11(k), 38 Stat. 251, 262 (1913). At the time, administration of this provision was placed with the Federal Reserve Board, rather than the OCC. This original version of section 92a was very short. As originally enacted, section 11(k) simply empowered the Board

> To grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, or registrar of stocks and bonds under such rules and regulations as the said board may prescribe.

Congress included this provision to enhance national banks' power to compete with state-chartered institutions which, "by reason of their broader functions, had shown ability to cut into the fields presumably appropriated to the national banks." H. Parker Willis & William H. Steiner, [*15] Federal Reserve Banking Practice 680 (1926). See also 51 Cong. Rec. 883-84 (1913).

This original version contained the basic State Law Condition ("when not in contravention of State or local law"). It also listed four, and only four, specific fiduciary capacities in which national banks could act. We have found no legislative history in 1913 explaining the purpose of the State Law Condition, but in light of subsequent developments, its purpose clearly was to limit the newly granted fiduciary powers to national banks in states where state institutions had fiduciary powers. That is, without the State Law Condition, the statute would have been a simple, absolute grant of the power to act in the four listed fiduciary capacities, and national banks in any and every state would have had that power, even in a state that did not permit its own state banks, trust companies or other corporations to engage in any or

all of the four activities. If granted in this absolute manner, it would have been like the power of a national bank to engage in any of its other federally authorized powers: the federal power cannot be prohibited or curtailed by the states. See note 2 above.

The [*16] 1913 statute was immediately controversial in some states. In a case arising in Michigan, the Supreme Court upheld the constitutionality of section 11(k). *First National Bank of Bay City v. Fellows, 244 U.S. 416 (1917).* A national bank in Michigan had obtained fiduciary powers from the Federal Reserve Board, but five state trust companies brought action in state court to question the right of the national bank to act as trustee, executor, administrator, and registrar of stocks and bonds. The Michigan Supreme Court held, first, that it was not in contravention of state law for a national bank to be granted such powers, because Michigan law allowed foreign corporations to act as fiduciaries in Michigan, but second that section 11(k) was invalid under the U.S. Constitution because Congress did not possess the power to convey fiduciary powers on any corporation including national banks. See *Fellows v. First National Bank of Bay City, 192 Mich. 640, 150 N.W. 335 (1916).* Trusts, estates, and other fiduciary affairs were particularly matters of local concern and thus were exclusively reserved for the states.

The United States Supreme Court reversed the result and upheld the [*17] constitutionality of section 11(k). Under the analysis first set forth in *McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819)* and *Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738 (1824),* Congress has the implied power to charter national banks as a means to carry out any of the enumerated powers of the federal government, and this includes the power to grant national banks the authority to engage in purely private functions if Congress judges the possession of such functions meet for making the bank successful and so able to carry out its public functions. *Fellows, 244 U.S. at 418-20.* And, in the Court's analysis, it was in the discretion of Congress to determine what private powers should be given to national banks, and so the grant of fiduciary powers in section 11(k) was lawful. *Fellows, 244 U.S. at 424.*

Moreover, the Court also offered an additional, narrower analysis for Congress' authority which later became the basis for the 1918 amendments to section 11(k). Even if Congress' discretion to add additional powers to national banks is not unlimited and can include only certain powers, it must include the power to grant to national banks whatever [*18] powers a state has conferred on state banks and state corporations that compete with national banks. By granting a power to such competing state institutions, the state has rendered that power one reasonably needed for the successful operation of a national bank, and so Congress can convey it to national banks. *Fellows, 244 U.S. at 425-26.* Section 11(k) met this circumstance because it granted the fiduciary powers only when not in contravention of State law, and so it was clearly within Congress' lawful powers. The Court's summation of this point became the basis for the critical 1918 amendments:

> [Section 11(k)] authorizes the exertion of the particular functions by national banks when not in contravention of the state law, that is, where the right to perform them is expressly given by the state law or what is equivalent is deducible from the state law because that law has given the functions to state banks or corporations whose business in a greater or less degree rivals that of national banks, thus engendering from the state law itself an implication of authority in Congress to do as to national banks that which the state law has done as to other corporations . . . .

[*19]

*244 U.S. at 426.*

In Fellows the Court held that Congress could grant fiduciary powers to national banks. However, although its reasoning also virtually declared that a state could not prohibit a national bank from exercising fiduciary powers if the state allowed state institutions to do so, the case did not directly reach that issue, since Michigan's law did not raise it. Michigan law both permitted Michigan corporations to act in fiduciary capacities and did not prohibit other corporations from also so acting. Thus, this situation met the Court's narrower test for when Congress would have the power to grant national banks fiduciary powers (i.e., if the state granted them to competing state institutions), but it did not raise the

question whether, under the authority of the "when not in contravention" clause, the same state could also ban national banks from exercising those powers.

In 1917, shortly after Fellows, this issue was addressed in an opinion of the United States Attorney General. The question was asked whether national banks located in New York could act as trustee, executor, and administrator. Unlike Michigan, the laws of New York empowered only trust [*20] companies organized under New York law to act in fiduciary capacities and expressly forbade any other corporation from doing so. The Attorney-General determined that granting fiduciary powers to a national bank in New York would thus be in contravention of state law and so not permitted under the express language of section 11(k). The opinion noted that the decision in Fellows demonstrated that Congress had the authority to grant fiduciary powers to national banks, even if state laws forbade it, but declared that Congress had not yet done so in section 11(k):

> The language [in Fellows] demonstrates the power of the National Legislature to confer authority upon national banks to act as trustee, executor, and administrator, where such powers are exercised by State trust companies, even though the State law discriminates against the national agencies in this regard. The power of Congress to determine how far national banks may be subject to State control is settled, and State regulations which conflict with the congressional enactments are invalid. (*Davis v. Elmira Bank, 161 U.S. 275; Easton v. Iowa, 188 U.S. 220; Van Reed v National Bank, 198 U.S. 554.*) But in [*21] this case Congress has not exerted its power. By section 11(k) it has explicitly constituted the local statutory provisions as the criterion of the corporate capacity of national banks. The New York statute, therefore, can not fairly be said to deny to national banks operating in New York a power Congress intended they should have.

31 Op. U.S. Att'y Gen. 186, 188 (November 26, 1917) (citations in original).

In 1918, Congress completely revised section 11(k). See Pub. L. No. 65-218, § 2, 40 Stat. 967, 968-69 (1918). First, Congress added the language that is now *12 U.S.C. § 92a*(b). This language was expressly added to limit the State Law Condition ("when not in contravention of State or local law") so as to achieve the result adumbrated in Fellows: a national bank could exercise fiduciary powers in a state, even if state law prohibited it, as long as that state permitted those powers to its own state institutions.

> Section 2 moreover sets forth that it shall not be deemed to be "in contravention of State or local law" to permit the exercise of such powers by national banks whenever the laws of the particular State authorize or permit the exercise of such powers [*22] by State banks, trust companies, or other corporations competing with national banks. Under a recent decision of the United States Supreme Court it is clearly settled that Congress has the power to confer authority upon national banks to act in these fiduciary capacities, where such powers are exercised by trust companies, State banks, or other competing corporations, even though the State law discriminates against national banks in this regard. The terms of section 11(k) are extended, therefore, to permit such powers to be granted to national banks in those States in which the State law discriminates against national banks in this respect.

H.R. Rep. No. 479, 65th Cong., 2d Sess. 2 (1918). Second, Congress expanded the list of expressly specified fiduciary capacities to the current eight and added the final power to act in any other fiduciary capacity permitted to state institutions in the state in which the national bank is located. See id. Finally, Congress also added a number of substantive provisions governing national banks' conduct of fiduciary powers now codified in *12 U.S.C. § 92a*(c)-92a(i). n3

> n3 Subsections 92a(j) and 92a(k) were added later, in 1930 and 1980 respectively. See Act of June 26, 1930,

1995 OCC Ltr. LEXIS 194, *22

Pub. L. No. 71-435, 46 Stat. 814 (1930); Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, Title VII, § 704, 94 Stat. 132, 187 (1980).

[*23]

Shortly after the 1918 amendments, the General Counsel of the Federal Reserve Board issued an opinion interpreting the State Law Condition, the new paragraph, and the relationship between them. This opinion reiterated that under the State Law Condition, a fiduciary power could be granted to a national bank, even if state law did not allow it for state institutions, as long as state law did not prohibit it for national banks (e.g., state law was silent on the power); and that the new paragraph acted only to limit the State Law Condition and did not decrease the situations in which national banks could be granted fiduciary powers:

> The phrase "when not in contravention of State or local law" is the only restrictive clause applicable in this discussion, for it is apparent that the succeeding paragraph is permissive rather than restrictive and operates solely as an exception to the restrictive clause of the first paragraph. The purpose of this exception was merely to insure to a national bank the right to exercise fiduciary powers in any case where a State bank, trust company, or other competing corporation is permitted under the State law to exercise those powers, even if [*24] the State laws should contain an express provision either directly or by necessary implication prohibiting national banks from doing so.

> . . . .

> The restrictive phrase "when not in contravention of State or local law" was retained in the first paragraph [the current section 92a(a)] without change and the second and supplementary paragraph [the current section 92a(b)] was inserted solely to protect national banks from any possible discrimination on the part of State legislators. In short, while giving to the legislature of each State in the first paragraph, the right expressly to prohibit national banks from exercising fiduciary powers, Congress, in the second paragraph, eliminates the possibility of discrimination against national banks by providing, as a rule of law, that no State statute shall be construed to prohibit a national bank from exercising any fiduciary power which a State bank, trust company, or other competing corporation can exercise.

> It is respectfully submitted, therefore, that the Federal Reserve Board may legally approve the application of any national bank to exercise any of the fiduciary powers authorized by section 11(k) unless there is an express statute [*25] of the State in which the national bank is located which either directly or by necessary implication prohibits a national bank from exercising those powers, and that even in the case where there is such an express statute, the Board may approve the application if any State bank, trust company, or other competing corporation in that State is permitted to exercise the powers applied for by the national bank.

*5 Fed. Res. Bull. 363-64* (March 31, 1919). See also Annual Report of the Comptroller of the Currency 13 (1918) ("Under its terms [section 11(k) as amended in 1918] States are in effect prohibited from denying to them [national banks] the right to exercise trust powers where such powers are exercised by State corporations.")

In 1924, the Supreme Court finally decided Congress' power to authorize national banks to exercise fiduciary powers even over directly conflicting state law. *Burnes National Bank v. Duncan, 265 U.S. 17 (1924).* A national bank in Missouri was named executor in a will, but the state courts denied appointment on the grounds that under Missouri law only state trust companies could so act and thus by the laws of Missouri national banks were not authorized [*26] to act as executors. The Supreme Court, in an opinion by Justice Holmes, first noted that under the first paragraph alone, with the State Law Condition, the state court result might be final, but that Congress had added the second paragraph to limit the first:

1995 OCC Ltr. LEXIS 194, *26

This says in a roundabout and polite but unmistakable way that whatever may be the state law, national banks having the permit of the Federal Reserve Board may act as executors if trust companies competing with them have the power.

*265 U.S. at 23.* In the case at hand, the criteria in the second paragraph were met, "and thus the naked question presented is whether Congress had the power to do what it tried to do." Id.

To this question, the Court reasoned Fellows already provided the answer: if Congress has the authority to grant a power to national banks and has granted the power, then the states may not deprive national banks of that power (except as Congress may have allowed), even if the subject area is one characteristically within the domain of the states. The power of Congress to confer a power on national banks

"excluded the power of the State in such case, although it might possess in a general [*27] sense authority to regulate such business, to use that authority to prohibit such business from being united by Congress with the banking function." *244 U.S. 425.* Now that Congress has expressed its paramount will this language is more apposite than ever. The States cannot use their most characteristic powers to reach unconstitutional results. ... There is nothing over which a State has more exclusive authority than the jurisdiction of its courts, but it cannot escape its constitutional obligations by the device of denying jurisdiction to courts otherwise competent. ... So here -- the State cannot lay hold of its general control of administration to deprive national banks of their powers to compete that Congress is authorized to sustain.

*265 U.S. at 24* (quotation from Fellows; other citations omitted).

Since 1918, the provisions granting national banks the authority to engage in fiduciary activities -- currently codified at *12 U.S.C. § 92a*(a) and 92a(b) -- have remained substantively unchanged. In 1962, Congress transferred administration of the provision from the Federal Reserve Board to the OCC. Former section 11(k) of the Federal Reserve Act was repealed, and its provisions [*28] reenacted (with the OCC substituted for the Board) as a separate law. See Pub. L. No. 87-722, 76 Stat. 668 (1962) (codified at *12 U.S.C. § 92a);* S. Rep. No. 2039, 87th Cong., 2d Sess. 1 (1962) ("No change would be made from the substantive provisions of section 11(k), other than the transfer of authority [to the OCC], so that there is no alteration of existing law regarding national banks acting in fiduciary capacities."). n4

n4 In the re-enactment, Congress added the present alphabetical subsection markers to the existing simple sequence of paragraphs. However, there were no subsection headings.

In summary, several fundamental propositions are evident from the statute, its legislative development, and basic concepts of national banking law reflected in the principal cases. First, Congress has the authority to grant fiduciary powers to national banks. Second, if Congress grants a power to national banks, the states cannot prohibit, impede, or restrict national banks from exercising it. Thus, third, but for the State Law Condition, national banks could exercise the fiduciary powers granted in section 92a(a) notwithstanding state law. n5 Fourth, in the State Law Condition, [*29] Congress has made national banks' power to act in fiduciary capacities contingent upon state law. But, finally, Congress has limited the State Law Condition by declaring that if a state allows its state institutions to exercise fiduciary powers, then national banks may exercise those powers, notwithstanding state laws to the contrary.

n5 We refer here only to the authority to have the legal capacity to act as a fiduciary. A national bank acting as trustee or executor of an estate is, of course, subject to the law governing the trust or estate. For example, a national bank's fiduciary duties in conducting its fiduciary activities and its standard of care in discharging those

duties are subject to the state or local law, or other law, governing the fiduciary relationship. The OCC's fiduciary regulations in 12 C.F.R. Part 9 recognize the applicability of such laws.

**2. The authority for a national bank to offer fiduciary services in a state is the same whether the bank is in-state or out-of-state.**

Your proposal raises one fundamental question: if a national bank proposes to offer fiduciary services and has trust offices both in its home state (i.e., the state of its [*30] main office) and in other states, in what manner do the state laws of the other states allowing or limiting the exercise of fiduciary powers apply to such a national bank under section 92a? In particular, if one of the other states has laws prohibiting or limiting out-of-state fiduciaries from conducting fiduciary business in that state and the state law treats an out-of-state national bank as an out-of-state fiduciary, may that state law be applied to an out-of-state national bank such as the proposed Trust Bank? We believe section 92a clearly establishes that such state laws may not prevent national banks from exercising fiduciary powers in a state in which state law permits the state's banks, trust companies or other corporations to exercise such powers. This determination was set into section 92a in 1918, and it applies equally to state laws limiting out-of-state national banks as it does to state laws limiting in-state national banks. This result is logically dictated by the statute and is consistent with similar provisions elsewhere.

**a. Section 92a gives no greater authority to state laws limiting out-of-state fiduciaries than to other state laws.**

Simply as a matter [*31] of pure logic under the given statutory framework, state laws limiting out-of-state fiduciaries must be subject to the same standards as other state laws. On the one hand, a state law restricting out-of-state fiduciaries from conducting fiduciary business in the state could apply to an out-of-state national bank only if the state law is within the authority conveyed upon the states in the State Law Condition in section 92a(a). If this type of state law were not within the State Law Condition, then it could not apply to restrict national banks from exercising their congressionally authorized fiduciary powers. And so, national banks from other states could conduct fiduciary business in the state. n6

> n6 If these state laws are outside the State Law Condition, then this situation would be similar to others in which a national bank from one state can conduct an authorized business in another state without regard to its being authorized by the other state. See, e.g., *Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299 (1978)* (national bank from one state lending to customers in another state may charge federally authorized interest rate without regard to law of customers' state); *Bank of America National Trust & Savings Ass'n v. Lima, 103 F.Supp. 916, 917-18* (national bank's ability to lend in a state does not depend on state's permission; state cannot require national banks to register as foreign corporations); *Indiana National Bank v. Roberts, 326 So.2d 802, 803 (Miss. 1976)* (same, citing other cases).

[*32]

And, on the other hand, if a state law restricting out-of-state fiduciaries is within the State Law Condition in section 92a(a), then it is also within the limitation of section 92a(b). The provision in section 92a(b) was expressly added to limit the scope of the State Law Condition. It is linked to the State Law Condition in its very language. It mandates that if a state permits its state institutions to exercise fiduciary powers, then national banks' exercise of them is not in contravention of state law, even if there are other state laws that purport to bar national banks. Thus, even if a state has laws barring out-of-state fiduciaries, those laws do not bar out-of-state national banks if the state permits its state institutions to exercise fiduciary powers.

We believe this conclusion is inescapable under the statute. In order to find that state laws barring out-of-state fiduciaries in such a state (i.e., one that permitted its state institutions to exercise fiduciary powers) could be applied to out-of-state national banks, we would have to conclude that a state law could both apply because of the State Law Condition and yet escape the rule of construction Congress placed [*33] on the State Law Condition. Such an

**Page 145**

interpretation of the statute is certainly not a "plain" one and indeed is highly implausible. By contrast, the interpretation that section 92a applies to these state laws in the same way it applies to others arises directly from the statutory language.

Since section 92a(b) was enacted to limit the State Law Condition, the clear meaning is that every purported instance of the exercise of fiduciary powers by a national bank being in contravention of state law is subjected to the protective standard added in section 92a(b). Textually, the introductory phrase ("whenever the laws of such State . . . .") is a reference to that state the laws of which it is asserted the grant of fiduciary powers would be in contravention of. That is, "such State" is the state referred to in the State Law Condition ("when not in contravention of State or local law"). The phrase may also be a reference to "the State in which the national bank is located" in the immediately preceding sentence. But all three of these terms refer to the same state: the state in which the national bank proposes to engage in fiduciary activities. In other words, the same level of contact [*34] with a state that is sufficient to make a national bank potentially subject to that state's laws under the State Law Condition in section 92a(a) also makes the bank located in that state for other section 92a(a) purposes. n7

> n7 This is a different meaning than "located" may have in other banking statutes. National banks have been found to be "located" in or "situated" in multiple jurisdictions (in which they have a main office, branch, or other physical office. See cases and OCC opinions cited in section B-2-b below. We believe this interpretation of "located" is correct for section 92a(a) because of its origin in the statute. Originally, as outlined earlier, in 1913 section 11(k) had only the phrase, "when not in contravention of State or local law." In 1918, both section 92a(b) and the expanded fiduciary capacities clause containing the phrase, "State in which the national bank is located," were added. They were separate changes done for different reasons. See H.R. Rep. 479, supra. But in each one, it is reasonable to presume that Congress was legislating with reference to the State already referred to in the statute: the State in which the national bank would be exercising fiduciary powers and whose state law was at issue in the State Law Condition. Unlike other statutes, in section 92a(a), the term "State in which the bank is located" is not used as the initial and principal identifier of the state to which the statute is referring.
>
> However, arguably the referent of "such State" in section 92a(b) is only to "the State in which the national bank is located" and the meaning of "states in which the bank is located" is not co-extensive with the states whose laws are asserted to be contravened in the State Law Condition. That is, "such State" refers only to states in which the bank is "located" and "located" does not include every state in which it proposes to engage in fiduciary activities. We need not resolve this question now because in your proposal, the Trust Bank would have brick-and-mortar trust offices in each state in which it proposed to offer fiduciary services, and so it would be clearly located in those states. And thus the limiting rule of construction of section 92a(b) would be invoked for those states even under this narrower interpretation.

[*35]

Moreover, Congress' purpose in adding section 92a(b) was to prevent states from preventing national banks from exercising fiduciary powers through prohibitory laws while allowing their own state banks and trust companies to have these powers. The statutory language encompasses all national banks in this protection from a state's discrimination. It is not limited only to national banks headquartered in the state. If the exercise of fiduciary powers by a national bank is asserted to be in contravention of state law, the standard of section 92a(b) applies whether the alleged contravention is of a state law barring all national banks or of a state law barring only some national banks (e.g., out-of-state national banks). Nothing in the statute or legislative history suggests that state laws that bar only a certain class of national banks are treated differently. Indeed, if section 92a is interpreted to allow states to discriminate against out-of-state banks but not against in-state banks, that would make it an instance of Congress allowing the states to discriminate in an area of interstate commerce. n8 But such action on Congress' part is not lightly inferred. See, e.g. [*36] , *Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992); Maine v. Taylor, 477 U.S. 131, 139 (1986).* There is no evidence of such congressional intent here, and so we believe section 92a may not be construed to allow such discrimination against

**Page 146**

out-of-state national banks.

> n8 State restrictions on the interstate provision of fiduciary services are clearly subject to scrutiny under the Commerce Clause, notwithstanding the state interest in overseeing trusts and estates. See *Lewis v. BT Investment Managers, Inc., 447 U.S. 27 (1980).*

Thus, in our view, with respect to a national bank that proposes to offer fiduciary services in more than one state, section 92a applies equally for each and every state. The use of a singular term in section 92a ("whenever the laws of such State ..."; "the laws of the State in which the bank is located") does not imply that Congress intended that the provisions of section 92a would apply only to one state for each national bank. Generally, legislative terms which are singular in form may apply to multiple subjects or objects, and plural terms to single. See *1 U.S.C. § 1;* First National Bank in *St. Louis v. Missouri, 263 U.S.* [*37] *640, 657 (1924); Johnston v. Penrod Drilling Co. 803 F.2d 867, 870 (5th Cir. 1986).* See generally 2A Sutherland Statutes and Statutory Construction § 47.34 (5th ed. 1992). In particular, there is no historical basis to attach significance to the use of singular nouns in the National Bank Act. See R. Robertson, The Comptroller and Bank Supervision: A Historical Appraisal 82 (1968). Moreover, the Supreme Court rejected such an interpretation when construing an earlier version of section 94, and said the use of the singular noun in the statute was not persuasive. *Citizens & Southern National Bank v. Bougas, 434 U.S. 35, 45 (1977).*

**b. The state-by-state application of section 92a is consistent with other statutes.**

Thus, section 92a authorizes national banks to offer fiduciary services in multiple states, but then conditions the exercise of that power within each state on a state-by-state basis under the same test: is the exercise of fiduciary powers by national banks prohibited by state law, and even if it is, does that state permit its state institutions to exercise these powers or not. This result is consistent with other banking statues that treat a [*38] single national bank as present in different states for purposes of that statute.

Other federal statutes also refer to the places where a national bank is "located," "situated," "existing," or of which it is a "citizen." n9 The United States Supreme Court has made clear that the locational language in these statutes should be flexibly construed, taking full account of changes in the banking system, to suit the underlying purposes of each provision, and has emphasized that "there is no enduring rigidity about the word 'located'" as it is used in these provisions. *Citizens & Southern National Bank v. Bougas, 434 U.S. at 44.* Hence the Supreme Court, lower federal courts, and the OCC consistently have held that, for purposes of these statutes, a national bank is not located only in the place of its main office but can be "located," "situated" or "existing" in, or be a "citizen" of, multiple cities, counties, or states. See, e.g., Bougas (venue); *Fisher v. First National Bank of Omaha, 548 F.2d 255 (8th Cir. 1977)* (interest rates); *Fisher v. First National Bank of Chicago, 538 F.2d 1284 (7th Cir. 1976),* cert. denied, *429 U.S. 1062 (1977)* (interest rates); [*39] *Seattle Trust & Savings Bank v. Bank of California N.A., 492 F.2d 48 (9th Cir. 1974),* cert. denied, *419 U.S. 844 (1974)* (establishing branches); *Bank of New York v. Bank of America, 853 F.Supp. 736 (S.D.N.Y. 1994)* (citizenship for diversity jurisdiction); *Connecticut National Bank v. Iacono, 785 F.Supp. 30 (D.R.I. 1992)* (original jurisdiction); Decision on the Applications of American Security Bank, N.A., Washington, D.C., and Maryland National Bank, Baltimore, Maryland (OCC Corporate Decision No. 94-05, February 4, 1994), reprinted in [1993-1994 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 89,695* (establishing branches, and mergers with other banks); OCC Interpretive Letter No. 686 (September 11, 1995), reprinted in *Fed. Banking L. Rep. (CCH) P 81-001* (interest rates); OCC Interpretive Letter No. 654 (December 19, 1994), reprinted in [1994-95 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 83,602* (directors' residency qualification).

> n9 See, e.g., *12 U.S.C. § 24*(Eighth) (charitable contributions); *12 U.S.C. § 36* (establishment of branches); *12 U.S.C. § 72* (directors' residency requirement); *12 U.S.C. § 85* (interest on loans); *12 U.S.C. § 90* (security for public deposits); *12 U.S.C. § 215* (consolidations); *12 U.S.C. § 215a* (mergers); *28 U.S.C. § 1348* (jurisdiction of

**Page 147**

U.S. district courts); *28 U.S.C. § 1394* (venue).

[*40]

In these other instances, just as with section 92a here, the statutes were similarly applied to the bank on a state-by-state basis. The bank was considered present in each state -- through a branch, another type of office, or merely doing business -- and treated under the statute in the same manner as any other national bank in the state.

Moreover, in the recent interstate branching statute Congress has provided a similar system for the application of state law to the interstate branches of national banks: within each host state, a branch of an out-of-state national bank is treated as an in-state national bank for purposes of applying that state's laws. See Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, § 102(b)(1), 108 Stat. 2338, 2350 (1994) (codified at *12 U.S.C. § 36*(f)(2)). These Riegle-Neal Act provisions do not directly apply to the authority to have trust powers, since the authority to have trust powers is governed by federal law in section 92a, not state laws. Nevertheless, since Congress has created a similar rule for the general applicability of state law to national banks' interstate branches when state law is applicable [*41] to national banks, it is reasonable to interpret section 92a as applying in a similar state-by-state manner for national banks' interstate fiduciary activities. Indeed, if the Riegle-Neal Act's applicable law provisions do apply to how state law applies to the fiduciary activities of an out-of-state national bank at a branch in a host state, supplementing section 92a in this regard, then clearly a host state could not prevent an out-of-state national bank from providing fiduciary services at a host state branch on the same basis as an in-state national bank. In many respects, our interpretation of section 92a simply makes the treatment of fiduciary activities at an interstate trust office the same as it indisputably would be at an interstate branch. n10

> n10 The Riegle-Neal Act also has another provision regarding the application of host state laws to the interstate branches of national banks in the four areas of community reinvestment, consumer protection, fair lending, and establishment of intrastate branches. See Riegle-Neal Act § 102(b)(1) (codified at *12 U.S.C. § 36*(f)(1)). In those areas, host state laws apply to an interstate branch of an out-of-state national bank in the host state to the same extent as such laws apply to a branch of a bank chartered by the host state, unless federal law preempts application of such state laws to national banks or application of the laws is found to have a discriminatory effect. State laws granting or prohibiting fiduciary powers to institutions do not appear to be in one of the four areas. But even if they were, and the applicable law provisions of section 36(f)(1) did apply to national bank fiduciary powers, the authority of an out-of-state national bank to offer fiduciary services at a branch in a host state would be like that of the host state's own banks. Thus, even in that case, the treatment of fiduciary activities would also be like our analysis of section 92a here.

[*42]

This interpretation of the statute also fosters desirable public policies. First, every national bank offering fiduciary services in a given state will have the same authority to conduct fiduciary business. A national bank conducting fiduciary business and administering trust assets at a trust office will be subject to the same standards irrespective of whether the office is part of an in-state national bank or an out-of-state national bank. Second, there will be a level playing field for enhanced competition in the provision of fiduciary services within each state, because more potential providers will be able to compete on similar terms.

We are aware that one federal district court reached a result inconsistent with this analysis. In *American Trust Company, Inc. v. South Carolina State Board of Bank Control, 381 F.Supp. 313 (D.S.C. 1974)* (three-judge court), the court upheld the application to North Carolina National Bank of South Carolina statutes that barred from South Carolina fiduciary appointments any corporation domiciled or licensed to do business in any state contiguous to South Carolina. This court held that a state could bar an out-of-state national bank from [*43] acting in fiduciary capacities in the state, even though its state institutions were permitted to act in those capacities. However, North Carolina National Bank did not raise the issue that section 92a preempted the South Carolina law; instead, it based its case on the Due Process and Commerce Clauses. In rejecting the Commerce Clause argument, the court viewed section 92a as a statute in which

1995 OCC Ltr. LEXIS 194, *43

Congress has allowed the states to impose burdens on interstate commerce: "Since South Carolina's ban on foreign testamentary trustees operates equally against state and national banks located in North Carolina, the exclusion of North Carolina National is not an impermissible burden on interstate commerce; Congress has allowed it by enacting § 92a." *381 F.Supp. at 323.*

We believe this reasoning and result were clearly mistaken. First, it completely ignored the statutory language and legislative history of sections 92a(a) and 92a(b) discussed earlier, and instead based its construction of the statute solely on an oversimplified generalization that the statute is intended to create "competitive equality." Second, in using the State Law Condition to reach its result, the court misused the limit [*44] placed on it in section 92a(b). Instead of comparing how a state treats national banks with how it treats its own banks, the court compared how South Carolina treated North Carolina state banks and North Carolina national banks. Third, there is no evidence in the language or legislative history of section 92a that Congress intended to grant the states the power to discriminate in interstate commerce in trust services. But it is well settled that Congress must manifest its unambiguous intent before a federal statute will be read to authorize state action that would otherwise be in violation of the Commerce Clause. See, e.g., *Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992); Maine v. Taylor, 477 U.S. 131, 139 (1986).* Indeed, since section 92a says nothing about the relation between a state and the state banks or trust companies of other states, it plainly is not a statute intended to give states power to burden interstate commerce. Finally, the court's treatment of the South Carolina statutes and the Commerce Clause is questionable in light of *Lewis v. BT Investment Managers, Inc., 447 U.S. 27 (1980).*

Two other cases have language that could suggest states have a [*45] power to restrict national banks from exercising trust business in their state. In a decision upholding a New Hampshire law that banned corporate fiduciaries in the state from advertising, in dictum the First Circuit stated that section 92a in effect gives states the "power to proscribe national banks from acting as executors." See *New Hampshire Bankers Ass'n v. Nelson, 460 F.2d 307, 308* (1st Cir.), cert. denied, *409 U.S. 1001 (1972)* (per curiam). And, in its decision on national bank trust offices, the Eighth Circuit used section 92a as a secondary basis for decision and held that section 92a permits each state "to nondiscriminately limit the location where fiduciary powers may be exercised." *St. Louis County National Bank, 548 F.2d at 720.* However, both cases are consistent with our analysis. At issue in both cases was whether the same limits that the state imposed on its own corporate fiduciaries also applied to national banks in the state. In our analysis, such limits would, if applicable, continue to apply within each state on a state-by-state basis. n11

n11 Moreover, we believe these cases are incorrect to the extent that they imply that section 92a grants the states the power to impose operational limitations on national bank fiduciary activities (such as banning advertising or limiting locations). Whether such state operational limits (e.g., administrative or ministerial provisions regarding how a state fiduciary institution organizes its business) are applicable to national banks is determined by general principles of preemption with respect to the applicability of state law to national banks; section 92a(a) does not incorporate them. The State Law Condition in section 92a pertains only to whether a national bank may or may not be granted the authority to act in a particular fiduciary capacity. When section 92a does incorporate state law for operational limits, it does so by specific provision with respect to particular types of limits. See *12 U.S.C. §§ 92a*(f), 92a(g) & 92a(i). Indeed, the fact that Congress expressly provided for state laws to apply only for these three areas strongly implies that Congress did not intend that other state administrative requirements governing how a corporate fiduciary conducts business would apply to national banks through section 92a. (Of course, such state laws governing the administration and operation of corporate fiduciaries are different from state laws governing the fiduciary relationships themselves. See note 5 above.) Some earlier OCC letters may suggest that all aspects of state law governing state fiduciary institutions apply to national banks. See, e.g., OCC Letter No. 525 (August 8, 1990), reprinted in *Fed. Banking L. Rep. (CCH) P 83,236.* However, those letters generally dealt with substantive fiduciary law and so may not have fully distinguished between state substantive fiduciary duties and standards and state administrative requirements and expressly stated that their analysis pertained to the former.

[*46]

1995 OCC Ltr. LEXIS 194, *46

Finally, we are aware that an early opinion of the Federal Reserve Board n12 and a similar opinion of the OCC n13 may be read by some to suggest that national banks are subject to state laws prohibiting nonresident fiduciaries. However, neither opinion directly considered the precise issue or offered any analysis. Indeed, the OCC opinion appears simply to be a restatement of the earlier Federal Reserve Board opinion for inclusion in an OCC collection of opinions regarding examination of trust departments. The opinions directly answer only the question whether a national bank located in one state may exercise fiduciary powers in another state when the laws of the other state do not prohibit it. In that instance, there would be no doubt but that the exercise of fiduciary powers would not be in contravention of state law, and so may be granted under section 92a(a). The opinions may give rise to the negative inference that, if the other state did prohibit nonresident fiduciaries, then an out-of-state national bank could not exercise fiduciary powers in that state. But, in fact, the opinions do not address that question. That would be an instance of a state's laws prohibiting the exercise [*47] of fiduciary powers by a national bank, thus requiring consideration of section 92a(b) in the determination whether the exercise of fiduciary powers is in contravention of state law. Moreover, even if these opinions had directly taken the position indicated in the negative inference above, they would need to be reconsidered in light of the subsequent cases, such as Citizens & Southern National Bank and Seattle Trust, establishing that national banking laws may appropriately be applied on a state-by-state basis. Similarly, with respect to fiduciary activities at interstate branches, they clearly would need to be reconsidered in light of the Riegle-Neal Act.

n12 In 1921 the Board stated:

The Federal Reserve Board is of the opinion, therefore, that a national bank which has been granted permission to exercise fiduciary powers under the provisions of section 11(k) may, without other authority, exercise the powers granted not only in the State where the bank is located but also in any other State the laws of which do not expressly or by necessary implication prohibit the exercise of those powers by national banks located in other States. The Board is of the opinion, however, that in any such case the national bank would have to conform to those laws of any State in which it is acting which relate to the exercise of fiduciary powers by foreign corporations.

*7 Fed. Res. Bull. 816 (1921).* In this ruling, the Board appears to assume that a national bank may be "located" in one and only one state for section 92a purposes. That assumption, of course, is incorrect today after Citizens & Southern National Bank, Seattle Trust, and the other cases cited earlier.
[*48]

n13 In 1963 shortly after administration of section 92a was transferred, the OCC issued a manual for trust examiners. It contained a number of opinions on aspects of the operation of a trust department. These included:

This Office is of the opinion that a national bank authorized to exercise fiduciary powers may, without additional authority from this Office, exercise such power in other jurisdictions, the laws of which do not exclude nonresident fiduciaries. Accordingly, a national bank with fiduciary powers may exercise them in another State or country if the bank conforms to the laws of that jurisdiction.

Comptroller's Manual for Representatives in Trusts, Section of Opinions, page G-1 (1963 ed.). See also Current Legal and Regulatory Developments, 1 National Banking Review 599, 610 (1964) (summarizing 1963 opinion). Since at least 1976, this opinion no longer appeared in later editions. See Comptroller's Handbook for National Trust Examiners, Precedents and Opinions Section (1976 ed.).

Page 16

1995 OCC Ltr. LEXIS 194, *48

**C. Conclusion.**

Therefore, we conclude that section 92a authorizes a national bank that has been granted fiduciary powers to exercise those powers in any state, [*49] including having trust offices in any state, except that the bank may not offer such services in a state that prohibits it and in which the state does not authorize or permit n14 its state banks, state trust companies or other corporations that compete with national banks to offer such services. An out-of-state national bank has the same authority under section 92a to offer fiduciary services in a state that in-state national banks have. The state has the authority to restrict national banks from exercising these powers only if it restricts these powers for its own state institutions. Thus, state laws prohibiting out-of-state fiduciaries from conducting fiduciary business in the state, or restricting these services, or conducting such services upon state approval requirements cannot apply to limit the section 92a authority of national banks. Only state laws that bar any or all fiduciary activities to all corporate fiduciaries, in particular including the state's own state banks, state trust companies, and other corporations, can limit out-of-state national banks under section 92a.

> n14 State laws that "authorize or permit" the exercise of fiduciary powers by state institutions for purposes of section 92a(b) clearly would include laws that specifically authorize state institutions to act in a specific fiduciary capacity. But the addition of the term "or permit" implies that something less than specific authorization in state statutes may be sufficient. One such example could be instances in which state institutions in a particular state are engaged in a particular fiduciary capacity by custom or state administrative determinations, even though there is no express state statute.

 [*50]

In your proposal, the Trust Bank would be headquartered in one state and have trust offices in a number of other states. You have asked us to confirm your position that section 92a preempts state laws in these other states that would prohibit the exercise of fiduciary powers by out-of-state national banks, even though state institutions (and in-state national banks) are permitted to exercise such powers. We believe this is not a new determination. While these state laws may not have been subjected to examination under section 92a previously, the relationship of section 92a and state law is well established. Since section 92a applies in the same manner for in-state and out-of-state national banks, these state laws would be subject to the same preemption analysis applied to earlier state laws that prohibited in-state national banks from exercising fiduciary powers or that attempt to place state approval or licensing requirements on the fiduciary activities of in-state national banks. See *Burnes National Bank, 265 U.S. at 23-24; Fidelity National Bank & Trust Co. v. Enright, 264 F. 236, 239 (W.D. Mo. 1920);* OCC Interpretive Letter No. 628 (July 19, 1993), reprinted in  [*51] [1993-94 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 83,511;* Letter from Peter Liebesman, Assistant Director (March 30, 1982) (unpublished). n15 While the analytic framework is not new, we believe it would be premature to apply it to particular states at this time. With respect to each state, that analysis is more appropriately done when an out-of-state national bank, such as the proposed Trust Bank, definitely seeks to offer fiduciary services in that state.

> n15 See also OTS Letter No. 94/CC-13 (June 13, 1994), reprinted in [1994 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 82,814* (similar preemption analysis for fiduciary activities of federal savings associations). Cf. OCC Letter No. 614 (January 15, 1993), reprinted in [1992-93 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 83,454* (similar preemption analysis for state licensing and visitation requirements for national bank lending in the state); OCC Letter No. 475 (March 22, 1989), reprinted in [1989-90 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 83,012* (similar preemption analysis for applicability of state approval and licensing requirement for other authorized activity); Letter from James F.E. Gillespie, Senior Attorney (August 11, 1986) (unpublished) (same); OCC Letter No. 122 (August 1, 1979), reprinted in [1981-82 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 85,203* (same); Letter from John Shockey, Chief Counsel (July 19, 1977) (unpublished) (same). See generally *Guthrie v. Harkness, 199 U.S. 148, 159 (1905)* (states may not exercise right of visitation over national

**Page 151**

banks).

[*52]

## II. Application of Section 92a(f) to an Interstate National Bank

Under section 92a(f), if a national bank conducts trust business in a state in which state-chartered fiduciaries are required to deposit securities with the state for the protection of private or court trusts, the national bank is required to make "similar deposits." You relate that some states require fiduciaries to deposit securities equal to a specified percentage of all their trust assets. We agree with your conclusion that a national bank conducting trust operations in multiple states is not required to calculate the amount of any such deposit required by a particular state on the basis of all of its trust assets nationwide, but only on the basis of those trust assets that the bank administers from offices located in that state.

When a national bank conducts trust operations in multiple states and administers trust assets at offices in multiple states, it becomes necessary to determine how the requirement of section 92a(f) applies. We agree that the best interpretation is to apply the requirement on a state-by-state basis, applying each state's requirement to trust assets administered at offices in  [*53]  that state. First, the statute requires that national banks make deposits that are "similar" to those required of state institutions, and not those that are "identical." Thus, the statute allows its requirements to be imposed in a flexible manner to address changing circumstances. Second, the obvious purpose of state deposit requirements is to protect beneficiaries of trusts administered in the state imposing the requirement. That purpose will be achieved if a national bank deposits securities based upon trust assets administered in the state. Indeed to require otherwise would, in effect, be allowing one state to impose a requirement that governs trust assets in, and protects beneficiaries in, another state.

Third, any other interpretation leads to absurd results, as shown in the following example. If two national banks are separately conducting trust business in two states (i.e., one bank in each state), each bank is subject to a deposit requirement based on the deposit requirement of its state. If the two banks merge (e.g., in a merger under *12 U.S.C. § 1831u),* then the deposit requirement of each state will apply to the total combined trust assets, unless section 92a(f)  [*54]  is applied on a state-by-state basis. There is no logical reason to suppose that Congress intended the combined bank's deposit requirement to be, in effect, more than (indeed, perhaps double) the aggregate of the requirements for the separate banks. Finally, we note that the Office of Thrift Supervision has taken this position in applying an identical provision in the Home Owners' Loan Act governing fiduciary activities of federal savings associations, *12 U.S.C. § 1464*(n)(5). See OTS Letter No. 92/CC-59 (December 24, 1992), reprinted in [1992-1993 Transfer Binder] *Fed. Banking L. Rep. (CCH) P 82,645.*

## CONCLUSION

We believe a national bank that has been granted fiduciary powers may offer fiduciary services in, and have trust offices in, multiple states. Such a national bank may exercise any of the fiduciary powers granted in section 92a(a) in any state unless that state both prohibits national banks and restricts its own state institutions from exercising that fiduciary power. We also agree that the deposit requirement of section 92a(f) is similarly applied on a state-by-state basis. We hope this analysis is helpful as you develop your plans for the proposed Trust  [*55]  Bank.

Sincerely,

Julie L. Williams
Chief Counsel

00819573     B: 1877 P: 0459

Page 1 of 14
Alan Spriggs, Summit County Utah Recorder
07/13/2007 03:39:29 PM Fee $36.00
By FIRST AMERICAN - SUN PEAK
Electronically Recorded by Simplifile

After Recording Return To:
MERIDIAS CAPITAL, INC.
990 WEST ATHERTON DRIVE
SALT LAKE CITY, UTAH 84123
Loan Number: 1400078859

Tax Serial No.: SSS-2-313

Fatco File # 385-4894285 (KP)

[Space Above This Line For Recording Data]

# DEED OF TRUST

**MIN:** 100256014000788596

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated   JULY 10, 2007            , together with all Riders to this document.
**(B)  "Borrower"** is   CATHERINE RICHARDS AHLERS, AN UNMARRIED WOMAN

Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is   MERIDIAS CAPITAL, INC.

Lender is a   NEVADA CORPORATION                                          organized
and existing under the laws of   NEVADA           .
Lender's address is   990 WEST ATHERTON DRIVE, SALT LAKE CITY, UTAH 84123

**(D)  "Trustee"** is   FIRST AMERICAN TITLE
1755 PROSPECTOR AVE, PARK CITY, UTAH 84098

**(E)  "MERS"** is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)  "Note"** means the promissory note signed by Borrower and dated   JULY 10, 2007
The Note states that Borrower owes Lender   FIVE HUNDRED SEVENTY-SIX THOUSAND AND
00/100                              Dollars (U.S. $ 576,000.00           ) plus interest.

Borrower Initials:

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                              Page 1 of 14

DocMagic *EForms* 800-649-1362
www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2037 .

(G)  "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☐ Other(s) [specify] |

(J)  "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "**Escrow Items**" means those items that are described in Section 3.

(N)  "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Borrower Initials: _____  _____  _____  _____  _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                    Page 2 of 14                    DocMagic *eForms* 800-649-1362
                                                                www.docmagic.com

00819573  Page 2 of 14  Summit County

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | SUMMIT | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

LOT 313, SILVER SUMMIT SUBDIVISION PHASE 2, ACCORDING TO THE
OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE SUMMIT COUNTY
RECORDER'S OFFICE.
A.P.N.: SSS-2-313

which currently has the address of                    5906 NORTH FAIRVIEW DRIVE
                                                                          [Street]

       PARK CITY                          , Utah        84098          ("Property Address"):
       [City]                                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Borrower Initials: _____  _____  _____  _____  _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                                        Page 3 of 14                    DocMagic *eFormula* 800-649-1362
                                                                                              www.docmagic.com

00819573  Page 3 of 14  Summit County

**Page 155**

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.

Borrower Initials: _____   _____   _____   _____   _____

Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

Borrower Initials: _____ _____ _____ _____ _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 5 of 14                          *DocMagic eForms* 800-649-1362
www.docmagic.com

00819573  Page 5 of 14  Summit County

**Page 157**

or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower Initials: _____  _____  _____  _____  _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 6 of 14                          DocMagic *eFarms* 800-649-1362
                                                                              www.docmagic.com

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Borrower  Initials: _____  _____  _____  _____  _____  _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                                Page 7 of 14

*DocMagic eFormas* 800-649-1362
www.docmagic.com

00819573  Page 7 of 14  Summit County

**Page 159**

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to

Borrower Initials: _____ _____ _____ _____ _____ _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 8 of 14                          DocMagic *ePerms* 800-649-1362
                                                                                www.docmagic.com

00819573  Page 8 of 14  Summit County

Page 160

Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to

Borrower Initials: _____  _____  _____  _____  _____  _____

Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations

Borrower Initials: _____ _____ _____ _____ _____ _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                                    Page 10 of 14

DocMagic *eFarms* 800-649-1362
www.docmagic.com

00819573  Page 10 of 14  Summit County

**Page 162**

secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Borrower Initials: _____  _____  _____  _____  _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                    Page 11 of 14

DocMagic *eForms* 800-649-1362
www.docmagic.com

00819573  Page 11 of 14  Summit County

**Page 163**

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

Borrower Initials: _____ _____ _____ _____ _____ _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 12 of 14

*DocMagic* *eForms* 800-649-1362
www.docmagic.com

00819573  Page 12 of 14  Summit County

**Page 164**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
CATHERINE RICHARDS          -Borrower
AHLERS

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

Witness:                    Witness:

_____    _____

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 13 of 14

DocMagic *℮Fₒᵣₘₛ* 800-649-1362
www.docmagic.com

00819573  Page 13 of 14  Summit County

**Page 165**

————————————— [Space Below This Line For Acknowledgment] —————————————

State of Utah                          )
                                       ) SS.
County of __SUMMIT_____   )

The foregoing instrument was acknowledged before me this _July 12, 2007_

by __CATHERINE RICHARDS AHLERS__

_____

_____

_____

Signature of Person Taking Acknowledgment

Title: _____

(Seal)                          Residing at: _____

Notary Public
KELLEY H. PENTZ
380 East Chalk Creek Rd
Coalville, Utah 84017
My Commission Expires
January 29, 2008
State of Utah

My commission expires: _January 29, 2008_

UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045 1/01                          Page 14 of 14

DocMagic *eForms* 800-649-1362
www.docmagic.com

00819573  Page 14 of 14  Summit County

**Page 166**

00871062    B: 1979 P: 1126
Page 1 of 1
Alan Spriggs, Summit County Utah Recorder
04/29/2009 02:04:51 PM Fee $10.00
By Backman FPTP
Electronically Recorded by Simplifile

RECORDING REQUESTED BY:
RECONTRUST COMPANY, N.A.

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-985-07-03
Richardson, TX 75082

TS#: 09 -0053370
TSG# 5-049920

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBSTITUTION OF TRUSTEE

RECONTRUST COMPANY, N.A., 2380 Performance Dr, TX2-985-07-03, Richardson, TX 75082, PHONE: (800) 281-8219, is hereby appointed successor Trustee under that certain Trust Deed dated July 10, 2007, executed by CATHERINE RICHARDS AHLERS, AN UNMARRIED WOMAN, as Trustor, in which MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., is named as Beneficiary and FIRST AMERICAN TITLE, is named as Trustee, and recorded in the office of the Recorder of Summit County, Utah, on July 13, 2007, as Instrument No. 00819573, in Book 1877, Page 0459.

Said Trust Deed covers the following described real property situated in Summit County, Utah:

**LOT 313, SILVER SUMMIT SUBDIVISION PHASE 2, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE SUMMIT COUNTY**

The undersigned, the current Beneficiary, hereby ratifies, approves, and confirms all action taken by the successor Trustee, RECONTRUST COMPANY, N.A., on the Beneficiary's behalf, in connection with the Trust Deed referenced above before this Substitution of Trustee is recorded.

Dated: 4/26/09

By: MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

Kari Marx    Assistant Secretary

STATE OF _____Texas_____
COUNTY OF _____Dallas_____

On 4/28/09 , before me ___Christopher A. Williams___ , personally appeared
_____Kari Marx_____ , known to me (or proved to me on the oath of
or through _____ ) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he/she executed the same for the purposes and
consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

CHRISTOPHER A. WILLIAMS
My Commission Expires
June 20, 2012

Notary Public's Signature

Tax ID: SSS-2-313                    Page 1 of 1                    UTSub (12/08)

**Page 167**

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-0407
Richardson, TX 75082

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
BAC HOME LOANS SERVICING, LP
400 National way
SIMI VALLEY, CA  93065

TS No: 09 -0053370
TSG No: 5-049920
APN: SSS-2-313

**00915546    B: 2066 P: 1473**
Page 1 of 2
Alan Spriggs, Summit County Utah Recorder
01/21/2011 09:40:09 AM Fee $12.00
By BACKMAN FPTP
Electronically Recorded by Simplifile

SPACE ABOVE THIS LINE FOR RECORDER'S

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE, FOR THE
CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2007-24 MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2007-24

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 07/10/2007, EXECUTED
BY: CATHERINE RICHARDS AHLERS, TRUSTOR: TO FIRST AMERICAN TITLE, AS TRUSTEE AND
RECORDED AS INSTRUMENT NO. 819573 ON 07/13/2007, IN BOOK 1877, PAGE 459 OF OFFICIAL
RECORDS IN THE COUNTY RECORDERS OFFICE OF SUMMIT COUNTY, IN THE STATE OF UTAH. THE
LAND AFFECTED BY THIS ASSIGNMENT IS LOCATED IN SUMMIT COUNTY, THE STATE OF UTAH
AND IS DESCRIBED AS FOLLOWS:

LOT 313, SILVER SUMMIT SUBDIVISION PHASE 2, ACCORDING TO THE OFFICIAL PLAT THEREOF
ON FILE AND OF RECORD IN THE SUMMIT COUNTY RECORDER'S OFFICE

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE
AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE
UNDER SAID DEED OF TRUST/MORTGAGE.

Dated: _/ – 10_ , 20_11_

By:  MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

BY:  **Assistant Secretary**  1-10-11

Tax ID: SSS-2-313                    Page 1 of 2                    *Form UTAssgn (04/08)*

STATE OF _Texas_ )
COUNTY OF _Tarrant_ )

On _1_/_10_/_11_, before me __**Maria Sagrario Montoya**__ , personally appeared
__**Laura Dalley**__ _Assist_ _Sec_, known to me (or proved to me on the oath of _____ or
through _TX D.L._ ) to be the person whose name is subscribed to the foregoing instrument and
acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

_Maria Sagrario Montoya_
Notary Public's Signature

MARIA SAGRARIO MONTOYA
My Commission Expires
September 10, 2014

RECORDING REQUESTED BY:
THE BANK OF NEW YORK MELLON FKA THE
BANK OF NEW YORK,AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF THE CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-24 MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2007-24

**WHEN RECORDED MAIL DOCUMENT
TAX STATEMENT TO:**
THE BANK OF NEW YORK MELLON FKA THE
BANK OF NEW YORK,AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF THE CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-24 MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2007-24,
400 National way, SIMI VALLEY, CA 93065

**00924402    B: 2084 P: 0698**
Page 1 of 2
Alan Spriggs, Summit County Utah Recorder
06/15/2011 08:18:09 AM Fee $14.00
By BACKMAN FPTP
Electronically Recorded

TS#: 09 -0053370
TSG# 5-049920

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# RESPA

### TRUSTEE'S DEED

This Deed is made by RECONTRUST COMPANY, N.A., as successor Trustee under the hereinafter described Trust Deed, in favor of THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK,AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWALT, INC., ALTERNATIVE LOAN TRUST 2007-24 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-24, 400 National way, SIMI VALLEY, CA 93065, as Grantee.

WHEREAS, on July 10, 2007, CATHERINE RICHARDS AHLERS, AN UNMARRIED WOMAN, as Trustor, executed and delivered to FIRST AMERICAN TITLE, as Trustee, for the benefit of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as Beneficiary, a certain Trust Deed to secure the performance by said Trustor of the obligations under a Promissory Note. The Trust Deed was recorded in the office of the Recorder of Summit County, State of Utah, on July 13, 2007, as Instrument No. 819573, in Book 1877, Page 459, and covered the property described below; and

WHEREAS, breach and default was made under the terms of the Trust Deed in the particulars set forth in the Notice of Default referred to below; and

WHEREAS, RECONTRUST COMPANY, N.A., executed and filed for record in the Office of the County Recorder of Summit County, a written Notice of Default containing an election to sell the trust property, which Notice of Default was recorded on April 29, 2009, as Instrument No. 871063, in book 1979 page 1127; and

WHEREAS RECONTRUST COMPANY, N.A., the successor Trustee in consequence of the declaration of default, election and demand for sale, and in accordance with said Trust Deed, executed the Notice of Trustee's Sale stating that it would sell at public auction to the highest bidder the property therein and hereafter described, and fixing the time and place of said sale as May 24, 2011, at 4:45 PM, of said day, and did cause copies of said notice to be posted for not less than 20 days before the date of sale therein . fixed, at the office of the county recorder in the county wherein said property is located, and also in a conspicuous place on the property to be sold; and said successor Trustee did cause a copy of the notice to be published once a week for three consecutive weeks before the date of sale in the THE PARK RECORD; and

WHEREAS, all applicable statutory provisions of the State of Utah and all of the provisions of said Trust Deed have been complied with as to the acts to be performed and the notices to be given; and

WHEREAS, the successor Trustee did, at the time and place of sale, then and there sell, at public auction, to Grantee above named, being the highest bidder therefor, the property described for the sum of $414,000.00.

NOW, THEREFORE, RECONTRUST COMPANY, N.A., successor Trustee, in consideration of the premises recited and of the sum above mentioned, bid and paid by Grantee, the receipt whereof is hereby acknowledged, and by virtue of the authority in it by said Trust Deed, grants and conveys unto Grantee above named, but without any covenant or warranty, express or implied, all of that certain property situated in Summit County, State of Utah, described as follows:

LOT 313, SILVER SUMMIT SUBDIVISION PHASE 2, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE SUMMIT COUNTY RECORDER'S OFFICE

Dated: June 3, 2011                    By:    RECONTRUST COMPANY, N.A.

_Sandra K. Hey 6-6-11_

SANDRA L. HICKEY Authorized Signer

STATE OF __Texas__
COUNTY OF __Tarrant__

On __6/6/11__, before me __Lang T. Elliott__, personally appeared __SANDRA L. HICKEY__ Auth. Sign., known to me (or proved to me on the oath of _____ or through ____121____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed. WITNESS MY HAND AND OFFICIAL SEAL

_LANG T. Elliott_
Notary Public's Signature

LANG T. ELLIOTT
My Commission Expires
February 22, 2015

00924402  Page 2 of 2  Summit County

Tax ID: SSS-2-313                    Page 2 of 2                    UTTrstDeed.doc (12/08)

**Page 171**

(800)756-3524 ext. 5754 or 5996

When recorded return to:     **(FT)**

Custom Title Solutions

2550 N. Redhill Ave.

Santa Ana, CA 92705

Prepared By:

VALERIE ARGYLE

COUNTRYWIDE HOME LOANS, INC.

10701 S. RIVER FRONT PKWY

#400

SOUTH JORDAN

UT 84095

ENT **164885:2007** PG 1 of 10
RANDALL A. COVINGTON
UTAH COUNTY RECORDER
2007 Nov 26 10:58 am FEE 28.00 BY JL
RECORDED FOR LSI - CTS-RECORDING
ELECTRONICALLY RECORDED

---
[Space Above This Line For Recording Data]
---

0001818207231007

Tax Serial Number: ~~40149000~~

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   NOVEMBER 07, 2007   , together with all Riders to this document.

**(B) "Borrower"** is

GWEN LINDA DUTCHER, AND RICHARD A DUTCHER, WIFE AND HUSBAND

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is

Countrywide Bank, FSB.

Lender is a FED SVGS BANK                                        organized and

existing under the laws of THE UNITED STATES

Lender's address is

1199 North Fairfax St. Ste.500, Alexandria, VA 22314

Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is

STEWART T MATHESON, ATTORNEY AT LAW

640 E FIRST SOUTH, SALT LAKE CITY, UT 84102

**(E) "Note"** means the promissory note signed by Borrower and dated   NOVEMBER 07, 2007   . The Note states that Borrower owes Lender

TWO HUNDRED EIGHTY SEVEN THOUSAND and 00/100

Dollars (U.S. $287,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   DECEMBER 01, 2037   .

UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Deed of Trust-UT

2006--UT (05/07)(d/i)                          Page 1 of 9                          Form 3045 1/01





Page 172

ENT **164885:2007** PG 2 of 10

DOC ID #: 0001818207231100?

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider           ☐ Second Home Rider
☐ Balloon Rider             ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                  ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                    of                    UTAH                    :
[Type of Recording Jurisdiction]                  [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

675 E 1400 N, MAPLETON
[Street/City]

Utah 84664-3827 ("Property Address");
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

ENT **164885:2007** PG 3 of 10

DOC ID #: 00018182072311007

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined

**Page 174**

under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in

**Page 175**

ENT **164885:2007** PG 5 of 10

DOC ID #: 00018182072311007

the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)    Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)    Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated**

PAD

## Page 176

automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is

provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

Deed of Trust-UT
2006--UT (05/07)                                    Page 7 of 9                                    Form 3045 1/01

*PAD*

# Page 178

ENT **164885:2007** PG 8 of 10

DOC ID #: 00018182072311007

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.**

**Page 179**

ENT **164885:2007** PG 9 of 10

DOC ID #: 00018182072311007

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
GWEN LINDA DUTCHER                - Borrower

_____ (Seal)
RICHARD A. DUTCHER                - Borrower

_____ (Seal)
                                  - Borrower

_____ (Seal)
                                  - Borrower

STATE OF UTAH, Utah                          County ss:

The foregoing instrument was subscribed and sworn to and acknowledged before me this November 7

_____ by Gwen Linda Dutcher, Richard A

Dutcher

My Commission Expires: 1-11-2011

Notary Public
Residing at: 218 E 2525 s.

Springville, Utah

BRIAN LLOYD 84663

BRIAN LLOYD
NOTARY PUBLIC-STATE OF UTAH
218 EAST 2525 SOUTH
SPRINGVILLE, UT 84663
COMM. EXP. 1-11-2011

Deed of Trust-UT
2006--UT (05/07)                    Page 9 of 9                    Form 3045 1/01

**Page 180**

ENT **164885:2007** PG 10 of 10

APN: 401490006

Order ID: 3958360
Loan No.: 181820723

## EXHIBIT A
## LEGAL DESCRIPTION

The land referred to in this policy is situated in the State of UT, County of UTAH, City of MAPLETON and described as follows:

The following described tract of land in Utah County, State of Utah:

Lot 6, Plat "A", Tony Gonzales Subdivision, Mapleton, Utah, according to the Official Plat thereof on file and of record in the Office of the Utah County Recorder.

WITH THE APPURTENANCES THERETO.

APN: 401490006

ENT **12000:2011** PG 1 of 3
**Jeffery Smith**
**UTAH COUNTY RECORDER**
2011 Feb 08 4:25 pm FEE 14.00 BY EO
RECORDED FOR LSI TITLE AGENCY INC.
ELECTRONICALLY RECORDED

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-0407
Richardson, TX 75082

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
BAC HOME LOANS SERVICING, LP
400 National way
SIMI VALLEY, CA  93065

TS No:  11 -0010004
TSG No:  110069203UTGSI
APN:  40-149-0006

SPACE ABOVE THIS LINE FOR RECORDER'S

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING LP

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 11/07/2007, EXECUTED BY: GWEN LINDA DUTCHER and RICHARD A DUTCHER, TRUSTOR: TO STEWART T MATHESON, ATTORNEY AT LAW, AS TRUSTEE AND RECORDED AS INSTRUMENT NO. 164885:2007 ON 11/26/2007 OF OFFICIAL RECORDS IN THE COUNTY RECORDERS OFFICE OF UTAH COUNTY, IN THE STATE OF UTAH. THE LAND AFFECTED BY THIS ASSIGNMENT IS LOCATED IN UTAH COUNTY, THE STATE OF UTAH AND IS DESCRIBED AS FOLLOWS:

SEE ATTACHED LEGAL DESCRIPTION

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

Dated: ___2/7___ , 20_11_          By:  COUNTRYWIDE BANK FSB

                                   BY: _____  2/7/11
                                   David M Gregory    Assistant Secretary

Tax ID: 40-149-0006          Page 1 of 2          *Form UTAssgn (04/08)*

ENT **12000:2011** PG 2 of 3

STATE OF _____ **Texas** )
COUNTY OF _____ **Tarrant** )

On 02/07/11, before me *Rosemarie S. Martinez*, personally appeared **David M Gregory    Assistant Secretary** known to me (or proved to me on the oath of _____ or through TVOI _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed. WITNESS MY HAND AND OFFICIAL SEAL

_Rosemarie S Martinez_
Notary Public's Signature

ROSEMARIE S. MARTINEZ
Notary Public State of Texas
Commission Expires
FEBRUARY 21, 2012

**Page 183**

ENT **12000:2011** PG 3 of 3

TS# 11-0010004
LEGAL DESCRIPTION

The land referred to in this policy is situated in the State of UT, County of UTAH, City of MAPLETON and described as follows:

The following described tract of land in Utah County, State of Utah:

Lot 6, Plat "A", Tony Gonzales Subdivision, Mapleton, Utah, according to the Official Plat thereof on file and of record in the Office of the Utah County Recorder.

WITH THE APPURTENANCES THERETO.

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-0407
Richardson, TX 75082

ENT **44759:2011** PG 1 of 1
**Jeffery Smith**
**Utah County Recorder**
2011 Jun 17 03:58 PM FEE 14.00 BY EO
RECORDED FOR LSI Title Insurance Agency of
ELECTRONICALLY RECORDED

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
BAC HOME LOANS SERVICING, LP
400 National way
SIMI VALLEY, CA  93065

TS No:  11 -0010004
TSG No: 110069203UTGSI
APN:  40-149-0006

RESPA

SPACE ABOVE THIS LINE FOR RECORDER'S

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

FEDERAL NATIONAL MORTGAGE ASSOCIATION

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 11/07/2007, EXECUTED BY: GWEN LINDA DUTCHER and RICHARD A DUTCHER, TRUSTOR: TO STEWART T MATHESON, ATTORNEY AT LAW, AS TRUSTEE AND RECORDED AS INSTRUMENT NO. 164885:2007 ON 11/26/2007 OF OFFICIAL RECORDS IN THE COUNTY RECORDERS OFFICE OF UTAH COUNTY, IN THE STATE OF UTAH. THE LAND AFFECTED BY THIS ASSIGNMENT IS LOCATED IN UTAH COUNTY, THE STATE OF UTAH AND IS DESCRIBED AS FOLLOWS:

LOT 6, PLAT ""A"", TONY GONZALES SUBDIVISION, MAPLETON, UTAH, ACCORDING TO THE

OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE COUNTY

RECORDER.

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

Dated: ___6·13___, 20_11_

By:  BAC HOME LOANS SERVICING LP FKA
COUNTRYWIDE HOME LOANS SERVICING LP,
BY BAC GP, LLC ITS GENERAL PARTNER

BY: *Carolyn Holleman* 6/13/11
       Carolyn Holleman    Assistant Secretary

STATE OF ___Texas___ )
COUNTY OF ___Tarrant___ )
On ___6·13·11___, before me ___R. Robinson___, personally appeared
___Carolyn Holleman  Asst. Sec___, known to me (or proved to me on the oath of _____ or
through ___DL___) to be the person whose name is subscribed to the foregoing instrument and
acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

_____
Notary Public's Signature

R. ROBINSON
MY COMMISSION EXPIRES
November 17, 2012

Tax ID: 40-149-0006         Page 1 of 1         *Form UTAssgn (04/08)*

**Page 185**

ENT 45235:2011 PG 1 of 2
Jeffery Smith
Utah County Recorder
2011 Jun 20 04:53 PM FEE 14.00 BY SS
RECORDED FOR LSI Title Insurance Agency of
ELECTRONICALLY RECORDED

RECORDING REQUESTED BY:
FEDERAL NATIONAL MORTGAGE ASSOCIATION

**WHEN RECORDED MAIL DOCUMENT
TAX STATEMENT TO:**
FEDERAL NATIONAL MORTGAGE
ASSOCIATION, 400 National way, SIMI VALLEY,
CA 93065

TS#: 11 -0010004
TSG# 110069203UTGSI

---

40-149-0006

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RESPA

### <u>TRUSTEE'S DEED</u>

This Deed is made by RECONTRUST COMPANY, N.A., as successor Trustee under the hereinafter described Trust Deed, in favor of FEDERAL NATIONAL MORTGAGE ASSOCIATION, 400 National way, SIMI VALLEY, CA 93065, as Grantee.

WHEREAS, on November 7, 2007, GWEN LINDA DUTCHER, AND RICHARD A DUTCHER, WIFE AND HUSBAND, as Trustor, executed and delivered to STEWART T MATHESON, ATTORNEY AT LAW, as Trustee, for the benefit of COUNTRYWIDE BANK FSB, as Beneficiary, a certain Trust Deed to secure the performance by said Trustor of the obligations under a Promissory Note. The Trust Deed was recorded in the office of the Recorder of Utah County, State of Utah, on November 26, 2007, as Instrument No. 164885:2007, and covered the property described below; and

WHEREAS, breach and default was made under the terms of the Trust Deed in the particulars set forth in the Notice of Default referred to below; and

WHEREAS, RECONTRUST COMPANY, N.A., executed and filed for record in the Office of the County Recorder of Utah County, a written Notice of Default containing an election to sell the trust property, which Notice of Default was recorded on February 8, 2011, as Instrument No. 12002:2011; and

WHEREAS RECONTRUST COMPANY, N.A., the successor Trustee in consequence of the declaration of default, election and demand for sale, and in accordance with said Trust Deed, executed the Notice of Trustee's Sale stating that it would sell at public auction to the highest bidder the property therein and hereafter described, and fixing the time and place of said sale as June 14, 2011, at 9:00 AM, of said day, and did cause copies of said notice to be posted for not less than 20 days before the date of sale therein fixed, at the office of the county recorder in the county wherein said property is located, and also in a conspicuous place on the property to be sold; and said successor Trustee did cause a copy of the notice to be published once a week for three consecutive weeks before the date of sale in the THE DAILY HERALD; and

WHEREAS, all applicable statutory provisions of the State of Utah and all of the provisions of said Trust Deed have been complied with as to the acts to be performed and the notices to be given; and

WHEREAS, the successor Trustee did, at the time and place of sale, then and there sell, at public auction, to Grantee above named, being the highest bidder therefor, the property described for the sum of $294,797.55.

---

Tax ID: 40-149-0006                      Page 1 of 2                      *UTTrstDeed.doc (12/08)*

**Page 186**

ENT**45235:2011** PG 2 of 2

NOW, THEREFORE, RECONTRUST COMPANY, N.A., successor Trustee, in consideration of the premises recited and of the sum above mentioned, bid and paid by Grantee, the receipt whereof is hereby acknowledged, and by virtue of the authority in it by said Trust Deed, grants and conveys unto Grantee above named, but without any covenant or warranty, express or implied, all of that certain property situated in Utah County, State of Utah, described as follows:

LOT 6, PLAT ""A"", TONY GONZALES SUBDIVISION, MAPLETON, UTAH, ACCORDING TO THE
OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE COUNTY RECORDER.

Dated: June 15, 2011

By: RECONTRUST COMPANY, N.A.

_Stephanie Y. King 6-16-11_
Stephanie Y. King          , Authorized Signer

STATE OF ___**Texas**___
COUNTY OF ___**Tarrant**___

On _16-16-11_          , before me _**Tanisha Newbill**_          , personally appeared _**Stephanie Y. King**_
Auth. Sign:          , known to me (or proved to me on the oath of _____ or through
_m_          ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

_Tanisha Newbill_
Notary Public's Signature

NOTARY PUBLIC
STATE OF TEXAS
TANISHA NEWBILL
My Commission Expires
August 20, 2013

"This instrument is being recorded as an
ACCOMMODATION ONLY, with no
representation as to its effect upon title"

Tax ID: 40-149-0006                    Page 2 of 2                    *UTTrstDeed.doc (12/08)*

**Page 187**

10214351

Return to: IV80588

Chicago Title
ServiceLink Division
4000 Industrial Blvd
Aliquippa, PA 15001

Prepared By:
HAI TAO Jensmith

Countrywide Home Loans, Inc.
dba America's Wholesale
Lender

1900 S STATE COLLEGE BLVD
465
ANAHEIM
CA 92806

10214351
09/06/2007 10:25 AM $32.00
Book - 9512 Pg - 3247-3258
GARY W. OTT
RECORDER, SALT LAKE COUNTY, UTAH
SERVICE LINK
4000 INDUSTRIAL BLVD
ALIQUIPPA PA 15001-9914
BY: ZJM, DEPUTY - MA 12 P.

———————————— [Space Above This Line For Recording Data] ————————————

145050881                    00017920106608007
[Escrow/Closing #]              [Doc ID #]

Tax Serial Number: 2002429003000

# DEED OF TRUST

MIN 1001337-0002451918-6

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated AUGUST 21, 2007        , together with all Riders to this document.
(B) "Borrower" is
RICHARD G FERGUSON, AND MICHELLE R FERGUSON, HUSBAND AND WIFE AS JOINT TENANTS

Borrower is the trustor under this Security Instrument.
(C) "Lender" is
Countrywide Bank, FSB.
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
(D) "Trustee" is
STEWART T. MATHESON, ATTNY AT LAW
648 E. FIRST SOUTH, SALT LAKE CITY, UT 84102

UTAH-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 11
-6A(UT) (0005)    CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291                   Form 3045 1/01
CONV/VA





BK 9512 PG 3247

DOC ID #: 00017920106608007

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "**Note**" means the promissory note signed by Borrower and dated  AUGUST 21, 2007    . The Note states that Borrower owes Lender

ONE HUNDRED EIGHTY NINE THOUSAND NINE HUNDRED and 00/100

Dollars (U.S. $ 189,900.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  SEPTEMBER 01, 2047  .

(G) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "**Escrow Items**" means those items that are described in Section 3.

(N) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of | SALT LAKE | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

-6A(UT) (0005)     CHL (08/05)          Page 2 of 11                    Form 3045 1/01

DOC ID #: 00017920106608007

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of
4452 SOUTH 5720 WEST, SALT LAKE CITY
[Street/City]
Utah 84128-7725 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

DOC ID #: 00017920106608007

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain

DOC ID #: 00017920106608007

priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**Page 192**

DOC ID #: 00017920106608007

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

-6A(UT) (0005)    CHL (08/05)    Page 6 of 11    Form 3045 1/01

DOC ID #: 00017920106608007

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

-6A(UT) (0005)    CHL (08/05)    Page 7 of 11    Form 3045 1/01

DOC ID #: 00017920106608007

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

-6A(UT) (0005)   CHL (08/05)   Page 8 of 11   Form 3045 1/01

DOC ID #: 00017920106608007

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous

-6A(UT) (0005)    CHL (08/05)    Page 8 of 11    Form 3045 1/01

DOC ID #: 00017920106608007

Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Request for Notices. Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

BK 9512 PG 3256

DOC ID #: 00017920106608007

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
RICHARD G. FERGUSON                        -Borrower

_____ (Seal)
MICHELLE R. FERGUSON                        -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

**STATE OF UTAH,** Salt Lake County ss:

The foregoing instrument was subscribed and sworn to and acknowledged before me this 8/22/2007 by Richard L. Ferguson and Michelle R. Ferguson, married

_____

_____

_____

_____

My Commission Expires: 5/22/09


Notary Public
Residing at: Salt Lake County

Notary Public
JACQUELINE A. WARDLE
7849 South 1950 West
West Jordan, Utah 84084
My Commission Expires
May 22, 2009
State of Utah

-6A(UT) (0005)      CHL (08/05)      Page 11 of 11      Form 3045 1/01

BK 9512 PG 3257

**Page 198**



# Exhibit "A"
## Legal Description

All that certain parcel of land situate in the County of Salt Lake, State of Utah, being known and designated as follows:

Lot 55, Cape Cod Estates Phase I, according to the Official Plat thereof, as recorded in the Office of the Salt Lake County Recorder, State of Utah.

Subject property is commonly known as: 4452 S 5720 W, Salt Lake City, UT 84128-7725.

Tax ID:   20-02-429-003-0000

1450588 - 1

BK 9512 PG 3258

11118927

11118927
1/19/2011 4:16:00 PM $14.00
Book - 9899 Pg - 3737-3739
Gary W. Ott
Recorder, Salt Lake County, UT
LSI TITLE CO
BY: eCASH, DEPUTY - EF 3 P.

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-0407
Richardson, TX 75082

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
BAC HOME LOANS SERVICING, LP
400 National way
SIMI VALLEY, CA  93065

TS No: 10 -0096541
TSG No: 100478714UTGSI
APN: 20-02-429-003

SPACE ABOVE THIS LINE FOR RECORDER'S

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING LP

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 08/21/2007, EXECUTED BY: RICHARD G FERGUSON and MICHELLE R FERGUSON, TRUSTOR: TO STEWART T. MATHESON, ATTNY AT LAW, AS TRUSTEE AND RECORDED AS INSTRUMENT NO. 10214351 ON 09/06/2007, IN BOOK 9512, PAGE 3247 OF OFFICIAL RECORDS IN THE COUNTY RECORDERS OFFICE OF SALT LAKE COUNTY, IN THE STATE OF UTAH. THE LAND AFFECTED BY THIS ASSIGNMENT IS LOCATED IN SALT LAKE COUNTY, THE STATE OF UTAH AND IS DESCRIBED AS FOLLOWS:

SEE ATTACHED LEGAL DESCRIPTION

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

Dated: __1|18__ , 20 11

By:  MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

BY: Carmelia Boone , Assistant Secretary

Tax ID: 20-02-429-003                    Page 1 of 2                    *Form UTAssgn (04/08)*

BK 9899 PG 3737
# Page 200

STATE OF ___**TEXAS**___ )

COUNTY OF ___Tarrant___ )

On _1/18/2011_ , before me ___Tammy Ruth Gist___ , personally appeared _Carmelia Boone, Asst. Sec._ , known to me (or proved to me on the oath of _____ or through _Tx DL_ ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed. WITNESS MY HAND AND OFFICIAL SEAL

___Tammy Ruth Gist___
Notary Public's Signature

> **TAMMY RUTH GIST**
> Notary Public, State of Texas
> My Commission Expires
> July 21, 2014

TS# 10-0096541
LEGAL DESCRIPTION

All that certain parcel of land situate in the County of Salt Lake, State of Utah, being known and designated as follows:

Lot 55, Cape Cod Estates Phase I, according to the Official Plat thereof, as recorded in the Office of the Salt Lake County Recorder, State of Utah.

Subject property is commonly known as: 4452 S 5720 W, Salt Lake City, UT 84128-7725.

11191392
6/1/2011 3:00:00 PM $10.00
Book - 9928 Pg - 2003
Gary W. Ott
Recorder, Salt Lake County, UT
LSI TITLE CO
BY: eCASH, DEPUTY - EF 1 P.

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-0407
Richardson, TX 75082

**WHEN RECORDED MAIL DOCUMENT**
**TAX STATEMENT TO:**
BAC HOME LOANS SERVICING, LP
400 National way
SIMI VALLEY, CA  93065

TS No: 10 -0096541
TSG No: 100478714UTGSI
APN: 20-02-429-003

SPACE ABOVE THIS LINE FOR RECORDER'S

# RESPA

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

FEDERAL NATIONAL MORTGAGE ASSOCIATION*

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 08/21/2007, EXECUTED BY: RICHARD G FERGUSON and MICHELLE R FERGUSON, TRUSTOR: TO STEWART T. MATHESON, ATTNY AT LAW, AS TRUSTEE AND RECORDED AS INSTRUMENT NO. 10214351 ON 09/06/2007, IN BOOK 9512, PAGE 3247 OF OFFICIAL RECORDS IN THE COUNTY RECORDERS OFFICE OF SALT LAKE COUNTY, IN THE STATE OF UTAH. THE LAND AFFECTED BY THIS ASSIGNMENT IS LOCATED IN SALT LAKE COUNTY, THE STATE OF UTAH AND IS DESCRIBED AS FOLLOWS:

LOT 55, CAPE COD ESTATES PHASE I, ACCORDING TO THE OFFICIAL PLAT THEREOF,

AS RECORDED IN THE OFFICE OF THE SALT LAKE COUNTY RECORDER, STATE OF

UTAH.

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

Dated: 5-3- , 20 11

By:   BAC HOME LOANS SERVICING, LP FKA
COUNTRYWIDE HOME LOANS SERVICING, LP
BY BAC GP, LLC, ITS GENERAL PARTNER

BY:   Lanetia Jones        Assistant Secretary

STATE OF   Texas      )
COUNTY OF   Tarrant      )

On 5/31/11  before me   Lang T. Elliott  , personally appeared
Lanetia Jones  Asst. Sec.  , known to me (or proved to me on the oath of  ~  or
through   DL  ) to be the person whose name is subscribed to the foregoing instrument and
acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

Lang T. Elliott
Notary Public's Signature

LANG T. ELLIOTT
My Commission Expires
February 22, 2015

Tax ID: 20-02-429-003          Page 1 of 1          *Form UTAssgn (04/08)*

11191393

11191393
6/1/2011 3:00:00 PM $14.00
Book - 9928 Pg - 2004-2005
Gary W. Ott
Recorder, Salt Lake County, UT
LSI TITLE CO
BY: eCASH, DEPUTY - EF 2 P.

RECORDING REQUESTED BY:
FEDERAL NATIONAL MORTGAGE ASSOCIATION

**WHEN RECORDED MAIL DOCUMENT
TAX STATEMENT TO:**
FEDERAL NATIONAL MORTGAGE
ASSOCIATION, 400 National way, SIMI VALLEY,
CA 93065

TS#: 10 -0096541
TSG# 100478714UTGSI

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RESPA

### TRUSTEE'S DEED

This Deed is made by RECONTRUST COMPANY, N.A., as successor Trustee under the hereinafter described Trust Deed, in favor of FEDERAL NATIONAL MORTGAGE ASSOCIATION, 400 National way, SIMI VALLEY, CA 93065, as Grantee.

WHEREAS, on August 21, 2007, RICHARD G FERGUSON, AND MICHELLE R FERGUSON, HUSBAND AND WIFE AS JOINT TENANTS, as Trustor, executed and delivered to STEWART T. MATHESON, ATTNY AT LAW, as Trustee, for the benefit of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as Beneficiary, a certain Trust Deed to secure the performance by said Trustor of the obligations under a Promissory Note. The Trust Deed was recorded in the office of the Recorder of Salt Lake County, State of Utah, on September 6, 2007, as Instrument No. 10214351, in Book 9512, Page 3247, and covered the property described below; and

WHEREAS, breach and default was made under the terms of the Trust Deed in the particulars set forth in the Notice of Default referred to below; and

WHEREAS, RECONTRUST COMPANY, N.A., executed and filed for record in the Office of the County Recorder of Salt Lake County, a written Notice of Default containing an election to sell the trust property, which Notice of Default was recorded on January 19, 2011, as Instrument No. 11118929, in book 9899 page 3743; and

WHEREAS RECONTRUST COMPANY, N.A., the successor Trustee in consequence of the declaration of default, election and demand for sale, and in accordance with said Trust Deed, executed the Notice of Trustee's Sale stating that it would sell at public auction to the highest bidder the property therein and hereafter described, and fixing the time and place of said sale as May 24, 2011, at 10:30 AM, of said day, and did cause copies of said notice to be posted for not less than 20 days before the date of sale therein fixed, at the office of the county recorder in the county wherein said property is located, and also in a conspicuous place on the property to be sold; and said successor Trustee did cause a copy of the notice to be published once a week for three consecutive weeks before the date of sale in the INTERMOUNTAIN COMMERCIAL RECORD; and

WHEREAS, all applicable statutory provisions of the State of Utah and all of the provisions of said Trust Deed have been complied with as to the acts to be performed and the notices to be given; and

WHEREAS, the successor Trustee did, at the time and place of sale, then and there sell, at public auction, to Grantee above named, being the highest bidder therefor, the property described for the sum of $178,696.00.

NOW, THEREFORE, RECONTRUST COMPANY, N.A., successor Trustee, in consideration of the premises recited and of the sum above mentioned, bid and paid by Grantee, the receipt whereof is hereby acknowledged, and by virtue of the authority in it by said Trust Deed, grants and conveys unto Grantee above named, but without any covenant or warranty, express or implied, all of that certain property situated in Salt Lake County, State of Utah, described as follows:

LOT 55, CAPE COD ESTATES PHASE I, ACCORDING TO THE OFFICIAL PLAT THEREOF, AS RECORDED IN THE OFFICE OF THE SALT LAKE COUNTY RECORDER, STATE OF UTAH.

Dated: May 31, 2011                    By:   RECONTRUST COMPANY, N.A.

_____ Lanetia Jones ————→ **Authorized Signer**

STATE OF __Texas__
COUNTY OF __Tarrant__

On __5/31/11_____, before me **Lang T. Elliott**_____, personally appeared **Lanetia Jones** **Auth. Sign.**_____, known to me (or proved to me on the oath of _____ or through _____ ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
WITNESS MY HAND AND OFFICIAL SEAL

_Lang T. Elliott_____
Notary Public's Signature

LANG T. ELLIOTT
My Commission Expires
February 22, 2015

This instrument is being recorded as an
ACCOMMODATION ONLY, with no
representation as to its effect upon title